UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                                            :
IN RE                                                       :   Chapter 11
                                                            :
OWENS CORNING, et al.,                                      :   Case Nos. 00-3837 to 3854 (JKF)
                                                            :   (Jointly Administered)
                                                            :
                                               Debtors.     :   Hearing Date: February 28, 2005 at 10:00 a.m.
                                                            :   Obj. Deadline: February 11, 2005 at 5:00 p.m.
                                                            :
------------------------------------------------------------x
```

**MOTION OF CREDIT SUISSE FIRST BOSTON, AS AGENT, FOR
ORDER AUTHORIZING IT TO COMMENCE AN ADVERSARY PROCEEDING ON
BEHALF OF THE DEBTORS' ESTATES AGAINST CERTAIN
PHYSICIANS WHO FALSELY REPORTED X-RAY READINGS
AS POSITIVE FOR ASBESTOS-RELATED IMPAIRMENT**

TO:   THE HONORABLE JUDITH K. FITZGERALD,
      UNITED STATES BANKRUPTCY JUDGE

Credit Suisse First Boston ("CSFB"), as Agent for the prepetition bank lenders to Owens Corning and certain of its subsidiaries, respectfully moves this Court, for an order, in the form attached hereto as Exhibit A, authorizing CSFB to commence an adversary proceeding (the "Adversary Proceeding") on behalf of the estates of the above-captioned debtors and debtors in possession (the "Debtors") against certain physicians who falsely reported chest radiograph (x-ray) readings as positive for asbestos-related disease in personal injury claims when, in fact, the claimants had no compensable asbestos-related impairment, resulting in the Debtors paying billions of dollars to settle asbestos-related injury claims that had no medical basis. A proposed complaint is attached hereto as Exhibit B.[1]

---

[1]   As this Court may know, CSFB has filed currently herewith a motion to withdraw the reference to the Bankruptcy Court with respect to this Motion.

## PRELIMINARY STATEMENT

1. Recent expert reports (including one commissioned by the Debtors themselves) have indicated that a small number of medical doctors specially trained and certified in the reading of x-rays, known as B-readers, have accounted for a dramatically disproportionate number of non-malignant asbestos personal injury claims filed against the Debtors and have routinely and systematically over-diagnosed non-malignant asbestos-related disease in support of such claims. These false x-ray readings were used to substantiate thousands of personal injury claims settled and paid by the Debtors prior to the filing of the Chapter 11 bankruptcy petition, resulting in injury to the Debtors and their creditors in excess of $1.5 Billion – including those individuals with legitimate asbestos-related personal injury claims.

2. Based on these facts, CSFB seeks permission from the Court to bring claims for fraud and negligent misrepresentation against these B-readers on behalf of the Debtors' estates. CSFB has made a written demand upon Owens Corning that it commence its own adversary proceeding against the B-readers, which was refused. *See* Exhibit C (demand letter dated December 20, 2004). The United States Court of Appeals for the Third Circuit has approved the practice of allowing creditors to sue derivatively on behalf of debtors that refuse to prosecute colorable claims to recover property for the benefit of the estate. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003). The Court should grant CSFB derivative standing to initiate the Adversary Proceeding on behalf of the Debtors' estates because there is a strong basis for the proposed claims against the B-readers and the Adversary Proceeding represents a potentially significant source of money for the Debtors' estates. In addition, the syndicate of lenders represented by CSFB is willing to bear the costs of pursing the Adversary Proceeding (while reserving the right to seek reimbursement of reasonable

attorneys' fees and costs incurred in pursuing the Adversary Proceeding as a substantial contribution pursuant to 11 U.S.C. § 503(b)(3)-(4), as well as the right to discontinue the suit upon notice to the Debtors), thereby eliminating any significant risk or net cost to the estates in granting this Motion.

## VENUE/JURISDICTION

3. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409. While the underlying suit sought to be brought is a non-core proceeding, this Motion involves both core and non-core issues pursuant to 28 U.S.C. § 157(b)(2).

