**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
 **DISTRICT OF DELAWARE**

---------------------------------------------------------------x

In re:

**OWENS CORNING**, et al.,

                Debtors.

**: Chapter 11**

**: Case Nos.: 00-3837 through 00-3854**

_____

**CREDIT SUISSE FIRST BOSTON**, as Agent for
Lenders to Owens Corning and its Affiliates,
derivatively on behalf of Owens Corning,

                Plaintiff,

Adv. Proc. ___

        -against-

**JURY TRIAL DEMANDED**

**RAYMOND A. HARRON,** Jay T. Segarra, James
W. Ballard, Philip H. Lucas, and John Does
Physicians 1 through 100,

                Defendants.

---------------------------------------------------------------x

## COMPLAINT

      Credit Suisse First Boston, as Agent for the pre-petition institutional lenders to

Owens Corning and certain of its affiliates, Debtors-In-Possession in the above-captioned

Chapter 11 cases ("Debtors," "Owens Corning" or "Company"), by and through its undersigned

counsel, alleges as and for its Complaint the following on information and belief:

## NATURE OF THE ACTION

1.      This action asserts claims for fraud and negligent misrepresentation against physicians who falsely reported chest radiograph (x-ray) readings as positive for asbestos-related disease when, in fact, the readings showed no compensable injury. These false reports—which came from medical doctors who were specially trained and certified in the reading of x-rays—resulted in Owens Corning paying Billions of dollars to "settle" asbestos-related personal injury claims against the Company that had no medical basis and should never have been filed.

2.      Recent scientific studies indicate that the individual physicians named herein as Defendants have accounted for a dramatically disproportionate number of asbestos personal injury claims filed against the Debtors and have routinely and systematically over-diagnosed non-malignant asbestos-related physical impairment in support of such claims.

3.      These false reports of asbestos-related injury were used to substantiate thousands of personal injury claims that Owens Corning settled and paid prior to filing a voluntary Chapter 11 bankruptcy petition on October 5, 2000, all to the great injury of the Company and its legitimate creditors—including those individuals with legitimate asbestos-related personal injury claims.

4.      Plaintiffs are creditors of Owens Corning and now seek relief derivatively on behalf of the estate of the Debtors who have neglected and refused to bring this lawsuit for themselves.

## JURISDICTION AND VENUE

5.      Jurisdiction over this adversary proceeding exists under 28 U.S.C. §§ 157, 1334, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

6.     This matter is related to a pending case under Title 11, but it is a non-core proceeding as defined by 28 U.S.C. § 157.   Credit Suisse First Boston, as Agent, does not consent to entry of final orders or judgment by the Bankruptcy Judge.

7.     This matter involves significant non-bankruptcy issues, including the adjudication of tort law claims under state law.  Further, Credit Suisse First Boston, as Agent, demands a trial by jury to all claims to which it is so entitled, and does not consent to a jury trial by the Bankruptcy Court pursuant to 28 U.S.C. § 157(e).

8.     Venue in this Court is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

9.     Credit Suisse First Boston, as Agent, has standing to bring these claims on behalf of the estate of the Debtors, as authorized by Order of the Bankruptcy Court, dated _____ (insert order granting standing).

## PARTIES

10.     The Plaintiff is Credit Suisse First Boston, Agent for the prepetition institutional lenders to Owens Corning.  Plaintiff brings this action derivatively on behalf of the estate of the Debtors in the above-captioned cases.

11.     The Debtors are Owens Corning, a Delaware corporation with its principal place of business in Toledo, Ohio, Fibreboard, a Delaware corporation with its principal place of business in California, and other affiliates and subsidiaries that also filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq*.

12.     Defendants are physicians who purported to provide medical documentation substantiating asbestos-related personal injury claims that were submitted to and paid by Owens Corning prior to its Chapter 11 filing.

13.     Defendant Dr. Raymond A. Harron is, upon information and belief, a resident of West Virginia and a physician licensed to practice medicine.

14.     Defendant Dr. Jay T. Segarra is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

15.     Defendant Dr. James W. Ballard is, upon information and belief, a resident of Alabama and a physician licensed to practice medicine.

16.     Defendant Dr. Philip H. Lucas is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

17.     John Doe Physicians 1 through 100 are pseudonyms for other physicians who have engaged in fraudulent practices detailed herein whose identities are presently unknown to Owens Corning but may be established after reasonable opportunity for further investigation and discovery.


## FACTS

### A.    Owens Corning, Asbestos, and the National Settlement Program

18.     Asbestos is a generic name given to a group of naturally occurring minerals often used in commercial applications to resist heat and corrosion.

