# EXHIBIT C

**SIMPSON THACHER & BARTLETT LLP**

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER

(212) 455-2655

E-MAIL ADDRESS

bostrager@stblaw.com

<u>BY FEDERAL EXPRESS (Mr. Kroll)</u>
<u>BY HAND (Mr. Podesta)</u>

December 20, 2004

Re:   Demand on Debtors-In-Possession Owens Corning
and Fibreboard To Commence Legal Action For
<u>Recovery Of Property Of The Bankruptcy Estate</u>

Stephen K. Kroll, Esq.
Senior Vice President, General Counsel and Secretary
Owens Corning
One Owens Corning Parkway
Toledo, Ohio 43659

Roger E. Podesta, Esq.
Special Counsel for Owens Corning and Fibreboard Corporation
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022

Gentlemen:

      We represent Credit Suisse First Boston in its capacity as Agent for the Institutional Lenders to Owens Corning ("CSFB") in connection with a matter of significant importance to the pending Chapter 11 proceedings captioned *In re Owens Corning et al.*, Case Nos. 00-3837 through 00-3854 (Bankr. D. Del.), and are sending you this demand letter on its behalf.

      CSFB has recently learned that certain physicians who purport to diagnose asbestos-related impairment by reviewing lung x-rays have fraudulently or negligently misreported potentially many thousands of x-ray results for individuals who subsequently asserted personal injury claims against Owens Corning or Fibreboard prior to their October 5, 2000 Chapter 11 filing. Despite the fact that a substantial portion of these claimants were not impaired and had no valid claim of injury, the physicians' medical reports falsely represented that they were eligible for settlement payments under National Settlement Programs instituted by Owens Corning and Fibreboard to handle asbestos personal injury claims.

LOS ANGELES      PALO ALTO      HONG KONG      LONDON      TOKYO

SIMPSON THACHER & BARTLETT LLP

Stephen K. Krull, Esq.
Roger E. Podesta, Esq.                    -2-                    December 20, 2004

      Given the magnitude of pre-petition payments Owens Corning and Fibreboard have made for non-malignant asbestos-related personal injuries, it is beyond doubt that the harm they have sustained as a result of this fraudulent activity has been substantial. CSFB believes that Owens Corning has the opportunity to obtain significant monetary redress for this injury and thus increase the size of the estate, to the benefit of all creditors—including those individuals with legitimate asbestos-related personal injury claims.

      CSFB hereby demands that Owens Corning file suit against the physicians named in the proposed complaint we have prepared and enclosed with this letter, based on the allegations set forth therein. Should Owens Corning refuse to commence such litigation, CSFB will seek leave of the Bankruptcy Court to prosecute these claims derivatively.

      Please let me know by the close of business on Monday, January 3, 2005, whether Owens Corning will commence this litigation and seek redress for the massive fraud that has been perpetrated against it. If, by the close of business on January 3rd, you have not either filed suit or responded that you will file suit by January 18, 2005, CSFB will seek leave of the Bankruptcy Court to proceed on behalf of Owens Corning.

      Thank you for your prompt attention to this important matter addressed in this demand letter.

Very truly yours,

Barry R. Ostrager

Enclosure

cc:   Mary Beth Hogan (by Hand)
      Francis L. Kellner (by Hand)
      Norman L. Pernick (by Facsimile)
      J. Kate Stickles (by Facsimile)

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------------------x

| | |
|---|---|
| In re:<br><br>**OWENS CORNING,** *et al.*,<br><br>               Debtors,<br><br>―――――――――――――<br><br>**OWENS CORNING,**<br><br>               Plaintiff,<br><br>      -against-<br><br>**RAYMOND A. HARRON,** Jay T. Segarra, James W. Ballard, Philip H. Lucas, and John Doe Physicians 1 through 100,<br><br>               Defendants. | **In Proceedings For Reorganization Under Chapter 11 Of The Bankruptcy Code**<br><br>**Case Nos.: 00-3837 through 00-3854**<br><br><br>Adv. Proc. _____<br><br><br>**JURY TRIAL DEMANDED** |

