**EXHIBIT 1**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
--------------------------------------------------------------x
                                          :
IN RE                                     :      Chapter 11
                                          :
OWENS CORNING, et al.,                    :      Case Nos. 00-3837 to 3854 (JKF)
                                          :      (Jointly Administered)
                                          :
                              Debtors.  :        Hearing Date: February 28, 2005 at 10:00 a.m.
                                          :      Obj. Deadline: February 11, 2005 at 5:00 p.m.
                                          :
--------------------------------------------------------------x
```

**MOTION OF CREDIT SUISSE FIRST BOSTON, AS AGENT, FOR**
**ORDER AUTHORIZING IT TO COMMENCE AN ADVERSARY PROCEEDING ON**
**BEHALF OF THE DEBTORS' ESTATES AGAINST CERTAIN**
**PHYSICIANS WHO FALSELY REPORTED X-RAY READINGS**
**AS POSITIVE FOR ASBESTOS-RELATED IMPAIRMENT**

**TO:    THE HONORABLE JUDITH K. FITZGERALD,**
**UNITED STATES BANKRUPTCY JUDGE**

Credit Suisse First Boston ("CSFB"), as Agent for the prepetition bank lenders to Owens Corning and certain of its subsidiaries, respectfully moves this Court, for an order, in the form attached hereto as Exhibit A, authorizing CSFB to commence an adversary proceeding (the "Adversary Proceeding") on behalf of the estates of the above-captioned debtors and debtors in possession (the "Debtors") against certain physicians who falsely reported chest radiograph (x-ray) readings as positive for asbestos-related disease in personal injury claims when, in fact, the claimants had no compensable asbestos-related impairment, resulting in the Debtors paying billions of dollars to settle asbestos-related injury claims that had no medical basis. A proposed complaint is attached hereto as Exhibit B. [1]

---

[1]    As this Court may know, CSFB has filed currently herewith a motion to withdraw the reference to the Bankruptcy Court with respect to this Motion.

DKT. NO. 14180
DT. FILED 1-12-2005

## PRELIMINARY STATEMENT

1.    Recent expert reports (including one commissioned by the Debtors themselves) have indicated that a small number of medical doctors specially trained and certified in the reading of x-rays, known as B-readers, have accounted for a dramatically disproportionate number of non-malignant asbestos personal injury claims filed against the Debtors and have routinely and systematically over-diagnosed non-malignant asbestos-related disease in support of such claims. These false x-ray readings were used to substantiate thousands of personal injury claims settled and paid by the Debtors prior to the filing of the Chapter 11 bankruptcy petition, resulting in injury to the Debtors and their creditors in excess of $1.5 Billion – including those individuals with legitimate asbestos-related personal injury claims.

2.    Based on these facts, CSFB seeks permission from the Court to bring claims for fraud and negligent misrepresentation against these B-readers on behalf of the Debtors' estates. CSFB has made a written demand upon Owens Corning that it commence its own adversary proceeding against the B-readers, which was refused. *See* Exhibit C (demand letter dated December 20, 2004). The United States Court of Appeals for the Third Circuit has approved the practice of allowing creditors to sue derivatively on behalf of debtors that refuse to prosecute colorable claims to recover property for the benefit of the estate. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003). The Court should grant CSFB derivative standing to initiate the Adversary Proceeding on behalf of the Debtors' estates because there is a strong basis for the proposed claims against the B-readers and the Adversary Proceeding represents a potentially significant source of money for the Debtors' estates. In addition, the syndicate of lenders represented by CSFB is willing to bear the costs of pursing the Adversary Proceeding (while reserving the right to seek reimbursement of reasonable

2

attorneys' fees and costs incurred in pursuing the Adversary Proceeding as a substantial contribution pursuant to 11 U.S.C. § 503(b)(3)-(4), as well as the right to discontinue the suit upon notice to the Debtors), thereby eliminating any significant risk or net cost to the estates in granting this Motion.

**VENUE/JURISDICTION**

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  While the underlying suit sought to be brought is a non-core proceeding, this Motion involves both core and non-core issues pursuant to 28 U.S.C. § 157(b)(2).

**FACTUAL/PROCEDURAL BACKGROUND**

**I.      GENERAL BACKGROUND**

4.      Medical research has described asbestosis as a "disappearing disease."[2]  While asbestos exposure has decreased dramatically since the passage of the Occupational Safety and Health Act (OSHA) in 1970,[3] the number of non-malignancy asbestos personal injury claims grew exponentially in the 1990s.[4]

5.      A growing body of research and literature provides an answer to this disparity: a large percentage of the claims are fraudulent.  The Rand Institute estimates that as of 2002 up to

---

[2]     W. Raymond Parkes, *Occupational Lung Disorders* (3d ed. 1994) at 464-78; Report of Professor Lester Brickman, In re Owens Corning, et al. (October 15, 2004) at 11.

[3]     Mark Reeves, *Makes sense to me: How Moderate, Targeted Tort Reform Legislation Could Solve the Nation's Asbestos Litigation Crisis*, 59 Vand. L. Rev. 1949, 1960 (2003); *see also* Stephen J. Carroll *et al.*, RAND Institute for Civil Justice, *Asbestos Litigation Costs and Compensation: An Interim Report* (2002) at vi.

[4]     Mark A. Peterson, Report on Owens Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims as of October 2000 (October 15, 2004) at 18.

90% of new asbestos claims were filed by individuals with little or no impairment.[5]  Non-

malignant claims accounted for approximately 64% of the compensation paid to asbestos

plaintiffs as of 2002.[6]  A 2003 Report of the American Bar Association Commission on Asbestos

Litigation ("ABA Asbestos Commission Report") explains:

> [In the 1990s] for-profit litigation screenings began systematically generating tens of
> thousands of new non-malignant claims each year by individuals who had some degree of
> occupational asbestos exposure, but did not have, and probably would never get an
> impairing asbestos-related disease. These individuals may or may not have markings on
> lung x-rays "consistent with" exposure to asbestos (and dozens of other possible causes)
> but do not, and may never, experience any symptoms of asbestos disease or develop any
> asbestos-related conditions that would impair or affect their life or daily functions.

American Bar Ass'n Commission on Asbestos Litigation (Feb. 2003) at 6.

6.     At the core of the so-called "entrepreneurial" model of asbestos litigation is the

mass recruitment of plaintiffs through "screenings" sponsored by plaintiffs' law firms in

collaboration with "for profit" litigation screening companies.[7]  These screening companies were

set up by individuals generally lacking medical experience to create a mechanism for screening

hundreds of thousands of workers who could claim to have been exposed to asbestos in the

workplace.  Screening companies have reportedly "processed" over one million workers, and

account for the "overwhelming majority of non-malignant claims" filed to date.[8]

7.     The ABA Asbestos Commission has found that such companies actively solicit

asymptomatic workers who may have been occupationally exposed to asbestos to have free chest

x-rays.  The companies' mass mailings tout: "You May Have Million Dollar Lungs" and urge

---

[5]     Stephen J. Carroll *et al.*, *Asbestos Litigation Costs and Compensation* at 40, 65.

[6]     *Id.* at 65.

workers to be screened even if they are not sick and exhibit no symptoms. The screenings are usually done in mobile vans parked near union halls or in hotel parking lots.[9]

8.     To read and interpret the volumes of x-rays taken by screening companies, plaintiffs' lawyers retain "B-readers," radiologists and pulmonologists certified by the National Institute for Occupational Safety and Health (NIOSH), a division of the Centers for Disease Control. The "B-reader" designation denotes the highest certification available for physicians trained in the use of the International Labour Organization System for classifying x-rays for the presence of dust-related lung conditions, including asbestos exposure injuries.

9.     While it is estimated that there are over 600 B-readers in the United States, only a small percentage of these radiologists (approximately 5%) are routinely selected by plaintiffs' counsel to read and interpret screening results.[10] The B-readers examine the x-rays after the fact, away from the patient and the testing site, and may not even be licensed to practice medicine in the state where the x-rays were taken. Some workers' x-rays are reportedly "shopped around" to a number of B-readers until one is found who will report a positive reading for asbestos-related injury sufficient to sustain a claim for compensation. As the ABA Report indicates, these x-ray

---

[7]     David Egilman, *Asbestos Screenings*, 42 Am. J. of Indus. Med. 163 (2002); Report of Professor Lester Brickman, *In re Owens Corning, et al.* (October 15, 2004) (No. 13004) at 7-8. According to the Brickman Report, the entrepreneurial model differs from the traditional model of toxic tort litigation whereby a potential plaintiff sees a doctor to treat his illness and is then referred to a lawyer. Under the entrepreneurial model, the order is reversed: it is the lawyer that recruits the plaintiff, and sends him to a screening company for an x-ray.

