# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | **Chapter 11** |
| | : | |
| **OWENS CORNING,** *et al.,* | : | **Case Nos. 00-3837 to 00-3854(JKF)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

**Hearing Date: 2/28/05 at 10:00 a.m.**
**Related to Docket Nos. 12850 and 12852**

## DEBTOR'S RESPONSE AND CONDITIONAL OPPOSITION TO THE MOTION OF CSFB, AS AGENT, TO COMMENCE AN ADVERSARY PROCEEDING ON BEHALF OF THE DEBTORS' ESTATES AGAINST CERTAIN PHYSICIANS

February 10, 2005

Roger E. Podesta
Mary Beth Hogan
Frances L. Kellner
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

Special Counsel for Debtors and
Debtors-in-Possession

Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
SAUL EWING LLP
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899-1266
(302) 421-6800

Counsel for Debtors and Debtors-in
Possession

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

Factual Statement ...................................................................................................... 4

1.    The Background. ................................................................................................. 4

2.    CSFB's Demand that the Debtor Commence a Lawsuit Against the X-ray
      B-Readers, and the Debtor's Response. ............................................................. 8

Argument ................................................................................................................... 12

I.    CSFB HAS FAILED TO MEET THE STANDARDS FOR
      ESTABLISHING THAT IT SHOULD BE GRANTED DERIVATIVE
      STANDING TO PURSUE AN ACTION AGAINST THE B-READERS
      ON BEHALF OF THE DEBTOR. ....................................................................... 12

      A.    CSFB Has Failed to Demonstrate that the Proposed Lawsuit
            Against the B-Readers Faces any Real Prospects for Success, Or
            that its Pursuit Would be Likely to Benefit the Debtor's Estate. .............. 14

      B.    The Debtor's Refusal to Pursue an Action Against the B-Readers is
            Reasonable and Justifiable. ...................................................................... 17

CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

## CASES

Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.),
    262 F.3d 96 (2d Cir. 2001) ........................................................................................ 12

Fogel v. Zell,
    221 F.3d 955 (7th Cir. 2000) .................................................................................... 13

In re G-I Holdings, Inc.,
    313 B.R. 612 (D.N.J. 2004)............................................................................13, 14, 16

Gibson Group, Inc. v. J.D. Irving, Ltd. (In re Gibson Group),
    66 F.3d 1436 (6th Cir. 1995) .............................................................................. 12, 18

In re iPCS, Inc.,
    297 B.R. 283 (N.D. Ga. 2003)............................................................................. 13, 16

In re Newcom Enterprises,
    287 B.R. 744 (E.D. Mo. 2003)................................................................................. 18

Infinity Investor Ltd. v. Kingsborough (In re Yes! Entertainment Corp.),
    316 B.R. 141 (D. Del. 2004)..................................................................................... 13

Louisiana World Exposition v. Federal Insurance Co.,
    858 F.2d 233 (5th Cir. 1988) ................................................................................... 18

National Forge Company v. Clark (in re National Forge Co.),
    304 B.R. 214 (W.D. Pa. 2004)................................................................................. 19

Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery,
    330 F.3d 548 (3d Cir. 2003) .............................................................................. 12, 19

Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.),
    303 F.3d 161 (2d Cir. 2002) ............................................................................... 12-13

Unsecured Creditors' Committee v. Noyes (In re STN Enterprises),
    779 F.2d 901 (2d Cir. 1985) .................................................................................... 13

## PUBLICATIONS

Alan M. Ducatman *et al.*, *B-Readers' and Asbestos Medical Surveillance*,
  30 J. of Occupational Medicine 644 (1988) ................................................................ 6

5B Wright & Miller, Federal Practice and Procedure: Civil 3d § 1357 (3d ed. 2004) ..... 14

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **IN RE:** | : | **Chapter 11** |
| | : | |
| **OWENS CORNING, _et al.,_** | : | **Case No. 00-3837 to 00-3854 (JKF)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

**Hearing Date: 2/28/05 at 10:00 a.m.**
**Related to Docket Nos. 12850 and 12852**

## DEBTOR'S RESPONSE AND CONDITIONAL OPPOSITION TO THE MOTION OF CSFB, AS AGENT, TO COMMENCE AN ADVERSARY PROCEEDING ON BEHALF OF THE DEBTORS' ESTATES AGAINST CERTAIN PHYSICIANS

Owens Corning, debtor and debtor-in-possession in the underlying bankruptcy action ("OC" or "the Debtor"), submits this brief in response and conditional opposition to the motion of CSFB, as agent, to commence an adversary proceeding on behalf of the Debtors' estates against certain B-readers, who allegedly fraudulently interpreted X-rays as positive for asbestos-related disease. The Debtor submits this brief to apprise this Court of the background of CSFB's request; the Debtor's reasons for not pursuing the action on its own behalf; and the conditions under which the Debtor would not oppose CSFB's motion.

