# EXHIBIT B

SOUTHERN DISTRICT OF MISSIS-
**FILED**

JAN 2 2 1997

J.T. NOBLIN CLERK
BY_____DL

UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

```
----------------------------- X
OWENS CORNING,                :
                              :
        Plaintiff,            :
                              :
        v.                    :
                              :
WILLIAM T. MCNEESE and        :
PULMONARY FUNCTION            :
LABORATORY, INC.,             :
                              :
        Defendants.           :
----------------------------- X
```

Civil Action No. 3:97cv29WS

Jury Trial Demanded

COMPLAINT

## I. NATURE OF THE ACTION

1.    This action asserts a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and claims for common law fraud, negligent misrepresentation, and injurious falsehood in response to the Defendants' long-standing, continuous, and systematic generation of false medical test results which have caused millions of dollars in damages to Plaintiff Owens Corning. Beginning in about 1988 and continuing to the present, the Defendants, along with unknown co-conspirators, systematically and continuously have generated false medical test results which have been used to substantiate the filing and settlement of approximately 10,000 non-malignant, asbestos-related cases against Owens Corning involving allegations of pulmonary impairment. The Defendants' repeated generation of false medical test results has made individuals appear to suffer from: (a) asbestos-related pulmonary impairment; or (b) a more severe asbestos-related pulmonary impairment. In response, Owens Corning now seeks relief, including treble damages, punitive damages, and attorneys fees.

DP003 002467

2.  Beginning in about 1978 and continuing through the present, the Defendants have been in the business primarily of conducting Pulmonary Function Tests ("PFTs") on persons with alleged occupational exposure to products containing asbestos, including insulation once manufactured by Owens Corning. These PFTs have been performed by the Defendants almost exclusively for plaintiffs' asbestos attorneys to provide purported medical support for the filing and settlement of thousands of non-malignant, asbestos-related injury claims against Owens Corning and other companies.

3.  PFTs measure an individual's pulmonary function through the individual's performance on certain breathing tests. When performed properly, PFTs provide objective, quantifiable measurements of lung function to determine if an individual is impaired and are used in the diagnosis of asbestos-related medical conditions. Consequently, PFTs have been and continue to be an extremely important factor in diagnosing potential asbestos-related claimants and valuing asbestos-related personal injury claims for purposes of both settlement and trial.

4.  At all times relevant to the Complaint, there have been well-established medical standards governing the administration of PFTs. These standards are designed to ensure the integrity of the testing process and the accuracy of PFT results. The Defendants have known of, and have been familiar with, these well-established standards.

2

DP003 002468

5.   In approximately 10,000 cases, the Defendants knowingly have engaged in a systematic pattern of gross departures from these well-established standards and thereby have generated false "positive" PFT results, i.e., results which falsely indicate pulmonary impairment. Specifically, the Defendants, in performing forced spirometric PFTs, have:

- Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must exhale forcibly for at least 6 seconds;

- Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must be administered three separate acceptable tests;

- Systematically disregarded the well-established PFT requirement that, in order to produce valid PFT results, each subject must be re-tested if the variability of his two highest test results exceeds 5%;

- Systematically obtained less than maximal exhalations from test subjects, as required to produce valid PFT results;

- Systematically generated PFT results in a manner intended to disguise the testing procedures used to generate the false positive PFT results.

6.   By systematically engaging in a pattern of gross departures from well-established standards and proper procedures for producing valid PFT results, the Defendants, along with unknown co-conspirators, have generated false PFT results which are medically unreliable and which are not bona fide or genuine statements of the medical conditions of the individuals tested by the Defendants.

3

DP003 002469

7.    The Defendants, along with unknown co-conspirators, have caused the false PFT results they generated to be used in the preparation of other false medical documentation. This documentation, along with the false PFT results, has been used to substantiate the filing of non-malignant, asbestos-related claims against Owens Corning and to enhance the settlement value of such claims. Attorneys with whom the Defendants have had established relationships have filed and settled asbestos-related cases based on the false PFT reports and medical documentation which have been generated by the Defendants and unknown co-conspirators. Under lucrative contingency fee agreements, these plaintiffs' asbestos attorneys have earned substantial fees through the filing and settlement of such claims. In turn, these attorneys, some of whom have had "fee-splitting" arrangements with the Defendants, have paid the Defendants millions of dollars.

8.    Owens Corning has entered into settlements of claims alleging non-malignant lung disease which were substantiated by the Defendants' false medical reports, and thousands of other such claims are still pending against Owens Corning. Thus, the Defendants' systematic pattern of generating false PFT results has caused, and continues to cause, direct and substantial injury to Owens Corning.

## II.    JURISDICTION AND VENUE

9.    Pursuant to Title 28, United States Code, Section 1331, this Court has subject matter jurisdiction over the claim alleged herein based upon RICO, Title 18, United States Code,

4

DP003 002470

Sections 1961, at seq., because such claims arise under the laws of the United States. Pursuant to Title 28, United States Code, Section 1367, this Court has subject matter jurisdiction over the state law claims alleged herein because the claims are related to the federal RICO claim.

