# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------x
IN RE: : Chapter 11
:
OWENS CORNING, et al., : Case No.: 00-3837 to 3854 (JKF)
: (Jointly Administered)
Debtors. :
. Hearing Date: February 28, 2005 at 10:00 a.m.
:
: Related to D.I. Nos. 12850 and
: 12852
---------------------------------------------x

**AFFIDAVIT OF ROGER E. PODESTA IN SUPPORT OF
DEBTOR'S RESPONSE AND CONDITIONAL OPPOSITION TO THE MOTION
OF CSFB, AS AGENT, TO COMMENCE AN ADVERSARY PROCEEDING ON
BEHALF OF THE DEBTORS' ESTATES AGAINST CERTAIN PHYSICIANS**

STATE OF NEW YORK    )
) ss:
COUNTY OF NEW YORK   )

Roger E. Podesta, being duly sworn, hereby deposes and says:

1. I am a Member of the Bar of the State of New York and of the law firm of Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022. Debevoise & Plimpton serves as special asbestos counsel to the Debtor in the above-captioned bankruptcy cases. I submit this affidavit in support of Debtor's Response and Conditional Opposition to the above-captioned motion of CSFB. I have personal knowledge of the matters set forth herein.

2. I have served since 1987 as Owens Corning's ("OC's") national counsel for asbestos litigation. In that capacity, I was involved in investigations commencing in 1995 of medical screening practices conducted by certain pulmonary function testing

("PFT") laboratories in Louisiana and Mississippi. In 1996, OC commenced a lawsuit against certain individuals and companies involved in conducting PFTs in conjunction with mass screenings of potential asbestos claimants (the "*Pitts* Lawsuit"). The *Pitts* lawsuit alleged that defendants, who conducted PFTs and took chest X-rays, disregarded proper testing procedures and manipulated test outcomes to create false "positive" results – that is, they found impairment in the pulmonary function of screened individuals when no impairment existed. The *Pitts* complaint accused defendants of fraud and RICO violations. In January 1997, OC brought substantially similar claims against another group of individuals and businesses involved in mass PFT screenings (the "McNeese Lawsuit") (the *Pitts* and *McNeese* Lawsuits are together referred to as the "PFT Lawsuits").

3. In connection with the PFT Lawsuits, OC investigated the possibility of bringing claims against certain of the X-ray B-readers who were involved in the mass screenings, including at least three of the B-readers who are defendants in CSFB's proposed complaint, Drs. Harron, Lucas and Segarra. OC considered claims against these B-readers (particularly Dr. Harron) because it was aware that they were responsible for very large numbers of positive diagnoses of asbestos-related disease, and suspected them of knowingly overreading X-rays.

4. Although OC suspected the B-readers of fraud, it decided, after careful consideration, including consultation with lead outside counsel Dan Webb of Winston & Strawn, not to sue the B-readers, but to focus on the PFT operators. There is substantial variability even among legitimate B-readers in interpreting X-rays for asbestosis, a fact

that would make it difficult for OC to prove, without concrete evidence, that the B-readers actually committed fraud. Thus, in order to avoid weakening its strong case against the PFT operators, OC made a deliberate, strategic decision not to sue the B-readers.

5. The PFT Lawsuits were hard-fought. Defendants in the *Pitts* Lawsuit brought counterclaims seeking multi-million dollar recoveries, including allegations of abuse of process, interference with business relationships, interference with contractual relations, defamation, intentional infliction of emotional distress, injurious falsehood, trade disparagement and trade libel. Defendants in the *McNeese* Lawsuit threatened OC with multi-million dollar counterclaims charging OC with attempting to deter the filing of legitimate personal injury claims and with attempting to drive the PFT operators out of business.

6. During the PFT Lawsuits, OC tried to develop evidence that the B-readers had received greater compensation for interpreting X-rays as positive for asbestos-related disease than they received for interpreting X-rays as negative. OC was unable to develop such evidence.

7. The PFT Lawsuits were settled in 1999. Although the settlements were generally favorable to OC, they did not come close to covering the legal expenses that OC had incurred; indeed, OC spent about three times more in legal fees than it received in settlement.

8. Although OC did not sue the B-readers in the PFT Lawsuits, it did take steps to protect itself against overreading by these B-readers. In particular, in many of

3

the NSP Agreements that OC entered into with plaintiffs' law firms in 1998, 1999 and 2000, OC negotiated provisions restricting the circumstances under which it would be required to accept X-ray readings from one or more of the doctors proposed by CSFB as defendants, including, in particular, Dr. Harron. Further, in settlement agreements pursuant to which OC resolved underlying asbestos claims that gave rise to the PFT Lawsuits, OC inserted provisions to pay only $1,000 per claim in cases supported by X-ray readings from suspect B-readers that did not also have evidence of impairment from valid PFT testing.

