# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------x
                                                :
IN RE                                           :
                                                :
OWENS CORNING, et al.,                          :
                                                :
------------------------------------------------x
                                                :
CREDIT SUISSE FIRST BOSTON,                     :
                                                :    **Civil Action No. 05-40 (JPF)**
                Movant,                          :    **Bankr. Case No. 00-3837 (JKF)**
                                                :    **Related to Bankr. Case Docket No. 14181**
        v.                                      :
                                                :
CERTAIN PHYSICIANS,                             :
                                                :
                Respondent.                     :
------------------------------------------------x
```

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## CSFB'S MOTION FOR WITHDRAWAL OF REFERENCE

Credit Suisse First Boston ("CSFB"), as Agent for the pre-petition bank lenders to the Debtors, respectfully submits this Reply Memorandum In Further Support Of CSFB's Motion To Withdraw The Reference to the Bankruptcy Court with respect to CSFB's motion for authorization to commence derivatively on behalf of the Debtors' estates an adversary proceeding against certain B-readers (the "Motion To Proceed Derivatively"). CSFB's proposed complaint alleges that the B-readers falsely reported x-ray readings as positive for asbestos-related disease in support of asbestos personal injury claims that were paid by the Debtors pre-petition.

In its opening brief, CSFB articulated four compelling reasons why judicial economy is served by withdrawing the reference with respect to the Motion To Proceed Derivatively:

1.  The contemplated jury trial action that CSFB seeks leave to prosecute would proceed before this Court, not the Bankruptcy Court;

2.  The Order referring this case to the Bankruptcy Court specifically contemplates withdrawal of the reference with respect to asbestos-related claims and issues such as the claims and issues presented by the contemplated action against the B-readers. *See* Order at 3, attached as Exhibit 2 to Memorandum Of Law In Support Of Motion To Withdraw The Reference;

3.  The criteria for granting derivative standing to a creditor requires the Court to determine if the contemplated claims are "colorable" under a motion to dismiss standard. As this is the Court that would preside over the merits of the claims in the event they were to proceed, it makes sense for this Court to be the one to evaluate whether the claims are "colorable" in the first instance;

4.  This Court withdrew the reference, and recently conducted hearings with respect to the estimation of pending asbestos personal injury claims. This lawsuit concerning the validity of asbestos personal injury claims paid pre-petition implicates common facts and evidence relating to B-reader fraud.

In short, withdrawal of the reference would eliminate the need for two courts (the Bankruptcy

Court and the District Court) both to consider the same issues on separate occasions.

Tellingly, the Debtors have completely failed to address the merits of CSFB's

argument that "cause" exists for withdrawing the reference. *See* Memorandum Of Law In

Support Of Motion To Withdraw The Reference at 2-6. Indeed, the Debtors do little more than

assert that they will argue to the Bankruptcy Court that the Motion To Proceed Derivatively is a

"core proceeding."[1] Debtors' Response To CSFB's Motion For Withdrawal Of Reference (the

"Debtors' Br.") at 2 n. 1. Yet, judicial economy and efficiency favor a limited withdrawal of the

reference regardless of whether the Motion To Proceed Derivatively is a "core proceeding" – a

characterization that is not determinative of whether this Court should grant the Motion. Indeed,

---

[1]    Likewise, the Debtors' bald assertion that the contemplated adversary proceeding is "not relevant to the estimation proceedings" is unpersuasive. Debtors' Br. at 2. Because the estimation proceedings involve allegations of fraud by the same B-readers, the District Court is already familiar with the issue. As such, judicial economy is served by withdrawal of the reference even though "the hearing has already been held." *Id.*

2

the core/non-core determination is especially irrelevant here because the Court's authority to

withdraw the reference is expressly not limited to whether the issue is core or non-core. *See*

Order at 3, attached as Exhibit 2 to Memorandum Of Law In Support Of Motion To Withdraw

The Reference.

