# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                          :
IN RE                                     :    Chapter 11
                                          :
OWENS CORNING, et al.,                    :    Case Nos. 00-3837 to 3854 (JKF)
                                          :    (Jointly Administered)
                                          :
                              Debtors. :
                                          :
                                          :
------------------------------------------------------------x
```

**REPLY MEMORANDUM IN FURTHER SUPPORT OF CSFB'S MOTION
TO COMMENCE AN ADVERSARY PROCEEDING AGAINST CERTAIN
PHYSICIANS ON BEHALF OF THE DEBTORS' ESTATES**

TO:    **THE HONORABLE JUDITH K. FITZGERALD,
       UNITED STATES BANKRUPTCY JUDGE**

Credit Suisse First Boston ("CSFB"), as Agent for the pre-petition bank lenders to

the Debtors, respectfully submits this Reply Memorandum in further support of CSFB's motion

for authorization to commence derivatively on behalf of the Debtors' estates an adversary

proceeding against certain B-readers (the "Motion To Proceed Derivatively"). CSFB's proposed

complaint alleges that the named defendants, and other as-yet unidentified B-readers, falsely

reported x-ray readings as positive for asbestos-related disease in support of asbestos personal

injury claims that were paid by the Debtors pre-petition.

As indicated in its moving papers, CSFB is prepared to fund the proposed

litigation on behalf of the debtors' estates and to seek reimbursement only out of any monies

recovered. Accordingly, the Court's inquiry on this motion is "limited to ascertaining whether

the proposed lawsuit has a colorable basis." *Unsecured Creditors' Comm. of Debtor STN Enter.

v. Noyes*, 779 F.2d 901, 906 (2d Cir. 1985) ("Of course, if the creditors' committee represents

that its fee arrangement with its attorney will in no event impose a net burden on the bankruptcy

estate (because the committee will pay the fee and seek reimbursement only out of any recovery), then the preliminary inquiry can be limited to ascertaining whether the proposed lawsuit has a colorable basis on which to proceed.").

**A.    Hypothetical Counterclaims Against The Debtor Are Irrelevant To Determining Whether A Proposed Derivative Lawsuit Has A Colorable Basis**

Critically, Owens Corning does *not* deny that CSFB's proposed fraud claims against B-readers may have merit. Rather, the debtors concede that "[i]t is possible that evidence supporting the proposed fraud claims will be developed during the silica [MDL] litigation" in Corpus Christi, Texas, in which many of the same B-readers "have been accused of questionable screening practices" and the judge "has expressed concern that there may have been fraud in connection with the medical diagnoses of silica claimants, and has ordered all four of the proposed defendants to testify in her courtroom, in her presence, in the middle of February." Debtors' Response And Conditional Opposition, at 3, 10.

Owens Corning's "conditional opposition" to the filing of a lawsuit against B-readers on its own behalf is premised solely on a fear that the estate would be subject to unspecified counterclaims—although "[t]he Debtor agrees that counterclaims would be without merit." Debtors' Response And Conditional Opposition, at 17. Accordingly, Owens Corning concedes that it would have no opposition to the suit if CSFB agrees to "indemnify the Debtor, its directors, officers, agents, professionals and employees against any costs or expenses, including legal fees, relating to counterclaims brought by the defendants." *Id.* at 19.

A fear of speculative and unspecified counterclaims against the debtor might accompany the filing of any lawsuit by or on behalf of the estate. Tellingly, Owens Corning cites not a single case for the proposition that a debtor's indemnification against counterclaims is a relevant factor in deciding whether to authorize a derivative action—let alone the determinative

factor (as Owens Corning urges). In fact, hypothetical counterclaims are not relevant to the

Court's determination of whether the claims CSFB seeks to advance have "a colorable basis" and

should be pursued. To determine whether a proposed derivative claim is colorable, courts look

simply to the allegations that the movant has proposed and the debtor has refused to prosecute,

applying a motion to dismiss standard. *See, e.g., In re G-I Holdings, Inc.*, 313 B.R. 612, 631

(Bankr. D.N.J. 2004).

Owens Corning's fear of counterclaims here is premised on the fact that

counterclaims were filed in connection with lawsuits Owens Corning pursued in 1996 and 1997

against Pulmonary Function Testing laboratories. According to Owens Corning, those

counterclaims were based on the very filing of Owens Corning's lawsuit and alleged "abuse of

process" causing interference with defendants' businesses. Debtors' Response And Conditional

Opposition, at 7. However, as Owens Corning itself properly concedes, such a claim would be

baseless here. *Id.* at 17.[1] While the debtors suggest "there is always the possibility of a large

adverse judgment if a claim is able to get to a jury," they ignore the fact that any counterclaim

would, by definition, be presented in the very adversary proceeding authorized by this Court. *Id.*

The suggestion that a patently meritless counterclaim would be permitted to deplete the estate—

especially when the suit alleged to be an abuse of process would have been authorized by the

Court—is not well taken.

---

[1]    It bears mention that the estate's right to seek redress from the judicial system for wrongs that
may have been inflicted upon it is constitutionally protected. *See Bounds v. Smith*, 430 U.S. 817,
828 (1977) (access to the courts is a fundamental constitutional right); *Ins. Co. v. Morse*, 87 U.S.
445, 451, 453-54 (1874) (a corporation is a citizen of the state by which it is created and "[e]very
citizen is entitled to resort to all the courts of the country, and to invoke the protection which all
the laws or all those courts may afford him"); *cf.* Del. Const., Art. 1, § 9. To sustain a claim for
abuse of process, some form of *coercion* to obtain a collateral advantage, not properly involved in
the proceeding itself, must be shown. *Nix v. Sawyer, 466* A.2d 407, 412 (Del.Super.1983) (citing
Prosser, *Law of Torts,* § 121 (4th Ed.1971)).

In short, Owens Corning's fear about pursuing viable claims because of hypothetical and baseless counterclaims is unfounded. Moreover, costs expended in defending against such baseless counterclaims, were they to be filed, are likely to be minimal since it is CSFB's counsel that would primarily be involved in the lawsuit and any discovery as to alleged abuse in bringing the action would be directed at CSFB's motives. In all events, defense costs incurred in defending against baseless counterclaims are properly recovered not from CSFB but from the defendants that improperly asserted them. Just as the lawsuit CSFB proposes to file is subject to Rule 11's requirement of a good faith basis, so too are any counterclaims. Should counterclaims be filed that have no merit and no purpose other than "to harass or to cause unnecessary delay or needless increase in the cost of litigation," the trial court would unquestionably have the power to remedy such an abuse of the legal system by fully shifting the cost to the offending parties. Fed. R. Civ. P. 11; *See, e.g., Edwards v. Wyatt*, No. CIV.A. 01-1333, 2001 U.S. Dist. LEXIS, at *17-18 (E. D. Pa. Nov. 5, 2001) (imposing Rule 11 sanctions on defendant's counsel for bringing counterclaims that were "clearly baseless" and stating that "the court will not excuse such blatant lack of diligence" or bad faith) (Ex. 1); *Hudson v. Moore Business Forms, Inc.,* 827 F.2d 450, 453 (9th Cir. 1987) (court ordered defendant to show cause why Rule 11 sanctions should not be imposed for wholly frivolous counterclaim brought for the improper purpose of harassing plaintiff into dropping the case and deterring others from bringing suit).

Owens Corning and its officers and directors owe fiduciary duties to creditors to maximize the value of the bankruptcy estate. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003); *Geyer v. Ingersoll Pubs. Co.*, 621 A.2d 784, 787 (Del Ch. 1992). It is simply inconsistent with the fiduciary duties of a debtor-

in-possession and its officers and directors to demand their own indemnification from a creditor

against baseless and hypothetical counterclaims as the price for giving consent to the creditor to

prosecute colorable claims on the estate's behalf that may increase the assets available to pay

creditors:

> A creditor's interests in a Chapter 11 context are not protected
> where the debtor-in-possession fails to fulfill its obligation to
> collect property of the estate. If a valid--and potentially profitable--
> cause of action exists under state law which the debtor-in-
> possession may assert on behalf of the corporation, *all* creditors are
> harmed when the debtor-in-possession refuses to pursue it. The
> value of the estate is not maximized and the ultimate recovery of
> all creditors is diminished.