## FACTUAL/PROCEDURAL BACKGROUND

### I. GENERAL BACKGROUND

4. Medical research has described asbestosis as a "disappearing disease."[2] While asbestos exposure has decreased dramatically since the passage of the Occupational Safety and Health Act (OSHA) in 1970,[3] the number of non-malignancy asbestos personal injury claims grew exponentially in the 1990s.[4]

5. A growing body of research and literature provides an answer to this disparity: a large percentage of the claims are fraudulent. The Rand Institute estimates that as of 2002 up to

---

[2] W. Raymond Parkes, *Occupational Lung Disorders* (3d ed. 1994) at 464-78; Report of Professor Lester Brickman, In re Owens Corning, et al. (October 15, 2004) at 11.

[3] Mark Reeves, *Makes sense to me: How Moderate, Targeted Tort Reform Legislation Could Solve the Nation's Asbestos Litigation Crisis*, 59 Vand. L. Rev. 1949, 1960 (2003); see also Stephen J. Carroll et al., RAND Institute for Civil Justice, *Asbestos Litigation Costs and Compensation: An Interim Report* (2002) at vi.

[4] Mark A. Peterson, Report on Owens Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims as of October 2000 (October 15, 2004) at 18.

90% of new asbestos claims were filed by individuals with little or no impairment.[5] Non-malignant claims accounted for approximately 64% of the compensation paid to asbestos plaintiffs as of 2002.[6] A 2003 Report of the American Bar Association Commission on Asbestos Litigation ("ABA Asbestos Commission Report") explains:

> [In the 1990s] for-profit litigation screenings began systematically generating tens of thousands of new non-malignant claims each year by individuals who had some degree of occupational asbestos exposure, but did not have, and probably would never get an impairing asbestos-related disease. These individuals may or may not have markings on lung x-rays "consistent with" exposure to asbestos (and dozens of other possible causes) but do not, and may never, experience any symptoms of asbestos disease or develop any asbestos-related conditions that would impair or affect their life or daily functions.

American Bar Ass'n Commission on Asbestos Litigation (Feb. 2003) at 6.

6. At the core of the so-called "entrepreneurial" model of asbestos litigation is the mass recruitment of plaintiffs through "screenings" sponsored by plaintiffs' law firms in collaboration with "for profit" litigation screening companies.[7] These screening companies were set up by individuals generally lacking medical experience to create a mechanism for screening hundreds of thousands of workers who could claim to have been exposed to asbestos in the workplace. Screening companies have reportedly "processed" over one million workers, and account for the "overwhelming majority of non-malignant claims" filed to date.[8]

7. The ABA Asbestos Commission has found that such companies actively solicit asymptomatic workers who may have been occupationally exposed to asbestos to have free chest x-rays. The companies' mass mailings tout: "You May Have Million Dollar Lungs" and urge

---

[5]   Stephen J. Carroll et al., *Asbestos Litigation Costs and Compensation* at 40, 65.

[6]   *Id.* at 65.

workers to be screened even if they are not sick and exhibit no symptoms. The screenings are usually done in mobile vans parked near union halls or in hotel parking lots.[9]

8. To read and interpret the volumes of x-rays taken by screening companies, plaintiffs' lawyers retain "B-readers," radiologists and pulmonologists certified by the National Institute for Occupational Safety and Health (NIOSH), a division of the Centers for Disease Control. The "B-reader" designation denotes the highest certification available for physicians trained in the use of the International Labour Organization System for classifying x-rays for the presence of dust-related lung conditions, including asbestos exposure injuries.

9. While it is estimated that there are over 600 B-readers in the United States, only a small percentage of these radiologists (approximately 5%) are routinely selected by plaintiffs' counsel to read and interpret screening results.[10] The B-readers examine the x-rays after the fact, away from the patient and the testing site, and may not even be licensed to practice medicine in the state where the x-rays were taken. Some workers' x-rays are reportedly "shopped around" to a number of B-readers until one is found who will report a positive reading for asbestos-related injury sufficient to sustain a claim for compensation. As the ABA Report indicates, these x-ray

---

[7] David Egilman, *Asbestos Screenings*, 42 Am. J. of Indus. Med. 163 (2002); Report of Professor Lester Brickman, *In re Owens Corning, et al.* (October 15, 2004) (No. 13004) at 7-8. According to the Brickman Report, the entrepreneurial model differs from the traditional model of toxic tort litigation whereby a potential plaintiff sees a doctor to treat his illness and is then referred to a lawyer. Under the entrepreneurial model, the order is reversed: it is the lawyer that recruits the plaintiff, and sends him to a screening company for an x-ray.