19.     It is established that prolonged exposure to asbestos may cause diseases of the lungs and other organs, and that such illnesses may not appear until years after exposure.

20.     Prior to 1972, Owens Corning and Owens Corning's subsidiary, Fibreboard Corporation, manufactured and distributed asbestos-containing products. Such manufacture and distribution has led to hundreds of thousands of asbestos-related personal injury

claims against Owens Corning, and these claims have ultimately forced the Company to seek reorganization under Chapter 11.

21.    Prior to filing for reorganization, Owens Corning attempted to address the flood of asbestos-related personal injury claims against it by implementing a National Settlement Program (NSP). The NSP was established via agreements with asbestos plaintiffs' law firms, and was intended to timely and accurately resolve asbestos-related personal injury claims with established procedures and fixed payments, without the attendant costs of litigating the claims in the civil justice system.

22.    Payments to individual claimants under the NSP depended upon the type and severity of the asbestos-related disease contacted by the claimant.  Payment was subject to evidence of a qualifying medical condition and exposure to Owens Corning products.

### B.    The Flood of Non-Malignant Asbestos-Related Personal Injury Claims

23.    Medical research has described asbestosis as a disappearing disease, and many pulmonology practices see no cases of the disease.  This phenomenon is generally believed to arise from the fact that asbestos exposure has decreased dramatically since the passage of the Occupational Safety and Health Act (OSHA) in 1970.

24.    Notwithstanding this decrease, the number of non-malignant asbestos-related personal injury claims grew exponentially in the 1990s.  It is estimated that up to 90% of new asbestos claims are filed by individuals with little or no impairment, and that payments for non-malignant claims account for approximately 64% of the compensation paid to asbestos plaintiffs.

25. Consistent with these broader trends, the vast majority of the asbestos personal injury claims filed against Owens Corning prior to its Chapter 11 filing were from claimants with alleged asbestos-related impairment that was non-malignant.

26. As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Owens Corning was 238,133. Of these resolved claims, 93.5% were paid. The average settlement amount was $7,573.

27. As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Fibreboard was 254,326. Of these resolved claims, 88.5% were paid. The average settlement amount paid was $4,754.

28. Upon information and belief, the total amount Owens Corning has paid pre-petition to resolve non-malignant asbestos-related personal injury claims is in excess of $2.5 Billion.

C.    **The Vast Majority of Non-Malignant Claims Were Fraudulent**

29. It has been widely recognized by the legal and medical professions alike that asbestos litigation over the last decade has not been driven by the occurrence of bona fide asbestos-related disease—which is in decline—but rather by for-profit litigation screening operations that aggressively solicit tens of thousands of new "victims" each year who do not have any compensable asbestos-related physical impairment.

30. Pulmonary x-rays are the principal medical diagnostic tool for identifying and documenting non-malignant asbestos-related disease for purposes of substantiating the existence of an asbestos personal injury claim and determining the amount for which a claim is settled, whether under the NSP, or independently of the NSP. A "positive" classification of an x-

ray sufficient for compensation by an asbestos defendant usually means noting a parenchymal abnormality and indicating a small opacity profusion category of 1/0 or higher, according to standards promulgated by the International Labour Organization (ILO) for reading and scoring x-rays for asbestos-related injury.

31.     "Screening" companies encourage workers to have free chest x-rays performed, even if they have no symptoms of any pulmonary impairment.  Such companies actively solicit asymptomatic workers who may have been occupationally exposed to asbestos, touting: "You May Have Million Dollar Lungs." The screenings are usually done in mobile vans parked near union halls or in hotel parking lots.

32.     These screening companies were set up by individuals generally lacking medical experience to create a mechanism for screening hundreds of thousands of workers who could claim to have been exposed to asbestos in the workplace.  Screening companies have reportedly processed over one million workers, and account for the overwhelming majority of non-malignant claims filed to date.

33.     "B-readers" (so called because they must pass part "B" of a test on x-ray interpretation) are typically physicians specially trained and certified to read and score pulmonary x-rays taken of workers alleged to have been exposed to asbestos.  In order to obtain the credential of B-reader, physicians must undergo certification by the National Institute of Occupational Safety and Health (NIOSH), a division of the Centers for Disease Control (CDC).