------------------------------------------------------------x

## COMPLAINT

Plaintiffs Owens Corning and Fibreboard Corporation, Debtors-In-Possession in the above-captioned Chapter 11 cases (collectively, "Owens Corning" or "Company"), by and through its undersigned counsel, alleges as and for its Complaint as follows:

## NATURE OF THE ACTION

1.  Owens Corning is the victim of a massive fraud perpetrated by physicians who falsely reported chest radiograph (x-ray) readings as positive for asbestos-related physical impairment when, in fact, the readings showed no impairment. These false reports—which came from medical doctors who were specially trained and certified in the reading of x-rays—resulted in Owens Corning paying Billions of dollars to "settle" asbestos-related personal injury claims against the Company that were had no medical basis and should never have been filed.

2.  Recent scientific studies indicate that the individual physicians named herein as Defendants have accounted for a dramatically disproportionate number of asbestos personal injury claims filed against Owens Corning and have routinely and systematically over-diagnosed non-malignant asbestos-related physical impairment in support of such claims.

3.  These false reports of asbestos-related injury were used to substantiate thousands of personal injury claims that Owens Corning settled and paid prior to filing a voluntary Chapter 11 bankruptcy petition on October 5, 2000, all to the great injury of the Company and its legitimate creditors—including those individuals with legitimate asbestos-related personal injury claims.

## JURISDICTION AND VENUE

4.  Jurisdiction over this adversary proceeding exists under 28 U.S.C. §§ 157, 1334, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

5.  This matter is related to a pending case under Title 11, but it is a non-core proceeding as defined by 28 U.S.C. § 157. Owens Corning does not consent to entry of final orders or judgment by a Bankruptcy Judge.

6. Owens Corning demands a trial by jury to all claims to which it is so entitled, and does not consent to a jury trial by the Bankruptcy Court pursuant to 28 U.S.C. § 157(e).

7. Venue in this Court is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

8. Owens Corning is a Delaware corporation with its principal place of business in Toledo, Ohio. Owens Corning filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq.*, on October 5, 2000.

9. Defendants are physicians who purported to provide medical documentation substantiating asbestos-related personal injury claims that were submitted to and paid by Owens Corning prior to its Chapter 11 filing.

10. Dr. Raymond A. Harron is, upon information and belief, a resident of West Virginia and a physician licensed to practice medicine.

11. Dr. Jay T. Segarra is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

12. Dr. James W. Ballard is, upon information and belief, a resident of Alabama and a physician licensed to practice medicine.

13. Dr. Philip H. Lucas is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

14. John Doe Physicians 1 through 100 are pseudonyms for other physicians who have engaged in the fraudulent practices detailed herein whose identities are presently unknown to Owens Corning but may be established after reasonable opportunity for further investigation and discovery.

## **FACTS**

### A.    Owens Corning, Asbestos and the National Settlement Program

15. Asbestos is a generic name given to a group of naturally occurring minerals often used in commercial applications to resist heat and corrosion. It is established that prolonged exposure to asbestos may cause diseases of the lungs and other organs, and that such diseases may not appear until years after exposure.

16. Prior to 1972, Owens Corning engaged in the manufacture and distribution of asbestos-containing products. Such manufacture and distribution has led to hundreds of thousands of asbestos-related personal injury claims against the Company, and these claims have ultimately forced the Company to seek reorganization under Chapter 11.

17. Prior to filing for reorganization, the Company attempted to address the flood of asbestos-related personal injury claims against it by implementing a National Settlement Program ("NSP"). The NSP was established via agreements with asbestos plaintiffs' law firms, and was intended to timely and accurately resolve asbestos-related personal injury claims with established procedures and fixed payments, without the attendant costs of litigating the claims in the civil justice system.

18. Payments to individual claimants under the NSP depended upon the type and severity of the asbestos-related disease contracted by the claimant. Payment was subject to evidence of a qualifying medical condition and exposure to Owens Corning products.

### B.    The Flood Of Non-Malignant Asbestos-Related Personal Injury Claims

19. Medical research has described asbestosis as a disappearing disease, and many pulmonology practices see no cases of the disease. This phenomenon is generally believed to arise from the fact that asbestos exposure has decreased dramatically since the passage of the Occupational Safety and Health Act (OSHA) in 1970.