[8]     Brickman Report at 8.

[9]     *Id.* at 8; American Bar Ass'n Commission on Asbestos Litig. (Feb. 2003), 8.

[10]    Brickman Report at 10.

readers spend only minutes in making their findings and are paid hundreds of thousands of dollars in the aggregate for reading mass quantities of chest x-rays.[11]

10.    When B-readers interpret x-rays for asbestos-related disease, they know they are doing so for purposes of providing "independent" and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant. They are also well aware of the cut-off of "1/0" in the ILO system that generally qualifies for compensation from an asbestos defendant, and often receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an x-ray exhibits positive indications of asbestos-related injury than if they report it does not.

11.    It has emerged that the B-reader reports used to substantiate asbestos-related claims often lack a sound scientific basis and are bereft of credibility. Rates of "positive" findings by certain doctors have been as high as 90% according to some studies, and an audit of non-malignancy claims conducted by the Manville Personal Injury Trust (one of the largest asbestos claims processors) has shown that certain B-readers whose findings served as the basis for thousands of claims failed an independent peer review more than 50% of the time.[12] Given these findings, the Manville Trust now refuses to pay claims based on medical evidence from certain laboratories and physicians whose diagnostic records are medically unsound.[13]

---

[11]    ABA Asbestos Commission Report at 8.

[12]    Griffin B. Bell, Asbestos Litigation and Judicial Leadership: *The Courts' Duty to Help Solve the Asbestos Litigation Crisis*, NLCPI, Vol. 6 (June 2002) at 7; ABA Asbestos Commission Report at 8.

[13]    Eddie Curran, "Diagnosing for Dollars?," *Mobile Register* (April 4, 2004).

## II.    THE DEBTORS HAVE BEEN VICTIMIZED BY THE FRAUD

12.    In 1998, in an attempt to address an ever-increasing flood of new asbestos personal injury claims, Owens Corning implemented a National Settlement Program ("NSP") to resolve such claims through settlement agreements with individual plaintiffs' law firms. Fibreboard also entered into an NSP. The NSP agreements established procedures and fixed payments for resolving, without litigation, valid asbestos-related personal injury claims against Owens Corning and Fibreboard. Payments to individual claimants under the NSP depended upon the type and severity of the asbestos-related disease contracted by the claimant and were subject to delivery of evidence of a qualifying medical condition and exposure to Owens Corning's or Fibreboard's products.

13.    The medical reports generated by a handful of B-readers provided the basis for confirming an asbestos plaintiff's medical condition and exposure to asbestos-containing products for purposes of the NSP agreements. Through recent scientific studies, most notably, the reports of Dr. Gary Friedman and Dr. Joseph Gitlin, as well as growing peer-reviewed literature, it has become increasingly evident that many of the 492,459 non-malignancy asbestos personal injury claims paid by Owens Corning and Fibreboard under their NSPs between 1990-2000 had no legitimate medical basis. As Owens Corning paid approximately $1.68 Billion to settle non-malignant claims prepetition, and Fibreboard paid approximately $1.06 Billion, the extent of the fraud would implicate more than a billion dollars.[14]

---

[14]    These figures are taken from the October 15, 2004 Mark A. Peterson Report on Owens Corning and Fibreboard Projected Liabilities for Asbestos Personal Injury Claims as of October 2000. According to Peterson, 238,133 non-malignancy claims were resolved by Owens Corning pre-petition, for an average settlement price of $7,573 and 93.5% of these claims were paid. That would net a total universe of potentially fraudulent non-malignancy claims paid by Owens Corning pre-petition of approximately $1.68 Billion.

A.    **The Friedman Report**

14.    Dr. Gary K. Friedman, a board-certified pulmonologist, was retained by Owens

Corning in 1999 to serve as a medical consultant to the NSP and thereafter continued to serve as

a consultant to Owens Corning in the bankruptcy.  In 2002, Dr. Friedman submitted a report to

Owens Corning to provide an estimate of the percentage of impaired nonmalignant claims under

NSP criteria to be expected in the population of total future claims asserted against Owens

Corning.

15.    As a part of his study, Dr. Friedman analyzed medical reports of 1,691 past claims

of nonmalignant asbestos-related injury against Owens Corning between 1994 and 1999. The

cases were randomly selected from 22,578 nonmalignant claims submitted to the NSP under

agreements where the B-readers had financial incentive to find indication of impairment.  The

case files Dr. Friedman reviewed contained analysis of chest x-ray reports, Pulmonary Function

Test results (PFTs), and other data.

16.    Dr. Friedman determined that of the sampled claims, only 13.3% met NSP criteria

as impaired.[15]  In other words, over 86% of the nonmalignant claims studied were unsupportable

by medical evidence.  Moreover, Dr. Friedman found that the incidence of impaired claims

which might be attributable to asbestos were between 8.16% and 10.46%, and concluded that the

vast number of claims for nonmalignant asbestos disease could not be explained on medical,

---

See Peterson Report at 9.  Similarly, Peterson estimates that 254,326 claims against
Fibreboard had been resolved at an average settlement rate of $4,754. He also estimates
that 88% of the claims were paid, meaning that damages to Fiberboard could amount to
$1.06 Billion. See id. at 31.

[15]    Expert Report of Dr. Gary K. Friedman (2002) at 33.

epidemiologic, pathologic, or other scientific grounds.[16]  The credibility of the initial B-readers' reports was further weakened by Dr. Friedman's observation that although there were approximately 600 certified B-readers in the United States at the time these reports were generated, only five radiologists were responsible for over 80% of the readings reviewed in the study.[17]  Of the 1,691 cases Dr. Friedman studied, 772 (46%) had been reviewed by the proposed defendant Dr. Raymond Harron, 229 were reviewed by the proposed defendant Dr. Jay Segarra, 87 were reviewed by the proposed defendant Dr. Philip H. Lucas, and 60 were reviewed by the proposed defendant Dr. James W. Ballard.  These four physicians provided the medical documentation for the majority of the 1,691 randomly-sampled claims that Dr. Friedman reviewed.

17.    Dr. Friedman concluded that the x-ray readings recorded by the proposed defendants differed significantly from what would be anticipated by a randomly-selected panel of B-readers nationwide and yielded results which were not even consistent with the spectrum of nonmalignant asbestos-related diseases identified within the peer-reviewed literature authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts.  For example, peer-reviewed studies consistently show that pleural disease (abnormality of the tissue that lines the outside of the lung and the inside of the rib cage) is more prevalent than pulmonary asbestosis in a variety of exposure settings.  However, as Dr. Friedman found, none of the proposed defendants identified more "pleural only" cases than pulmonary asbestosis.  Of the 1,691 cases reviewed, only 124 "pleural only" cases were identified, a result that is fundamentally inconsistent with the peer-reviewed literature.  In the medical reports generated by the proposed

---

[16]    *Id.* at 13, 35.

[17]    *Id.* at 11.

defendants, the ratio of pulmonary asbestosis to "pleural only" disease (the far more prevalent type), was 47 to 1. In the remaining reports submitted by over 40 other B-readers and physicians, the ratio of pulmonary asbestosis to "pleural only" disease was 2 to 1. In addition, the proposed defendants demonstrated medically unsound idiosyncrasies and propensities in diagnosing asbestos-related injury. For instance, several proposed defendants repeatedly found that all six lung zones were involved in a low-profusion x-ray with no pleural change, an extremely rare occurrence according to peer-reviewed literature.

**B.    The Gitlin Report**

18.    Dr. Friedman's report was followed more recently in 2004 by the results of a study conducted by Dr. Joseph Gitlin published in the Journal of Academic Radiology of the Johns Hopkins University Department of Radiology.[18]  The study reviewed 492 chest x-rays that were read as positive for asbestos-related impairment by initial B-readers. Six consultants in chest radiology and certified B-readers were asked to reinterpret the x-rays independently and without knowledge of their provenance.

19.    Whereas initial B-readers had diagnosed asbestosis in 95.9% of the studied cases, the six consultants classified the same x-ray films as positive in only 4.5% of the cases. As Gitlin concluded, the sheer magnitude of the difference between the interpretations by initial readers and the six consultants is simply too great to be attributed to good-faith inter-observer variability. Compared with the consultant readers, the initial B-readers were 9.2 times more likely to conclude that pleural abnormalities consistent with asbestos exposure were visible in the x-rays.