### PRELIMINARY STATEMENT

The problem CSFB seeks to redress is an issue with which the Debtor has been familiar for many years. Indeed, OC actually commenced similar fraud and RICO litigation against certain medical screening laboratories in 1996 and 1997, alleging that individuals and companies that conducted pulmonary function tests ("PFTs")

fraudulently found lung impairment in individuals where no such impairment existed. (The *Pitts* and *McNeese* Lawsuits; together, the "PFT Lawsuits.")  Most of the B-readers named in CSFB's proposed complaint had provided X-ray readings to the laboratories that were defendants in the PFT Lawsuits.  As part of preparing for the PFT Lawsuits, OC investigated the quality of the B-readings and seriously considered bringing fraud and RICO claims against the B-readers as well.  For reasons detailed below, OC made a deliberate, strategic decision not to do so.

In response to CSFB's recent demand, the Debtor again considered the claim against the B-readers and once again decided not to bring the suit, for four reasons.  First, it would be difficult to prove fraud based on the evidence that is currently available to the Debtor; second, difficult statute of limitations issues exist; third, the filing of the lawsuit will likely subject the Debtor to the risk and expense of litigating against sizeable counterclaims; and fourth, the Debtor's experience in the PFT Lawsuits suggests that attorneys' fees and costs incurred in prosecuting the proposed litigation are likely to substantially exceed monetary recoveries by the estate.

Although the Debtor does not now believe that bringing a fraud claim against the B-readers is in the best interests of the Debtor's estate, the Debtor is not opposed in principle to such a claim.  In particular, if the Debtor were to learn of new evidence of fraud or fraudulent concealment on the part of the B-readers, and if a way were found to overcome the statute of limitations defenses, it would consider bringing the proposed lawsuit itself.  Indeed, as representatives of the Debtor informed Simpson Thacher, the Debtor has been monitoring developments in the silica MDL cases in Corpus Christi,

2

Texas, in which many of the same B-readers have been accused of questionable screening practices in connection with silica claims. It is possible that evidence supporting the proposed fraud claims will be developed during the silica litigation. Absent such evidence, the Debtor remains unconvinced that prosecution of the proposed claims is in the best interests of its estate.

CSFB has tried to assuage the Debtor's concerns by offering to pay the legal fees, costs and expenses associated with the prosecution of the lawsuit, but that solves only part of the problem. OC's experience in the PFT lawsuits indicates that the lawsuit will be bitterly contested and that counterclaims seeking millions of dollars will likely be filed against the Debtor. The Debtor, in its response to CSFB's demand letter, informed CSFB of this and requested that CSFB agree to indemnify the Debtor and its estate from any such counterclaims, including the costs and expense of defending against them. The Debtor doubts that any counterclaims would have merit; however, if it has learned anything from its experiences in the world of asbestos litigation, it is that corporate defendants are sometimes vulnerable to surprising jury verdicts.

If, in addition to paying the costs associated with the prosecution of the suit against the B-readers, CSFB agrees to indemnify the Debtor against the costs and expenses associated with any counterclaims, then the Debtor will have no objection to CSFB's prosecution of the claim. Because CSFB has so far refused this request to indemnify, the Debtor continues to oppose the suit, because it is not in the best interests of the estate. CSFB cannot establish that it is entitled to derivative standing, and CSFB's motion should be denied.

3

## Factual Statement

### 1.    The Background.

Because of its manufacture, installation and sale of an asbestos-containing

insulation product called Kaylo, OC has been a defendant in asbestos personal injury

litigation since the early 1970s. Beginning in the late 1980s, there was a significant

increase in the number of non-malignant claims filed against the Debtors. This increase

resulted in part from mass screenings of workers believed to have been exposed to

asbestos.