10. Pursuant to Title 28, United States Code, Section 1332, this Court also has subject matter jurisdiction over all claims alleged herein because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

11. Venue is proper in this District and Division pursuant to Title 28, United States Code, Section 1391(b)(1), because all of the Defendants reside in this District and Division; pursuant to Title 28, United States Code, Section 1391(b)(2), because a substantial part of the events or omissions giving rise to this action occurred in this District and Division; and pursuant to Title 18, United States Code, Section 1965(a), because each Defendant resides, is found, has an agent, and transacted his affairs in this District and Division.

### III. THE PARTIES

12. Plaintiff Owens Corning is a Delaware corporation with its principal place of business in Toledo, Ohio.

13. Defendant Pulmonary Function Laboratory, Inc. ("PFL") is a Mississippi corporation with its principal place of business at 129 Bennington Point, Madison, Mississippi. PFL is qualified to do business in Alabama, Ohio, and Indiana. PFL has

5

DP003 002471

operated as a corporation since it incorporated in December 1990. From about 1981 until about December 1990, PFL was a partnership. From about 1978 until about 1981, PFL was a sole proprietorship. At all times relevant to the Complaint, PFL has been in the business of performing PFTs and has operated in Mississippi, Alabama, Ohio, and Indiana.

14. Defendant William T. McNeese ("McNeese") resides at 1175 Rice Road, Madison, Mississippi. While PFL was a sole proprietorship, McNeese was the sole owner of PFL. While PPL was a partnership, McNeese was a partner in PFL with his son, Michael McNeese. Since PFL's incorporation, McNeese has been the President and a shareholder of PFL, and all other shareholders and officers are members of McNeese's family.

## IV. FACTS

### A. Background of Asbestos and Asbestos Litigation

15. Asbestos is a generic name given to a group of natural, fibrous minerals. Because asbestos has several valuable properties, including resistance to heat and fibrous strength, it was used for a number of years in numerous commercial applications, including the production of high-temperature insulation.

16. Asbestos-related personal injury or wrongful death claims generally allege that the plaintiff suffers pulmonary disease and/or impairment caused by the inhalation of asbestos fibers. Asbestos-related medical conditions encompass three broad categories:

6

DP003 002472

a.   malignancies, such as mesothelioma and lung cancer;

b.   non-malignant asbestosis, which causes scarring of lung tissue and often is accompanied by an impairment of lung function demonstrated by a PFT; and

c.   non-malignant pleural changes, such as markings, thickening, or other changes to the lining of the lung, which rarely are accompanied by an impairment of lung function.

17.  Owens Corning's involvement in asbestos litigation, including the cases involving individuals tested by Defendants McNeese and PFL, arose from its manufacture and/or sale from 1953 through 1973 of an insulation product called Kaylo.

18.  The vast majority of the claims filed against Owens Corning have involved an allegation of non-malignant disease. A critically important factor in the valuation and settlement of these claims has been diagnosis of asbestos-related medical conditions and proof of pulmonary impairment. Like other defendants in asbestos-related litigation, Owens Corning typically pays more to settle claims substantiated by medical evidence of pulmonary impairment, and often will not pay anything for claims for which there is no such evidence.

19.  In recent years, filings of asbestos-related lawsuits in Mississippi and Texas -- the primary states in which such cases have been filed against Owens Corning based upon screenings conducted by Defendants McNeese and PFL -- have fueled

7

DP003 002473

a dramatic increase in the number of non-malignancy filings against Owens Corning.

20.   During the approximately 5-year period from 1991 through 1996, cases filed in these states alone have accounted for approximately 32% of the total number of asbestos-related cases filed against Owens Corning.  Cases filed in these states have accounted for approximately 50% of the asbestos-related cases filed against Owens Corning during the two-year time-frame of 1994-1995.

**B.    The PFL Enterprise and the Defendants' Screening Operations**

21.   Defendant    PFL    began    operating    as    a    sole proprietorship in about 1978, was established as a general partnership in 1981, and was incorporated in Mississippi on December 21, 1990. Defendant PFL was qualified to do business in Alabama on October 25, 1991 and in Ohio on May 12, 1995. Defendant PFL also has conducted business in Indiana since approximately June 1996.

22.   From its inception and continuing through the present, Defendant PFL has been in the business primarily of administering PFTs.  PFL has conducted its PFT operations in various union halls in Mississippi (from about 1978 until about the mid-1980s) and through its testing laboratories located in Gautier, Mississippi (from about 1988 to present); Bessemer, Alabama (from about 1991 to present); Cleveland, Ohio (from about May 1995 to present); and Highland, Indiana (from about June 1996 to present). Defendant PFL and its PFT laboratories collectively are referred to hereafter as the "PFL Enterprise."