9. On December 20, 2004, I received a letter from Barry Ostrager of Simpson Thacher & Bartlett LLP, counsel for CSFB, demanding that OC file suit against certain B-readers and enclosing a proposed complaint. (*See* Exh. 1.)

10. On December 27, 2004, I sent a letter to Mr. Ostrager in which Stephen Krull, OC's Senior Vice President, General Counsel and Secretary, and I offered to meet with Mr. Ostrager in early January to discuss the proposed lawsuit. (*See* Exh. 2.)

11. On January 4, 2004, I attended a meeting with Mr. Krull, Norman Pernick, bankruptcy counsel for the Debtors, Barry Ostrager, and Tyler Robinson and Katharine Nolan, Mr. Ostrager's colleagues. At that meeting, I told Mr. Ostrager and his colleagues that OC was not opposed in principle to commencing a litigation against the proposed defendants or any other B-readers, if those individuals could be shown to have engaged in fraud. I also told them about the PFT Lawsuits -- specifically, that OC had filed them against PFT operators in 1996 and 1997, and that OC had seriously considered suing several of CSFB's proposed defendants but had concluded that the X-ray readings were

4

too subjective and the variations in X-ray interpretations between legitimate B-readers were too substantial to make out an attractive fraud case. I explained that for that reason, OC in 1996 and 1997 made a strategic decision to focus on the PFT results, which we believed could be shown to be objectively fraudulent.

12. I further told Mr. Ostrager and his colleagues that I believed there were serious statute of limitations issues that had arisen since the filing of the PFT Lawsuits that would make a suit against the B-readers even more difficult than it had been in the mid-1990s.

13. Also at the January 4 meeting, Mr. Ostrager said that CSFB would agree to bear the legal costs of a suit against the B-readers and would seek reimbursement from the Debtor's estate only out of any recoveries in the litigation. I informed Mr. Ostrager and his colleagues that, in my view, the allegations CSFB proposed would be fiercely contested, as the PFT Lawsuits had been. I told them that I was concerned that the potential legal costs of the suit could easily exceed monetary recovery.

14. Given the consideration OC had already given to the proposed lawsuit and the difficulties in proving the fraud claim, and considering the serious statute of limitations problems that had since arisen with the passage of time, we told CSFB at the January 4 meeting that OC was reluctant to bring suit against the proposed defendants in the absence of new evidence of fraud. I therefore asked Mr. Ostrager if he had any support for the allegation contained in Paragraph 35 of the proposed complaint alleging that the defendants received greater compensation for finding positive indications of asbestos-related injury than for negative ones. Despite my asking this question several

times, Mr. Ostrager did not provide any indication that he was aware of new evidence or of specific support for this allegation.

15. Finally, at the January 4 meeting, I informed Mr. Ostrager and his colleagues that several of the proposed defendants have been accused of questionable screening practices in connection with the silica cases consolidated in the MDL 1553 proceeding in federal court in Corpus Christi, Texas before Judge Janis Graham Jack. Judge Jack has expressed concern that there may have been fraud in connection with the medical diagnoses of silica claimants, and has ordered all four of the proposed defendants to testify in her courtroom, in her presence, in the middle of February. I told Mr. Ostrager that OC would monitor the testimony to see if they revealed evidence of fraud.

16. On January 10, I sent Mr. Ostrager a letter informing him that, at the present time, OC was not prepared to file the proposed complaint on its behalf and would not consent to CSFB's pursuit of a derivative suit on its behalf, and detailing the bases for this decision. The letter further informed Mr. Ostrager of OC's concern about potential counterclaims if the suit was filed, and stated that OC might reconsider its opposition to CSFB's prosecution of the proposed complaint if CSFB agreed to indemnify OC, its directors, officers, agents, professionals and employees from any counterclaims that may be filed by the defendants. (Exh. 3.)

Further affiant sayeth not this tenth day of February, 2005.

*Roger E. Podesta*
Roger E. Podesta

Sworn to before me this
10th day of February 2005

*Notary Public*

CARON F. GELINEAU
Notary Public, State of New York
No. 01GE5009056
Qualified in New York County
Commission Expires March 8, 2007

7