Rather than argue the merits of CSFB's Motion, the Debtors appear simply to

refer to their letter of January 10, 2005 from Roger Podesta, special counsel to Owens Corning,

to Barry Ostrager, counsel for CSFB, (appended to their brief) in which the Debtors refused

CSFB's demand that the Debtors prosecute the proposed lawsuit.[2]  Having placed the merits of

their refusal at issue on this Motion, it suffices to observe the following:

1.    *Owens Corning contends that it made a "deliberate strategic decision" in
      1996/1997 not to sue B-readers because ILO x-ray interpretation is "too
      subjective" and refused CSFB's demand because there is an "absence of
      significant new evidence of fraud."*

CSFB's draft complaint (a copy of which was submitted to Owens Corning with

CSFB's December 20, 2004 demand letter, and to this Court with the Motion To Withdraw The

Reference) is based principally upon the May 21, 2002 Report of Dr. Gary K. Friedman, about

which Dr. Friedman subsequently elaborated during his deposition held on December 14, 2004

(CSFB obtained a copy of this Report for the first time on September 3, 2004). Dr. Friedman is a

_____

[2]    In this regard, the Debtors try to read significance into the fact that CSFB did not publicly file a
       copy of Mr. Podesta's letter with CSFB's motion for derivative standing in the first instance. The
       significance is this: CSFB did not think it was appropriate to do so because the letter reveals the
       substance of counsel's candid and strategic discussions concerning a proposed litigation of
       mutual interest to both parties, held at a time when Owens Corning ostensibly was taking the
       demand under serious consideration. CSFB considered that meeting confidential, if not perhaps
       even privileged. Obviously the Debtors are entitled to voice their concerns about the lawsuit and
       reasons for refusing the demand in whatever terms they choose to publicly file in court, and
       CSFB fully expected they would do so. CSFB thinks it unfortunate, however, that they would
       choose, in addition, to reveal the specific discussions that were had candidly and confidentially
       with CSFB in a genuine desire to advance the litigation interests of both CSFB and Owens
       Corning. Be that as it may, CSFB is not surprised and, for the reasons discussed below, finds
       nothing in the letter (nor heard anything in the parties' confidential discussions on January 4,
       2005) that justifies Owens Corning's failure to prosecute the proposed claims against the
       defendant B-readers.

3

board-certified pulmonologist whom Owens Corning retained – in connection with the claims
estimation proceedings over which this Court recently presided – to study the validity of
nonmalignant asbestos personal-injury claims that were paid by Owens Corning pre-petition in
connection with its National Settlement Program ("NSP"). On May 21, 2002, Dr. Friedman
reported to Owens Corning his conclusion, *inter alia*, that nearly 87% of the randomly sampled
1,691 claims failed to meet NSP medical documentation criteria for paying a claim. He opined,
based on this result, that as much as two-thirds of all nonmalignant claims submitted for payment
under Owens Corning's NSP did not meet medical criteria for payment and should not have been
paid. *See* Friedman Deposition Tr. at 215-16.[3] Dr. Friedman specifically concluded that his
results could not be explained by subjective variation in the interpretation of individual x-rays.
*See* Friedman Deposition Tr. at 109-110. Dr. Friedman further discovered that only five B-
readers accounted for 80% of his sample. Four of them are the named defendants in CSFB's
proposed lawsuit (the fifth one is deceased). Significantly, Dr. Friedman testified at deposition
that his understanding – obtained from Mr. Podesta – was that the 1,691 claims studied were
submitted to Owens Corning in connection with its NSP, which was not commenced until 1998 –
*after* Owens Corning made its referenced strategic decision not to pursue claims against B-
readers. *See* Friedman Deposition Tr. at 142-43.

        In short, the May 21, 2002 Friedman Report is significant new evidence of B-
reader fraud, that cannot be explained away by subjective variation, implicating potentially
hundreds of thousands of claims that the Debtors paid *after* they made their strategic decision not

---

[3]     Selected portions of the 12/14/04 transcript of Dr. Friedman's deposition testimony are appended
hereto as Exhibit A.

4

to sue B-readers.[4] As Mr. Podesta's letter reflects, CSFB has offered to fund the costs of
pursuing the proposed lawsuit, obviating any risk to the Debtors' estate, subject to CSFB's right
to seek reimbursement of legal fees from monies recovered.