*La. World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 249 (5th Cir. 1998).

Owens Corning has conceded that CSFB's proposed lawsuit may have merit and

that hypothetical counterclaims would not. As Owens Corning itself observes, B-reader fraud is

already the subject of related litigation in Texas in which the judge "has expressed concern that

there may have been fraud in connection with the medical diagnoses of silica claimants."

Debtors' Response And Conditional Opposition, at 10. Yet Owens Corning's proffered course

of action is simply to watch someone else's discovery unfold and potentially change its mind

about suing B-readers later, depending on what develops in the silica case, rather than pursue its

own litigation and take its own discovery now. Respectfully, that cannot be the appropriate

course for maximizing the value of the estate, particularly in light of the statute of limitations

issues that Owens Corning raises in its brief.

**B.     Significant New Evidence Supports CSFB's Proposed Lawsuit
         And Implicates A Potentially Substantial Recovery**

In opposing CSFB's proposed lawsuit against B-readers, Owens Corning pretends

as if the lawsuit seeks to challenge the same x-ray readings, based on the same evidence, that

Owens Corning considered but decided against pursuing in connection with its 1996 and 1997

lawsuits against PFT laboratories. That is simply not true. The proposed allegations in CSFB's draft complaint, on their face, are premised on the May 2002 Report of Dr. Gary Friedman, which revealed for the first time—less than three years ago—that up to 87% of the several hundred thousand non-malignant personal injury claims settled and paid by the debtors *after* 1997, which totaled billions of dollars, were unsubstantiated by adequate medical documentation.

Further, while Owens Corning concluded in 1997 that it did not have a claim for fraud based on the alleged subjectivity of x-ray analysis, the Friedman Report specifically concluded that the results obtained in the 2002 study could *not* be explained away by subjective variation among different B-readers. In short, the 2002 Friedman Report is new and different evidence than Owens Corning considered in 1996 or 1997 and implicates different asbestos claims settled and paid by Owens Corning and Fibreboard under their respective NSP programs *after* 1997.[2]

## C.    The Statute Of Limitations Provides No Basis For Denying CSFB's Motion For Derivative Standing

Unless it is apparent on the face of CSFB's proposed complaint that the statute of limitations bars the lawsuit, it would be inappropriate to deny CSFB's motion for derivative

---

[2]    In a footnote, Owens Corning questions whether the proposed B-reader defendants are in sufficient privity with the debtors that they owe a duty not to negligently misrepresent x-ray readings. Debtors' Response And Conditional Opposition, at 15, n.8. Delaware courts, which have adopted Section 552 of the Restatement (Second) of Torts, do "not require[] that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. . . . [I]t is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons . . ." *Carello v. PricewaterhouseCoopers LLP*, No. Civ. A. 01C-10-219RRC, 2002 Del. Super. LEXIS 180, at *20 (Del. Super. July 3, 2002)(Ex. 2). As alleged in CSFB's proposed complaint, "[w]hen B-readers interpret x-rays for asbestos-related disease, they know they are doing so for purposes of providing 'independent' and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant" such as Owens Corning and Fibreboard. Proposed Complaint (Exhibit B to CSFB's Motion), at ¶ 39.

standing based on a <u>fact-intensive</u> affirmative defense that CSFB has had no discovery of and no chance to oppose and disprove. *See In re G-I Holdings, Inc.*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004) (applying motion to dismiss standard to determine whether a creditor committee's derivative suit had a colorable basis; holding that an affirmative defense is a bar to the action only "when the face of the complaint clearly reveals the existence of a meritorious affirmative defense"); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004) (expressing reluctance to dismiss actions based on statute of limitations grounds that turn on fact-intensive tolling doctrines); *In re Exide Technologies, Inc.*, 299 B.R. 732, 752 (Bankr. D. Del. 2003) (a plaintiff has no burden to plead facts in its proposed complaint in anticipation of an affirmative defense). As the Third Circuit has stated, "[w]hether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 346 (3d Cir. 2001).

On its face, the proposed complaint is based on the May 2002 findings of Dr. Gary Friedman. Owens Corning confirms that as of 1997, after careful investigation, Owens Corning concluded that it did not have a factual basis for a fraud claim against B-readers at that point in time. Whether or not Owens Corning was put on notice of a viable fraud claim after 1997 but at some point before the May 2002 Friedman report is a fact-intensive question. It cannot dictate whether CSFB has standing to prosecute the proposed lawsuit and take discovery in the first place to find out when the applicable limitations period commenced to run. *See, e.g., Krug v. Beebe Med. Ctr.*, No. Civ. A. 02C-06-093, 2003 Del. Super. LEXIS, at *3-4 (Del. Super. Sept. 30, 2003) (Ex.3).

## CONCLUSION

For the foregoing additional reasons, CSFB respectfully requests that the Court grant the Motion To Proceed Derivatively and enter an order authorizing CSFB to commence an adversary proceeding on behalf of the debtors' estates.

Dated:       February 18, 2005

LANDIS RATH & COBB LLP

_____
Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Tel:  (302) 467-4400
Fax:  (302) 467-4450

*Attorneys for Credit Suisse First Boston, as Agent*

Of Counsel:

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Tel:  (212) 455-2000
Fax:  (212) 455-2502

# EXHIBIT 1

LEXSEE 2001 U.S. DIST. LEXIS 18249

**JOHN JOSEPH EDWARDS Plaintiff, v. AARON WESLEY WYATT, Defendant.**

**CIVIL ACTION No. 01-1333**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2001 U.S. Dist. LEXIS 18249**

**November 5, 2001, Decided**

**DISPOSITION:** Defendant's motion for extension denied. Plaintiff's motion to dismiss defendant's counterclaims granted. Plaintiff's motion for Rule 11 sanctions against defendant's counsel granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For JOHN JOSEPH EDWARD, PLAINTIFF: STEPHEN L. BRAGA, BAKER BOTTS, LLP, WASHINGTON, DC USA. STEWART A. LEVY, BAKER BOTTS, LLP, WASHINGTON, DC USA. BRIAN P. KENNEY, KENNEY/O'SHEA, LLP, PHILADELPHIA, PA USA.

For A. WESLEY WYATT, DEFENDANT-COUNTER-CLAIMANT: JEFFREY ZUCKER, FISHER SCHUMACHER & ZUCKER LLC, PHILADELPHIA, PA USA. ARENT FOX KINTNER FLOTKIN & KAHN, WASHINGTON, DC USA. IRA B. SILVERSTEIN, SILVERSTEIN & BELLIN, LLC, PHILADELPHIA, PA USA.

**JUDGES:** JAMES McGIRR KELLY, J.

**OPINIONBY:** JAMES McGIRR KELLY

**OPINION:**

**MEMORANDUM AND ORDER**

**J. M. KELLY, J.**

**NOVEMBER 5, 2001**

Presently before the Court is Motion To Dismiss Defendant's Counterclaims filed by Plaintiff, John Joseph Edwards, and a Motion For Extension Of Time In Which To Respond To Plaintiff's Motion To Dismiss Defendant's Counterclaims filed by Defendant, Aaron Wesley Wyatt. Plaintiff further filed a motion for Rule

11 sanctions to be imposed on Defendant's counsel, Ira Silverstein. In this diversity action, Plaintiff filed suit against Defendant alleging breach of contract, promissory estoppel and fraudulent misrepresentation. Defendant filed an answer and asserted counterclaims, alleging abuse of process [*2] and intentional infliction of emotional distress. For the following reasons, Defendant's Motion For Extension is denied and Plaintiff's Motion To Dismiss Defendant's Counterclaims is granted.

**GENERAL BACKGROUND**

The alleged facts giving rise to the bitter and acrimonious relationship between the parties are as follows. Plaintiff Edwards is the former president of Pilot Air Freight Corporation ("Pilot"), a company which was in need of refinancing and additional outside investment in order to remain financially stable. In 1994, Richard Philips ("Philips"), Pilot's attorney at the time, secured outside investment from Defendant Wyatt and structured a refinancing of the company's banking arrangements.

Eventually, Philips and Wyatt became members of Pilot's Board of Directors and acquired rights to secure outstanding shares of the company. In addition, Philips became Pilot's chief executive officer ("CEO") while Edwards, retaining his position as director of Pilot, entered into a three-year employment agreement with the company. The relationship between the three men, however, soon disintegrated in the face of disagreements and struggle for power over the company, eventually [*3] leading to Edward's termination in 1995.