[8] Brickman Report at 8.

[9] *Id.* at 8; American Bar Ass'n Commission on Asbestos Litig. (Feb. 2003), 8.

[10] Brickman Report at 10.

readers spend only minutes in making their findings and are paid hundreds of thousands of dollars in the aggregate for reading mass quantities of chest x-rays.[11]

10. When B-readers interpret x-rays for asbestos-related disease, they know they are doing so for purposes of providing "independent" and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant. They are also well aware of the cut-off of "1/0" in the ILO system that generally qualifies for compensation from an asbestos defendant, and often receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an x-ray exhibits positive indications of asbestos-related injury than if they report it does not.

11. It has emerged that the B-reader reports used to substantiate asbestos-related claims often lack a sound scientific basis and are bereft of credibility. Rates of "positive" findings by certain doctors have been as high as 90% according to some studies, and an audit of non-malignancy claims conducted by the Manville Personal Injury Trust (one of the largest asbestos claims processors) has shown that certain B-readers whose findings served as the basis for thousands of claims failed an independent peer review more than 50% of the time.[12] Given these findings, the Manville Trust now refuses to pay claims based on medical evidence from certain laboratories and physicians whose diagnostic records are medically unsound.[13]

---

[11]  ABA Asbestos Commission Report at 8.

[12]  Griffin B. Bell, Asbestos Litigation and Judicial Leadership: *The Courts' Duty to Help Solve the Asbestos Litigation Crisis*, NLCPI, Vol. 6 (June 2002) at 7; ABA Asbestos Commission Report at 8.

[13]  Eddie Curran, "Diagnosing for Dollars?," *Mobile Register* (April 4, 2004).

## II. THE DEBTORS HAVE BEEN VICTIMIZED BY THE FRAUD

12. In 1998, in an attempt to address an ever-increasing flood of new asbestos personal injury claims, Owens Corning implemented a National Settlement Program ("NSP") to resolve such claims through settlement agreements with individual plaintiffs' law firms. Fibreboard also entered into an NSP. The NSP agreements established procedures and fixed payments for resolving, without litigation, valid asbestos-related personal injury claims against Owens Corning and Fibreboard. Payments to individual claimants under the NSP depended upon the type and severity of the asbestos-related disease contracted by the claimant and were subject to delivery of evidence of a qualifying medical condition and exposure to Owens Corning's or Fibreboard's products.

13. The medical reports generated by a handful of B-readers provided the basis for confirming an asbestos plaintiff's medical condition and exposure to asbestos-containing products for purposes of the NSP agreements. Through recent scientific studies, most notably, the reports of Dr. Gary Friedman and Dr. Joseph Gitlin, as well as growing peer-reviewed literature, it has become increasingly evident that many of the 492,459 non-malignancy asbestos personal injury claims paid by Owens Corning and Fibreboard under their NSPs between 1990-2000 had no legitimate medical basis. As Owens Corning paid approximately $1.68 Billion to settle non-malignant claims prepetition, and Fibreboard paid approximately $1.06 Billion, the extent of the fraud would implicate more than a billion dollars.[14]

---

[14] These figures are taken from the October 15, 2004 Mark A. Peterson Report on Owens Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims as of October 2000. According to Peterson, 238,133 non-malignancy claims were resolved by Owens Corning pre-petition, for an average settlement price of $7,573 and 93.5% of these claims were paid. That would net a total universe of potentially fraudulent non-malignancy claims paid by Owens Corning pre-petition of approximately $1.68 Billion.

### A. The Friedman Report

14. Dr. Gary K. Friedman, a board-certified pulmonologist, was retained by Owens Corning in 1999 to serve as a medical consultant to the NSP and thereafter continued to serve as a consultant to Owens Corning in the bankruptcy. In 2002, Dr. Friedman submitted a report to Owens Corning to provide an estimate of the percentage of impaired nonmalignant claims under NSP criteria to be expected in the population of total future claims asserted against Owens Corning.