34.     Between 1994 and 1999 there were approximately 600 certified "B-readers" in the United States.

35.     Of this pool of B-readers, however, only a handful were routinely consulted and asked by plaintiffs' lawyers to read and score thousands upon thousands of

pulmonary x-rays for purposes of providing medical documentation of asbestos-related disease to substantiate asbestos personal injury claims then submitted by plaintiffs' lawyers to asbestos defendants, including the Debtors in this case. These B-readers developed reputations for systematically interpreting chest x-rays of asbestos claimants as positive for asbestos-related disease in 90-100% of all cases.

36.     The B-readers examine the x-rays after the fact, away from the patient and the testing site, and may not even be licensed to practice medicine in the state where the x-rays were taken. Some x-ray readers spend only minutes in making their findings and are paid hundreds of thousands of dollars in the aggregate for reading mass quantities of chest x-rays.

37.     Upon information and belief, some claimants' x-rays are "shopped around" to a number of B-readers until one is found who will report a positive reading for asbestos-related injury sufficient to sustain a claim for compensation.

38.     Rates of "positive" findings by these doctors have been as high as 90% according to some studies, and an audit of non-malignancy claims conducted by the Manville Personal Injury Trust (one of the largest asbestos claims processors) has shown that certain B-readers whose findings served as the basis for thousands of claims failed independent review more than 50% of the time. Given these findings, the Manville Trust now refuses to pay claims based on medical evidence from certain laboratories and by physicians whose diagnostic record appeared medically unsound.

39.     When B-readers interpret x-rays for asbestos-related disease, they know they are doing so for purposes of providing "independent" and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant, they know the cut off of 1/0 in the ILO system that generally

qualifies for compensation from an asbestos defendant, and they frequently receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an x-ray exhibits positive indications of asbestos-related injury than if they report it does not.

40.    Two recent scientific studies have independently audited samples of B-reader x-ray reports and have revealed that the incidence of asbestos-related nonmalignant impairment reported by the Defendants named in this Complaint is totally inconsistent with available peer review literature and is medically and scientifically incredible.


### D.    Report of Dr. Gary K. Friedman

41.    Dr. Gary K. Friedman, a board-certified pulmonologist, was retained by Owens-Corning in 1999 to serve as a medical consultant to the NSP and thereafter continued to serve as a consultant to Owens Corning in the bankruptcy.

42.    Dr. Friedman was chosen to consult to the NSP as an expert acceptable to both defendants and plaintiffs in connection with the review and analysis of asbestos-related claims.  Dr. Friedman has testified at trial or in deposition in asbestos related cases on more than 60 occasions at the request of plaintiffs' counsel.

43.    In 2002, Dr. Friedman submitted a report to Owens Corning to provide an estimate of the percentage of impaired nonmalignant claims under NSP criteria to be expected in the population of total future claims asserted against Owens Corning.

44.    In connection with his report, Dr. Friedman reviewed 1,691 past claims of nonmalignant asbestos-related injury against Owens Corning between 1994 and 1999.  The cases were randomly selected from 22,578 nonmalignant claims submitted to the NSP under

agreements where the B-readers had financial incentive to find indication of impairment.  The case files Dr. Friedman reviewed contained analysis of chest x-ray reports, Pulmonary Function Test results (PFTs), and other data.

45.    Dr. Friedman concluded that the actual incidence of impaired claims which might be attributable to asbestos in the studied sample of claims was between 8.16% and 10.46% and that the vast number of claims for nonmalignant asbestos disease could not be explained on medical epidemiologic, pathologic, or other scientific grounds.

46.    Of the claims submitted for review, only 13.3% met minimal medical standards that had been agreed upon by Owens Corning and asbestos plaintiffs' law firms as a part of the NSP.  In other words, over 87% of the nonmalignant claims studied were utterly unsupportable by medical evidence.

47.    Of the 1,691 cases Dr. Friedman studied, 772 (46%) had been reviewed by the Defendant, Dr. Raymond Harron, 229 were reviewed by the Defendant, Dr. Jay Segarra, 87 were reviewed by the Defendant Dr. Philip H. Lucas, and 60 were reviewed by the Defendant Dr. James W. Ballard. These four physicians provided the medical documentation for the majority of the 1,691 randomly-sampled claims that Dr. Friedman reviewed.

48.    Dr. Friedman concluded that the x-ray readings recorded by the Defendants differed significantly from what would be anticipated by a randomly selected panel of reliable B-readers nationwide and yielded results which were not even consistent with the spectrum of nonmalignant asbestos related diseases identified within the peer review literature authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts.