20. Notwithstanding this decrease, the number of non-malignant asbestos-related personal injury claims grew exponentially in the 1990s and continues to surge. It is estimated that up to 90% of new asbestos claims are filed by individuals with little or no impairment, and that payments for non-malignant claims account for approximately 64% of the compensation paid to asbestos plaintiffs.

21. Consistent with these broader trends, the vast majority of the asbestos-related personal injury claims filed against Owens Corning prior to its Chapter 11 filing were from claimants with alleged asbestos-related impairment that was non-malignant.

22. As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Owens Corning was 238,133. Of these resolved claims, 93.5% were paid. The average settlement amount was $7,573.

23. As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Fibreboard was 254,326. Of these resolved claims, 88.5% were paid. The average settlement amount paid was $4,754.

24. Upon information and belief, the total amount Owens Corning has paid pre-petition to resolve non-malignant asbestos-related personal injury claims is in excess of $2.5 Billion.

C. **The Vast Majority Of Non-Malignant Claims Were Fraudulent**

25. It has been widely recognized by the legal and medical professions alike that asbestos litigation over the last decade has not been driven by the occurrence of bona fide asbestos-related disease—which is on the decline—but rather by for-profit litigation screening operations that aggressively solicit tens of thousands of new "victims" each year who do not have any compensable asbestos-related physical impairment.

26. Pulmonary x-rays are the principal medical diagnostic tool for identifying and documenting non-malignant asbestos-related disease for purposes of substantiating the existence of an asbestos personal injury claim and determining the amount for which a claim is settled, whether under the NSP, or independently of the NSP. A "positive" classification of an x-ray sufficient for compensation by an asbestos defendant usually means noting a parenchymal abnormality and indicating a small opacity profusion category of 1/0 or higher, according to standards promulgated by the International Labour Organization (ILO) for reading and scoring x-rays for asbestos-related injury.

27. "Screening" companies encourage workers to have free chest x-rays performed, even if they have no symptoms of any pulmonary impairment. Such companies actively solicit asymptomatic workers who may have been occupationally exposed to asbestos, touting: "You May Have Million Dollar Lungs." The screenings are usually done in mobile vans parked near union halls or in hotel parking lots.

28. These screening companies were set up by individuals generally lacking medical experience to create a mechanism for screening hundreds of thousands of workers who could claim to have been exposed to asbestos in the workplace. Screening companies have reportedly processed over one million workers, and account for the overwhelming majority of non-malignant claims filed to date.

29. "B-readers" (so called because they must pass part "B" of a test on x-ray interpretation) are typically physicians specially trained and certified to read and score pulmonary x-rays of workers alleged to have been exposed to asbestos. In order to obtain the credential of B-reader, physicians must undergo certification by the National Institute of Occupational Safety and Health (NIOSH), a division of the Centers for Disease Control (CDC).

30. Between 1994 and 1999 there were approximately 600 certified "B-readers" in the United States.

31. Of this pool of B-readers, however, only a handful were routinely consulted and asked by plaintiffs' lawyers to read and score thousands upon thousands of pulmonary x-rays for purposes of providing medical documentation of asbestos-related impairment to substantiate asbestos personal injury claims then submitted by plaintiffs' lawyers to asbestos defendants, including Owens Corning in this case. These B-readers developed reputations for systematically interpreting chest x-rays of asbestos claimants as positive for asbestos-related impairment in 90-100% of all cases.

32. The B-readers examine the x-rays after the fact, away from the patient and the testing site, and may not even be licensed to practice medicine in the state where the x-rays were taken. These physicians purport to be acting as litigation consultants and to be looking for x-ray evidence that is 'consistent with' asbestos-related disease. Some x-ray readers spend only minutes in making their findings and are paid hundreds of thousands of dollars in the aggregate for reading mass quantities of chest x-rays.

33. Upon information and belief, some claimants' x-rays are "shopped around" to a number of B-readers until one is found who will report a positive reading for asbestos-related injury sufficient to sustain a claim for compensation.