20.     Almost two-thirds of the claimants whose x-rays were studied in the Gitlin report are plaintiffs who have filed claims against Owens Corning. The initial B-readers studied in the Gitlin report included proposed defendants Dr. Jay T. Segarra, Dr. James W. Ballard, Dr. Phillip H. Lucas, and Dr. Ray A. Harron. When the results are aggregated, these radiologists, identified in both the Friedman and Gitlin reports, are virtually certain to have submitted x-ray reports that were fraudulent.

## III.     THE DEBTORS HAVE REFUSED TO INITIATE SUIT AGAINST THE B-READERS

21.     On December 20, 2004, CSFB delivered a letter to Owens Corning (attached hereto as Exhibit C), which explained the apparent wrongdoing by the B-readers and demanded that the Debtors initiate their own suit. The letter enclosed a draft complaint in the Debtors' name against the B-readers and informed Owens Corning of CSFB's intention to file the present Motion if it did not receive a response by January 3, 2005. Owens Corning has proven unwilling to prosecute the proposed suit, prompting CSFB to file the present motion.

## RELIEF REQUESTED

22.     By this Motion, CSFB seeks authorization to initiate the Adversary Proceeding against the B-readers to pursue certain claims and causes of action. A proposed form of order is attached hereto as Exhibit A.

---

[18]     Joseph N. Gitlin *et al.*, *Comparison of B-Readers Interpretations of Chest Radiographs For Asbestos Related Changes*, 11 J. Acad. Radiol. 843 n.8 (2004).

## ARGUMENT

### I.    CSFB SHOULD BE GRANTED DERIVATIVE STANDING

23.    CSFB seeks permission from the Court to initiate an adversary proceeding against the B-readers on behalf of the Debtors' estates. The United States Court of Appeals for the Third Circuit has held that it is "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate." *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003).

24.    The *Cybergenics* decision arose in the context of a creditors' committee's standing to pursue a fraudulent conveyance action under 11 U.S.C. § 544(b). *Id.* at 552. Other courts have extended *Cybergenics* to encompass derivative suits under other provisions of the Bankruptcy Code. *See, e.g., In re Valley Media, Inc.*, No. 01-11353, 2003 WL 21956410, at *2 (Bankr. D. Del. Aug. 14, 2003) ("nothing in [*Cybergenics*] suggest[s] that a creditors' committee's derivative standing should be any different in the context of a § 542(a) turnover action or a §547(b) preference action"). Moreover, the *Cybergenics* decision applies equally to allow a derivative suit by an individual creditor, as opposed to a creditors' committee. *Infinity Investors Ltd. v. Donald Kingsborough (In re Yes! Entertainment Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) ("[a]lthough the Third Circuit discussed creditors' committees specifically, the Court is persuaded that its decision is applicable here [to a creditor].").

### A.    CSFB Has Met The Standard For Derivative Standing

25.    In granting a motion for derivative standing, a recent decision in the District Court for the District of Delaware sets out the factors to be considered: whether "(1) the trustee unjustifiably refuses a demand to pursue the action; (2) the creditor establishes a colorable claim or cause of action; and (3) the creditor seeks and obtains leave from the bankruptcy court to

12

prosecute the action for and in the name of the trustee." *Yes! Entertainment*, 316 B.R. at 144

(applying the above legal requisites of derivative standing *de novo* on appeal and reversing and

reinstating the action before the Bankruptcy Court.); *Valley Media*, 2003 WL 21956410, at *2

(cited in *Yes! Entertainment*); *see also Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) ("If a

trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a

creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in

place of, and in the name of, the trustee.").

### 1.    The Debtors Have Unjustifiably Refused To Prosecute An Action

26.    On December 20, 2004, CSFB delivered a letter to Owens Corning setting forth

CSFB's position that the Debtors have claims for fraud and negligent misrepresentation against

the B-readers which, if successful, would result in significant recovery to the Debtors' estates

and their creditors. *See* Exhibit C. CSFB gave Owens Corning a full two weeks to consider the

demand, and stated its intention to file the present Motion if the Debtors did not agree by that

date to file their own complaint against the B-readers by January 18, 2005. CSFB also attached a

draft complaint in the Debtors' name. On December 27, 2004, Owens Corning suggested a

meeting with counsel for CSFB to discuss a potential suit by the Debtors against the B-readers.

Counsel for CSFB agreed to discuss the suit in a meeting on January 4, 2005. At the conclusion

of the January 4 meeting, Owens Corning agreed to consider pursuing a cause of action against

the B-readers. On January 10, 2005, Owens Corning informed counsel for CSFB that it was

refusing to pursue a cause of action against the B-readers on its own behalf, and would not

consent to CSFB's offer to pursue the Adversary Proceeding derivatively, despite CSFB's offer

to bear the costs of pursuing the suit.

13

27.    As set forth in detail below, the Debtors' refusal to prosecute an action against the B-readers is unjustified.  The proposed claims against the B-readers are well-grounded in fact and law, and could result in significant recovery to the Debtors' estates.  Courts have held that the refusal to pursue a viable claim that would benefit the estate is itself an unjustified refusal.  For example, the court in *In re Newcorn Enters. Ltd.,* 287 B.R. 744 (Bankr. E.D. Mo. 2002), granted the creditors' committee's motion for derivative standing to file an adversary complaint under 11 U.S.C. § 544(a), holding that "[t]he existence of the Committee's unpursued colorable claim which would benefit the estate is sufficient to meet the Committee's burden to show that the inaction was unjustified." 287 B.R. at 750.  Likewise, the U.S. Court of Appeals for the Fifth Circuit also addressed the meaning of "unjustified" refusal in *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988), holding:

> [I]n determining whether a debtor-in-possession's refusal was unjustified, we must look to whether the interests of creditors were left unprotected as a result.  As the interests of creditors are imperiled where valid and profitable state law causes of action are neglected by the debtor-in-possession, the unjustified refusal calculus will generally amount to little more than a cost-benefit analysis.

*Id.* at 253 n.20 (citations omitted); *see also Canadian Pac. Forest Prods., Inc. v. J.D. Irving, Ltd. (In re The Gibson Group)*, 66 F.3d 1436, 1445 (6th Cir. 1996) (citing *Louisiana World Exposition* with approval).

## 2.    CSFB Has Alleged Colorable Claims Against The B-Readers

28.    CSFB, standing in the shoes of the Debtors, has alleged colorable claims against the B-readers.  "Because the [creditor] is not required to present its proof, the [colorable claim] inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *In re G-I Holdings, Inc.*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004) ("The colorable claim element of the derivative standing test requires the Court to decide whether the

Committee has asserted claims for relief that on appropriate proof would support a recovery.") (quotations omitted); *see also Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) ("[the] bare-bones facts state, at least, a colorable claim . . . [even if] there may be adequate defenses which come to light when answers to the Complaint are filed . . ."); *In re iPCS, Inc.*, 297 B.R. 283, 291-92 (Bankr. N.D. Ga. 2003) (stating a claim is colorable if the claim would survive a motion to dismiss for failure to state a claim). As such, the Court "must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts," and the motion for derivative standing should be granted unless it appears beyond doubt that CSFB can prove no set of facts in support of its claim which would entitle it to relief. *G-I Holdings*, 313 B.R. at 631.

29.     CSFB has alleged colorable claims of fraud and misrepresentation against the B-readers. A cause of action for fraud generally requires a showing that defendants falsely represented (or concealed where there was a duty to disclose) material facts with knowledge or recklessness, and such representation or concealment induced plaintiff to take action in reasonable reliance upon the misrepresentation, causing plaintiff to suffer damages as a result. *Stephenson v. Capano Development*, 462 A.2d 1069, 1074 (Del. 1983) ("At common law, fraud . . . consists of: 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance."); *Kronenberg v. Katz*, No. 19964, 2004 WL 1152282, at *13 (Del. Ch. May 19, 2004) (same).

30.     A cause of action for negligent misrepresentation is identical to a cause of action for fraud, except that a less culpable state of mind is required:  defendants must have made the misrepresentation without knowledge as to its truth or falsity, or made the representation under circumstances in which they ought to have known of its falsity. *Id.* at *13.

31.     The Friedman and Gitlin reports discussed above (and the draft complaint attached hereto as Exhibit B) identify a specific group of radiologists who are virtually certain to have submitted x-ray reports claiming asbestos-related disease, when, in fact, there was no compensable injury.  From the magnitude of misdiagnoses, it can be inferred that the B-readers knew the diagnoses were false, or at a bare minimum, that the B-readers made the diagnoses without knowledge as to their truth or falsity or under circumstances in which they ought to have known of their falsity.  These misdiagnoses were obviously material, as they allowed asbestos claimants to recover sums from the Debtors that they were not legitimately due.  The Debtors' reliance on these reports was justifiable, given each B-reader was certified by a federal agency (the National Institute for Occupational Health and Safety, a division of the Centers for Disease Control).