By the mid-1990s, OC became aware of what it believed to be fraudulent

practices in the conduct and reporting of results of certain mass-screening testing

processes. In June 1996, in response to what OC described as "a long-standing scheme"

"to generate false medical test results to substantiate tens of thousands of personal injury

cases against Owens Corning involving allegations of asbestos-related, non-malignant

pulmonary impairment" – a scheme that served "to defraud [OC] out of tens of millions

of dollars," OC brought suit against certain individuals and companies involved in the

business of conducting mass screenings (the "*Pitts* Lawsuit"). (*See* Exh. A at 1). The

*Pitts* Lawsuit alleged that defendants, who conducted PFTs and took chest X-rays,

disregarded proper testing procedures and manipulated test outcomes to create false

"positive" results – that is, they found impairment in the pulmonary function of screened

individuals when no impairment existed. The Complaint accused defendants of fraud and

RICO violations. In January 1997, the Debtor brought substantially similar claims

4

against another group of individuals and businesses involved in mass PFT screenings (the "McNeese Lawsuit") (*see* Exh. B).

At the time OC filed the PFT Lawsuits, it seriously considered bringing claims against certain of the X-ray B-readers who were involved in the mass screenings (including proposed defendants Harron, Lucas and Segarra). (*See* Podesta Aff. (Exh. C) ¶ 3.) OC was well aware at that time that a handful of B-readers, including several of CSFB's proposed defendants, were responsible for a vast number of positive diagnoses, and suspected them of overreading the X-rays so as to find evidence of asbestosis where other B-readers would not. Indeed, in connection with the PFT Lawsuits, OC retained Dr. Joseph N. Gitlin to arrange a study of interpretations of chest X-rays of workers allegedly exposed to asbestos. The study sought to determine whether the positive findings of asbestos-related disease made by the B-readers in connection with cases in which the *Pitts* defendants provided PFT results held up on a review by six independent B-readers. In his December 10, 1998 report, *A Comparison of Readers' Interpretations of Chest X-Ray Interpretations of Chest X-Ray Examinations of Workers Asserted to be Exposed to Asbestos*, Dr. Gitlin agreed with what OC had suspected, and reported that the X-ray readings done in connection with the *Pitts* screenings were irreconcilable with those done by his panel. In particular, the B-readers involved in the *Pitts* screenings reported a vastly higher percentage of asbestosis than did the independent B-readers. (*See* Exh. D.)

Despite Dr. Gitlin's report, OC made the deliberate, strategic decision not to sue the B-readers. B-readers – individuals who have been trained and certified to read X-rays

to diagnose certain lung diseases – use an accepted method for diagnosing asbestos-related lung disease. Moreover, the process of reading the X-rays is subjective, with substantial interreader variability even among legitimate B-readers who have no incentive to misdiagnose disease. *See* Alan M. Ducatman *et al.*, *'B-Readers' and Asbestos Medical Surveillance*, 30 J. of Occupational Medicine 644 (1988) (in study of B-readings conducted in a non-litigation setting, twenty-three B-readers, each of whom read approximately 5,000 X-rays, revealed a 300-fold variance in the tendencies of some B-readers to interpret an X-ray as positive for asbestosis, and a fifteen fold variance even among NIOSH instructors, the people who train B-reader candidates and administer the certification tests). (*See* Exh. E.) This variability made OC's burden to prove fraud far more difficult. For this reason, OC concluded after careful consideration, including consultation with Dan Webb of Winston & Strawn, lead outside counsel in the PFT Lawsuits, that while it had a strong fraud case against the PFT operators, it would be considerably more difficult to prove that the B-readers acted fraudulently. (*See* Podesta Aff. ¶ 4.) In order to avoid weakening its strong case against the PFT laboratories, OC decided not to sue the B-readers but rather to focus the *Pitts* and *McNeese* Lawsuits on PFTs.[1] (*Id.*)

---

[1]    Although OC did not sue the suspect B-readers in the mid-1990s, it did take steps to protect itself against overreading by these B-readers. In particular, in many of the NSP Agreements that OC entered into with numerous plaintiffs' law firms in 1998, 1999 and 2000, OC negotiated provisions restricting the circumstances under which they would be required to accept X-ray readings from one or more of the doctors proposed by CSFB as defendants, including, in particular, Dr. Harron. Further, in settlement agreements pursuant to which OC resolved underlying asbestos claims