8

DP003 002474

23.. In addition to administering PFTs, beginning in about 1988, and continuing through the present, the PFL Enterprise has coordinated or performed complete "screenings" of individuals for asbestos-related medical conditions. These "screenings," which the PFL Enterprise has coordinated and performed for various plaintiffs' asbestos attorneys, have involved several components, including: (a) the administration of PFTs; (b) the interviewing of test subjects to arrange for their representation by lawyers and to confirm the payment terms for the screening process; (c) the administration of chest x-rays; and (d) the administration of a physical examination.

24. Both in administering PFTs and in coordinating and performing complete "screenings," the PFL Enterprise has employed or associated with numerous other individuals who have been involved in the generation of PFT results and other medical documentation relating to the screening process. These individuals include: (a) PFT technicians who have administered PFTs; (b) other personnel who have performed intake procedures, conducted interviews of test subjects, and completed and processed paperwork in connection with the administration of the PFTs, (c) doctors who have conducted physical examinations; (d) technicians who have performed x-rays; (e) doctors who have read and interpreted x-rays; and (f) doctors who have reviewed the PFT results and x-rays and prepared diagnostic reports relating to the test subjects.

25. Defendant McNeese has been involved in the administration of PFTs since at least 1973. Defendant McNeese has

9

DP003 002475

received extensive training in the performance of PFTs and has worked as a pulmonary function technician. As a result of his previous education, employment and training, Defendant McNeese has known about the well-established standards governing the administration of PFTs, including the standards adopted by the American Thoracic Society ("ATS") in 1987, 1991, 1994, and 1995.

26. In conducting their PFT operations and screening operations, the PFL Enterprise and Defendant McNeese used PFT equipment manufactured by the Collins Equipment Company. As a result of his education, training, and extensive use of such equipment, Defendant McNeese, at all times relevant to the Complaint, has been familiar with the proper operation of the Collins PFT equipment.

27. Defendant McNeese, as the principal owner and chief operator of the PFL Enterprise, has controlled virtually all aspects of its operations. Defendant McNeese personally has performed thousands of PFTs for the PFL Enterprise. He also has hired, trained and supervised other test operators who have conducted thousands of additional PFTs for the PFL Enterprise. Defendant McNeese has developed and instituted the procedures for the performance of PFTs at the PFL Enterprise and has instructed PFL's test operators on the manner in which they should perform PFTs for PFL. Defendant McNeese also has been present at virtually every testing site where the PFL Enterprise has administered PFTs and has overseen and monitored virtually all of its PFT procedures and results.

10

28. In instances where the PFL Enterprise has conducted complete asbestos-related screenings, Defendant McNeese personally has coordinated the screening process, including the hiring of the various PFT technicians, doctors, x-ray technicians, and other personnel who have been involved in the screening process.

29. Since its inception in about 1978, the PFL Enterprise has obtained test subjects from various sources. During the period from about 1978 until about 1988, unions referred large numbers of their members to the PFL Enterprise for testing. In addition, others involved in conducting mass screening operations have referred individuals to the PFL Enterprise for testing. For example, in 1990, Glenn and Jerry Pitts, who have operated several related mass screening businesses -- Pulmonary Advisory Services, Inc., Pulmonary Advisory Services of Louisiana, Inc., and Pulmonary Testing Services, Inc. -- referred approximately 120 individuals to the PFL Enterprise for testing.

30. Since about 1988, the PFL Enterprise has obtained its test subjects primarily in two ways. First, the PFL Enterprise has obtained test subjects through various forms of solicitation which it has initiated, including the use of a 1-800 number and advertisements. Second, the PFL Enterprise has obtained test subjects from plaintiffs' asbestos attorneys with whom the PFL Enterprise has had established relationships.

31. In cases where test subjects have been solicited by the PFL Enterprise and have not been represented by attorneys at the time of testing, Defendants have referred those test subjects

11

DP003 002477

to plaintiffs' asbestos attorneys with whom they have had established relationships. Where the test subjects have met certain prerequisites established by these attorneys, the attorneys have agreed in advance to pay the Defendants, and then in fact have paid the Defendants, for the costs of the PFTs.

32. Likewise, in instances where test subjects have been referred to the PFL Enterprise by attorneys with whom the PFL Enterprise has had substantial relationships, the attorneys have agreed to pay, and in fact have paid, for the cost of the testing. Thus, the PFL Enterprise has conducted its operations, including the administration of PFTs and the performance of complete screenings, almost exclusively for plaintiffs' asbestos attorneys to substantiate the filing and settlement of non-malignant, asbestos-related claims. Very few, if any, of the test subjects screened by the PFL Enterprise have been referred to Defendant PFL by their treating physician.

33. Moreover, in more than 4000 cases, the Defendants have administered PFTs or conducted complete screenings of test subjects pursuant to "fee-splitting" agreements or "contingency contracts" with several plaintiffs' asbestos attorneys. Under these arrangements, the Defendants have been entitled to receive, and in some cases have received, a percentage of the settlement proceeds or verdict amounts obtained by these attorneys through asbestos-related personal injury claims substantiated by the false PFT results generated by the Defendants.