2.    *Notwithstanding CSFB's willingness to assume all of the risk associated with the
cost of prosecuting the proposed lawsuit, Owens Corning contends that the threat
of potential counterclaims against Owens Corning is too costly*

According to Owens Corning, the risk of pursuing otherwise viable claims against

B-readers is too great because the proposed defendants might assert counterclaims that allege
Owens Corning is trying to deter the filing of legitimate medical claims. Apparently such
counterclaims were alleged when Owens Corning sued – and then favorably settled – claims
against Pulmonary Function Testing laboratories in 1996 and 1997. But in light of the merits of
the proposed claims, Owens Corning's fears of such counterclaims (at least as having any real
merit) are unfounded. If Owens Corning's officers and directors are not up to prosecuting viable
claims on behalf of the estate unless they receive indemnification from CSFB against potential
(meritless) counterclaims, it would appear that they either have not lived up to their fiduciary
duties in the past, or are not living up to them now.

3.    *Owens Corning can find no "collateral benefits" to the estate in the proposed
lawsuit*

In addition to any light it may shed on the merits of future nonmalignant asbestos

personal injury claims, this lawsuit has the potential to discourage the filing of baseless claims in
the first instance, both against these Debtors and many others, to the benefit of all creditors,
among them, asbestos personal injury claimants with legitimate injuries. It is astonishing that

---

[4]    Moreover, as set forth in CSFB's Motion To Proceed Derivatively, the Friedman report is one of
numerous studies and reports that support the claims CSFB proposes to file against B-readers.
*See* Motion To Proceed Derivatively at ¶¶ 13, 18-20, attached as Exhibit 1 to the Memorandum
Of Law In Support Of The Motion To Withdraw The Reference.

5

Owens Corning would take the position that trying to pursue a remedy where there clearly has been a massive fraud against the company offers no "collateral benefit" to the estate. That is a level of cynicism CSFB does not share.

**CONCLUSION**

For the foregoing additional reasons, CSFB respectfully requests that the Court grant the Motion To Withdraw The Reference and enter an order authorizing a limited withdrawal of the reference to the Bankruptcy Court with respect to the Motion To Proceed Derivatively.

Dated:    January 28, 2005

LANDIS RATH & COBB LLP

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Tel:  (302) 467-4400
Fax:  (302) 467-4450

*Attorneys for Credit Suisse First Boston, as Agent*

OF COUNSEL:

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Tel:  (212) 455-2000
Fax:  (212) 455-2502

**EXHIBIT A**

GARY FRIEDMAN

1      A.   Pneumoconiosis, yes, sir.

2      Q.   Okay.  And that accurately states your

3    findings?

4      A.   Yes, sir.

5      Q.   And if you'll skip the next paragraph and go

6    to the one following that, it says, It is recognized

7    that there may be variation between B Readers and the

8    interpretation of radiographs.  And then it says,

9    While on any given x-ray a legitimate dispute may

10   arise --

11              MS. HOGAN:  You skipped a parenthetical.

12              MR. HICKERSON:  I did, yes.

13      Q.   (BY MR. HICKERSON) The parenthetical says, 20

14   percent interreader variation has been reported.

15   While on any given x-ray, a legitimate dispute may

16   arise concerning which interpretation is appropriate

17   for a given x-ray, especially for x-rays at low

18   profusion, the likelihood of such differences should

19   be significantly diminished when a large cohort of

20   patients are evaluated.

21              Can you tell me what you're talking about

22   here?

23      A.   Well, if you take a single x-ray and you have

24   two different individuals read the same x-ray, there

25   is -- they could differ up to 20 percent of their time

GARY FRIEDMAN

1    in their interpretation of the x-ray.  In fact, the

2    same B Reader could look at the same x-ray a week

3    apart and possibly have -- differ 20 percent of the

4    time with his own interpretation.

5              But if you take a large group of x-rays,

6    the -- there should be some meaning out so you're not

7    just looking at one film.  But again, you might have a

8    20 percent variation over the group, but a lot of the

9    differences when you do epidemiologic studies, that's

10   one reason for looking at large groups is to find what

11   the whole group represents as opposed to one

12   individual film.  So again, that is the benefit of

13   looking at large groups like this as opposed to

14   looking at one single x-ray.

15        Q.  Right.  And then where it continues here it

16   says, In such instances -- do I take it that means

17   when you're looking at a large group of x-rays?