Edwards, being denied his salary and bonuses due to him under his employment agreement, petitioned for chapter 11 bankruptcy which was converted into a Chapter 7 liquidation. Early in 1998, while the bankruptcy proceedings were ongoing, Edwards and Wyatt entered into a Settlement Agreement in an attempt to resolve past differences. The two also entered into a

Consulting Agreement in which Edwards was to assist Wyatt with the sale of a public offering of Pilot. In addition, Wyatt allegedly made the following three oral financial promises: (1) that he would help Edwards gain maximum value for the sale of his stock in Pilot; (2) that he would help Edwards regain monies owed to Edwards by Pilot, including past salary, bonuses, and retained earnings; and (3) that he would not enter into any agreement with Phillips to settle the bankruptcy sale proceeding without including Edwards in settlement discussions.

According to Edwards, Wyatt made these promises to "ensure that Edwards remained aligned with him and unaligned with Phillips throughout the course of the bankruptcy sale proceeding." Pl.'s Compl. P 41. Wyatt valued the collaboration with Edwards [*4] because he was in the midst of a battle with Phillips for control of Pilot, a corporation which Wyatt's investment advisors believed could be worth more than $ 100 million. Although Edwards' Pilot stock was legally controlled by the bankruptcy trustee at this time, the trustee regularly solicited Edwards' views on actions relating to the disposition of the stock because it was well known that there was going to be a surplus estate in which the debtor would retain a significant monetary interest.

During the course of the bankruptcy sale proceeding, Wyatt and Phillips submitted competing bids for the purchase of Edwards' Pilot stock and other assets. One week before the hearing on the final sale of Edwards' Pilot stock, Wyatt told Edwards to be sure that Edwards' bankruptcy counsel expressed a preference for Wyatt's bid in order to enhance Wyatt's chance of success in purchasing Edwards' assets.

On October 30, 1998, the day of the scheduled proceeding, Wyatt and Phillips informed the bankruptcy court that they had entered into a separate settlement agreement. They had joined together to offer a joint bid of $ 5,200,000.00 plus settlement of all claims between Wyatt, Phillips, Pilot, [*5] and the bankruptcy estate of Edwards. Edwards was not included in settlement discussions or the final agreement.

Edwards objected to the joint bid as an illegal collusive effort to control the sale price for his assets in the bankruptcy court. On December 15, 1998, the Bankruptcy Court rejected the objection and permitted the sale of Edwards' assets controlled by the trustee. Edwards received approximately $ 3,000,000.00 from the sale of these assets.

On December 29, 1999, Edwards filed a complaint against Wyatt, asserting claims of breach of contract, promissory estoppel and fraudulent misrepresentation in the District Court for the District of Columbia. On January 18, 2001, the D.C. District Court, finding no

personal jurisdiction over the Defendant, ordered that the case be transferred to this Court. Subsequently, on July 31, 2001, this Court denied Wyatt's Motion to Dismiss. By stipulation, Wyatt was granted a week's extension to answer the complaint by August 24, 2001. On August 24, 2001, Ira Silverstein n1 was admitted pro hac vice to this Court and took over as lead counsel for Wyatt. Along with the answer, Wyatt asserted affirmative defenses and two counterclaims against [*6] Edwards and his counsel, Stephen Braga, claiming abuse of process and intentional infliction of emotional distress.

n1 Ira Silverstein was Wyatt's counsel during the time the parties were negotiating the bankruptcy situation and was allegedly deeply involved in the negotiations and meetings between the parties which eventually led to the filing of this lawsuit.

## I. DEFENDANT'S MOTION FOR EXTENSION OF TIME

### A. Facts

On September 18, 2001, Plaintiff's counsel, Stephen Braga, by way of Federal Express, served on Defendant's counsel, Ira Silverstein, two items: (1) advance notification of Motion for Sanctions Under Rule 11; and (2) a copy of the Plaintiff's Motion To Dismiss Defendant's Frivolous Counterclaims, filed on September 17, 2001. No cover letter was enclosed.

Silverstein never responded to either items and missed the October 5, 2001 deadline to reply to Plaintiff's Motion to Dismiss. On October 12, 2001, Braga e-mailed Silverstein inquiring as to whether the Defendant was withdrawing his [*7] counterclaims and whether he intended to oppose the motion to dismiss. Two days later, Silverstein replied, requesting an extension to respond to Plaintiff's Motion to Dismiss. He explained that he failed to respond because he did not realize that the set of papers he received on September 18, 2001 contained two separate items. He stated that he was assuming, based on the top page of the package, that the whole package was the pre-filing notice required under Federal Rule of Civil Procedure 11(c)(1)(A).

### B. Standard of Review and Discussion

Courts have discretion to grant extensions where the movant shows the delay was the result of "excusable neglect." In re Cendant Corp. Prides Lit., 189 F.R.D. 321, 323-324 (D.N.J. 1999). Federal Rule of Civil Procedure 6(b)(2) states:

When by these rules or by notice given thereunder . . . an act is required . . . to be done at or within a specified time, the court for cause shown may at any time in its discretion . . . upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

In determining what constitutes excusable [*8] neglect, courts are to consider all relevant circumstances surrounding the delay. In re Cendant Corp. Prides Lit., 189 F.R.D. at 324 (citing Pioneer Invest. Serv. Co. v. Brunswick Assoc. Ltd. Partnership, 507 U.S. 380, 395, 123 L. Ed. 2d 74, 113 S. Ct. 1489 (1993)). Relevant factors include the following: (1) the danger of prejudice to the nonmovant; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith. Id. Other factors include: (1) whether the inadvertence reflected professional incompetence such as ignorance of the rules of procedure; (2) whether an asserted inadvertence reflects an easily manufactured excuse incapable of verification by the court, and; (3) complete lack of diligence. Id. (citing Dominic v. Hess Oil V.I. Corp., 841 F.2d 513, 517 (3d Cir. 1988).

This is a clear case of neglect, but not of excusable neglect. Although Plaintiff's counsel might have clarified the situation by inserting a cover letter with the package, Defendant's counsel could [*9] not have reasonably assumed that the whole package related solely to the Rule 11 notification. The Rule 11 notification is only one page long and it clearly references the Plaintiff's Motion to Dismiss Defendant's Counterclaims. Furthermore, even if Defendant's counsel were to be believed, his actions amount to complete lack of diligence. He should have reviewed the documents sent to him. The simple act of leafing through the documents would have revealed that the Motion to Dismiss Defendant's Counterclaims was filed with this Court. The Court will not excuse such blatant lack of diligence by counsel. Therefore, the Court denies the Defendant's Motion.

## II.   PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS

Having denied the Defendant's Motion For An Extension, the Court may treat Plaintiff's Motion To Dismiss as uncontested and summarily dismiss the Defendant's Counterclaims under Local Civil Rules 7.1(c). Rule 7.1(c) expressly states that in the absence of a timely response, the motion, with the exception of a summary judgment motion, may be granted as uncontested. In light of Plaintiff's Rule 11 Motion seeking sanctions against Defendant's counsel for the filing [*10] of frivolous counterclaims, however, the Court will address the merits of the counterclaims.

### A. Facts

For the purposes of this Motion, Wyatt's assertions underlying his counterclaims will be accepted as true. First, Wyatt claims Edwards sought to terrorize him by bringing this action in a jurisdiction to which Wyatt has no connection and by including irrelevant, immaterial and scandalous allegations in the complaint. Secondly, it is alleged that Edward's counsel, Steven Braga, threatened to depose Wyatt's wife in an effort to coerce a settlement and attempted to meet with her ex parte by writing directly to her. Lastly, Wyatt complains of Edward's intent to inquire into Wyatt's net worth.

### B. Standard Of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). A court must determine whether the party making the claim would be entitled to relief under any set of facts that could be established in support of his or her claim. Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)(citing Conley, 355 U.S. at 45-46); [*11] see also Wisniewski v. Johns-Manville Corp., 759 F.2d 271, 271 (3d Cir. 1985). In considering a motion to dismiss, all allegations in the complaint must be accepted as true and viewed in the light most favorable to the non-moving party. Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)(citations omitted).