15. As a part of his study, Dr. Friedman analyzed medical reports of 1,691 past claims of nonmalignant asbestos-related injury against Owens Corning between 1994 and 1999. The cases were randomly selected from 22,578 nonmalignant claims submitted to the NSP under agreements where the B-readers had financial incentive to find indication of impairment. The case files Dr. Friedman reviewed contained analysis of chest x-ray reports, Pulmonary Function Test results (PFTs), and other data.

16. Dr. Friedman determined that of the sampled claims, only 13.3% met NSP criteria as impaired.[15] In other words, over 86% of the nonmalignant claims studied were unsupportable by medical evidence. Moreover, Dr. Friedman found that the incidence of impaired claims which might be attributable to asbestos were between 8.16% and 10.46%, and concluded that the vast number of claims for nonmalignant asbestos disease could not be explained on medical,

---

See Peterson Report at 9. Similarly, Peterson estimates that 254,326 claims against Fibreboard had been resolved at an average settlement rate of $4,754. He also estimates that 88% of the claims were paid, meaning that damages to Fiberboard could amount to $1.06 Billion. *See id.* at 31.

[15] Expert Report of Dr. Gary K. Friedman (2002) at 33.

epidemiologic, pathologic, or other scientific grounds.[16] The credibility of the initial B-readers' reports was further weakened by Dr. Friedman's observation that although there were approximately 600 certified B-readers in the United States at the time these reports were generated, only five radiologists were responsible for over 80% of the readings reviewed in the study.[17] Of the 1,691 cases Dr. Friedman studied, 772 (46%) had been reviewed by the proposed defendant Dr. Raymond Harron, 229 were reviewed by the proposed defendant Dr. Jay Segarra, 87 were reviewed by the proposed defendant Dr. Philip H. Lucas, and 60 were reviewed by the proposed defendant Dr. James W. Ballard. These four physicians provided the medical documentation for the majority of the 1,691 randomly-sampled claims that Dr. Friedman reviewed.

17. Dr. Friedman concluded that the x-ray readings recorded by the proposed defendants differed significantly from what would be anticipated by a randomly-selected panel of B-readers nationwide and yielded results which were not even consistent with the spectrum of nonmalignant asbestos-related diseases identified within the peer-reviewed literature authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts. For example, peer-reviewed studies consistently show that pleural disease (abnormality of the tissue that lines the outside of the lung and the inside of the rib cage) is more prevalent than pulmonary asbestosis in a variety of exposure settings. However, as Dr. Friedman found, none of the proposed defendants identified more "pleural only" cases than pulmonary asbestosis. Of the 1,691 cases reviewed, only 124 "pleural only" cases were identified, a result that is fundamentally inconsistent with the peer-reviewed literature. In the medical reports generated by the proposed

---

[16] *Id.* at 13, 35.

[17] *Id.* at 11.

9

defendants, the ratio of pulmonary asbestosis to "pleural only" disease (the far more prevalent type), was 47 to 1. In the remaining reports submitted by over 40 other B-readers and physicians, the ratio of pulmonary asbestosis to "pleural only" disease was 2 to 1. In addition, the proposed defendants demonstrated medically unsound idiosyncrasies and propensities in diagnosing asbestos-related injury. For instance, several proposed defendants repeatedly found that all six lung zones were involved in a low-profusion x-ray with no pleural change, an extremely rare occurrence according to peer-reviewed literature.

### B. The Gitlin Report

18. Dr. Friedman's report was followed more recently in 2004 by the results of a study conducted by Dr. Joseph Gitlin published in the Journal of Academic Radiology of the Johns Hopkins University Department of Radiology.[18] The study reviewed 492 chest x-rays that were read as positive for asbestos-related impairment by initial B-readers. Six consultants in chest radiology and certified B-readers were asked to reinterpret the x-rays independently and without knowledge of their provenance.

19. Whereas initial B-readers had diagnosed asbestosis in 95.9% of the studied cases, the six consultants classified the same x-ray films as positive in only 4.5% of the cases. As Gitlin concluded, the sheer magnitude of the difference between the interpretations by initial readers and the six consultants is simply too great to be attributed to good-faith inter-observer variability. Compared with the consultant readers, the initial B-readers were 9.2 times more likely to conclude that pleural abnormalities consistent with asbestos exposure were visible in the x-rays.