49.    Peer review studies consistently show that pleural disease (of the tissue that lines the outside of the lung and the inside of the rib cage) is more prevalent than pulmonary

asbestosis in a variety of exposure settings. However, as Dr. Friedman found, none of the Defendants identified more "pleural only" cases than pulmonary asbestosis.  Of the 1,691 cases reviewed, only 124 "pleural only" cases were identified, a result that fundamentally contradicts the peer review literature.  In the medical reports generated by Defendants, the ratio of pulmonary asbestosis to "pleural only," the far more prevalent type, was 47 to 1.  In the remaining reports submitted by over 40 other B-readers and physicians, the ratio of pulmonary asbestosis to "pleural only" was 2 to 1.

50.    Defendants demonstrated medically unsound idiosyncrasies and propensities in diagnosing asbestos-related injury. For instance, several defendants repeatedly found that all six lung zones were involved in a low-profusion x-ray with no pleural change, an extremely rare finding according to peer review literature.

### E.    Report of Dr. Joseph N. Gitlin

51.    Dr. Friedman's report was followed more recently in 2004 by the results of a study conducted by Dr. Joseph Gitlin et al. published in the Journal of Academic Radiology of the Johns Hopkins University Department of Radiology.  The study reviewed a sample of 492 chest x-rays that were read as positive for asbestos-related disease by initial B-readers.  Six consultants in chest radiology and also certified B-readers were asked to reinterpret the x-rays independently and without knowledge of their provenance.

52.    Whereas initial B-readers had diagnosed asbestosis in 95.9% of the studied cases, the six consultants classified the same x-ray films as positive in only 4.5% of the cases. As Gitlin concluded, the magnitude of the difference between the interpretations by initial

readers and the six consultants is simply too great to be attributed to good faith inter-observer variability.

53.     Compared with the consultant readers, the initial B-readers were 9.2 times more likely to conclude that pleural abnormalities consistent with asbestos-exposure were visible in the x-rays.

54.     The initial B-readers studied in the Gitlin report included Defendant Dr. Jay T. Segarra, Defendant Dr. James W. Ballard, Defendant Dr. Phillip H. Lucas, and Defendant Dr Ray A. Harron.

### FIRST CLAIM FOR RELIEF
### (COMMON LAW FRAUD)

55.     Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 54 above as if fully set forth herein.

56.     As described above, Defendants made false and fraudulent representations of fact by reporting false positive indications of asbestos-related disease in the x-rays of personal injury claimants who in fact had no compensable asbestos-related injury.

57.     At the time Defendants made such false and fraudulent representations of fact, Defendants were aware, or were reckless in failing to be aware, of the falsity of such representations.

58.     The false reports Defendants generated were meant to be professional, independent, and authoritative, based on specialized medical training.  The Debtors reasonably and justifiably relied on Defendants' reports of asbestos-related injury in settling and paying asbestos personal injury claims.

59.     Until such time as the results of independent medical expert studies revealed that the Defendant B-readers' x-ray reports could not possibly be accurate, Owens

Corning had no reason to discover, and could not have discovered, that it was the victim of a widespread fraud.

## SECOND CLAIM FOR RELIEF
### (NEGLIGENT MISREPRESENTATION)

60.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

61.     As described above, Defendants made false and misleading representations of fact by reporting false positive indications of asbestos-related disease in the x-rays of personal injury claimants who in fact had no compensable asbestos-related injury.

62.     At the time Defendants made these misrepresentations, they either knew of the falsity of the misrepresentations or ought to have known that the representations were false and failed to make diligent efforts to ensure their reliability.

63.     Defendants made these misrepresentations knowing that they would serve as the basis for Debtors to settle and pay asbestos-related claims, and generated reports with the intent to induce both claimants and Debtor to act upon them.

64.     Given Defendants' status as federally-licensed B-readers whose reports were supposed to be independent and credible, Plaintiffs justifiably relied on Defendants' false and misleading reports and suffered injury as a result of Defendants' negligence.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in its favor and against the Defendants for compensatory damages in an amount to be determined at trial, and interest and the costs and disbursements of this action, including fees and reasonable

attorneys' fees, against the Defendants, jointly and severally; and such other and further relief as the Court shall deem just and proper.


Dated:  New York, New York
        _____, 2005

                                        LANDIS RATH & COBB LLP


                                        By: _____
                                             Richard S. Cobb (I.D. No. 3157)
                                             Rebecca L. Butcher (I.D. No. 3816)
                                             919 Market Street, Suite 600
                                             Wilmington, Delaware 19810
                                             Tel:  (302) 467-4400
                                             Fax:  (302) 467-4450


                                        *Attorneys for Credit Suisse First Boston, as Agent*

Of Counsel:

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Tel:  (212) 455-2000
Fax:  (212) 455-2502