34. Rates of "positive" findings by these doctors have been as high as 90% according to some studies, and an audit of non-malignancy claims conducted by the Manville Personal Injury Trust (one of the largest asbestos claims processors) has shown that certain B-readers whose findings served as the basis for thousands of claims failed independent review more than 50% of the time. Given these findings, the Manville Trust now refuses to pay claims

based on medical evidence from certain laboratories and by physicians whose diagnostic record appeared medically unsound.

35. When B-readers interpret x-rays for asbestos-related disease, they know they are doing so for purposes of providing "independent" and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant, they know the cut off of 1/0 in the ILO system that generally qualifies for compensation from an asbestos defendant, and they receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an x-ray exhibits positive indications of asbestos-related injury than if they report it does not.

36. Two recent scientific studies have independently audited samples of B-reader x-ray reports and have revealed that the incidence of asbestos-related nonmalignant impairment reported by the Defendants named in this Complaint is totally inconsistent with available peer review literature and is medically and scientifically incredible.

D.  **Report of Dr. Gary K. Friedman**

37. Dr. Gary K. Friedman, a board-certified pulmonologist, was retained by Owens-Corning in 1999 to serve as a medical consultant to the NSP and thereafter continued to serve as a consultant to Owens Corning in the bankruptcy.

38. Dr. Friedman was chosen to consult to the NSP as an expert acceptable to both defendants and plaintiffs in connection with the review and analysis of asbestos-related claims. Dr. Friedman has testified at trial or in deposition in asbestos related cases on more than 60 occasions at the request of plaintiffs' counsel.

39. In 2002, Dr. Friedman submitted a report to Owens Corning to provide an estimate of the percentage of impaired nonmalignant claims under NSP criteria to be expected in the population of total future claims asserted against Owens Corning.

40. In connection with his report, Dr. Friedman reviewed 1691 past claims of nonmalignant asbestos-related injury against Owens Corning between 1994 and 1999. The cases were randomly selected from 22,578 nonmalignant claims submitted to the NSP under agreements where the B-readers had financial incentive to find indication of impairment. The case files Dr. Friedman reviewed contained analysis of chest x-ray reports, Pulmonary Function Test results (PFTs), and other data.

41. Dr. Friedman concluded that the actual incidence of impaired claims which might be attributable to asbestos in the studied sample of claims was between 8.16% and 10.46% and that the vast number of claims for nonmalignant asbestos disease could not be explained on medical epidemiologic, pathologic, or other scientific grounds.

42. Of the claims submitted for review, only 13.3% met minimal medical standards that had been agreed upon by Owens Corning and asbestos plaintiffs' law firms as a part of the NSP. In other words, over 87% of the nonmalignant claims studied were utterly unsupportable by medical evidence.

43. Of the 1,691 cases Dr. Friedman studied, 772 (46%) had been reviewed by the Defendant, Dr. Raymond Harron, 229 were reviewed by the Defendant, Dr. Jay Segarra, 87 were reviewed by the Defendant Dr. Philip H. Lucas, and 60 were reviewed by the Defendant Dr. James W. Ballard. These four physicians provided the medical documentation for the majority of the 1,691 randomly-sampled claims that Dr. Friedman reviewed.

9

44. Dr. Friedman concluded that the x-ray readings recorded by the Defendants differed significantly from what would be anticipated by a randomly selected panel of reliable B-readers nationwide and yielded results which were not even consistent with the spectrum of nonmalignant asbestos related diseases identified within the peer review literature authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts.

45. Peer review studies consistently show that pleural disease (of the tissue that lines the outside of the lung and the inside of the rib cage) is more prevalent than pulmonary asbestosis in a variety of exposure settings. However, as Dr. Friedman found, none of the Defendants identified more "pleural only" cases than pulmonary asbestosis. Of the 1691 cases reviewed, only 124 "pleural only" cases were identified, a result that fundamentally contradicts the peer review literature. In the medical reports generated by Defendants, the ratio of pulmonary asbestosis to "pleural only," the far more prevalent type, was 47 to 1. In the remaining reports submitted by over 40 other B-readers and physicians, the ratio of pulmonary asbestosis to "pleural only" was 2 to 1.