**B.     Initiation Of An Adversary Proceeding Would Be In The Best Interest Of The Debtors' Estates**

32.     While *Yes! Entertainment* held that a creditor need only demonstrate an unjustified refusal by the debtor upon demand and the existence of a colorable claim to obtain bankruptcy court permission to pursue an action on behalf of the debtor, 316 B.R. at 145, other courts have further considered whether "an action asserting such claim(s) is likely to benefit the reorganization estate." *Unsecured Creditors Comm. of Debtor STN Enter. v. Noyes* (*In re STN Enter.*), 779 F.2d 901, 905 (2d Cir. 1985); *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir.

2001) (claim must be in the "best interest" of the estate). Here, it is clear that the commencement of a lawsuit against the B-readers is, in fact, in the best interest of the Debtors' estates.

33.    The "best interest" inquiry essentially asks whether the relative potential benefits outweigh the costs of prosecuting causes of action for the benefit of the estate. *STN Enters.*, 779 F.2d at 906 (bankruptcy court must "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce"); *Nat'l Forge*, 304 B.R. at 223 ("The Court has had ample opportunity to serve the role as 'gatekeeper' in this case to weigh the potential benefit of the litigation against the costs that might be incurred.").

34.    As CSFB is willing to fund the cost of prosecuting a claim against the B-readers on behalf of the Debtors' estates, there will be essentially no cost to the Debtors' estates if the lawsuit does not result in recovery, and a net benefit if the lawsuit does result in recovery. *STN Enters.*, 779 F.2d at 905-06 ("Of course, if the [creditor bringing the action] represents that its fee arrangement with its attorney will in no event impose a net burden on the bankruptcy estate (because the [creditor] will pay the fee and seek reimbursement only out of any recovery), the [] inquiry can be limited to ascertaining whether the proposed lawsuit has a colorable basis on which to proceed.").

35.    Moreover, the initiation of the Adversary Proceeding against the B-readers would not delay confirmation of the Debtors' Plan of Reorganization. The claims against the B-readers could be assigned to a post-confirmation Litigation Trust, which would distribute any proceeds to the beneficiaries of such a trust as designated in the Plan.

36.    CSFB is confident that the Adversary Proceeding will result in the inurnment of significant monies to the Debtors' estates, and reserves the right to seek reimbursement of reasonable attorney's fees and costs incurred in prosecuting the Adversary Proceeding from such proceeds pursuant to Sections 503(b)(3)-(4) of the Bankruptcy Code.  11 U.S.C. §503(b)(3)(D) (the Court may reimburse "the actual, necessary expenses" of a creditor "in making a substantial contribution in a case under chapter . . . 11 of this title"); 11 U.S.C. § 503(b)(4) ("reasonable compensation for professional services rendered by an attorney" may be paid); *see also Lebron v. Mechem Fin., Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) ("in determining whether there has been a substantial contribution pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors") (quotations and alterations omitted).

37.    Since the Banks are undertaking the cost of litigating the suit, CSFB also reserves the right to discontinue the Adversary Proceeding at any time, subject to reasonable notice to the Debtors and the opportunity to take over the suit.

## CONCLUSION

All the grounds requisite for granting derivative standing exist: There is a colorable claim in favor of the estate, which is not being pursued, and in respect of which CSFB is willing to take the risk of funding. There is no cognizable rationale for not allowing this potential benefit to the estate to be prosecuted. As such, CSFB respectfully requests entry of an order granting the relief requested herein and such further relief as the Court deems just and proper. A proposed form of order is attached hereto as Exhibit A.

Dated: January 12, 2005

LANDIS RATH & COBB LLP

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Tel: (302) 467-4400
Fax: (302) 467-4450

*Attorneys for Credit Suisse First Boston, as Agent*

OF COUNSEL:

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Tel: (212) 455-2000
Fax: (212) 455-2502

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
 **DISTRICT OF DELAWARE**

-----------------------------------------------------------------x

In re:                                                    :

**OWENS CORNING**, et al.,                                :
                                                          :
                                 Debtors.                 : **Chapter 11**
                                                          :
                                                          : **Case Nos.: 00-3837 through 00-3854**
                                                          :
                                                          :
                                                          :
                                                          :
                                                          :
_____                  :
                                                          :
**CREDIT SUISSE FIRST BOSTON**, as Agent for  :
Lenders to Owens Corning and its Affiliates,              :
derivatively on behalf of Owens Corning,                  :
                                                          :
                                 Plaintiff,               :
                                                          :  Adv. Proc. ____
                -against-                                 :
                                                          :
                                                          :
                                                          : **JURY TRIAL DEMANDED**
**RAYMOND A. HARRON,** Jay T. Segarra, James :
W. Ballard, Philip H. Lucas, and John Does               :
Physicians 1 through 100,                                 :
                                                          :
                                 Defendants.              :
                                                          :
-----------------------------------------------------------------x

## COMPLAINT

      Credit Suisse First Boston, as Agent for the pre-petition institutional lenders to

Owens Corning and certain of its affiliates, Debtors-In-Possession in the above-captioned

Chapter 11 cases ("Debtors," "Owens Corning" or "Company"), by and through its undersigned

counsel, alleges as and for its Complaint the following on information and belief:

## NATURE OF THE ACTION

1.     This action asserts claims for fraud and negligent misrepresentation against physicians who falsely reported chest radiograph (x-ray) readings as positive for asbestos-related disease when, in fact, the readings showed no compensable injury. These false reports—which came from medical doctors who were specially trained and certified in the reading of x-rays—resulted in Owens Corning paying Billions of dollars to "settle" asbestos-related personal injury claims against the Company that had no medical basis and should never have been filed.

2.     Recent scientific studies indicate that the individual physicians named herein as Defendants have accounted for a dramatically disproportionate number of asbestos personal injury claims filed against the Debtors and have routinely and systematically over-diagnosed non-malignant asbestos-related physical impairment in support of such claims.

3.     These false reports of asbestos-related injury were used to substantiate thousands of personal injury claims that Owens Corning settled and paid prior to filing a voluntary Chapter 11 bankruptcy petition on October 5, 2000, all to the great injury of the Company and its legitimate creditors—including those individuals with legitimate asbestos-related personal injury claims.

4.     Plaintiffs are creditors of Owens Corning and now seek relief derivatively on behalf of the estate of the Debtors who have neglected and refused to bring this lawsuit for themselves.

## JURISDICTION AND VENUE

5.     Jurisdiction over this adversary proceeding exists under 28 U.S.C. §§ 157, 1334, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

6.    This matter is related to a pending case under Title 11, but it is a non-core proceeding as defined by 28 U.S.C. § 157.  Credit Suisse First Boston, as Agent, does not consent to entry of final orders or judgment by the Bankruptcy Judge.

7.    This matter involves significant non-bankruptcy issues, including the adjudication of tort law claims under state law.  Further, Credit Suisse First Boston, as Agent, demands a trial by jury to all claims to which it is so entitled, and does not consent to a jury trial by the Bankruptcy Court pursuant to 28 U.S.C. § 157(e).

8.    Venue in this Court is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    Credit Suisse First Boston, as Agent, has standing to bring these claims on behalf of the estate of the Debtors, as authorized by Order of the Bankruptcy Court, dated _____ (insert order granting standing).

## PARTIES

10.    The Plaintiff is Credit Suisse First Boston, Agent for the prepetition institutional lenders to Owens Corning.  Plaintiff brings this action derivatively on behalf of the estate of the Debtors in the above-captioned cases.

11.    The Debtors are Owens Corning, a Delaware corporation with its principal place of business in Toledo, Ohio, Fibreboard, a Delaware corporation with its principal place of business in California, and other affiliates and subsidiaries that also filed voluntary petitions for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq.*

12.    Defendants are physicians who purported to provide medical documentation substantiating asbestos-related personal injury claims that were submitted to and paid by Owens Corning prior to its Chapter 11 filing.

13.     Defendant Dr. Raymond A. Harron is, upon information and belief, a resident of West Virginia and a physician licensed to practice medicine.

14.     Defendant Dr. Jay T. Segarra is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

15.     Defendant Dr. James W. Ballard is, upon information and belief, a resident of Alabama and a physician licensed to practice medicine.

16.     Defendant Dr. Philip H. Lucas is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

17.     John Doe Physicians 1 through 100 are pseudonyms for other physicians who have engaged in fraudulent practices detailed herein whose identities are presently unknown to Owens Corning but may be established after reasonable opportunity for further investigation and discovery.