The PFT Lawsuits were hard-fought and expensive to litigate. Defendants in the *Pitts* Lawsuit brought counterclaims seeking multi-million dollar recoveries, including allegations of abuse of process, interference with business relationships, interference with contractual relations, defamation, intentional infliction of emotional distress, injurious falsehood, trade disparagement and trade libel. Defendants in the *McNeese* Lawsuit similarly threatened OC with multimillion dollar counterclaims charging OC with attempting to deter the filing of legitimate personal injury claims and with attempting to drive the PFT operators out of business. (*Id.* ¶ 5.) After more than three years of time-consuming, expensive litigation, the *Pitts* and *McNeese* Lawsuits were settled in 1999. Although the settlements were generally favorable to OC, they did not come close to covering the legal expenses that OC had incurred in connection with the Lawsuits. (*Id.* ¶ 7.)[2]

---

that gave rise to the PFT Lawsuits, OC inserted provisions to pay only $1,000 per claim in cases supported by X-ray readings from suspect B-readers that did not also have evidence of impairment from valid PFT testing. (Podesta Aff. ¶ 8.)

[2]    The terms of the settlements of the PFT Lawsuits raise potentially troublesome issues for any action by OC against the B-readers. In particular, the releases may discharge certain of the potential claims against the B-readers if they are found to be employees or agents of the screening laboratories. Moreover, at least one of the releases arguably obligates OC to indemnify the released defendant from claims for contribution or indemnification brought against him by the B-readers. Because the settlements are confidential, however, OC is not free to disclose their terms, absent court order.

2.    **CSFB's Demand that the Debtor Commence a Lawsuit
      Against the X-ray B-Readers, and the Debtor's Response.**

On December 20, 2004, counsel for the Debtor received from Barry Ostrager of

Simpson Thacher & Bartlett LLP, counsel for CSFB, a letter claiming that CSFB had

"recently learned" that physicians had falsely and fraudulently diagnosed asbestos-related

disease in the X-rays of thousands of individuals who subsequently asserted personal

injury claims against the Debtors. Writing that, in its view, "Owens Corning has the

opportunity to obtain significant monetary redress" for this fraud, CSFB demanded that

the Debtor file suit against the B-readers. (*See* Podesta Aff. Exh. 1.)

By return letter dated December 27, 2004, Roger Podesta of Debevoise &

Plimpton LLP, special counsel to the Debtors, stated that he and Stephen Krull, the

Debtor's Senior Vice President, General Counsel and Secretary, would be available in

early January to meet with CSFB's representatives to discuss the proposed lawsuit. (*See*

Podesta Aff. Exh. 2.) On January 4, 2004, Mr. Podesta, Mr. Krull and Norman Pernick,

bankruptcy counsel for the Debtors, met with Barry Ostrager and his colleagues. At the

meeting, the Debtor's representatives told CSFB's representatives that the Debtor was not

opposed in principle to commencing a litigation against the proposed defendants or any

other B-readers, if those individuals could be shown to have engaged in fraud. The

Debtor's representatives further told CSFB's representatives about the PFT Lawsuits,

OC's investigation of a possible claim against the B-readers in conjunction with those

suits, the Debtor's decision not to pursue the claim given the difficulties of proving fraud,

the serious statute of limitations issues that had since arisen, and their concern that the

costs of pursuing the action could far exceed monetary recovery. (Podesta Aff. ¶¶ 11 & 12 .) CSFB's representatives informed the Debtor's representatives that CSFB would agree to bear the legal costs of a suit against the B-readers and would seek reimbursement from the Debtor's estate only out of any recoveries in the litigation. (*Id.* ¶ 13.) CSFB's representatives also informed Debtor's representatives that, notwithstanding the serious legal obstacles to the ultimate success of the proposed lawsuit, the mere filing of the complaint would yield "collateral benefits" to CSFB and the members of the Bank Group. (*See* Podesta Aff. Exh. 3 at 3.)  Although CSFB did not specify in detail what these "collateral benefits" would be, the Debtor does not believe that they can be equated with benefits to the Debtor's estate.

Given the consideration the Debtor had already given to the proposed lawsuit and the difficulties in proving the fraud claim, and considering the serious statute of limitations problems that had since arisen with the passage of time, the Debtor told CSFB at the January 4 meeting that it was reluctant to bring suit against the proposed defendants in the absence of new evidence of fraud. Mr. Podesta asked Mr. Ostrager if he had any new proof of fraud; specifically, he asked whether Simpson Thacher had any support for the allegation it made in Paragraph 35 of the proposed complaint alleging that the defendants received greater compensation for finding positive indications of asbestos-related injury than for negative ones, evidence that OC had unsuccessfully tried to develop during discovery in the PFT Litigation. (*See id.* ¶¶ 6 & 14.) Mr. Ostrager did

9

not provide any indication that he was aware of new evidence or of specific support for Paragraph 35, despite being asked several times.[3]  (*Id.* ¶ 14.)