12

DP003 002478

34.  In most instances, the the Defendants have been entitled under these arrangements to 15% of the gross total settlement proceeds or verdict awards.  In other instances, the Defendants have been entitled under these arrangements to 50% of the attorneys' share of such proceeds or verdict awards.

35.  Under the applicable rules which provide ethical standards for attorneys, including Rule 5.4 of the Mississippi Rules of Professional Conduct, at least some of these financial arrangements between the Defendants and the attorneys representing the individuals tested by the Defendants are improper and against public policy.

36.  In addition, at least some of these financial arrangements constitute violations of the ethical standards governing medical professionals, including Section 6.01 of the Code of Medical Ethics published by the American Medical Association.

37.  These financial arrangements have provided strong financial incentive for the Defendants to generate false medical tests for use in support of asbestos-related personal injury claims.  For example, in connection with one group of such arrangements which PFL had entered into with several plaintiffs' asbestos attorneys, PFL filed a lawsuit in 1992 against the attorneys seeking to recover approximately $27 million that PFL claimed it was entitled to receive from the attorneys under these arrangements.  Pulmonary Function Laboratory, Inc. v. William Roberts Wilson, Jr., P.A., Murray & Wilson, Mississippi Asbestos Associates, P.A., Richard M. Fountain, Richard B. Schwartz, William

13

DP003 002479

Roberts Wilson, Jr., Mitchell Tyner, and Steven B. Murray, No. 92-73383 (Circuit Court, First Judicial District, Hinds County, Mississippi).

38. Accordingly, the primary focus of the Defendants has been to generate evidence that the individuals they have tested suffered from non-malignant, asbestos-related disease and pulmonary impairment. Under the Defendants' referral relationships, "fee-splitting" arrangements, and "contingency contracts," the business of identifying and screening non-malignant, asbestos-related personal injury claims has been very lucrative for the Defendants. The Defendants have been paid millions of dollars for their mass screening, high volume, assembly line PFT operations.

C. Pulmonary Function Testing Standards and Procedures

39. The diagnosis of the presence and severity of non-malignant, asbestos-related disease and impairment is based on several clinical factors including PFTs, a chest x-ray, and a physical examination.

40. The evaluation of x-rays typically is used as one factor in assessing whether an individual has a pulmonary disease, using the severity classifications established by the International Labor Organization ("ILO"). However, x-rays cannot directly measure pulmonary impairment and alone are insufficient to measure accurately the degree or severity of pulmonary dysfunction. Similarly, while in some cases a physical examination may detect symptoms occasionally associated with lung disease, a physical

14

DP003 002480

examination alone cannot be used to establish the type, degree, severity or probable cause of pulmonary impairment.

41.  In contrast, PFTs provide objective, quantifiable measures of lung function to determine if an individual is impaired.  Thus, they are the primary tool used to evaluate non-malignant, asbestos-related personal injury claims and are widely used in asbestos litigation by plaintiffs and defendants alike to determine settlement amounts and as evidence at trial.

42.  Forced spirometric PFTs involve the measurement of the movement of air into and out of the lungs during a variety of breathing maneuvers.  Forced spirometry is the most widely used type of PFT, and it is one of the types conducted by the Defendants in evaluating potential claimants.

43.  In forced spirometry testing, an individual first deeply inhales air into his lung (i.e., inspiration) and then blows the air out of his lungs (i.e., expiration) as forcibly as possible and for as long as possible, into a machine called a spirometer.  The spirometer measures certain values relating to the individual's inspiration, such as inspiratory volume and inspiratory peak, and the individual's expiration, including the force of the expiration, the volume of air expired, and the rate of expiration.

44.  The pulmonary measurements obtained through forced spirometric PFTs include:

a.  forced vital capacity ("FVC"), which is the individual's vital capacity, or the total expiratory volume of the lung, performed with maximum expiratory effort;

15

b.   forced expiratory volume during the first second of expiration ("FEV1") and with maximum effort, which is the volume of air exhaled during the first second of the FVC; and

c.   the FEV1/FVC ratio, which represents the percentage of the individual's total forced vital capacity (FVC) which is exhaled during the patient's initial one second of expiration (FEV1).

45.   These measurements are used to determine whether the individual has any pulmonary function impairment by comparing the individual's measurements to a set of predicted measurements for that individual based on age and other physical characteristics.

46.   There are well-established standards that govern the administration of forced spirometric PFTs.   The applicable standards are set forth by the American Thoracic Society ("ATS") in a written statement entitled "Standardization of Spirometry--1987 Update" and in subsequent standards issued by the ATS in 1991, 1994, and 1995 (the "ATS Standards").

47.   The principal purpose of the ATS Standards is to ensure the accuracy, integrity and validity of PFT results by establishing testing criteria that must be met by the medical doctor or technician administering spirometric tests.