18        A.  That's correct.

19        Q.  In such instances the results are not

20   dependent upon subjective interpretation of a single

21   x-ray but rather a profile of the reader's

22   interpretations -- but rather a profile of the

23   reader's interpretations can be compared against

24   others who are interpreting the radiographs as well as

25   against outcomes which might be expected from studies

GARY FRIEDMAN

Page 111

1    published in the peer reviewed literature.

2                    Do you agree with that statement?  Is

3    that accurately worded?

4        A.  Yes, sir.

5        Q.  And is that still your opinion?

6        A.  Yes, sir.

7                    If you could turn to the next page.  It's

8    the paragraph -- it's page 5 at the top, Bates number

9    68 at the bottom under -- next to the No. 1 it says, A

10   significant number of cases should be negative, in our

11   experience 85 percent or more of all cases submitted

12   to use by plaintiffs.

13       A.  It should be submitted to us instead of to

14   use.  I'm sorry.

15       Q.  That would have been my first question.

16       A.  You can go ahead and ask it.

17       Q.  Right.  So 85 percent or more of all cases

18   submitted to us by plaintiff's attorneys are found to

19   be negative for asbestos-related diseases.  Can you

20   explain what you meant when you said that?

21       A.  Well, based on our experience in -- in --

22   when we're asked to look at large groups of claims

23   historically in the past, 85 percent or more of the

24   time we determined that the individuals did not have

25   an asbestos-related disease, and as we got into --

GARY FRIEDMAN

1    6?

2                    MR. HICKERSON:  Yes.  I'm sorry.

3        Q.  (BY MR. HICKERSON) And it says here that the

4    study represents an analysis of x-ray reports of

5    pulmonary function reports and other data on a

6    representative sample randomly selected from 2 --

7    22,578 asbestos nonmalignant claims submitted to the

8    NSP under the financial incentive existed for

9    identification of impairment.

10                    Now, my first question about that

11   sentence is, do you know how the sample of 22,578

12   asbestos nonmalignant claims was selected?

13       A.  It's my understanding that these represented

14   claims that were filed under agreements that

15   specifically differentiated between individuals who

16   were impaired and nonimpaired according to the NSP

17   criteria and where it was spelled out such that there

18   was a financial incentive for impairment as opposed to

19   agreements where there may have been a -- what they

20   called a blended value for their cases, and so that is

21   my understanding of where these -- this number came

22   from.

23       Q.  Okay.  And do you know -- do you recall where

24   your understanding that you just testified about came

25   from?

GARY FRIEDMAN

1    A.   That's what I believe I was told by counsel

2  for the NSP.   I believe Mr. Podesta may have told me

3  that himself.   But he also indicated that there were

4  other claims where there was impairment -- other

5  agreements where there was impairment that may not

6  have been defined because it was blended or not as

7  well defined.

8    Q.   Right.   Do you know whether the 22,578

9  claims, whether they were all submitted by claimants

10  as impaired claims?

11    A.   I'm sorry.   Can you repeat that again?

12    Q.   Do you know whether all the 22,578 claims

13  were claimed by the asbestos claimants to be impaired

14  claims?

15    A.   I don't think that they were.   I think that

16  they were submitted under an agreement that would have

17  differentiated between impaired and nonimpaired, but I

18  don't think they were all submitted with the

19  representation that they were impaired.

20    Q.   Would the claims have had a representation

21  one way or the other as to whether they were impaired

22  when they were submitted?

23    A.   I think that there -- we did get some claim

24  forms that had a face sheet that had a check box that

25  allowed us or the -- when the people who were

GARY FRIEDMAN

Page 144

1    reviewing the claims at Integrex to see how it was

2    submitted, but that wasn't -- we really focused on the

3    medical document, but I believe there was a -- a face

4    sheet that allowed a distinction as to how that claim

5    was being submitted.  But that's not something we put

6    into our database, I don't believe.

7        Q.  Right.  If you go down a little further, it

8    says a total of 1,691 charts were submitted for

9    review.  I had no involvement in the selection of

10   cases.  Is that an accurate statement?