### C. Discussion

#### 1. Abuse of process

The tort of abuse of process is the improper use of legal process after it has been issued. McGee v. Feege, 517 Pa. 247, 255, 535 A.2d 1020 (1987). "The term 'process' has been interpreted in Pennsylvania to encompass all of the procedures incident to the litigation process, including discovery proceedings, the noticing of depositions and the issuing of subpoenas." Pellegrino Food Products Co., Inc. v. City of Warren, 136 F. Supp. 2d 391, 407 (W.D. Pa. 2000). To state a cause of action for the tort of abuse of process, the complainant must allege the following:(1) that the tortfeasor used a legal process against the complainant; (2) that the use of legal process was primarily to accomplish a purpose for which the process was not designed; and (3) that [*12] Complainant suffered harm as a result. Hart v O'Malley,

436 Pa. Super. 151, 647 A.2d 542, 551 (Pa. Super. Ct. 1994).

There is simply no claim for abuse of process "where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." Schmidheiny v. Weber, 164 F. Supp. 2d 484, 2001 WL 1172693, at * 10 (E.D. Pa. 2001)(citations omitted). "That judicial process was initiated with a bad motive is not enough; an allegation of coercive use of the process is required." Id. "Abuse of process usually pertains to situations involving extortion by means of attachment, execution or garnishment, and blackmail by means of an arrest or criminal prosecution." Id. The only "process" here is the initial complaint and the summons requiring Wyatt to respond to the Complaint. First, Wyatt complains of Edwards' initial choice to bring this action in the District Court for the District of Columbia, a forum which was inconvenient to him. Wyatt may have suffered inconvenience but there was no abuse of any process. The initial complaint and summons were used for [*13] their intended purposes, to initiate action against Wyatt. That the D.C. district court found no personal jurisdiction over Wyatt is irrelevant. The legal process here was carried out to its authorized conclusion and the case was properly transferred to this Court.

Similarly, there is no abuse of process where Edwards included "irrelevant, immaterial and scandalous allegations" in the ad damnum clause of the Complaint. Plaintiff is entitled to state the facts as he sees them in his Complaint, within the bounds of the law. That Wyatt felt harassed and outraged by the allegations contained in the Complaint is not relevant to the tort of abuse of process. Otherwise, every person who has ever been the subject of litigation could sue under this tort.

Wyatt further alleges that Edwards and Braga attempted to coerce a settlement by frightening and harassing Wyatt's wife. Again, there is no legal process which is being abused. Although legal process relating to discovery, such as subpoenas, come under the abuse of process tort, here there was no such coercive legal process. Counsel merely wrote a letter seeking to gather facts. As such, the issue of marital privilege need not be addressed [*14] until and unless the Plaintiff actually seeks to compel the deposition or testimony of the wife as to the communications between herself and Wyatt.

Lastly, Wyatt complains of Edward's inquiry into his net worth. Again, there is no legal process being used here. Braga merely wrote a letter stating Plaintiff's intent to inquire into Wyatt's net worth. Even if there was some legal process being used, "when punitive damages are alleged, the weight of authority requires that a defendant disclose his financial condition in pretrial discovery

*without* requiring a prima facie showing of punitive damages to justify the discovery." Caruso v. Coleman Co., 157 F.R.D. 344, 348 (E.D. Pa. 1994). Hence, there is no abuse of process under any set of circumstances.

### 2. Intentional Infliction of Emotional Distress

Pennsylvania courts follow the Restatement formulation of the tort of intentional infliction of emotional distress. Pavlik v. Lane Limited/Tobacco Exporters Int'l, 135 F.3d 876, 890 (3d Cir. 1998). The Restatement states, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject [*15] to liability for such emotional distress, and if bodily harm to the other results from it for such bodily harm." Restatement (Second) of Torts § 46 (West 2001). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, as to be regarded as atrocious, and utterly intolerable in a civilized community." Pavlik, 135 F.3d at 890. Furthermore, a threshold requirement for this tort is an allegation of physical harm. Hart, 647 A.2d at 554 (citing Kazatsky v. King David Mem'l Park, 515 Pa. 183, 527 A.2d 988 (1987)).

Here, Wyatt has utterly failed to allege any physical injury or harm. The Counterclaim alleges only that Wyatt suffered financial harm and emotional stress. As such, although Edwards' litigation tactics are not so extreme and outrageous as to go beyond all possible bounds of decency, the Court need not discuss this point any further. The Counterclaim of intentional infliction of emotional distress will be dismissed because Defendant failed to allege physical harm.

Accordingly, Plaintiff's Motion To Dismiss Defendant's Counterclaims is granted.

### III. RULE 11 [*16]  SANCTION

Under Federal Rule of Civil Procedure 11(c), the Court may impose appropriate sanctions on attorneys who violate Rule 11(b), which states:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-- (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of

litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack [*17] of information or belief.

District courts retain broad discretion in determining the appropriate sanctions under Rule 11. Langer v. Monarch Life Ins. Co., 966 F.2d 786, 810 (3d Cir. 1992). The range of sanctions include,

> a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances. Whatever the ultimate sanction imposed, the district court should utilize the sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose.

Id. "The purpose of sanctions is to deter future violations, and [sic] monetary sanctions should not be more severe than those necessary to deter repeated violations of the rule." Giangrasso v. Kittatinny Reg'l High Sch. Bd. of Educ., 865 F. Supp. 1133, 1141 (D.N.J. 1994).

Here, as the Court ruled above, Defendant's Counterclaims are clearly baseless. As such, the Court

finds it appropriate to impose Rule 11 sanctions against Defendant's counsel, Ira Silverstein. Silverstein had twenty-one days in which to withdraw the frivolous Counterclaims, [*18] yet he failed to act, even under the threat of sanctions. Related to his failure to withdraw the counterclaims is Silverstein's failure to file an answer to Plaintiff's Motion to Dismiss Defendant's Counterclaims in a timely manner.

Based on the above and the fact that this is Silverstein's first misconduct in this case, the Court will, at this time, merely admonish counsel's behavior for the record. Although Silverstein's conduct may have resulted from a complete lack of diligence rather than bad motive, the Court will not excuse such blatant lack of diligence. Silverstein is on notice that the Court may choose to impose more severe sanctions should he engage in any further misconduct in this case.

## ORDER

**AND NOW**, this 5th day of November, 2001, in consideration of the Motion For An Extension Of Time To Respond To Plaintiff's Motion to Dismiss Defendant's Counterclaims (Doc. No. 13) filed by the Defendant, Aaron Wesley Wyatt and the Response of the Plaintiff, John Joseph Edwards, thereto and the Motion to Dismiss Defendant's Counterclaims (Doc. No. 12) filed by Plaintiff, John Joseph Edwards, it is **ORDERED**:

1. Defendant's Motion For Extension Of Time [*19] To Respond to Plaintiff's Motion To Dismiss Defendant's Counterclaims is **DENIED**.

2. Plaintiff's Motion To Dismiss Defendant's Counterclaims is **GRANTED**.

3. Plaintiff's Motion For Rule 11 Sanctions against Ira Silverstein, Esq., Defendant's counsel, is **GRANTED**. Ira Silverstein, Esq., is ADMONISHED that he has violated Federal Rule of Civil Procedure 11(b) and that any future violations may result in further sanctions.

BY THE COURT:

JAMES McGIRR KELLY, J.

# EXHIBIT 2

1 of 1 DOCUMENT

**MARK W. CARELLO and KAREN CARELLO NOCKET, Plaintiffs, v. PRICEWATERHOUSECOOPERS LLP, Defendant.**

**C.A. No. 01C-10-219 RRC**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

**2002 Del. Super. LEXIS 180**

**May 23, 2002, Submitted**
**July 3, 2002, Decided**

**DISPOSITION:** [*1] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** Kevin William Gibson, Esquire, Gibson & Perkins, P.C., Media, Pennsylvania, Attorney for Plaintiffs.

Gregory V. Varallo, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, and Martin L. Perschetz, Esquire, Schulte Roth & Zabel LLP, New York, New York (pro hac vice), Attorneys for Defendant.

**JUDGES:** Richard R. Cooch.

**OPINIONBY:** Richard R. Cooch

**OPINION:**

**MEMORANDUM OPINION**

COOCH, J.