20. Almost two-thirds of the claimants whose x-rays were studied in the Gitlin report are plaintiffs who have filed claims against Owens Corning. The initial B-readers studied in the Gitlin report included proposed defendants Dr. Jay T. Segarra, Dr. James W. Ballard, Dr. Phillip H. Lucas, and Dr. Ray A. Harron. When the results are aggregated, these radiologists, identified in both the Friedman and Gitlin reports, are virtually certain to have submitted x-ray reports that were fraudulent.

### III. THE DEBTORS HAVE REFUSED TO INITIATE SUIT AGAINST THE B-READERS

21. On December 20, 2004, CSFB delivered a letter to Owens Corning (attached hereto as Exhibit C), which explained the apparent wrongdoing by the B-readers and demanded that the Debtors initiate their own suit. The letter enclosed a draft complaint in the Debtors' name against the B-readers and informed Owens Corning of CSFB's intention to file the present Motion if it did not receive a response by January 3, 2005. Owens Corning has proven unwilling to prosecute the proposed suit, prompting CSFB to file the present motion.

### RELIEF REQUESTED

22. By this Motion, CSFB seeks authorization to initiate the Adversary Proceeding against the B-readers to pursue certain claims and causes of action. A proposed form of order is attached hereto as Exhibit A.

---

[18] Joseph N. Gitlin *et al.*, *Comparison of B-Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004).

# ARGUMENT

## I.   CSFB SHOULD BE GRANTED DERIVATIVE STANDING

23.   CSFB seeks permission from the Court to initiate an adversary proceeding against the B-readers on behalf of the Debtors' estates. The United States Court of Appeals for the Third Circuit has held that it is "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate." *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003).

24.   The *Cybergenics* decision arose in the context of a creditors' committee's standing to pursue a fraudulent conveyance action under 11 U.S.C. § 544(b). *Id.* at 552. Other courts have extended *Cybergenics* to encompass derivative suits under other provisions of the Bankruptcy Code. *See, e.g., In re Valley Media, Inc.*, No. 01-11353, 2003 WL 21956410, at *2 (Bankr. D. Del. Aug. 14, 2003) ("nothing in [*Cybergenics*] suggest[s] that a creditors' committee's derivative standing should be any different in the context of a § 542(a) turnover action or a §547(b) preference action"). Moreover, the *Cybergenics* decision applies equally to allow a derivative suit by an individual creditor, as opposed to a creditors' committee. *Infinity Investors Ltd. v. Donald Kingsborough (In re Yes! Entertainment Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) ("[a]lthough the Third Circuit discussed creditors' committees specifically, the Court is persuaded that its decision is applicable here [to a creditor].").

### A.   CSFB Has Met The Standard For Derivative Standing

25.   In granting a motion for derivative standing, a recent decision in the District Court for the District of Delaware sets out the factors to be considered: whether "(1) the trustee unjustifiably refuses a demand to pursue the action; (2) the creditor establishes a colorable claim or cause of action; and (3) the creditor seeks and obtains leave from the bankruptcy court to

prosecute the action for and in the name of the trustee." *Yes! Entertainment*, 316 B.R. at 144 (applying the above legal requisites of derivative standing *de novo* on appeal and reversing and reinstating the action before the Bankruptcy Court.); *Valley Media*, 2003 WL 21956410, at *2 (cited in *Yes! Entertainment*); *see also Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) ("If a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee.").

### 1. The Debtors Have Unjustifiably Refused To Prosecute An Action

26. On December 20, 2004, CSFB delivered a letter to Owens Corning setting forth CSFB's position that the Debtors have claims for fraud and negligent misrepresentation against the B-readers which, if successful, would result in significant recovery to the Debtors' estates and their creditors. *See* Exhibit C. CSFB gave Owens Corning a full two weeks to consider the demand, and stated its intention to file the present Motion if the Debtors did not agree by that date to file their own complaint against the B-readers by January 18, 2005. CSFB also attached a draft complaint in the Debtors' name. On December 27, 2004, Owens Corning suggested a meeting with counsel for CSFB to discuss a potential suit by the Debtors against the B-readers. Counsel for CSFB agreed to discuss the suit in a meeting on January 4, 2005. At the conclusion of the January 4 meeting, Owens Corning agreed to consider pursuing a cause of action against the B-readers. On January 10, 2005, Owens Corning informed counsel for CSFB that it was refusing to pursue a cause of action against the B-readers on its own behalf, and would not consent to CSFB's offer to pursue the Adversary Proceeding derivatively, despite CSFB's offer to bear the costs of pursuing the suit.