46. Defendants demonstrated medically unsound idiosyncrasies and propensities in diagnosing asbestos-related injury. For instance, several defendants repeatedly found that all six lung zones were involved in a low-profusion x-ray with no pleural change, an extremely rare finding according to peer review literature.

E. **Report of Dr. Joseph N. Gitlin**

47. Dr. Friedman's report was followed more recently in 2004 by the results of a study conducted by Dr. Joseph Gitlin et al. published in the Journal of Academic Radiology of the Johns Hopkins University Department of Radiology. The study reviewed a sample of 551 chest x-rays that were read as positive for asbestos-related impairment by initial B-readers. Six

consultants in chest radiology and also certified B-readers were asked to reinterpret the x-rays independently and without knowledge of their provenance.

48. Whereas initial B-readers had diagnosed asbestosis in 95.9% of the studied cases, the six consultants classified the same x-ray films as positive in only 4.5% of the cases. As Gitlin concluded, the magnitude of the difference between the interpretations by initial readers and the six consultants is simply too great to be attributed to good faith inter-observer variability.

49. Compared with the consultant readers, the initial B-readers were 9.2 times more likely to conclude that pleural abnormalities consistent with asbestos-exposure were visible in the x-rays.

50. There is no support in the literature on x-ray studies of workers exposed to asbestos or other mineral dusts for the high level of positive findings recorded by the initial B-readers in the Gitlin study.

51. Almost two-thirds of the claimants who's x-rays were studied in the Gitlin report are plaintiffs who have filed claims against Owens Corning.

52. The initial B-readers studied in the Gitlin report included Defendant Dr. Jay T. Segarra, Defendant Dr. James W. Ballard, Defendant Dr. Phillip H. Lucas, and Defendant Dr Ray A. Harron.

### FIRST CLAIM FOR RELIEF
### (COMMON LAW FRAUD)

53. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 52 above as if fully set forth herein.

11

54. As described above, Defendants made false and fraudulent representations of fact by reporting false positive indications of asbestos-related impairment in the x-rays of personal injury claimants who in fact had no asbestos-related impairment.

55. At the time Defendants made such false and fraudulent representations of fact, Defendants were aware, or were reckless in failing to be aware, of the falsity of such representations.

56. The false reports Defendants generated were meant to be professional, independent, and authoritative, based on specialized medical training. Owens Corning reasonably and justifiably relied on Defendants' reports of asbestos-related impairment in settling and paying asbestos personal injury claims.

57. Until such time as the results of independent medical expert studies revealed that the Defendant B-readers' x-ray reports could not possibly be accurate, Owens Corning had no reason to discover, and could not have discovered, that it was the victim of a widespread fraud.

### SECOND CLAIM FOR RELIEF
### (NEGLIGENT MISREPRESENTATION)

58. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 57 as if fully set forth herein.

59. As described above, Defendants made false and misleading representations of fact by reporting false positive indications of asbestos-related impairment in the x-rays of personal injury claimants who in fact had no asbestos-related impairment.

60. At the time Defendants made these misrepresentations, they either knew of the falsity of the misrepresentations or ought to have known that the representations were false and failed to make diligent efforts to ensure their reliability.

12

61. Defendants made these misrepresentations knowing that they would serve as the basis for Owens Corning to settle and pay asbestos-related claims, and generated reports with the intent to induce both claimants and Owens Corning to act upon them.

62. Given Defendants' status as federally-licensed B-readers whose reports were supposed to be independent and credible, Plaintiffs justifiably relied on Defendants' false and misleading reports and suffered injury as a result of Defendants' negligence.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in its favor and against the Defendants for compensatory damages in an amount to be determined at trial, and interest and the costs and disbursements of this action, including fees and reasonable attorneys' fees, against the Defendants, jointly and severally; and such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
      [      ]

DEBEVOISE & PLIMPTON LLP

By _____
Roger E. Podesta
919 Third Avenue
New York, New York 10021
(212) 909-6000

Special Counsel for Owens Corning