## FACTS

### A.     Owens Corning, Asbestos, and the National Settlement Program

18.     Asbestos is a generic name given to a group of naturally occurring minerals often used in commercial applications to resist heat and corrosion.

19.     It is established that prolonged exposure to asbestos may cause diseases of the lungs and other organs, and that such illnesses may not appear until years after exposure.

20.     Prior to 1972, Owens Corning and Owens Corning's subsidiary, Fibreboard Corporation, manufactured and distributed asbestos-containing products. Such manufacture and distribution has led to hundreds of thousands of asbestos-related personal injury

claims against Owens Corning, and these claims have ultimately forced the Company to seek reorganization under Chapter 11.

21.    Prior to filing for reorganization, Owens Corning attempted to address the flood of asbestos-related personal injury claims against it by implementing a National Settlement Program (NSP). The NSP was established via agreements with asbestos plaintiffs' law firms, and was intended to timely and accurately resolve asbestos-related personal injury claims with established procedures and fixed payments, without the attendant costs of litigating the claims in the civil justice system.

22.    Payments to individual claimants under the NSP depended upon the type and severity of the asbestos-related disease contacted by the claimant.  Payment was subject to evidence of a qualifying medical condition and exposure to Owens Corning products.

### B.    The Flood of Non-Malignant Asbestos-Related Personal Injury Claims

23.    Medical research has described asbestosis as a disappearing disease, and many pulmonology practices see no cases of the disease.  This phenomenon is generally believed to arise from the fact that asbestos exposure has decreased dramatically since the passage of the Occupational Safety and Health Act (OSHA) in 1970.

24.    Notwithstanding this decrease, the number of non-malignant asbestos-related personal injury claims grew exponentially in the 1990s.  It is estimated that up to 90% of new asbestos claims are filed by individuals with little or no impairment, and that payments for non-malignant claims account for approximately 64% of the compensation paid to asbestos plaintiffs.

25.    Consistent with these broader trends, the vast majority of the asbestos personal injury claims filed against Owens Corning prior to its Chapter 11 filing were from claimants with alleged asbestos-related impairment that was non-malignant.

26.    As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Owens Corning was 238,133. Of these resolved claims, 93.5% were paid. The average settlement amount was $7,573.

27.    As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Fibreboard was 254,326. Of these resolved claims, 88.5% were paid. The average settlement amount paid was $4,754.

28.    Upon information and belief, the total amount Owens Corning has paid pre-petition to resolve non-malignant asbestos-related personal injury claims is in excess of $2.5 Billion.

C.    **The Vast Majority of Non-Malignant Claims Were Fraudulent**

29.    It has been widely recognized by the legal and medical professions alike that asbestos litigation over the last decade has not been driven by the occurrence of bona fide asbestos-related disease—which is in decline—but rather by for-profit litigation screening operations that aggressively solicit tens of thousands of new "victims" each year who do not have any compensable asbestos-related physical impairment.

30.    Pulmonary x-rays are the principal medical diagnostic tool for identifying and documenting non-malignant asbestos-related disease for purposes of substantiating the existence of an asbestos personal injury claim and determining the amount for which a claim is settled, whether under the NSP, or independently of the NSP. A "positive" classification of an x-

ray sufficient for compensation by an asbestos defendant usually means noting a parenchymal abnormality and indicating a small opacity profusion category of 1/0 or higher, according to standards promulgated by the International Labour Organization (ILO) for reading and scoring x-rays for asbestos-related injury.

31.    "Screening" companies encourage workers to have free chest x-rays performed, even if they have no symptoms of any pulmonary impairment.  Such companies actively solicit asymptomatic workers who may have been occupationally exposed to asbestos, touting: "You May Have Million Dollar Lungs." The screenings are usually done in mobile vans parked near union halls or in hotel parking lots.

32.    These screening companies were set up by individuals generally lacking medical experience to create a mechanism for screening hundreds of thousands of workers who could claim to have been exposed to asbestos in the workplace.  Screening companies have reportedly processed over one million workers, and account for the overwhelming majority of non-malignant claims filed to date.

33.    "B-readers" (so called because they must pass part "B" of a test on x-ray interpretation) are typically physicians specially trained and certified to read and score pulmonary x-rays taken of workers alleged to have been exposed to asbestos.  In order to obtain the credential of B-reader, physicians must undergo certification by the National Institute of Occupational Safety and Health (NIOSH), a division of the Centers for Disease Control (CDC).

34.    Between 1994 and 1999 there were approximately 600 certified "B-readers" in the United States.

35.    Of this pool of B-readers, however, only a handful were routinely consulted and asked by plaintiffs' lawyers to read and score thousands upon thousands of

pulmonary x-rays for purposes of providing medical documentation of asbestos-related disease to substantiate asbestos personal injury claims then submitted by plaintiffs' lawyers to asbestos defendants, including the Debtors in this case. These B-readers developed reputations for systematically interpreting chest x-rays of asbestos claimants as positive for asbestos-related disease in 90-100% of all cases.

36.     The B-readers examine the x-rays after the fact, away from the patient and the testing site, and may not even be licensed to practice medicine in the state where the x-rays were taken. Some x-ray readers spend only minutes in making their findings and are paid hundreds of thousands of dollars in the aggregate for reading mass quantities of chest x-rays.

37.     Upon information and belief, some claimants' x-rays are "shopped around" to a number of B-readers until one is found who will report a positive reading for asbestos-related injury sufficient to sustain a claim for compensation.

38.     Rates of "positive" findings by these doctors have been as high as 90% according to some studies, and an audit of non-malignancy claims conducted by the Manville Personal Injury Trust (one of the largest asbestos claims processors) has shown that certain B-readers whose findings served as the basis for thousands of claims failed independent review more than 50% of the time. Given these findings, the Manville Trust now refuses to pay claims based on medical evidence from certain laboratories and by physicians whose diagnostic record appeared medically unsound.

39.     When B-readers interpret x-rays for asbestos-related disease, they know they are doing so for purposes of providing "independent" and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant, they know the cut off of 1/0 in the ILO system that generally

qualifies for compensation from an asbestos defendant, and they frequently receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an x-ray exhibits positive indications of asbestos-related injury than if they report it does not.

40.    Two recent scientific studies have independently audited samples of B-reader x-ray reports and have revealed that the incidence of asbestos-related nonmalignant impairment reported by the Defendants named in this Complaint is totally inconsistent with available peer review literature and is medically and scientifically incredible.

### D.    Report of Dr. Gary K. Friedman

41.    Dr. Gary K. Friedman, a board-certified pulmonologist, was retained by Owens-Corning in 1999 to serve as a medical consultant to the NSP and thereafter continued to serve as a consultant to Owens Corning in the bankruptcy.

42.    Dr. Friedman was chosen to consult to the NSP as an expert acceptable to both defendants and plaintiffs in connection with the review and analysis of asbestos-related claims.  Dr. Friedman has testified at trial or in deposition in asbestos related cases on more than 60 occasions at the request of plaintiffs' counsel.

43.    In 2002, Dr. Friedman submitted a report to Owens Corning to provide an estimate of the percentage of impaired nonmalignant claims under NSP criteria to be expected in the population of total future claims asserted against Owens Corning.

44.    In connection with his report, Dr. Friedman reviewed 1,691 past claims of nonmalignant asbestos-related injury against Owens Corning between 1994 and 1999.  The cases were randomly selected from 22,578 nonmalignant claims submitted to the NSP under

agreements where the B-readers had financial incentive to find indication of impairment. The case files Dr. Friedman reviewed contained analysis of chest x-ray reports, Pulmonary Function Test results (PFTs), and other data.

45.    Dr. Friedman concluded that the actual incidence of impaired claims which might be attributable to asbestos in the studied sample of claims was between 8.16% and 10.46% and that the vast number of claims for nonmalignant asbestos disease could not be explained on medical epidemiologic, pathologic, or other scientific grounds.

46.    Of the claims submitted for review, only 13.3% met minimal medical standards that had been agreed upon by Owens Corning and asbestos plaintiffs' law firms as a part of the NSP. In other words, over 87% of the nonmalignant claims studied were utterly unsupportable by medical evidence.

47.    Of the 1,691 cases Dr. Friedman studied, 772 (46%) had been reviewed by the Defendant, Dr. Raymond Harron, 229 were reviewed by the Defendant, Dr. Jay Segarra, 87 were reviewed by the Defendant Dr. Philip H. Lucas, and 60 were reviewed by the Defendant Dr. James W. Ballard. These four physicians provided the medical documentation for the majority of the 1,691 randomly-sampled claims that Dr. Friedman reviewed.