Finally, at the January 4 meeting, the Debtor's representatives informed CSFB's representatives that several of the proposed defendants have been accused of questionable screening practices in connection with the silica cases consolidated in the MDL 1553 proceeding in federal court in Corpus Christi, Texas before Judge Janis Graham Jack. (*Id.* ¶ 15.) Judge Jack has expressed concern that there may have been fraud in connection with the medical diagnoses of silica claimants, and has ordered all four of the proposed defendants to testify in her courtroom, in her presence, in the middle of February.  (*Id.*)  The Debtor will review the transcript of that testimony, as well as the transcript of testimony of other B-readers, to see if they reveal evidence of fraudulent practices that can support a claim of fraud or fraudulent concealment.[4]

By letter dated January 10, 2005, counsel for the Debtor reiterated the information that they had provided to counsel for CSFB at the January 4 meeting. (*See* Podesta Aff. Exh. 3.)  Based on this information, they informed CSFB that "at the present time and on

---

[3]    In its Reply Memorandum in Further support of CSFB's Motion for Withdrawal of Reference, submitted to the District Court on January 28, 2005 (the "Reply Memorandum"), CSFB contends that it has "significant new evidence of fraud," and points to the May 21, 2002 Report of Dr. Gary Friedman. (Exh. F at 3-5.)  However, the Friedman Report only served to confirm what the Debtor already knew from the December 1998 Gitlin Report. (*See supra* at 5.)

[4]    *See also* Jonathan D. Glater, *Companies Get Weapon in Injury Suits*, N.Y. Times, February 2, 2005, at C1 (reporting that more than half the plaintiffs in the silica lawsuit previously filed asbestos claims to compensate them for the same lung injury) (Exh. G).

the existing state of knowledge, Owens Corning is not prepared to file the proposed CSFB complaint." (*Id.* at 2.) The letter explained that "[g]iven the serious statute of limitations problems and in the absence of significant new evidence of fraud, Owens Corning believes that prosecution of the proposed lawsuit would have uncertain prospects for success, would not be in the best interests of its estate and would amount to little more than a publicity stunt." (*Id.* at 2-3.) Nevertheless, the letter stated that "Owens Corning may reconsider its opposition to CSFB's prosecution of the proposed complaint if CSFB and the members of the Bank Group agree not only to bear the costs of litigation but also to indemnify Owens Corning, its directors, officers, agents, professionals and employees from any counterclaims that may be filed by the Defendants." (*Id.* at 3.)

CSFB did not agree to indemnify the Debtor from the counterclaims. Instead, on January 12, two days after receiving Mr. Podesta's January 10 letter, CSFB filed the instant motion, arguing that the Debtor's refusal to bring the proposed lawsuit was "unjustified." (CSFB Br. at 13-14.) CSFB's moving papers do not attach the January 10 letter, which describes in detail the Debtor's justification for declining to sue the B-readers. Nor do they refer to the fact that at the January 4 meeting, the Debtor described to CSFB in some detail its concerns with bringing such a suit. Rather, all CSFB chose to tell this Court is that the Debtor was "unwilling to prosecute the suit." (CSFB Br. at 11).[5]

---

[5]    Although CSFB has since told the District Court that it did not mention the discussion in the January 4 meeting or attach the January 10 letter because it considered them to be "confidential" and "perhaps even privileged" (Exh. F at 3 n.2), the Debtor's justification for refusing to bring the suit is at the very heart of the law concerning derivative standing (*see infra* at 12-13), and it is disingenuous for CSFB

**Argument**

**I.    CSFB HAS FAILED TO MEET THE STANDARDS FOR
ESTABLISHING THAT IT SHOULD BE GRANTED
DERIVATIVE STANDING TO PURSUE AN ACTION
<u>AGAINST THE B-READERS ON BEHALF OF THE DEBTOR.</u>**

The Court of Appeals for the Third Circuit has held that a creditors' committee

may be permitted to bring derivative lawsuits on behalf of debtors-in-possession under

certain circumstances. *See Official Committee of Unsecured Creditors of Cybergenics

Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (en banc).[6]  While the Third Circuit did

not specify the procedures or standards for derivative standing, it cited with approval the

standards established by the Second and Seventh Circuits, *id.* at 566-67, which hold

generally that derivative standing may exist where a debtor-in-possession "unreasonably"

or "unjustifiably" fails to bring suit on "colorable claims." *See Commodore Int'l Ltd. v.

Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001) (derivative standing

may exist "where the debtor in possession unreasonably fails to bring suit on its claims");

*Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)*, 303 F.3d 161, 166

---

to suggest that a discussion of the Debtor's strategic decisions could somehow be
avoided.

[6]    Although *Cybergenics* addressed the question of derivative standing for creditors'
committees as opposed to individual creditors, other courts have held that individual
creditors may also be entitled to derivative standing. *See, e.g., Gibson Group, Inc. v.
J.D. Irving, Ltd. (In re Gibson Group)*, 66 F.3d 1436 (6th Cir. 1995) (granting
individual creditor derivative standing to sue); *Infinity Investor Ltd. v. Kingsborough
(In re Yes! Entertainment Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) (granting
individual creditor derivative standing to sue and stating that "[a]lthough the Third
Circuit [in *Cybergenics*] discussed creditors' committees specifically, the Court is
persuaded that its decision is applicable here.").

n.2 (2d Cir. 2002) (standing may exist where the debtor "unjustifiably failed to bring suit") (citing *Unsecured Creditors Comm. v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir. 1985)); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) (a creditor may obtain permission to bring a derivative action where a trustee "unjustifiably refuses a demand to bring an action to enforce a colorable claim" of the creditor); *see also Infinity Investor Ltd. v. Kingsborough (In re Yes! Entertainment Corp.*), 316 B.R. 141, 145 (D. Del. 2004) (under the Second and Seventh Circuit guidelines, "derivative standing requires: (1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action.") (Citations omitted).

Other courts have further suggested that for derivative standing to be permitted, pursuit of the claim must benefit the estate. An analysis of whether an estate would be benefited depends on "a determination of probabilities of legal success and financial recovery in [the] event of success." *In re STN Enterprises*, 779 F.2d at 905; *see also In re iPCS, Inc.*, 297 B.R. 283, 291 (N.D. Ga. 2003) (to determine whether pursuit of a claims is likely to benefit the estate, the court should weigh the likelihood of success and of financial recovery, as well as the costs of the litigation).

CSFB has failed to meet its burden of demonstrating that it has satisfied the test for derivative standing. *See In re G-I Holdings, Inc.*, 313 B.R. 612, 629 (D.N.J. 2004) ("it is the committee's burden in the first instance to demonstrate that it has satisfied the test for derivative standing."). It has failed to establish that the proposed lawsuit against the B-readers has any real prospects of succeeding; has failed to establish that pursuit of

the claim would be likely to benefit the estate; and has failed to establish that the

Debtor's refusal to pursue the claim at this time is unreasonable or unjustifiable.

A.    **CSFB Has Failed to Demonstrate that the Proposed Lawsuit Against the B-Readers Faces any Real Prospects for Success, Or that its Pursuit Would be Likely to Benefit the Debtor's Estate.**

"The colorable claim element of the derivative standing test requires the Court to

decide whether the [party seeking standing] has asserted 'claims for relief that on

appropriate proof would support a recovery.'" *In re G-I Holdings, Inc.*, 313 B.R. at 631

(citations omitted). "[I]n ascertaining whether a plaintiff has stated a cognizable claim,

the court also examines the facts as alleged by the plaintiff for any dispositive affirmative

defenses." *Id.* "A complaint showing that the governing statute of limitations has run on

the plaintiff's claim for relief is the most common situation in which the affirmative

defense appears on the face of the pleading." 5B Wright & Miller, Federal Practice and

Procedure: Civil 3d § 1357 (3d ed. 2004); *see also In re G-I Holdings*, 313 B.R. at 631

(same).

As described above, OC analyzed the strength of a fraud claim against the X-ray

B-readers in the mid-1990s and decided against making such a claim on the ground that it

would be difficult to prove that the B-readers acted fraudulently, given the subjective

nature of reading X-rays and the absence of any direct proof of fraud. Since that time,

the proposed lawsuit against the B-readers has grown even more difficult, for there are

now serious statute of limitations issues that could well block the suit.