48.   A forced spirometry test does not produce valid measurements of pulmonary function unless the subject first takes a complete inspiration and then exhales forcibly for a sufficient time during the test with maximum expiratory effort.   Thus, the ATS Standards require a subject to exhale forcibly for a minimum of six

16

DP003 002482

seconds or until the subject reaches a plateau (no change in the volume of the subject's expiration) for at least 1-to-2 seconds.

49. If a subject does not exhale forcibly for the full mandatory minimum 6-second duration, or until there is no measurable volume change during the final 2 seconds of expiration, the subject will not fully express the vital capacity of his lungs, resulting in an understated FVC reading and an overstated FEV1/FVC ratio.

50. The ATS Standards also require that the subject of an FVC test and an FEV1 test perform a minimum of three acceptable breathing maneuvers. If there is a variability in the results of the two largest FVCs or FEV1s of more than 5%, the results are not considered valid for interpretation and the subject should be required to perform an additional three-to-five maneuvers (depending on their variability).

51. If properly administered, forced spirometric testing, and in particular the FEV1/FVC ratio derived from such testing, can differentiate between two basic types of lung dysfunction: obstructive patterns and restrictive patterns. An obstructive pattern indicates that the flow of air out of an individual's lungs is obstructed. A restrictive pattern indicates that the individual's total lung volume is reduced. Asbestos-related lung impairment is restrictive in nature and pulmonary impairment that is obstructive in nature is not caused by asbestos.

52. Accordingly, accurate forced spirometric PFT results are particularly important not only in helping to determine whether

17

DP003 002483

asbestos-related disease and pulmonary impairment exist in an individual, but also in distinguishing between lung impairment caused by exposure to asbestos and obstructive impairment unrelated to asbestos.

53.    In addition to forced spirometric PFTs, there are two other types of PFTs commonly performed to measure an individual's pulmonary function.  One of these tests involves an individual's performance of certain breathing maneuvers to determine an individual's total lung capacity ("TLC").  The other type of PFT involves the performance of certain breathing maneuvers to determine the individual's diffusing capacity ("DLCO"), which indicates the ability of the individual's lungs to properly transfer gases between the lungs and the blood.

54.    As with forced spirometric PFTs, in order to ensure the validity of the results of these types of PFTs, well-established standards must be followed when administering these types of PFTs.  In addition, as with spirometric PFTs, these tests are at times used as an aid to determine whether pulmonary impairment exists in an individual and the nature and severity of such impairment.  In connection with the operation of the PFL Enterprise, the Defendants have performed these types of PFTs on individuals in conjunction with spirometric PFTs.

D.    **The Defendants' Systematic Pattern of Gross Departures From The Well-Established Standards For The Administration of PFTs**

55.    At all times relevant to the Complaint, the Defendants, in operating the PFL Enterprise, engaged in a

18

systematic pattern of gross departures from well-established standards governing the administration of PFTs. In doing so, the Defendants have generated false measurements of their test subjects' pulmonary measurements including, but not limited to, FVC, FEV1, FEV1/FVC ratio, DLCO, and TLC, and have produced false evidence of pulmonary impairment used to substantiate the filing and settlement of non-malignant, asbestos-related claims.

56. At all times relevant to the Complaint, the Defendants have known of, and been familiar with, the ATS Standards and other well-established standards governing the proper administration of PFTs. Nonetheless, Defendant McNeese, on behalf of PFL, has personally performed thousands of PFTs, and supervised the performance of thousands of additional PFTs, which systematically and grossly departed from these standards.

57. In some instances, Defendant McNeese expressly has instructed the PFL Enterprise's test operators to perform PFTs in a manner which clearly violates the ATS Standards and other well-accepted standards for administering PFTs.

58. In other instances, Defendant McNeese has instructed and required PFL's PFT technicians to administer PFTs so quickly that following McNeese's instructions necessarily has prohibited the technicians from administering the tests in compliance with ATS Standards and other well-established standards.

59. Defendant McNeese has monitored and reviewed the PFT results generated by the PFL Enterprise and has known of their falsity. Nonetheless, Defendant McNeese has caused these false PFT

19

DP003 002485

results to be used in the preparation of diagnoses of non-malignant, asbestos-related illnesses and to be used to substantiate the filing and settlement of asbestos-related claims.

60. Medical experts have conducted an examination of a sample consisting of approximately 3,486 cases in which the Defendants administered PFTs to substantiate asbestos-related injury claims against Owens Corning. This review confirms that the Defendants' gross departure from ATS Standards on a systematic basis dramatically has skewed forced spirometric measurements which has: (a) made individuals appear to suffer from asbestos-related pulmonary impairment; or (b) made individuals appear to suffer from a more severe pulmonary impairment.