11       A.  Yes.

12       Q.  Okay.  Do you have any knowledge as to how

13   the sample of 1,691 was selected from the larger

14   sample of 22,578?

15       A.  I have a rough idea that I can share with you

16   because I was not involved in that selection process.

17   It's my understanding that Vasquez -- Dr. Vasquez did

18   a stratified random sample using 12 stratifications,

19   and he had determined -- it was his determination that

20   a sampling size of 2,000 would be the appropriate

21   sample size.

22               It's my understanding that Dr. Vasquez

23   then had those things randomly selected through

24   Integrex.  Integrex pulled the records and then sent

25   them to me.  And it was at that point that I first

GARY FRIEDMAN

Page 214

1          They had 200 to 215,000 claims at the

2    time I was retained, so I don't know that I can

3    honestly give you a view from on high as far as the

4    overview is to all the nonmeritorious claims.  I think

5    that, if I say so myself, we did a very thorough job

6    in investigating the problem areas, and I can speak to

7    those, I think there were problems.  Beyond that you'd

8    have to go to others who have a better view of the

9    bigger universe of claims.

10         Q.  (BY MR. HICKERSON) Okay.  Thank you.  Can I

11   ask you to turn a few more pages in to page 34994, the

12   Bates number at the bottom.

13         A.  Yes, sir.

14         Q.  And it's -- at the top it says, Assessment of

15   current nonmalignant claims opinion.  And number one

16   it says, At least 66 percent of the nonmalignant

17   claims submitted do not represent compensable disease

18   in my opinion.  Can I ask you whether you believe

19   that's an accurate statement?

20              MS. HOGAN:  Object to form.

21         A.  I think it was accurate based on the studies

22   that you and I have gone through.  There may be more

23   on those 23 boxes that we haven't covered.

24         Q.  (BY MR. HICKERSON) We're going to get to

25   those.

GARY FRIEDMAN

Page 215

```
1        A.  Okay.  Do you promise?
2                That was my sense.  It was not
3   necessarily a scientific measurement that I could
4   produce you a document for but that was my gestalt,
5   when I say compensable disease, I meant under the
6   strict terms under the NSP agreements.  May not be the
7   tort system or some other setting but in the NSP
8   agreements, I think that that was a fairly accurate
9   overview based on the things you and I visited
10  together.
11       Q.  So it's your view that some two-thirds of the
12  nonmalignant claims submitted under the NSP should not
13  have been paid?
14                MS. HOGAN:  Object to form.
15  Mischaracterizes testimony.
16                MR. SWETT:  Objection to form.
17       Q.  (BY MR. HICKERSON) Would you agree with that
18  statement?
19       A.  The determination whether claims should be
20  paid or not was never in my purview.  It's whether
21  they met medical criteria and should they be paid
22  based on what I viewed as medical criteria.
23       Q.  Taking that qualification, is it your opinion
24  that two-thirds of the nonmalignant claims submitted
25  under the NSP did not meet medical criteria for
```

GARY FRIEDMAN

1    payment under the NSP agreement?

2                    MS. HOGAN:  Object to form.

3                    MR. SWETT:  Same objection.

4        A.   Again, I think within the context of the

5    cases I reviewed prior to the preparation of this

6    document, that was my view, yes, sir.

7        Q.   (BY MR. HICKERSON) Okay.

8        A.   Based on medical criteria under the NSP

9    agreement.

10       Q.   Yes.  Thank you.  The next sentence it says,

11   80 percent of the nonmalignant claims submitted would

12   not qualify as impaired under the terms of the

13   agreement.  Was this the topic that you later did the

14   report that we just went through in some detail?

15       A.   The 1,691?

16       Q.   Yes.

17       A.   Yes, it is -- it was to focus on those -- on

18   the impaired claims, yes, sir.

19       Q.   And so the first sentence here is not limited

20   to impaired claims; is that right?  Your opinion that

21   at least 66 percent of the nonmalignant claims

22   submitted do not represent compensable disease.