**INTRODUCTION**

Before the Court is a motion for summary judgment ("the Motion") filed by defendant PricewaterhouseCoopers LLP ("PwC") n1 against plaintiffs Mark W. Carello and Karen Carello Nocket ("Plaintiffs"). Plaintiffs' action sounds in tort for negligent misrepresentation, specifically the alleged negligence of a public accountant to a third party with whom there was no privity of contract and where the only harm suffered was economic in nature. The issue here is whether PwC owed Plaintiffs a duty, such duty potentially arising either through 1) Plaintiffs' inclusion in a class of similarly-situated business owners who relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason, [*2] Inc. ("Lason") and which were prepared by PwC, or 2) a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, in order for a duty to arise, PwC would have had to have known (or have had reason to have known) that Lason would share its financial statements with the class or with Plaintiffs as part of a potential business transaction.

n1 PwC originally filed a motion to dismiss the complaint but both parties attached affidavits to their subsequent submissions in connection with that motion; the Court, with the agreement of the parties, will therefore treat the motion as one for summary judgment. See Super. Ct. Civ. R. 12(b) (providing that a motion to dismiss shall be treated as one for summary judgment if "matters outside the pleadings are presented to and not excluded by the Court").

In their proposed First Amended Complaint, n2 Plaintiffs allege that PwC negligently audited the [*3] financial statements of its client, Lason; Plaintiffs aver that they relied upon those statements in subsequently deciding to sell their business, Delaware Processing Services, Inc. ("DPS") to Lason. PwC advances two grounds for summary judgment in its Motion: 1) that under Superior Court Civil Rule 12(b)(6), Plaintiffs have failed to state a claim upon which relief can be granted; n3 and 2) that under Superior Court Civil Rule 9(b),

2002 Del. Super. LEXIS 180, *

Plaintiffs have failed to plead negligence with particularity.

> n2 Plaintiffs originally filed a Complaint alleging negligence and fraud, and they sought an award of punitive damages. At oral argument on PwC's Motion, the Court granted Plaintiffs leave to submit a proposed amended complaint (as well as affidavits) in connection with Court-ordered supplemental memoranda. The proposed First Amended Complaint does not include a fraud count but avers only negligence.

> n3 Although originally filed as a motion to dismiss, PwC's submissions on the motion subsequent to the original motion's conversion did not re-characterize PwC's argument; PwC has maintained throughout this litigation that it is entitled to judgment as a matter of law because it did not owe Plaintiffs any duty at the time Plaintiffs decided to sell their business because they decided to sell after Lason made an SEC filing on March 31, 1999.

[*4]

Because there are material facts in dispute and PwC is not entitled to judgment as a matter of law when those facts are viewed in a light most favorable to Plaintiffs, PwC's motion for summary judgment is **DENIED**.

## FACTS

Plaintiffs were the sole shareholders of DPS, a company whose purpose was to service "financial institutions and similarly situated institutions in capturing and processing data"; n4 each plaintiff owned 50% of DPS's issued and outstanding stock prior to selling DPS to Lason. n5 Plaintiffs sold DPS to Lason through a transaction that closed on November 19, 1999 and which involved a complicated deferred "earn out" formula that was apparently engineered to partly compensate Plaintiffs *in futuro*. Plaintiffs allege that in deciding to sell their business to Lason, they in part relied "on [a] review...of...statements [relating to Lason's financial health] and [PwC's] assessment of the financial condition of Lason as represented by such audited financial statements...." n6 PwC had "audited Lason's annual financial statements." n7

> n4 First Am. Compl. P6.

> n5 First Am. Compl. P5. [*5]

> n6 First Am. Compl. P68.

> n7 Def.'s Mot. P1.

A further chronology drawn from the First Amended Complaint follows: "In April, 1998, the Plaintiffs...were contacted by...representatives of Lason, soliciting DPS's data entry business for a Lason subsidiary..."; n8 "In the third quarter of 1998...DPS began doing business with Lason through its subsidiary"; n9 "During the period 1996 through 1999, Lason completed the acquisition of 76 companies (55 of which were completed during the two year period 1998-1999)"; n10 "The Plaintiffs, as part of their investigation to enter into the sale...reviewed and relied on Lason's Annual Report, 10-K and the audited financial statements accompanying such reports for the periods ending December 31, 1997, and December 31, 1998...together with Lason's...10-Q, and the unaudited financial statements accompanying such report, for the periods ending December 31, 1998, March 31, 1999, and June 30, 1999..."; n11 "The Plaintiffs subsequently learned [after DPS was acquired by Lason] that Lason's reported revenues on its audited financial statements, and its 10Ks, and [*6] 10Qs, for the reporting fiscal years 1997, 1998, and 1999, which were prepared by...[PwC], were not based upon an accounting method which was in conformity with Generally Accepted Accounting Principles ('GAAP')." n12

> n8 First Am. Compl. P11.

> n9 First Am. Compl. P12.

> n10 First Am. Compl. P13.

> n11 First Am. Compl. P54.

> n12 First Am. Compl. P93.

On December 5, 2001, Lason filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. n13 As a result of the accounting irregularities that Plaintiffs allege existed in Lason's audited financial statements and (presumably) because of Lason's subsequent filing for bankruptcy protection, Plaintiffs aver that Lason "cannot and will not be able to" pay the "earn out" Plaintiffs argue is now due them as part of the DPS acquisition. Plaintiffs assert that PwC is liable to them "in that had [PwC] not misstated the income of Lason contrary to [Generally Accepted Accounting Principles], Plaintiffs never would have agreed to sell DPS [*7] to Lason." n14

> n13 First Am. Compl. P106.

n14 First Am. Compl. P120.

Additionally, Plaintiffs claim that they relied on the alleged oral representations of Timothy Molnar, a PwC employee whom Plaintiffs apparently believed was a certified public accountant and who Plaintiffs state "specifically advised the Plaintiffs that the structure of the Lason [acquisition] was a 'fair one' and represented a 'good deal' for the Plaintiffs...." n15 The oral representations Plaintiffs purportedly relied upon included an alleged statement by Molnar to the effect that "if there was anything else the Plaintiffs should look at or needed to know about the financial condition of Lason [in consideration of whether to sell their business to Lason][,]...what...[PwC] reported to the SEC...should be alright [sic]." In affidavits they have submitted in connection with this litigation, Plaintiffs state that after "meeting with Mr. Molnar...and after reviewing Lason's audited financial statements together with the 10Ks and [*8] the 10Qs prepared by...[PwC]...[we] decided to accept Lason's terms and proceed with the sale of our DPS stock to Lason." n16

n15 First Am. Compl. P65.

n16 Carello Aff. P5 (Ex. A to Pls.' Sur Reply); Carello Nocket Aff. P5 (Ex. B to Pls.' Sur Reply)

PwC has attached two affidavits to its submissions opposing Plaintiffs' asserted cause of action. The first affidavit is from Timothy Molnar, the PwC employee whom Plaintiffs allege was the CPA who made certain representations concerning the financial health of Lason to Plaintiffs when they were contemplating the sale of their business; in his affidavit, Molnar denies he participated in PwC's audit of Lason's financial records, states that he was unfamiliar with Lason's financial condition (and denies that he made any representations to the contrary), and refutes that he ever represented to Plaintiffs that he was a CPA. n17 The second of PwC's attached affidavits is from Cheryl L. Dunn, the "engagement partner" for PwC's audits of the financial statements [*9] of Lason, Inc. Dunn's affidavit states "I am confident that, at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements, I did not know about a potential acquisition by Lason of DPS." n18

n17 See Molnar Aff. PP3, 4, 5 (Ex. A to Def.'s Supplemental Reply Mem.).

n18 Dunn Aff. P4 (Ex. B to Def.'s Supplemental Reply Mem.).

## CONTENTIONS OF THE PARTIES

Plaintiffs concede (and PwC argues) that in Delaware the applicable standard of the tort of negligent misrepresentation lies in section 552 of the Restatement (Second) of Torts. That section, in pertinent part, provides that:

> (1) One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others...is subject to liability for pecuniary loss caused to [those others] by their justifiable reliance...
> (2)...the liability is limited to loss suffered (a) by the person or one of a limited group of persons [*10] for whose benefit and guidance [the information supplier]...knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [the information supplier] knows that the recipient...intends [the information to influence]... n19

n19 Restatement (Second) of Torts § 552 (1977).