13

27.     As set forth in detail below, the Debtors' refusal to prosecute an action against the B-readers is unjustified. The proposed claims against the B-readers are well-grounded in fact and law, and could result in significant recovery to the Debtors' estates. Courts have held that the refusal to pursue a viable claim that would benefit the estate is itself an unjustified refusal. For example, the court in *In re Newcorn Enters. Ltd.*, 287 B.R. 744 (Bankr. E.D. Mo. 2002), granted the creditors' committee's motion for derivative standing to file an adversary complaint under 11 U.S.C. § 544(a), holding that "[t]he existence of the Committee's unpursued colorable claim which would benefit the estate is sufficient to meet the Committee's burden to show that the inaction was unjustified." 287 B.R. at 750. Likewise, the U.S. Court of Appeals for the Fifth Circuit also addressed the meaning of "unjustified" refusal in *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988), holding:

> [I]n determining whether a debtor-in-possession's refusal was unjustified, we must look to whether the interests of creditors were left unprotected as a result. As the interests of creditors are imperiled where valid and profitable state law causes of action are neglected by the debtor-in-possession, the unjustified refusal calculus will generally amount to little more than a cost-benefit analysis.

*Id.* at 253 n.20 (citations omitted); *see also Canadian Pac. Forest Prods., Inc. v. J.D. Irving, Ltd. (In re The Gibson Group)*, 66 F.3d 1436, 1445 (6th Cir. 1996) (citing *Louisiana World Exposition* with approval).

### 2.     CSFB Has Alleged Colorable Claims Against The B-Readers

28.     CSFB, standing in the shoes of the Debtors, has alleged colorable claims against the B-readers. "Because the [creditor] is not required to present its proof, the [colorable claim] inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *In re G-I Holdings, Inc.*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004) ("The colorable claim element of the derivative standing test requires the Court to decide whether the

Committee has asserted claims for relief that on appropriate proof would support a recovery.") (quotations omitted); *see also Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) ("[the] bare-bones facts state, at least, a colorable claim . . . [even if] there may be adequate defenses which come to light when answers to the Complaint are filed . . ."); *In re iPCS, Inc.*, 297 B.R. 283, 291-92 (Bankr. N.D. Ga. 2003) (stating a claim is colorable if the claim would survive a motion to dismiss for failure to state a claim). As such, the Court "must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts," and the motion for derivative standing should be granted unless it appears beyond doubt that CSFB can prove no set of facts in support of its claim which would entitle it to relief. *G-I Holdings*, 313 B.R. at 631.

29.     CSFB has alleged colorable claims of fraud and misrepresentation against the B-readers. A cause of action for fraud generally requires a showing that defendants falsely represented (or concealed where there was a duty to disclose) material facts with knowledge or recklessness, and such representation or concealment induced plaintiff to take action in reasonable reliance upon the misrepresentation, causing plaintiff to suffer damages as a result. *Stephenson v. Capano Development*, 462 A.2d 1069, 1074 (Del. 1983) ("At common law, fraud . . . consists of: 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance."); *Kronenberg v. Katz*, No. 19964, 2004 WL 1152282, at *13 (Del. Ch. May 19, 2004) (same).

30.     A cause of action for negligent misrepresentation is identical to a cause of action for fraud, except that a less culpable state of mind is required: defendants must have made the misrepresentation without knowledge as to its truth or falsity, or made the representation under circumstances in which they ought to have known of its falsity. *Id.* at *13.

31.     The Friedman and Gitlin reports discussed above (and the draft complaint attached hereto as Exhibit B) identify a specific group of radiologists who are virtually certain to have submitted x-ray reports claiming asbestos-related disease, when, in fact, there was no compensable injury. From the magnitude of misdiagnoses, it can be inferred that the B-readers knew the diagnoses were false, or at a bare minimum, that the B-readers made the diagnoses without knowledge as to their truth or falsity or under circumstances in which they ought to have known of their falsity. These misdiagnoses were obviously material, as they allowed asbestos claimants to recover sums from the Debtors that they were not legitimately due. The Debtors' reliance on these reports was justifiable, given each B-reader was certified by a federal agency (the National Institute for Occupational Health and Safety, a division of the Centers for Disease Control).