48.    Dr. Friedman concluded that the x-ray readings recorded by the Defendants differed significantly from what would be anticipated by a randomly selected panel of reliable B-readers nationwide and yielded results which were not even consistent with the spectrum of nonmalignant asbestos related diseases identified within the peer review literature authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts.

49.    Peer review studies consistently show that pleural disease (of the tissue that lines the outside of the lung and the inside of the rib cage) is more prevalent than pulmonary

asbestosis in a variety of exposure settings. However, as Dr. Friedman found, none of the
Defendants identified more "pleural only" cases than pulmonary asbestosis. Of the 1,691 cases
reviewed, only 124 "pleural only" cases were identified, a result that fundamentally contradicts
the peer review literature. In the medical reports generated by Defendants, the ratio of
pulmonary asbestosis to "pleural only," the far more prevalent type, was 47 to 1. In the
remaining reports submitted by over 40 other B-readers and physicians, the ratio of pulmonary
asbestosis to "pleural only" was 2 to 1.

50.    Defendants demonstrated medically unsound idiosyncrasies and
propensities in diagnosing asbestos-related injury. For instance, several defendants repeatedly
found that all six lung zones were involved in a low-profusion x-ray with no pleural change, an
extremely rare finding according to peer review literature.

### E.    Report of Dr. Joseph N. Gitlin

51.    Dr. Friedman's report was followed more recently in 2004 by the results
of a study conducted by Dr. Joseph Gitlin et al. published in the Journal of Academic Radiology
of the Johns Hopkins University Department of Radiology. The study reviewed a sample of 492
chest x-rays that were read as positive for asbestos-related disease by initial B-readers. Six
consultants in chest radiology and also certified B-readers were asked to reinterpret the x-rays
independently and without knowledge of their provenance.

52.    Whereas initial B-readers had diagnosed asbestosis in 95.9% of the
studied cases, the six consultants classified the same x-ray films as positive in only 4.5% of the
cases. As Gitlin concluded, the magnitude of the difference between the interpretations by initial

readers and the six consultants is simply too great to be attributed to good faith inter-observer variability.

53.    Compared with the consultant readers, the initial B-readers were 9.2 times more likely to conclude that pleural abnormalities consistent with asbestos-exposure were visible in the x-rays.

54.    The initial B-readers studied in the Gitlin report included Defendant Dr. Jay T. Segarra, Defendant Dr. James W. Ballard, Defendant Dr. Phillip H. Lucas, and Defendant Dr Ray A. Harron.

## FIRST CLAIM FOR RELIEF
### (COMMON LAW FRAUD)

55.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 54 above as if fully set forth herein.

56.    As described above, Defendants made false and fraudulent representations of fact by reporting false positive indications of asbestos-related disease in the x-rays of personal injury claimants who in fact had no compensable asbestos-related injury.

57.    At the time Defendants made such false and fraudulent representations of fact, Defendants were aware, or were reckless in failing to be aware, of the falsity of such representations.

58.    The false reports Defendants generated were meant to be professional, independent, and authoritative, based on specialized medical training. The Debtors reasonably and justifiably relied on Defendants' reports of asbestos-related injury in settling and paying asbestos personal injury claims.

59.    Until such time as the results of independent medical expert studies revealed that the Defendant B-readers' x-ray reports could not possibly be accurate, Owens

Corning had no reason to discover, and could not have discovered, that it was the victim of a widespread fraud.

## SECOND CLAIM FOR RELIEF
### (NEGLIGENT MISREPRESENTATION)

60.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

61.    As described above, Defendants made false and misleading representations of fact by reporting false positive indications of asbestos-related disease in the x-rays of personal injury claimants who in fact had no compensable asbestos-related injury.

62.    At the time Defendants made these misrepresentations, they either knew of the falsity of the misrepresentations or ought to have known that the representations were false and failed to make diligent efforts to ensure their reliability.

63.    Defendants made these misrepresentations knowing that they would serve as the basis for Debtors to settle and pay asbestos-related claims, and generated reports with the intent to induce both claimants and Debtor to act upon them.

64.    Given Defendants' status as federally-licensed B-readers whose reports were supposed to be independent and credible, Plaintiffs justifiably relied on Defendants' false and misleading reports and suffered injury as a result of Defendants' negligence.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in its favor and against the Defendants for compensatory damages in an amount to be determined at trial, and interest and the costs and disbursements of this action, including fees and reasonable

15

attorneys' fees, against the Defendants, jointly and severally; and such other and further relief as the Court shall deem just and proper.

Dated:  New York, New York
           _____, 2005

                         LANDIS RATH & COBB LLP

                         By:_____
                             Richard S. Cobb (I.D. No. 3157)
                             Rebecca L. Butcher (I.D. No. 3816)
                             919 Market Street, Suite 600
                             Wilmington, Delaware 19810
                             Tel:  (302) 467-4400
                             Fax:  (302) 467-4450

                         *Attorneys for Credit Suisse First Boston, as Agent*

Of Counsel:

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Tel:  (212) 455-2000
Fax:  (212) 455-2502

# EXHIBIT C

SIMPSON THACHER & BARTLETT LLP

425 LEXINGTON AVENUE
NEW YORK, N.Y. 10017-3954
(212) 455-2000

FACSIMILE (212) 455-2502

DIRECT DIAL NUMBER

(212) 455-2655

E-MAIL ADDRESS

bostrager@stblaw.com

BY FEDERAL EXPRESS (Mr. Kroll)
BY HAND (Mr. Podesta)                    December 20, 2004

Re:    Demand on Debtors-In-Possession Owens Corning
       and Fibreboard To Commence Legal Action For
       Recovery Of Property Of The Bankruptcy Estate

Stephen K. Kroll, Esq.
Senior Vice President, General Counsel and Secretary
Owens Corning
One Owens Corning Parkway
Toledo, Ohio 43659

Roger E. Podesta, Esq.
Special Counsel for Owens Corning and Fibreboard Corporation
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022

Gentlemen:

        We represent Credit Suisse First Boston in its capacity as Agent for the
Institutional Lenders to Owens Corning ("CSFB") in connection with a matter of significant
importance to the pending Chapter 11 proceedings captioned *In re Owens Corning et al.*,
Case Nos. 00-3837 through 00-3854 (Bankr. D. Del.); and are sending you this demand
letter on its behalf.

        CSFB has recently learned that certain physicians who purport to diagnose
asbestos-related impairment by reviewing lung x-rays have fraudulently or negligently
misreported potentially many thousands of x-ray results for individuals who subsequently
asserted personal injury claims against Owens Corning or Fibreboard prior to their October
5, 2000 Chapter 11 filing. Despite the fact that a substantial portion of these claimants were
not impaired and had no valid claim of injury, the physicians' medical reports falsely
represented that they were eligible for settlement payments under National Settlement
Programs instituted by Owens Corning and Fibreboard to handle asbestos personal injury
claims.

SIMPSON THACHER & BARTLETT LLP

Stephen K. Krull, Esq.
Roger E. Podesta, Esq.                    -2-                    December 20, 2004

     Given the magnitude of pre-petition payments Owens Corning and Fibreboard have made for non-malignant asbestos-related personal injuries, it is beyond doubt that the harm they have sustained as a result of this fraudulent activity has been substantial. CSFB believes that Owens Corning has the opportunity to obtain significant monetary redress for this injury and thus increase the size of the estate, to the benefit of all creditors—including those individuals with legitimate asbestos-related personal injury claims.

     CSFB hereby demands that Owens Corning file suit against the physicians named in the proposed complaint we have prepared and enclosed with this letter, based on the allegations set forth therein. Should Owens Corning refuse to commence such litigation, CSFB will seek leave of the Bankruptcy Court to prosecute these claims derivatively.

     Please let me know by the close of business on Monday, January 3, 2005, whether Owens Corning will commence this litigation and seek redress for the massive fraud that has been perpetrated against it. If, by the close of business on January 3rd, you have not either filed suit or responded that you will file suit by January 18, 2005, CSFB will seek leave of the Bankruptcy Court to proceed on behalf of Owens Corning.

     Thank you for your prompt attention to this important matter addressed in this demand letter.