CSFB has recently requested that Judge Fullam toll Delaware's three year statute

of limitations pending decision on this motion and on the motion to withdraw the

14

reference. (*See* Exh. H.) Even if this request is granted, there will continue to be significant statute of limitations issues, for the proposed defendants will undoubtedly argue that the statute of limitations began to run in the mid-1990s, when the Debtor became aware of the possibly fraudulent X-ray readings, not in May 2002 with the completion of the Friedman Report. Indeed, OC investigated the very issue of B-reader fraud in 1996 and 1997 while preparing the PFT Lawsuits. Further, the NSP Agreements, many of which specifically restricted claims supported by X-ray interpretations from suspect B-readers, were entered into between 1998 and 2000, long before the Friedman Report. Without new evidence of fraud,[7] and without a basis for avoiding the affirmative defense of statute of limitations, CSFB's proposed claim faces very uncertain prospects for success.[8]

Nor will pursuit of the claim be likely to benefit the Debtor's estate. "[T]o determine whether the exercise of derivative standing . . . would be in the best interest of

---

[7] While CSFB contends that the B-readers "often receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an X-ray exhibits positive indications of asbestos-related injury than if they report it does not" (CSFB Br. at 6), it provides no specific factual support for these statements despite, as noted above, being asked for that support at the January 4 meeting. *See supra* at 9-10.

[8] Moreover, whatever factual issues exist with respect to the fraud claim, there are serious questions about the legal viability of the proposed second claim for negligent misrepresentation. In essence, the negligent representation claim alleges that defendants, as expert witnesses in the underlying asbestos cases, owed a duty to the opposing party – OC – to exercise reasonable care in forming their opinions. We are unaware of any precedent supporting such a duty, and its potential ramifications would be enormous and far-reaching.

the estates, the Court may weigh the 'probability of success and financial recovery,' as well as the anticipated costs of litigation, as part of a cost/benefit analysis conducted to determine whether pursuit of the colorable claims are likely to benefit the estate." *In re iPCS, Inc.*, 297 B.R. at 298 (citation omitted); *see also In re G-I Holdings, Inc.*, 313 B.R. at 628 (benefit to estate is based on a cost-benefit analysis performed by the court) (citations omitted).

Even if new evidence of fraud existed and the statute of limitations obstacles could be overcome, it is still not clear that pursuit of CSFB's proposed claim against the B-readers would be in the best interests of the Debtor's estate. First, it is doubtful that the likely recovery against individual physician defendants would be sufficient to cover what will undoubtedly be very considerable legal expenses, let alone provide a meaningful addition to the estates. Even in the PFT Lawsuits, in which OC had stronger evidence of fraud and little in the way of statute of limitations problems, the settlements were considerably less than the legal fees spent in pursuing the claims.

Although CSFB contends that because it is willing to fund the cost of the prosecution of fraud claims against the B-readers, "there will be essentially no cost to the Debtor's estates if the lawsuit does not result in recovery" (CSFB Br. at 17), that is only part of the picture. CSFB has thus far declined to indemnify against counterclaims, including attorneys' fees and costs associated with them.[9] To the contrary, CSFB has

---

[9] It is particularly noteworthy that CSFB refuses to indemnify the Debtor for attorneys' fees and other costs related to the counterclaims, yet reserves the right to discontinue the proceeding at any time. (*See* CSFB Br. at 18). It is not difficult to

again refused to do so in its Reply Memorandum, though it states that any such counterclaims would be without merit. (*See* Exh. F at 5.)[10] While the Debtor agrees that counterclaims would be without merit, that does not make them free of risk; nor does it render them inexpensive to litigate. As the Debtor well knows, there is always the possibility of a large adverse judgment if a claim is able to get to a jury, even if CSFB and the Debtor view the claim as without merit.[11]

**B.    The Debtor's Refusal to Pursue an Action Against the B-Readers is Reasonable and Justifiable.**

As described above, the Debtor's refusal to pursue the action against the B-readers was made after serious deliberation and was based on the reasonable and well-justified decision that pursuit of the claim was not in the best interests of the estate. Indeed, four years prior to bankruptcy, OC brought very similar lawsuits against medical screening laboratories, and at that time, made a deliberate, strategic decision not to initiate litigation against most of these very same B-readers. Given the absence of new

---

imagine CSFB initiating suit and then discontinuing it only after saddling the Debtor with the need to contest vigorously pursued counterclaims.