61. Specifically, the Defendants systematically violated the ATS Standard requiring the subject to exhale for at least 6 seconds. In the sample of cases reviewed by medical experts, approximately 3,245 of those cases contained data concerning the expiratory time. In over 98% of these cases, the Defendants produced test results in which this standard was not met. Further, over 54% of these subjects exhaled for less than 3 seconds, which is an extraordinary departure from ATS Standards.

62. In addition, the Defendants systematically violated the ATS Standard requiring a subject's two largest FVCs or FEV1s to be reproducible within 5% of one another. The Defendants not only have failed to conduct two reproducible tests, but also expressly have instituted a policy to perform only one forced spirometric

20

maneuver in knowing and flagrant violation of the applicable ATS standard concerning reproducibility of tests.

63.  Consequently, by engaging in a systematic departure from ATS standards for forced spirometry, the Defendants artificially have created a decreased FVC and an abnormal FEV1/FVC ratio to create the impression of restrictive impairment. Thus, the Defendants' non-compliance with the proper standards for administering PFTs has generated false "positive" PPT results used to substantiate diagnoses of non-malignant, asbestos-related impairment.

64.  In certain circumstances, an individual who suffers from certain severe pulmonary disease may not -- as a result of substantial impairment -- be able to exhale for a full six seconds. However, such individuals would comprise an extremely small percentage (if any) of any group of individuals who, like virtually all of the individuals tested by Defendants, were able to work and who walked into the testing facilities without assistance.

65.  By contrast, a hospital testing purely for medical reasons rarely observes patients who are unable to exhale 6 seconds, even when testing individuals with severe pulmonary restrictions. A sample of 118 patients with various respiratory disorders tested at LDS Hospital in Salt Lake City, Utah, revealed that over 86% were able to achieve exhalation rates in excess of the 6-second standard. As noted above, the sample of approximately 3,486 subjects tested by the Defendants met this standard in less than 2% of the tests reviewed. Set forth below are graphs

21

DP003 002487

comparing the expiratory times of subjects in a sample of the Defendants' tests and those of individuals in tests performed properly at LDS Hospital.

DP003 002488



## PFL Enterprise
## Percent Less Than 6 Seconds = 98.2%

(Total Number of Observations = 3,245)



## LDS Hospital
## Percent Less Than 6 Seconds = 13.6%

(Total Number of Observations = 118)

23

66.  In addition to generating false test results derived through forced spirometric PFTs, the Defendants also have generated false results from the other types of PFTs they performed. Specifically, by violating well-established testing standards and other procedures, the Defendants have generated results which falsely understate individuals' TLC and DLCO measurements and often resulted in results which falsely showed an individual had pulmonary impairment.

67.  In sum, the Defendants have engaged in a systematic pattern of gross departures from well-established PFT standards. This pattern has resulted in the repeated generation of PFT data which has falsely understated the individuals' FVC measurements, falsely overstated the individuals' FEV1/FVC ratios, falsely understated the individuals' TLC and DLCO measurements, and falsely substantiated diagnoses of asbestos-related conditions with accompanying pulmonary impairment.  The Defendants have known that this false data would be used as medical evidence to substantiate the filing and settlement of asbestos-related personal injury claims against Owens Corning and others, including claims in which the Defendants, pursuant to "contingency contracts," had a direct financial interest.

68.  The Defendants' systematic pattern of producing false PFT results, which has enriched the Defendants, has caused direct and substantial financial injury to Owens Corning's business and property.  The injuries which have been proximately caused by

24

DP003 002490

the Defendants' repeated generation of false PFT results include, but are not limited to:

a.    settlement payments, or portions thereof, made by Owens Corning based in part on false PFT results generated by the Defendants; and

b.    expenses incurred, such as attorneys fees, administrative expenses, and other litigation-related costs in defending claims filed against Owens Corning based upon false PFT results generated by the Defendants; and

c.    the negative impact of the Defendants' false test results on Owens Corning's financial condition.

### First Cause of Action: RICO, 18 U.S.C. § 1962(c)

### Defendant:    William T. McNeese

69.    Owens Corning repeats and realleges the allegations contained in paragraphs 1 through 68 as though fully set forth herein.

70.    At all times relevant to this Complaint, Defendant McNeese has satisfied the definition of a "person" within the meaning of that term as used in Title 18, United States Code, Sections 1961(3) and 1962(c).

71.    At all times relevant to this Complaint, Defendant PFL has constituted an "enterprise" (the "PFL Enterprise") within the meaning of that term as used in Title 18, United States Code, Sections 1961(4) and 1962(c).

25

DP003 002491

72. At all times relevant to this Complaint, Defendant McNeese has been employed by and/or otherwise associated with the PFL Enterprise.

73. Defendant McNeese has participated, directly and indirectly, in the unlawful affairs of the PFL Enterprise through a pattern of racketeering activity, in violation of Title 18, United States Code Section, 1962(c).