23                   MS. HOGAN:  Objection to form.

24                   MR. SWETT:  Objection.

25       A.   That --

## CERTIFICATE OF SERVICE

I, Rebecca L. Butcher, do hereby certify that I caused a true and correct copy of the foregoing **REPLY MEMORANDUM IN FURTHER SUPPORT OF CSFB'S MOTION FOR WITHDRAWAL OF REFERENCE** to be served by hand delivery (City of Wilmington only) and first-class mail on January 28, 2005, on the attached service list.

In addition to the attached service list, a courtesy copy of this pleading will be delivered to Chambers of The Honorable John P. Fullam via Federal Express Priority Mail Overnight Delivery.

Rebecca L. Butcher, Esquire
I.D. No. 3816

404.002-6746.DOC

## Owens Corning
## Civil Action No. 05-40 (JPF)
## Service List

Norman L. Pernick, Esq.
J. Kate Stickles, Esq.
Saul Ewing LLP
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899-1266
(Counsel to Owens Corning, et al.)

Frank J. Perch, III, Esq.
Office of the U.S. Trustee
Federal Bldg. 2nd Floor
844 King Street
Wilmington, DE 19801
(US Trustee)

William H. Sudell, Jr., Esq.
Morris, Nichols, Arsht and Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(Counsel to Creditors' Committee)

Mark S. Chehi, Esq.
Skadden Arps, et al.
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(Special Counsel to the Debtors)

Edmund Emrich, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
(Counsel to Future Representative)

Elihu Inselbuch, Esq.
Rita Tobin, Esq.
Caplin & Drysdale, Chartered
399 Park Avenue
New York, NY 10022-4614
(Counsel to Asbestos Committee)

Stephen H. Case, Esq.
Davis Polk & Wardell
450 Lexington Avenue
New York, NY 10017
(Counsel to Creditors' Committee)

James L. Patton, Esq.
Young Conaway, et al.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(Counsel to Future Representative)

Marla R. Eskin, Esq.
Mark Hurford, Esq.
Campbell & Levine, LLC
800 N. King Street, Suite 300
Wilmington, DE 19801
(Counsel to Asbestos Committee)

D.J. Baker, Esq.
Skadden Arps, et al.
Four Times Square
New York, NY 10036
(Special Counsel to the Debtors)

J. Andrew Rahl, Jr., Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020
(Special Counsel to Creditors' Committee)

James J. McMonagle, Esq.
24 Walnut Street
Chagrin Falls, OH 44022
(Counsel to Future Representative)

.

Kenneth H. Eckstein, Esq.
Gary M. Becker, Esq.
Kramer Levin, et al.
919 Fourth Avenue
New York, NY 10022
(Bank Group)

Francis A. Monaco, Jr., Esq.
Monzack & Monaco, P.A.
1201 Orange Street
Suite 400
Wilmington, DE 19801
(Special Counsel to Committee)

Ralph I. Miller, Esquire
Weil, Gotshal & Manges
100 Crescent Court
Suite 1300
Dallas, Texas 75201-6950
(Counsel for Bank Group)

Martin J. Bienenstock, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
(Counsel for Bank Group)

Charles O. Monk, II, Esquire
Saul Ewing LLP
100 S. Charles Street
Baltimore, MD 21201

Peter Van N. Lockwood, Esq.
Nathan D. Finch, Esq.
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005
(Counsel to Asbestos Committee)

Roger E. Podesta, Esq.
Mary Beth Hogan, Esq.
Helen Y. Kim, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
(Special Counsel to Debtors)

Richard W. Riley, Esq.
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, DE 19801-1246
(Counsel to the Ad Hoc Committee of Bondholders)

Linda M. Carmichael, Esq.
White and Williams LLP
824 N. Market Street, Suite 902
Wilmington, DE 19899-0709
(Counsel for Century Indemnity Company)

William S. Katchen, Esq.
Duane Morris LLP
744 Broad Street
Newark, NJ 07102
(Counsel to the Ad Hoc Committee of Bondholders)

Tancred V. Schiavoni, Esq.
Gerald A. Stein, Esq.
Robert Winter, Esq.
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
(Counsel for Century Indemnity Company)

Jane W. Parver, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
(Counsel for James J. McMonagle,
Legal Representative for Future Claimants)

404.002-6746.DOC