The pertinent factual allegations Plaintiffs make in support of their argument that PwC should now be found liable under the Restatement formulation follow: "Upon information and belief, DPS, was targeted for acquisition by Lason as early as the third financial quarter of 1998, and no later than January of 1999, during or prior to the period...[PwC] was performing [its] 1999 audit of Lason's financial statements"; n20 "Upon information and belief, the Defendant as an integral part of Lason's acquisition team had actual knowledge that the Plaintiffs were targeted for acquisition by Lason during or prior to the period the Defendant was performing its 1999 audit of Lason's financial statements"; [*11] n21 "It is believed and therefore averred, that...[PwC] as an integral member of the Lason acquisition team was or should have been aware that companies considering an acquisition by Lason, such as DPS, would rely on the audited financial statements of Lason, and its 10Ks and 10Qs filed with the SEC, to determine if they should accept Lason's offer of purchase"; n22 that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies"; n23

2002 Del. Super. LEXIS 180, *

and "As a result and direct proximate cause of...[PwC's] negligence, the Plaintiffs have been and will be damaged, in that had...[PwC] not misstated the income of Lason contrary to GAAP, Plaintiffs never would have agreed to sell DPS to Lason." n24

   n20 First Am. Compl. P20.

   n21 First Am. Compl. P21.

   n22 First Am. Compl. P64.

   n23 Pls.' Answer to Def.'s Mot. at 4 n. 4.

   n24 First Am. Compl. P120.

   Despite the attached Cheryl L. Dunn affidavit (the "engagement partner" for PwC's audits of the [*12] financial statements of Lason, Inc) to the effect that "at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements" PwC did not know about a potential acquisition of DPS by Lason, Plaintiffs state that they "would suspect that...[PwC] has hundreds of employees that may have a different recollection" and that they "have the absolute right to take discovery on this potential issue." n25

   n25 Pls.' Sur Reply at 2.

   In response, PwC argues that under section 552 of the Restatement (Second) of Torts, Plaintiffs have failed to allege the requisite duty PwC would have had to have owed them for PwC now to be potentially liable to Plaintiffs. Specifically, PwC argues that Plaintiffs have failed to allege a "pecuniary loss caused by justifiable reliance upon...false information" n26 because "the last audited financial statements issued before the sale of DPS was even contemplated were for the year ending December 31, 1998 [and]...thus Plaintiffs allege that Lason's failure to make a [*13] payment due after October 31, 2000 was caused by PwC's audit report on financial statements for a period that ended almost *two years earlier*." n27 PwC argues that Plaintiff's factual averments "contain[] no cognizable allegation that PwC's audit reports--rather than Lason's subsequent financial problems--caused Plaintiffs' losses." n28 In support of its argument that PwC did not owe Plaintiffs a duty as alleged, PwC states that the pleadings "make[] clear that PwC could not possibly have known about a proposed sale of DPS to Lason, or [have] intended that its audit reports be used in connection with such a sale, since Plaintiffs claim not even to have been approached about the sale until July 1, 1999" and "the audited financial statements on which Plaintiffs claim to have relied...were

filed with the S.E.C. on March 31, 1998 and March 31, 1999, respectively." n29 PwC argues "to be liable for negligent misrepresentation under Restatement Section 552, a defendant must have owed to the plaintiff the requisite duty *at the time the alleged misrepresentations were made*." n30 Citing Outdoor Techs., Inc. v. Allfirst Fin., Inc., n31 PwC further argues that Plaintiffs' averments, [*14] particularly those relative to their encounter with Timothy Molnar, the PwC employee whom Plaintiffs allege was the PwC CPA who made certain representations to them, fail to establish a business relationship with PwC such that PwC can now be held liable to Plaintiffs.

   n26 Def.'s Mot. P2.

   n27 Id. (emphasis in original).

   n28 Id.

   n29 Def.'s Mot. P3.

   n30 Def.'s Supplemental Reply Mem. at 1 (emphasis in original); Def.'s Reply Mem. at 3.

   n31 2001 WL 541472 (Del. Super.) (granting defendant-banks' motion for summary judgment because those banks and their counsel did not owe a duty to non-customer attempting to cash a check drawn on them).

   Additionally, PwC argues that "a complaint alleging negligent misrepresentation...must allege 'the specific manner in which the [statement] is misleading' (citation omitted)," and that although the pleadings "purport[] to set forth numerous Generally Accepted Accounting Principles, [they] fail to allege how any of these principles [*15] allegedly [were] violated." n32 Accordingly, PwC argues that it is entitled to judgment as a matter of law because Plaintiffs have failed to plead negligence with particularity as required by Superior Court Civil Rule 9(b).

   n32 Def.'s Mot. P5.

### STANDARD OF REVIEW

   Summary judgment is granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. n33 The court must view the facts in a light most favorable to the non-moving party. n34 A court "reviews the summary judgment motion and response papers and seeks to determine whether the record reveals a disputed factual issue material enough to require a trial and factfinder

determination...." n35 A "nontrivial factual dispute created by the nonmovant [such as by the attachment of an affidavit disputing the other side's allegations] will usually bar summary judgment so long as the contested facts are material even if the nonmovant's support is considered weak by the court." n36

n33 Super. Ct. Civ. R. 56(c); Burkhart v. Davies, 602 A.2d 56, 59 (Del. 1991). [*16]

n34 Merrill v. Crothall-American, Inc., 606 A.2d 96, 99-100 (Del. 1992).

n35 11 James Wm. Moore et al., Moore's Federal Practice § 56.11[5][a], at 56-108 (3d ed. 2002).

n36 Id., § 56.11[7][b], at 56-124.

**DISCUSSION**

In order for PwC to be potentially held liable to Plaintiffs, Plaintiffs must show that PwC owed Plaintiffs a duty, either through Plaintiffs' inclusion in a class of similarly-situated business owners who relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason and which were prepared by PwC, or through a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, PwC would have had to have known (or have had reason to have known) that Lason would share those statements with the class or with Plaintiffs as part of a potential business transaction.

As noted by this Court in its 1990 decision in Guardian Construction Co. v. Tetra Tech Richardson, Inc., n37 [*17] "Delaware case law is divided on the issue of whether privity of contract is a prerequisite for the imposition of liability on a negligence theory where the damages sought to be recovered are purely economic." n38 Finding, however, that a lack of contractual privity between the design engineer and the general contractor involved there was "not fatal," the Guardian Construction court held that section 552 of the Restatement (imposing liability on suppliers of information to third parties who are intended recipients of the information when that information contains negligent misrepresentations) was the proper standard for claims of negligent misrepresentation brought in the Delaware courts, and the Court then "specifically adopted" the Restatement's standard. n39

n37 583 A.2d 1378 (Del. Super. Ct. 1990) (holding in part that claim of general contractor and subcontractor against design engineer for negligent misrepresentation as to tidal heights and project benchmarks in seaside construction project was cognizable despite lack of contractual privity between the parties).

n38 Guardian Construction, 583 A.2d at 1384. [*18]

n39 583 A.2d at 1386.

It has been said that "the Restatement rule...appears to be a sensible and moderate approach to the potential consequences of imposing unlimited negligence liability...[on third parties with whom there is no privity of contract and where the only harm alleged is economic in nature]." n40 This Court, in Danforth v. Acorn Structures, Inc. n41 stated that the Restatement view represented "the definite weight of authority." n42 Some courts have taken different approaches than that suggested by the Restatement, however, either on the one hand "by denying recovery to third parties for auditor negligence in the absence of a third party relationship to the auditor that is 'akin to privity[]'," or on the other hand by allowing recovery "based on auditor negligence to third parties whose reliance on the audit report was 'foreseeable[]'." n43 But "most jurisdictions, supported by the weight of commentary and the modern English common law...have steered [the] middle course...of § 552." n44

n40 Bily v. Arthur Young & Co., 3 Cal. 4th 370, 834 P.2d 745, 769, 11 Cal. Rptr. 2d 51 (Cal. 1992) (adopting the Restatement rule and rejecting the "foreseeability" approach that California courts had until that time followed in a case where investors in corporation brought a professional malpractice action against an independent auditor that had examined a corporation's books prior to the corporation's initial public offering). [*19]

n41 1991 WL 269956 (Del. Super.), aff'd on other grounds, 608 A.2d 1194 (Del. 1992).