**B.     Initiation Of An Adversary Proceeding Would Be In The Best Interest Of The Debtors' Estates**

32.     While *Yes! Entertainment* held that a creditor need only demonstrate an unjustified refusal by the debtor upon demand and the existence of a colorable claim to obtain bankruptcy court permission to pursue an action on behalf of the debtor, 316 B.R. at 145, other courts have further considered whether "an action asserting such claim(s) is likely to benefit the reorganization estate." *Unsecured Creditors Comm. of Debtor STN Enter. v. Noyes (In re STN Enter.)*, 779 F.2d 901, 905 (2d Cir. 1985); *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir.

2001) (claim must be in the "best interest" of the estate). Here, it is clear that the commencement of a lawsuit against the B-readers is, in fact, in the best interest of the Debtors' estates.

33.  The "best interest" inquiry essentially asks whether the relative potential benefits outweigh the costs of prosecuting causes of action for the benefit of the estate. *STN Enters.*, 779 F.2d at 906 (bankruptcy court must "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce"); *Nat'l Forge*, 304 B.R. at 223 ("The Court has had ample opportunity to serve the role as 'gatekeeper' in this case to weigh the potential benefit of the litigation against the costs that might be incurred.").

34.  As CSFB is willing to fund the cost of prosecuting a claim against the B-readers on behalf of the Debtors' estates, there will be essentially no cost to the Debtors' estates if the lawsuit does not result in recovery, and a net benefit if the lawsuit does result in recovery. *STN Enters.*, 779 F.2d at 905-06 ("Of course, if the [creditor bringing the action] represents that its fee arrangement with its attorney will in no event impose a net burden on the bankruptcy estate (because the [creditor] will pay the fee and seek reimbursement only out of any recovery), the [] inquiry can be limited to ascertaining whether the proposed lawsuit has a colorable basis on which to proceed.").

35.  Moreover, the initiation of the Adversary Proceeding against the B-readers would not delay confirmation of the Debtors' Plan of Reorganization. The claims against the B-readers could be assigned to a post-confirmation Litigation Trust, which would distribute any proceeds to the beneficiaries of such a trust as designated in the Plan.

36.     CSFB is confident that the Adversary Proceeding will result in the inurnment of significant monies to the Debtors' estates, and reserves the right to seek reimbursement of reasonable attorney's fees and costs incurred in prosecuting the Adversary Proceeding from such proceeds pursuant to Sections 503(b)(3)-(4) of the Bankruptcy Code.  11 U.S.C. §503(b)(3)(D) (the Court may reimburse "the actual, necessary expenses" of a creditor "in making a substantial contribution in a case under chapter . . . 11 of this title"); 11 U.S.C. § 503(b)(4) ("reasonable compensation for professional services rendered by an attorney" may be paid); *see also Lebron v. Mechem Fin., Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) ("in determining whether there has been a substantial contribution pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors") (quotations and alterations omitted).

37.     Since the Banks are undertaking the cost of litigating the suit, CSFB also reserves the right to discontinue the Adversary Proceeding at any time, subject to reasonable notice to the Debtors and the opportunity to take over the suit.

## CONCLUSION

All the grounds requisite for granting derivative standing exist: There is a colorable claim in favor of the estate, which is not being pursued, and in respect of which CSFB is willing to take the risk of funding. There is no cognizable rationale for not allowing this potential benefit to the estate to be prosecuted. As such, CSFB respectfully requests entry of an order granting the relief requested herein and such further relief as the Court deems just and proper. A proposed form of order is attached hereto as Exhibit A.

Dated: January 12, 2005

LANDIS RATH & COBB LLP

_____
Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Tel: (302) 467-4400
Fax: (302) 467-4450

*Attorneys for Credit Suisse First Boston, as Agent*

OF COUNSEL:

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Tel: (212) 455-2000
Fax: (212) 455-2502