Very truly yours,

Barry R. Ostrager

Enclosure

cc:    Mary Beth Hogan (by Hand)
       Francis L. Kellner (by Hand)
       Norman L. Pernick (by Facsimile)
       J. Kate Stickles (by Facsimile)

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------------x

In re:                                                :
                                                      :
**OWENS CORNING**, *et al.*,                          :    **In Proceedings For Reorganization Under**
                                                      :    **Chapter 11 Of The Bankruptcy Code**
                     Debtors,                         :
                                                      :    **Case Nos.: 00-3837 through 00-3854**
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
                                                      :
_____              :
                                                      :
**OWENS CORNING**,                                    :
                                                      :
                          Plaintiff,                  :
                                                      :
          -against-                                   :    Adv. Proc. _____
                                                      :
                                                      :
                                                      :
**RAYMOND A. HARRON**, Jay T. Segarra, James          :
W. Ballard, Philip H. Lucas, and John Doe             :
Physicians 1 through 100,                             :    **JURY TRIAL DEMANDED**
                                                      :
                          Defendants.                 :
                                                      :
                                                      :
                                                      :
---------------------------------------------------------------x

## COMPLAINT

Plaintiffs Owens Corning and Fibreboard Corporation, Debtors-In-Possession in the above-captioned Chapter 11 cases (collectively, "Owens Corning" or "Company"), by and through its undersigned counsel, alleges as and for its Complaint as follows:

## NATURE OF THE ACTION

1.     Owens Corning is the victim of a massive fraud perpetrated by physicians who falsely reported chest radiograph (x-ray) readings as positive for asbestos-related physical impairment when, in fact, the readings showed no impairment. These false reports—which came from medical doctors who were specially trained and certified in the reading of x-rays—resulted in Owens Corning paying Billions of dollars to "settle" asbestos-related personal injury claims against the Company that were had no medical basis and should never have been filed.

2.     Recent scientific studies indicate that the individual physicians named herein as Defendants have accounted for a dramatically disproportionate number of asbestos personal injury claims filed against Owens Corning and have routinely and systematically over-diagnosed non-malignant asbestos-related physical impairment in support of such claims.

3.     These false reports of asbestos-related injury were used to substantiate thousands of personal injury claims that Owens Corning settled and paid prior to filing a voluntary Chapter 11 bankruptcy petition on October 5, 2000, all to the great injury of the Company and its legitimate creditors—including those individuals with legitimate asbestos-related personal injury claims.

## JURISDICTION AND VENUE

4.     Jurisdiction over this adversary proceeding exists under 28 U.S.C. §§ 157, 1334, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.

5.     This matter is related to a pending case under Title 11, but it is a non-core proceeding as defined by 28 U.S.C. § 157.  Owens Corning does not consent to entry of final orders or judgment by a Bankruptcy Judge.

2

6.      Owens Corning demands a trial by jury to all claims to which it is so entitled, and does not consent to a jury trial by the Bankruptcy Court pursuant to 28 U.S.C. § 157(e).

7.      Venue in this Court is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

8.      Owens Corning is a Delaware corporation with its principal place of business in Toledo, Ohio. Owens Corning filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101 *et seq.*, on October 5, 2000.

9.      Defendants are physicians who purported to provide medical documentation substantiating asbestos-related personal injury claims that were submitted to and paid by Owens Corning prior to its Chapter 11 filing.

10.     Dr. Raymond A. Harron is, upon information and belief, a resident of West Virginia and a physician licensed to practice medicine.

11.     Dr. Jay T. Segarra is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

12.     Dr. James W. Ballard is, upon information and belief, a resident of Alabama and a physician licensed to practice medicine.

13.     Dr. Philip H. Lucas is, upon information and belief, a resident of Mississippi and a physician licensed to practice medicine.

14.     John Doe Physicians 1 through 100 are pseudonyms for other physicians who have engaged in the fraudulent practices detailed herein whose identities are presently unknown to Owens Corning but may be established after reasonable opportunity for further investigation and discovery.

3

## FACTS

### A.   Owens Corning, Asbestos and the National Settlement Program

15.   Asbestos is a generic name given to a group of naturally occurring minerals often used in commercial applications to resist heat and corrosion. It is established that prolonged exposure to asbestos may cause diseases of the lungs and other organs, and that such diseases may not appear until years after exposure.

16.   Prior to 1972, Owens Corning engaged in the manufacture and distribution of asbestos-containing products. Such manufacture and distribution has led to hundreds of thousands of asbestos-related personal injury claims against the Company, and these claims have ultimately forced the Company to seek reorganization under Chapter 11.

17.   Prior to filing for reorganization, the Company attempted to address the flood of asbestos-related personal injury claims against it by implementing a National Settlement Program ("NSP"). The NSP was established via agreements with asbestos plaintiffs' law firms, and was intended to timely and accurately resolve asbestos-related personal injury claims with established procedures and fixed payments, without the attendant costs of litigating the claims in the civil justice system.

18.   Payments to individual claimants under the NSP depended upon the type and severity of the asbestos-related disease contracted by the claimant. Payment was subject to evidence of a qualifying medical condition and exposure to Owens Corning products.

### B.   The Flood Of Non-Malignant Asbestos-Related Personal Injury Claims

19.   Medical research has described asbestosis as a disappearing disease, and many pulmonology practices see no cases of the disease. This phenomenon is generally believed to arise from the fact that asbestos exposure has decreased dramatically since the passage of the Occupational Safety and Health Act (OSHA) in 1970.

4

20.    Notwithstanding this decrease, the number of non-malignant asbestos-related personal injury claims grew exponentially in the 1990s and continues to surge. It is estimated that up to 90% of new asbestos claims are filed by individuals with little or no impairment, and that payments for non-malignant claims account for approximately 64% of the compensation paid to asbestos plaintiffs.

21.    Consistent with these broader trends, the vast majority of the asbestos-related personal injury claims filed against Owens Corning prior to its Chapter 11 filing were from claimants with alleged asbestos-related impairment that was non-malignant.

22.    As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Owens Corning was 238,133. Of these resolved claims, 93.5% were paid. The average settlement amount was $7,573.

23.    As of October 5, 2000, the number of non-malignant asbestos-related personal injury claims filed between 1990 and 2000 and resolved by Fibreboard was 254,326. Of these resolved claims, 88.5% were paid. The average settlement amount paid was $4,754.

24.    Upon information and belief, the total amount Owens Corning has paid pre-petition to resolve non-malignant asbestos-related personal injury claims is in excess of $2.5 Billion.

C.    **The Vast Majority Of Non-Malignant Claims Were Fraudulent**

25.    It has been widely recognized by the legal and medical professions alike that asbestos litigation over the last decade has not been driven by the occurrence of bona fide asbestos-related disease—which is on the decline—but rather by for-profit litigation screening operations that aggressively solicit tens of thousands of new "victims" each year who do not have any compensable asbestos-related physical impairment.

5

26.    Pulmonary x-rays are the principal medical diagnostic tool for identifying and documenting non-malignant asbestos-related disease for purposes of substantiating the existence of an asbestos personal injury claim and determining the amount for which a claim is settled, whether under the NSP, or independently of the NSP. A "positive" classification of an x-ray sufficient for compensation by an asbestos defendant usually means noting a parenchymal abnormality and indicating a small opacity profusion category of 1/0 or higher, according to standards promulgated by the International Labour Organization (ILO) for reading and scoring x-rays for asbestos-related injury.

27.    "Screening" companies encourage workers to have free chest x-rays performed, even if they have no symptoms of any pulmonary impairment. Such companies actively solicit asymptomatic workers who may have been occupationally exposed to asbestos, touting: "You May Have Million Dollar Lungs." The screenings are usually done in mobile vans parked near union halls or in hotel parking lots.

28.    These screening companies were set up by individuals generally lacking medical experience to create a mechanism for screening hundreds of thousands of workers who could claim to have been exposed to asbestos in the workplace. Screening companies have reportedly processed over one million workers, and account for the overwhelming majority of non-malignant claims filed to date.

29.    "B-readers" (so called because they must pass part "B" of a test on x-ray interpretation) are typically physicians specially trained and certified to read and score pulmonary x-rays of workers alleged to have been exposed to asbestos. In order to obtain the credential of B-reader, physicians must undergo certification by the National Institute of Occupational Safety and Health (NIOSH), a division of the Centers for Disease Control (CDC).

6

30.    Between 1994 and 1999 there were approximately 600 certified "B-readers" in the United States.

31.    Of this pool of B-readers, however, only a handful were routinely consulted and asked by plaintiffs' lawyers to read and score thousands upon thousands of pulmonary x-rays for purposes of providing medical documentation of asbestos-related impairment to substantiate asbestos personal injury claims then submitted by plaintiffs' lawyers to asbestos defendants, including Owens Corning in this case. These B-readers developed reputations for systematically interpreting chest x-rays of asbestos claimants as positive for asbestos-related impairment in 90-100% of all cases.

32.    The B-readers examine the x-rays after the fact, away from the patient and the testing site, and may not even be licensed to practice medicine in the state where the x-rays were taken. These physicians purport to be acting as litigation consultants and to be looking for x-ray evidence that is 'consistent with' asbestos-related disease. Some x-ray readers spend only minutes in making their findings and are paid hundreds of thousands of dollars in the aggregate for reading mass quantities of chest x-rays.