[10]    CSFB's contention in its Reply Memorandum that the Debtor's request for indemnification somehow indicates that the Debtor is not living up to its fiduciary duties (Exh. F at 5) completely disregards the Debtor's obligation to protect the assets of the estate. Indeed, it is this duty that motivated the Debtor to reject CSFB's demand. After all, any counterclaims would in all likelihood be brought against the Debtor and its estate, not against individual officers and directors.

[11]    Nor should the disruption to the Debtor's business from prosecuting the lawsuit be disregarded in conducting the cost/benefit analysis to determine whether a suit is in the Debtor's best interests, as prosecution will undoubtedly require considerable time and effort on the part of many of the Debtor's employees. The burden of discovery, in particular, will fall heavily on the Debtor.

17

evidence of fraud, the statute of limitations concerns, the risks from counterclaims, and the Debtor's experience in the PFT Lawsuits, the refusal to file the claim can hardly be considered "unjustified;" rather, it is a well-reasoned choice based on protecting the estate's assets.[12] At best, from CSFB's perspective, the refusal to pursue the claim is a difference of opinion as to the strength of the case, and there is no support for the proposition that a difference in legal judgment between a debtor and a creditor amounts to an abuse of discretion on the part of the debtor such that the creditor is entitled to obtain derivative standing allowing it to substitute its legal judgment for that of the debtor.[13]

---

[12]    It is particularly noteworthy that, in finding the Debtor's refusal to bring suit "unreasonable," CSFB wholly ignores the fact that not a single other asbestos defendant has ever sued the B-readers for fraud, even though X-rays by these same B-readers have been submitted to scores of asbestos defendants and trusts, including many who continue to be active in the tort system.

[13]    A review of the case law cited by CSFB underscores that this is not the type of situation that usually underlies the grant of derivative standing to a creditor. Rather, those cases typically deal with situations in which the Debtor's decision not to bring an action is tainted by conflict of interest. *See, e.g., In re Gibson Group,* 66 F.3d 1436, 1441 (6th Cir. 1995) (debtor-in-possession refused to file action to avoid allegedly preferential and fraudulent transfers it made; court noted that debtors-in-possession "often act[ ] under the influence of conflicts of interest" in deciding whether to bring actions); *Louisiana World Exposition v. Federal Insurance Co.,* 858 F.2d 233, 253 (5th Cir. 1988) (management committee of debtor-in-possession's board of directors declined to vote on a demand that they bring a complaint against officers and directors for gross negligence, mismanagement and breach of fiduciary duty; court noted that "the debtor-in-possession's refusal was understandable given the grave conflict of interest implications); *In re Newcorn Enterprises,* 287 B.R. 744, 747 (E.D. Mo. 2002) (debtor "[n]ot surprisingly" refused to commence adversary proceeding to marshal the assets of the estate, presumably because such action could subject real estate owned by principal shareholder of debtor to be included in debtor's assets and therefore subject to the claims of creditors.) *See also*

18

Finally, although the Debtor harbors serious doubts about whether a fraud-based lawsuit against the B-readers on the present record is in the best interests of its estate, the Debtor will withdraw its opposition if CSFB agrees not only to cover the entire cost of prosecuting the claim, but also to indemnify the Debtor, its directors, officers, agents, professionals and employees against any costs or expenses, including legal fees, relating to counterclaims brought by the defendants.

---

*Cybergenics*, 330 F.3d at 573 (pointing out that management of debtor may be lax in pursuing avoidance actions due to conflicts of interests); *National Forge Company v. Clark (In re National Forge Co.)*, 304 B.R. 214, 222 (W.D. Pa. 2004) (granting derivative standing where "[d]ebtors' management has a conflict of interest in pursuing the fraudulent conveyance action.").

## CONCLUSION

For the reasons stated above, the Debtor respectfully requests that the Court deny

CSFB's motion in its entirety (unless CSFB provides the indemnifications described

above), and grant such further relief as the Court deems just and proper.

Dated:  February 10, 2005

Respectfully submitted,

SAUL EWING LLP

/s/ Norman L. Pernick
Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, Delaware  19899-1266
(302) 421-6800

Counsel for Owens Corning and
Fibreboard Corporation

-and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Mary Beth Hogan
Frances L. Kellner

919 Third Avenue
New York, New York  10022
(212) 909-6000

Special Counsel for Owens
Corning and Fibreboard Corporation