74. Defendant McNeese has engaged in a "pattern of racketeering activity" within the meaning of that phrase as used in Title 18, United States Code, Sections 1961(5) and 1962(a). Specifically, Defendant McNeese has committed the following acts of mail fraud, in violation of Title 18, United States Code, Section 1341, which constituted racketeering predicate acts:

a. Defendant McNeese has devised and executed a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, by intentionally and/or recklessly generating false medical test results in order to: (i) support personal injury claims against Owens Corning; and (ii) induce settlements of such claims on favorable monetary terms.

b. The purpose of the scheme has been to defraud Owens Corning of millions of dollars in personal injury settlements or verdicts by generating bogus medical testing results for use in support of asbestos-related claims against Owens Corning.

c. The manner and means by which Defendant McNeese has accomplished and attempted to accomplish his scheme has been by

26

generating and enhancing the settlement value of asbestos-related injury claims against Owens Corning through the production of false medical data and reports, including false PFT reports, in support of those claims. In particular, Defendant McNeese has designed and carried out, or has caused to be carried out, medical screening procedures in a manner intended to produce fraudulent PFT reports. These fraudulent PFT reports have been produced so that they have understated the individuals' FVCs, overstated the individuals' FEV1/FVC ratios, understated the individuals' TLCs, and understated the individuals' DLCOs. The scheme also has been accomplished by causing the fraudulent PFT results to be included in the diagnostic reports which have concluded that the individuals suffer from an asbestos-related medical condition and impairment.

        d.    Pursuant to and in furtherance of the scheme to defraud, Defendant McNeese has generated, or has caused to be generated, and caused to be submitted to Owens Corning medical reports containing false PFT data. Among the medical reports containing false information are the PFT reports generated by Defendant McNeese and Defendant PFL and the diagnostic reports which rely upon such PFT reports to substantiate claims filed in lawsuits against Owens Corning by the individuals listed on the attached Appendix A to this Complaint. Each of these false PFT reports and false diagnostic reports constitutes a separate false statement in furtherance of Defendant McNeese's scheme. The reports for these individuals are false in one or more of the following respects:

27

DP003 002493

i.   The PFT report falsely understated the individuals's FVC;

ii.  The PFT report falsely overstated the individual's FEV1/FVC ratio;

iii. The PFT report falsely understated the individual's TLC;

iv.  The PFT report falsely understated the individual's DLCO; and/or

v.   The diagnostic report incorporated the false data contained in the PFT report in diagnosing the individual with an asbestos-related medical condition.

e.   Defendant McNeese has made frequent use of and caused the use of the United States mails during the course of and in furtherance of his fraud scheme. Specifically, shortly after the PFTs have been conducted on the individuals Defendant McNeese and Defendant PFL have tested, Defendant McNeese has caused the mails to be used in furtherance of his scheme in several respects, including, but not limited to:

i.   the mailing of PFT reports and medical files and other information and correspondence from Defendants PFL and McNeese to the diagnosing doctors;

ii.  the mailing of invoices and payments for PFTs performed, and other information and correspondence, between the Defendants

28

and the attorneys to whom the Defendants
provided the PFT results; and

iii. the mailing of bills from PFT technicians
to Defendants PFL and McNeese reflecting
services performed by the PFT technicians
in conducting PFTs for Defendants PFL and
McNeese.

75. Following Defendant McNeese's and Defendant PFL's
normal business practice and office procedure, the PFT reports and
diagnostic reports relating to the individuals set forth in
Appendix A hereto, and other records used in furtherance of the
scheme, have been mailed, including in the foregoing manners. Each
of these uses of the mails constitutes a separate violation of
Title 18, United States Code, Section 1341.

76. Plaintiff Owens Corning has been injured in its
business and property by reason of Defendant McNeese's violation of
Title 18, United States Code, Section 1962(c).

Second Cause of Action: COMMON LAW FRAUD

Defendants:    William T. McNeese and Pulmonary Function
               Lab, Inc.

77. Owens Corning repeats and realleges the allegations
contained in paragraphs 1 through 68 as though fully set forth
herein.

78. As described above, the Defendants have made false
and fraudulent representations of material fact, namely false and
misleading medical reports, including PFT reports, which were
generated through fraudulent procedures.

29

DP003 002495

79. At the time the Defendants have made such false and fraudulent representations, the Defendants have been aware of the falsity of such representations.

80. The Defendants have made the misrepresentations with the intent to deceive both the individuals who were the subjects of the false test reports as well as companies such as Owens Corning.

81. The individuals who have been the subjects of the false test reports have relied upon the results of these reports in pursuing asbestos-related claims against Owens Corning, and Owens Corning has relied on these reports in connection with the defense and settlement of these claims, resulting in injury to Owens Corning which has been proximately caused by the Defendants' fraud.

82. Because of the nature of the Defendants' fraud, Owens Corning did not discover the fraud, and could not have reasonably been expected to do so, until after January 1996.

83. The Defendants' conduct has been wanton, reckless, oppressive, and constituted a willful disregard of Owens Corning's rights.

Third Cause of Action: COMMON LAW NEGLIGENT MISREPRESENTATION

Defendants: William T. McNeese and Pulmonary Function Lab, Inc.