n42 Id. at *2.

n43 Bily, 834 P.2d at 752.

n44 Id.

While "most jurisdictions" have analyzed negligent misrepresentation liability of accountants to third parties under the Restatement approach, interpretations of section 552 "vary...[and] the more expansive cases [*i.e.*, those jurisdictions purporting to use section 552 in their analyses but not concentrating on limiting recovery to a person or group of persons that the accountant actually knew would rely on an audit report] have been criticized as effectively eliminating all of the restrictions the Restatement sought to impose." n45 One court has stated that the "better reasoned decisions interpret § 552 as limiting...potential liability...to actual knowledge of the limited although unnamed group...as well as actual knowledge of the particular financial transaction that such information is designed to influence...measured at the moment the audit report is published...." n46 Such an interpretation is supported [*20] by comment h to section 552 itself, which provides:

> ...it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied...it is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it...it is enough...that the maker...knows that his recipient intends to transmit the information to a similar person, persons or group. n47

Thus a plaintiff invoking a cause of action under negligent misrepresentation involving section 552 must show that the defendant supplied the information to a party for use in that party's business transactions with the plaintiff or a class of which the plaintiff was a member. n48

n45 Elizabeth Williams, Cause of Action Against Accountant for Negligent Performance of Professional Services, 15 COA2d 395 (2000); cf. Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc., 2002 WL 1335360 (Del. Super.) (finding that company whose primary business purpose was the transportation of fuel oil was not "in the business of supplying information" as required by section 552, and recognizing that those courts that have taken a more "expansive view" of that section may hold otherwise). [*21]

n46 Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 688 N.E.2d 1368, 1372 (Mass. 1998) (applying the Restatement standard to an action brought by a buyer of the controlling interest in a corporation against the accountants who had audited the financial statements accompanying the company's annual report and holding that accountants were not liable to purchaser because they had no knowledge that the controlling interest was to be sold).

n47 Restatement (Second) of Torts § 552 cmt. h (1977).

n48 But cf. Danforth v. Acorn Structures, 1991 WL 269956, at *2 (Del. Super.) (stating that under section 552 "the plaintiff must show that the defendant supplied the information to *the plaintiff* for use in business transactions with third parties) (emphasis added); Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc., 2002 WL 1335360, at *6 (Del. Super.) (quoting Acorn Structures).

The reasoning behind limiting the liability of an information-providing party (including accountants who audit financial statements) rests [*22] on the theory that "the misinformer actually knows [that the relying party] will receive inaccurate information...because the misinformer knows that [its] client will channel the work product to that restricted group." n49 An illustration of these liability-limiting concepts can be found in an illustration to comment h to section 552 of the Restatement:

> A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used un a wide variety of financial transactions

by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements...to obtain a loan from X Bank...[and] through reliance upon [the negligently prepared financial statements]...X Bank suffers pecuniary loss. A is not liable to X Bank. n50

Thus, under the Restatement, [*23] an information supplier retained to furnish information for no particular purpose does not undertake a duty to third parties when the information supplier neither knows nor has reason to know of the intended use to which that information will be put by the information supplier's client.

> n49 First Nat'l Bank of Commerce v. Monco Agency Inc., 911 F.2d 1053, 1060 (5th Cir. 1990) (holding that under Louisiana law circumstantial evidence offered by a bank of an accounting firm's knowledge that statements it had audited for its client would be relied on by the bank in making loans to the firm's client did not raise genuine issue of material fact so as to prevent summary judgment in favor of the accounting firm).

> n50 Restatement (Second) of Torts § 552 cmt. h, illus. 10 (1977).

* * *

In this case, Plaintiffs have alleged their reliance on certain financial statements of Lason that were audited by PwC at a time when a class of persons similar to and including Plaintiffs were allegedly contemplating [*24] the sale of their businesses to Lason; Plaintiffs also allege that they would not have sold their business to Lason had the statements PwC audited not been "misstated" and "contrary to Generally Accepted Accounting Principles." Plaintiffs apparently have not been able to collect that part of the purchase price that was to accumulate after the close of the sale of DPS to Lason, given that Lason subsequently filed for bankruptcy. Plaintiffs have therefore potentially shown the cause and effect of their claimed loss, contrary to PwC's assertion that Plaintiffs have failed to show that "that PwC's audit reports--rather than Lason's subsequent financial problems--caused Plaintiffs' losses." n51

> n51 Def.'s Mot. P2.

Plaintiffs may also possibly be able to show that they were within a "limited group of persons" for whose benefit and guidance PwC knew Lason intended to supply their audited statements and to whom PwC knew that Lason intended to influence with those same statements. n52 Plaintiffs attempt to provide this crucial [*25] link when they allege that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies." n53 Given that Plaintiffs allege that from 1996 through 1999 Lason "completed the acquisition of 76 companies," n54 and that PwC presumably was the accounting firm that Lason retained during this time period, Plaintiffs' assertion that PwC played some part in Lason's competitive acquisitioning might be established.

> n52 See Restatement (Second) of Torts § 552 (1977).

> n53 Pls.' Answer to Def.'s Mot. at 4 n. 4.

> n54 First Am. Compl. P13.

If in fact Lason was "actively gobbling up companies," and PwC was in fact Lason's accounting firm during this time period, it is possible that PwC knew or should have known that third parties might be relying on the PwC work product Plaintiffs claim was negligently prepared, because "in many cases, the accountant preparing a financial statement for his client, although he does not know the identity of the particular [*26] party or parties to whom his client intends to exhibit his report, is aware of the use to which his client intends to put the report, and thus is aware of the class of parties to whom the report will be exhibited." n55 Under the facts as Plaintiffs present them (that Lason completed the acquisition of 76 companies during the period 1996 through 1999, all the while using PwC's services), such a class could possibly consist of those entities or persons who utilized the PwC reports as part of their pre-sale considerations in those years Lason was actively acquiring other businesses, i.e., those parties who would reasonably rely on the statement PwC audited for Lason with knowledge that Lason would then show the statements to third parties with an interest similar to that of Plaintiffs. Such a class, if so determined, would comport with the Restatement's contemplated limitation on liability, and in so doing, should allay the concerns of an accountant's liability to an unknown class for unknown amounts in an unknowable time frame. Thus, PwC's argument that it is not liable for Lason's failure to make "earn out" payments to Plaintiffs in late 2000 based on the fact that PwC's alleged [*27] negligently-prepared work product covered a period ending at least two years prior is not persuasive at this summary

judgment stage; to the extent that Lason's last public filing prior to the sale of Plaintiffs' business occurred in March 1999, given that Plaintiffs may have been members of a class of companies Lason "gobbled up" between 1996 and 1999, and to whom PwC potentially knew its work product was to be distributed, the March 1999 date is not critical. Additionally, should Plaintiffs eventually be able to show that they were in fact a member of such a class, PwC's argument that Plaintiffs cannot show "something more than a casual business encounter" n56 with PwC would be meritless, as a business relationship between the class members and PwC via Lason and its utilization of PwC's auditing services for the purpose of acquiring members of the class might well impliedly establish the requisite business relationship.

n55 Jack W. Shaw, Jr., Annotation, Liability of Public Accountant to Third Parties, 46 A.L.R.3d 979, 1003 (1972).

n56 Outdoor Technologies, 2001 WL 541472, at *5.

[*28]

PwC's claim that liability may be improperly imposed on a party such as PwC (as enunciated by illustration to comment 10 of the Restatement) is unfounded. That illustration applies only to audited statements where the auditor neither knows nor has reason to know of the intended use to which the audited statements will be put. In the illustration, the financial statements are audited by an accountant primarily to benefit its own client and only collaterally or incidentally audited to benefit a potential lender. The facts of this case, if developed as Plaintiffs allege, tend to show otherwise. This Court cannot be sure from the present state of the record what knowledge PwC had at the time it audited the relevant Lason statements, and for whose benefit the services were performed. Where "reasonable minds could conclude from the allegations [in the pleadings] that...annual audits...were prepared for another purpose [other than being prepared solely to file with the SEC], that being the influencing of the transactions in question," a motion to dismiss can be denied under § 552. n57 In the context (as here) of a motion for summary judgment and at the outset of litigation, "the record [*29] is necessarily thin...[and] as litigation continues with ensuing disclosure and discovery, the record becomes far richer factually." n58

n57 In re Smartalk Teleservices, Inc. Securities Litigation, 124 F. Supp. 2d 505, 525

(S.D. Ohio 2000) (denying motion to dismiss and holding that auditors owed a third party a duty of care where there were aware during preparation of documents that their client was interested in acquiring another company, which company was one of only four on national participants in the market).