33.    Upon information and belief, some claimants' x-rays are "shopped around" to a number of B-readers until one is found who will report a positive reading for asbestos-related injury sufficient to sustain a claim for compensation.

34.    Rates of "positive" findings by these doctors have been as high as 90% according to some studies, and an audit of non-malignancy claims conducted by the Manville Personal Injury Trust (one of the largest asbestos claims processors) has shown that certain B-readers whose findings served as the basis for thousands of claims failed independent review more than 50% of the time. Given these findings, the Manville Trust now refuses to pay claims

7

based on medical evidence from certain laboratories and by physicians whose diagnostic record appeared medically unsound.

35.    When B-readers interpret x-rays for asbestos-related disease, they know they are doing so for purposes of providing "independent" and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant, they know the cut off of 1/0 in the ILO system that generally qualifies for compensation from an asbestos defendant, and they receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an x-ray exhibits positive indications of asbestos-related injury than if they report it does not.

36.    Two recent scientific studies have independently audited samples of B-reader x-ray reports and have revealed that the incidence of asbestos-related nonmalignant impairment reported by the Defendants named in this Complaint is totally inconsistent with available peer review literature and is medically and scientifically incredible.

D.    **Report of Dr. Gary K. Friedman**

37.    Dr. Gary K. Friedman, a board-certified pulmonologist, was retained by Owens-Corning in 1999 to serve as a medical consultant to the NSP and thereafter continued to serve as a consultant to Owens Corning in the bankruptcy.

38.    Dr. Friedman was chosen to consult to the NSP as an expert acceptable to both defendants and plaintiffs in connection with the review and analysis of asbestos-related claims. Dr. Friedman has testified at trial or in deposition in asbestos related cases on more than 60 occasions at the request of plaintiffs' counsel.

8

39.    In 2002, Dr. Friedman submitted a report to Owens Corning to provide an estimate of the percentage of impaired nonmalignant claims under NSP criteria to be expected in the population of total future claims asserted against Owens Corning.

40.    In connection with his report, Dr. Friedman reviewed 1691 past claims of nonmalignant asbestos-related injury against Owens Corning between 1994 and 1999. The cases were randomly selected from 22,578 nonmalignant claims submitted to the NSP under agreements where the B-readers had financial incentive to find indication of impairment. The case files Dr. Friedman reviewed contained analysis of chest x-ray reports, Pulmonary Function Test results (PFTs), and other data.

41.    Dr. Friedman concluded that the actual incidence of impaired claims which might be attributable to asbestos in the studied sample of claims was between 8.16% and 10.46% and that the vast number of claims for nonmalignant asbestos disease could not be explained on medical epidemiologic, pathologic, or other scientific grounds.

42.    Of the claims submitted for review, only 13.3% met minimal medical standards that had been agreed upon by Owens Corning and asbestos plaintiffs' law firms as a part of the NSP. In other words, over 87% of the nonmalignant claims studied were utterly unsupportable by medical evidence.

43.    Of the 1,691 cases Dr. Friedman studied, 772 (46%) had been reviewed by the Defendant, Dr. Raymond Harron, 229 were reviewed by the Defendant, Dr. Jay Segarra, 87 were reviewed by the Defendant Dr. Philip H. Lucas, and 60 were reviewed by the Defendant Dr. James W. Ballard. These four physicians provided the medical documentation for the majority of the 1,691 randomly-sampled claims that Dr. Friedman reviewed.

9

44.    Dr. Friedman concluded that the x-ray readings recorded by the Defendants differed significantly from what would be anticipated by a randomly selected panel of reliable B-readers nationwide and yielded results which were not even consistent with the spectrum of nonmalignant asbestos related diseases identified within the peer review literature authored by plaintiffs' experts or authors deemed authoritative by plaintiffs' experts.

45.    Peer review studies consistently show that pleural disease (of the tissue that lines the outside of the lung and the inside of the rib cage) is more prevalent than pulmonary asbestosis in a variety of exposure settings. However, as Dr. Friedman found, none of the Defendants identified more "pleural only" cases than pulmonary asbestosis. Of the 1691 cases reviewed, only 124 "pleural only" cases were identified, a result that fundamentally contradicts the peer review literature. In the medical reports generated by Defendants, the ratio of pulmonary asbestosis to "pleural only," the far more prevalent type, was 47 to 1. In the remaining reports submitted by over 40 other B-readers and physicians, the ratio of pulmonary asbestosis to "pleural only" was 2 to 1.

46.    Defendants demonstrated medically unsound idiosyncrasies and propensities in diagnosing asbestos-related injury. For instance, several defendants repeatedly found that all six lung zones were involved in a low-profusion x-ray with no pleural change, an extremely rare finding according to peer review literature.

E.    **Report of Dr. Joseph N. Gitlin**

47.    Dr. Friedman's report was followed more recently in 2004 by the results of a study conducted by Dr. Joseph Gitlin et al. published in the Journal of Academic Radiology of the Johns Hopkins University Department of Radiology. The study reviewed a sample of 551 chest x-rays that were read as positive for asbestos-related impairment by initial B-readers. Six

10

consultants in chest radiology and also certified B-readers were asked to reinterpret the x-rays independently and without knowledge of their provenance.

48.    Whereas initial B-readers had diagnosed asbestosis in 95.9% of the studied cases, the six consultants classified the same x-ray films as positive in only 4.5% of the cases. As Gitlin concluded, the magnitude of the difference between the interpretations by initial readers and the six consultants is simply too great to be attributed to good faith inter-observer variability.

49.    Compared with the consultant readers, the initial B-readers were 9.2 times more likely to conclude that pleural abnormalities consistent with asbestos-exposure were visible in the x-rays.

50.    There is no support in the literature on x-ray studies of workers exposed to asbestos or other mineral dusts for the high level of positive findings recorded by the initial B-readers in the Gitlin study.

51.    Almost two-thirds of the claimants who's x-rays were studied in the Gitlin report are plaintiffs who have filed claims against Owens Corning.

52.    The initial B-readers studied in the Gitlin report included Defendant Dr. Jay T. Segarra, Defendant Dr. James W. Ballard, Defendant Dr. Phillip H. Lucas, and Defendant Dr Ray A. Harron.

## FIRST CLAIM FOR RELIEF
## (COMMON LAW FRAUD)

53.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 52 above as if fully set forth herein.

11

54.    As described above, Defendants made false and fraudulent representations of fact by reporting false positive indications of asbestos-related impairment in the x-rays of personal injury claimants who in fact had no asbestos-related impairment.

55.    At the time Defendants made such false and fraudulent representations of fact, Defendants were aware, or were reckless in failing to be aware, of the falsity of such representations.

56.    The false reports Defendants generated were meant to be professional, independent, and authoritative, based on specialized medical training. Owens Corning reasonably and justifiably relied on Defendants' reports of asbestos-related impairment in settling and paying asbestos personal injury claims.

57.    Until such time as the results of independent medical expert studies revealed that the Defendant B-readers' x-ray reports could not possibly be accurate, Owens Corning had no reason to discover, and could not have discovered, that it was the victim of a widespread fraud.

## SECOND CLAIM FOR RELIEF
## (NEGLIGENT MISREPRESENTATION)

58.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 57 as if fully set forth herein.

59.    As described above, Defendants made false and misleading representations of fact by reporting false positive indications of asbestos-related impairment in the x-rays of personal injury claimants who in fact had no asbestos-related impairment.

60.    At the time Defendants made these misrepresentations, they either knew of the falsity of the misrepresentations or ought to have known that the representations were false and failed to make diligent efforts to ensure their reliability.

12

61.    Defendants made these misrepresentations knowing that they would serve as the basis for Owens Corning to settle and pay asbestos-related claims, and generated reports with the intent to induce both claimants and Owens Corning to act upon them.

62.    Given Defendants' status as federally-licensed B-readers whose reports were supposed to be independent and credible, Plaintiffs justifiably relied on Defendants' false and misleading reports and suffered injury as a result of Defendants' negligence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment in its favor and against the Defendants for compensatory damages in an amount to be determined at trial, and interest and the costs and disbursements of this action, including fees and reasonable attorneys' fees, against the Defendants, jointly and severally; and such other and further relief as the Court shall deem just and proper.

Dated:  New York, New York
         [              ]


                                    DEBEVOISE & PLIMPTON LLP


                            By  _____
                                    Roger E. Podesta
                                    919 Third Avenue
                                    New York, New York 10021
                                    (212) 909-6000

                                    Special Counsel for Owens Corning

13