84. Owens Corning repeats and realleges the allegations contained in paragraphs 1 through 68 as though fully set forth herein.

85. As described above, the Defendants have made false representations of material fact, namely, false and misleading medical reports, including PFT reports, as a result of PFTs which

30

were administered in violation of applicable and well-established standards governing the administration of such tests.

86. The Defendants have made such false representations because of their failure to exercise due care.

87. The Defendants had constructive knowledge of the falsity of their PFT test results, or should have known of the falsity of such results.

88. The Defendants have known and intended that the medical reports containing the false statements would be provided to the individuals who have been the subjects of those reports, as well as to defendants in asbestos-related personal injury lawsuits, including Owens Corning.

89. The Defendants have known and intended that the individuals who have been the subjects of the medical reports containing the false statements would rely on, and act on, those medical reports.

90. The Defendants have known and intended that Owens Corning and other defendants in asbestos-related personal injury lawsuits would rely on, and act on, the medical reports containing the false statements.

91. The individuals who have been the subjects of the medical reports containing the false statements reasonably have relied upon these reports in pursuing asbestos-related claims against Owens Corning.

92. Owens Corning, and other defendants in the asbestos-related personal injury lawsuits, reasonably have relied upon the

31

DP003 002497

medical reports containing the false statements in connection with the defense and settlement of these claims.

93.  This reasonable reliance by the individual subjects and by Owens Corning on the medical reports containing the false statements directly has resulted in injury to Owens Corning.

94.  Because  of  the  nature  of  the  Defendants' misrepresentations, Owens Corning did not discover them, and could not have reasonably been expected to do so, until after January 1996.

### Fourth Cause of Action: INJURIOUS FALSEHOOD

Defendants:     William T. McNeese and Pulmonary Function Lab, Inc.

95.  Owens Corning repeats and realleges the allegations contained in paragraphs 1 through 68 as though fully set forth herein.

96.  As described above, the Defendants produced and generated false statements harmful to Owens Corning's pecuniary interests, namely, false and misleading medical reports, including PFT reports.  These reports were false in that they made the individuals who were the subjects of such tests, and who the Defendants knew had claimed to have been exposed to asbestos through Owens Corning's products: (a) falsely appear to suffer from an asbestos-related pulmonary impairment or condition; or (b) falsely appear to suffer from a more severe asbestos-related pulmonary impairment or condition.

32

DP003 002498

97. The Defendants produced such false statements by intentionally failing to comply with well-established standards for PFTs, or by recklessly failing to comply with such standards.

98. The Defendants provided and published, or caused to be provided and published, such false statements to the individuals they tested, to the attorneys representing such individuals, to doctors who diagnosed such individuals with asbestos-related medical conditions, and to others.

99. At the time they made and published the false statements, the Defendants either knew of the falsity of such statements, should have known of the falsity of such statements, or acted in reckless disregard of the falsity of such statements.

100. The Defendants either intended that the false statements would cause harm to Owens Corning's pecuniary interests, or knew or should have known that the false statements were likely to cause harm to Owens Corning's pecuniary interests, in part because they were aware that the individuals were likely to file claims against Owens Corning based on the false statements.

101. The false statements caused harm to Owens Corning's pecuniary interests, and Owens Corning suffered pecuniary loss from such false statements, in part because such false statements resulted in lawsuits against Owens Corning through which Owens Corning suffered substantial financial injury.

102. The Defendants fraudulently concealed the false nature of the false medical reports they generated, and Owens

33

DP003 002499

Corning did not discover the falsity of such reports, and could not reasonably have been expected to do so, until after January 1996.

34

DP003 002500

### PRAYER FOR RELIEF

103. WHEREFORE, Owens Corning respectfully requests the following relief:

a. An award to Owens Corning of its actual damages, including prejudgment interest, trebled pursuant to Title 18, United States Code, Section 1964(c);

b. An award to Owens Corning of full reimbursement of its costs and expenses relating to this action, including reasonable attorneys' fees, as provided in Title 18, United States Code, Section 1964(c);

c. An award to Owens Corning of punitive damages to punish and deter the Defendants' willful and wanton conduct; and

d. Such further relief, including punitive damages, as the Court deems appropriate and the law provides.

Scott E. Delacroix #4823 (LA)
William B. Gaudet #1374(LA)
Charles P. Adams, Jr. MFB #1047
ADAMS AND REESE
M-Tel Center
Suite 900
200 South Lamar Street
Jackson, MS 39225
(601) 353-3234

Dan K. Webb #02954087 (IL)
Timothy J. Rivelli #3124639 (IL)
WINSTON & STRAWN
35 W. Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

Alex A. Alston, Jr. #1543
ALSTON, RUTHERFORD,
& VAN SLYKE
121 North State Street
Post Office Drawer 1532
Jackson, Mississippi  39215-1532
(601) 948-6882

Dated: January 22, 1997

35