n58 Moore's, supra note 35, § 56.11[3], at 56-98.

Having found that on the present record PwC is not entitled to judgment as a matter of law, the Court could deny PwC's motion for summary judgment on that prong alone. However, the competing affidavits submitted by the parties additionally show that there are some material facts in dispute--namely, what PwC knew about Lason's potential use for the statements PwC was auditing, and when PwC knew it. Summary judgment is not [*30] warranted on that prong either. As an oft-cited treatise states, in the context of a summary judgment motion, a court is constrained to deny the motion even if the "nonmovant's support is considered weak by the court." n59 Summary judgment will further not be granted if "upon examination of all the facts, it seems desirable to inquire [more] thoroughly into them in order to clarify the application of the law to the circumstances." n60 Here, the Court cannot presently know what facts Plaintiffs may ultimately be able to establish, but at this juncture the Court will allow further discovery based on Plaintiffs' somewhat meager but legally sufficient showing of material facts in dispute.

n59 Moore's, supra note 36.

n60 Ebersole v. Lowengrub, 54 Del. 463, 180 A.2d 467, 470, 4 Storey 463 (Del. 1962) (reversing grant of summary judgment where the record failed to explain why a driver of a motor vehicle suddenly stopped his vehicle thereby causing a multiple-vehicle collision).

* * *

PwC's second argument [*31] that the pleadings fail to plead negligence with particularity is also not persuasive. In Snyder v. Butcher & Co., n61 the defendants filed a motion to dismiss predicated on plaintiffs' alleged failure to plead fraud and negligence with particularity, even though the plaintiffs had identified the promotional materials they relied upon in deciding to invest in privately-owned radio stations, had identified the alleged misrepresentations contained in those promotional materials, and had identified the parties who prepared and distributed the promotional

2002 Del. Super. LEXIS 180, *

materials. This Court there permitted the fraud and negligence claims to withstand the motion to dismiss as "Defendants were informed of the act Plaintiff complained of and... [could] adequately prepare for response and defense[;] the Amended Complaint did not seem to be a pretext for a fishing expedition, but contained allegations of a substantial suit[;]...[and] Defendants were being exposed to a suit which, while it may not [have] ultimately been successful...[could not] correctly be characterized as unfounded." n62 Additionally, the rule requiring particularity in the pleading of negligence "must be applied in light [*32] of the particular situation presented in any case," n63 and less particularity is required "when the facts lie more in the knowledge of the opposite party, than of the party pleading." n64 The Court finds those statements and the holding of Snyder applicable to this case, requiring denial of PwC's motion for summary judgment on this ground.

n61 1992 WL 240344 (Del. Super.) (denying motion to dismiss and holding in part that claims of fraud and negligence were sufficiently pleaded to satisfy Superior Court Civil Rule 9(b)).

n62 Snyder, 1992 WL 240344, at *10.

n63 Phillips v. Delaware Power & Light Co., 56 Del. 533, 194 A.2d 690, 697, 6 Storey 533 (Del. Super. Ct. 1963)

n64 Id.

## CONCLUSION

For the reasons stated above, PwC's motion for summary judgment is **DENIED**. The Court will deem the Plaintiffs' First Amended Complaint filed today; PwC shall file an answer to that amended complaint by July 15, 2002.

**IT IS SO ORDERED** [*33] .

Richard R. Cooch

# EXHIBIT 3

1 of 1 DOCUMENT

**Krug, et al. v. Beebe Medical Center, et al.**

**C.A. No. 02C-06-093**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

**2003 Del. Super. LEXIS 334**

**June 6, 2003, Submitted**
**September 30, 2003, Decided**

**DISPOSITION:** [*1] Defendant's Motion to Dismiss GRANTED.

**LexisNexis(R) Headnotes**

**COUNSEL:** Andre G. Bouchard, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, DE.

Michael D. Carr, Esquire, Wilmington, DE.

John A. Elzufon, Esquire, Elzufon Austin Reardon Tarlov & Mondell, Wilmington, DE.

Melanie K. Sharp, Esquire, Young Conaway Stargatt & Taylor, Wilmington, DE.

Gilbert F. Shelsby, Jr., Esquire, Morgan Shelsby & Leoni, Newark, DE.

**JUDGES:** FRED S. SILVERMAN, JUDGE.

**OPINION:**

After reviewing Defendant's March 18, 2003 motion to dismiss on statute of limitations grounds, I conclude that the statute has indeed run and Plaintiff's claims are barred. In light of recent case law, this case is relatively straightforward.

Plaintiff's complaint concerns a cardiac catheterization, and an alleged lack of informed consent and negligence. Specifically, Plaintiff pinpoints June 12, 1999 as when he originally underwent a catheterization, and June 14, 1999 as when Defendant unnecessarily and negligently performed a repeat catheterization. Plaintiff filed his complaint on June 12, 2002, which was three years after Defendant's negligence and Plaintiff's injury.

The issue is whether a patient is on notice of possible medical [*2] negligence, thus triggering the statute of limitations, when informed that a second catheterization is necessary only days after undergoing the original procedure. Delaware law imposes a two-year statute of limitations on plaintiffs bringing medical negligence claims. n1 The period begins to run from the date when the injury occurs. n2 Injured plaintiffs have as much as an extra year if the injury is unknown to them and cannot be discovered through reasonable diligence. n3 The additional time for bringing a suit is known as the "discovery rule." n4

n1 DEL CODE ANN. tit. 18, § 6856 (2003).n2 18 *Del. C.* § 6856.n3 *Id.* See *Parsons v. Marvel*, 2001 Del. Super. LEXIS 493, 2001 WL 1739451 (Del. Super. Ct.)(citing *Ewing v. Beck*, 520 A.2d 653, 663 (Del. 1987))(one year extension in § 6856(1) only available where injuries not physically ascertainable).n4 Bridgestone/Firestone, Inc. v. Cap Gemini America, Inc., 2002 Del. Super. LEXIS 291, 2002 WL 1042089, at *20-21 (Del. Super. Ct.)(citing *Began v. Dixon*, 547 A.2d 620, 623 (Del. Super. Ct. 1988))(discovery rule applies to medical malpractice actions involving inherently unknowable injuries where no observable or objective factors put laypeople on notice).

[*3]

*Brown v. E.I. DuPont de Nemours and Company, Inc.* n5 explains the "discovery rule." *Brown* states that

the rule "starts the limitations period running only 'when a legal injury is sustained.' Thus, the statute of limitations period began to run when plaintiffs were on notice of a potential tort claim." n6 In the absence of actual notice, plaintiffs are on inquiry notice when they are chargeable with knowing that their rights have been violated. n7

n5 820 A.2d 362 (Del. 2003).n6 *Id.* at 368-369.n7 *Id.* at 368, n.21.

Usually, whether and when a person is on notice presents a jury question. Even so, no reasonable juror could conclude that Plaintiff was not on actual or inquiry notice that he had a potential claim as of June 14, 1999. After undergoing a heart catheterization on June 12, 1999, Plaintiff was at least under a duty to inquire into why a repeat procedure was necessary only two days later. Plaintiff, therefore, was on notice, [*4]  or inquiry notice, of a "potential tort claim," and the statute of limitations began running on June 14, 1999. Plaintiff's June 12, 2002 complaint falls outside the two-year period specified in § 6856 by almost a full year.

This motion's outcome seemed clear after the oral argument. Nevertheless, the court gave Plaintiff a final chance to expand the record and explain how it was that the second catheterization did not put him on notice. Plaintiff chose not to provide more about why he did not file suit sooner.

Plaintiff may have received substandard medical care. It is difficult to see why he had to undergo back-to-back heart catheterizations. And the court prefers to give Plaintiff his day in court. Nevertheless, the law requires that injured parties investigate their claims and file suit within a specific time. Plaintiff missed the deadline.

Defendant's motion to dismiss on statute of limitations grounds is ***GRANTED.***

**IT IS SO ORDERED.**