# EXHIBIT 2

1 of 1 DOCUMENT

**MARK W. CARELLO and KAREN CARELLO NOCKET, Plaintiffs, v. PRICEWATERHOUSECOOPERS LLP, Defendant.**

**C.A. No. 01C-10-219 RRC**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

**2002 Del. Super. LEXIS 180**

**May 23, 2002, Submitted**
**July 3, 2002, Decided**

**DISPOSITION:** [*1] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** Kevin William Gibson, Esquire, Gibson & Perkins, P.C., Media, Pennsylvania, Attorney for Plaintiffs.

Gregory V. Varallo, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware, and Martin L. Perschetz, Esquire, Schulte Roth & Zabel LLP, New York, New York (pro hac vice), Attorneys for Defendant.

**JUDGES:** Richard R. Cooch.

**OPINIONBY:** Richard R. Cooch

**OPINION:**

### MEMORANDUM OPINION

COOCH, J.

### INTRODUCTION

Before the Court is a motion for summary judgment ("the Motion") filed by defendant PricewaterhouseCoopers LLP ("PwC") n1 against plaintiffs Mark W. Carello and Karen Carello Nocket ("Plaintiffs"). Plaintiffs' action sounds in tort for negligent misrepresentation, specifically the alleged negligence of a public accountant to a third party with whom there was no privity of contract and where the only harm suffered was economic in nature. The issue here is whether PwC owed Plaintiffs a duty, such duty potentially arising either through 1) Plaintiffs' inclusion in a class of similarly-situated business owners who relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason, [*2] Inc. ("Lason") and which were prepared by PwC, or 2) a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, in order for a duty to arise, PwC would have had to have known (or have had reason to have known) that Lason would share its financial statements with the class or with Plaintiffs as part of a potential business transaction.

> n1 PwC originally filed a motion to dismiss the complaint but both parties attached affidavits to their subsequent submissions in connection with that motion; the Court, with the agreement of the parties, will therefore treat the motion as one for summary judgment. See Super. Ct. Civ. R. 12(b) (providing that a motion to dismiss shall be treated as one for summary judgment if "matters outside the pleadings are presented to and not excluded by the Court").

In their proposed First Amended Complaint, n2 Plaintiffs allege that PwC negligently audited the [*3] financial statements of its client, Lason; Plaintiffs aver that they relied upon those statements in subsequently deciding to sell their business, Delaware Processing Services, Inc. ("DPS") to Lason. PwC advances two grounds for summary judgment in its Motion: 1) that under Superior Court Civil Rule 12(b)(6), Plaintiffs have failed to state a claim upon which relief can be granted; n3 and 2) that under Superior Court Civil Rule 9(b),

2002 Del. Super. LEXIS 180, *

Plaintiffs have failed to plead negligence with particularity.

> n2 Plaintiffs originally filed a Complaint alleging negligence and fraud, and they sought an award of punitive damages. At oral argument on PwC's Motion, the Court granted Plaintiffs leave to submit a proposed amended complaint (as well as affidavits) in connection with Court-ordered supplemental memoranda. The proposed First Amended Complaint does not include a fraud count but avers only negligence.

> n3 Although originally filed as a motion to dismiss, PwC's submissions on the motion subsequent to the original motion's conversion did not re-characterize PwC's argument; PwC has maintained throughout this litigation that it is entitled to judgment as a matter of law because it did not owe Plaintiffs any duty at the time Plaintiffs decided to sell their business because they decided to sell after Lason made an SEC filing on March 31, 1999.

[*4]

Because there are material facts in dispute and PwC is not entitled to judgment as a matter of law when those facts are viewed in a light most favorable to Plaintiffs, PwC's motion for summary judgment is **DENIED**.

### FACTS

Plaintiffs were the sole shareholders of DPS, a company whose purpose was to service "financial institutions and similarly situated institutions in capturing and processing data"; n4 each plaintiff owned 50% of DPS's issued and outstanding stock prior to selling DPS to Lason. n5 Plaintiffs sold DPS to Lason through a transaction that closed on November 19, 1999 and which involved a complicated deferred "earn out" formula that was apparently engineered to partly compensate Plaintiffs *in futuro*. Plaintiffs allege that in deciding to sell their business to Lason, they in part relied "on [a] review...of...statements [relating to Lason's financial health] and [PwC's] assessment of the financial condition of Lason as represented by such audited financial statements...." n6 PwC had "audited Lason's annual financial statements." n7

> n4 First Am. Compl. P6.

> n5 First Am. Compl. P5. [*5]

> n6 First Am. Compl. P68.

> n7 Def.'s Mot. P1.

A further chronology drawn from the First Amended Complaint follows: "In April, 1998, the Plaintiffs...were contacted by...representatives of Lason, soliciting DPS's data entry business for a Lason subsidiary..."; n8 "In the third quarter of 1998...DPS began doing business with Lason through its subsidiary"; n9 "During the period 1996 through 1999, Lason completed the acquisition of 76 companies (55 of which were completed during the two year period 1998-1999)"; n10 "The Plaintiffs, as part of their investigation to enter into the sale...reviewed and relied on Lason's Annual Report, 10-K and the audited financial statements accompanying such reports for the periods ending December 31, 1997, and December 31, 1998...together with Lason's...10-Q, and the unaudited financial statements accompanying such report, for the periods ending December 31, 1998, March 31, 1999, and June 30, 1999..."; n11 "The Plaintiffs subsequently learned [after DPS was acquired by Lason] that Lason's reported revenues on its audited financial statements, and its 10Ks, and [*6] 10Qs, for the reporting fiscal years 1997, 1998, and 1999, which were prepared by...[PwC], were not based upon an accounting method which was in conformity with Generally Accepted Accounting Principles ('GAAP')." n12

> n8 First Am. Compl. P11.

> n9 First Am. Compl. P12.

> n10 First Am. Compl. P13.

> n11 First Am. Compl. P54.

> n12 First Am. Compl. P93.

On December 5, 2001, Lason filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. n13 As a result of the accounting irregularities that Plaintiffs allege existed in Lason's audited financial statements and (presumably) because of Lason's subsequent filing for bankruptcy protection, Plaintiffs aver that Lason "cannot and will not be able to" pay the "earn out" Plaintiffs argue is now due them as part of the DPS acquisition. Plaintiffs assert that PwC is liable to them "in that had [PwC] not misstated the income of Lason contrary to [Generally Accepted Accounting Principles], Plaintiffs never would have agreed to sell DPS [*7] to Lason." n14

> n13 First Am. Compl. P106.

2002 Del. Super. LEXIS 180, *

n14 First Am. Compl. P120.

Additionally, Plaintiffs claim that they relied on the alleged oral representations of Timothy Molnar, a PwC employee whom Plaintiffs apparently believed was a certified public accountant and who Plaintiffs state "specifically advised the Plaintiffs that the structure of the Lason [acquisition] was a 'fair one' and represented a 'good deal' for the Plaintiffs...." n15 The oral representations Plaintiffs purportedly relied upon included an alleged statement by Molnar to the effect that "if there was anything else the Plaintiffs should look at or needed to know about the financial condition of Lason [in consideration of whether to sell their business to Lason][,]...what...[PwC] reported to the SEC...should be alright [sic]." In affidavits they have submitted in connection with this litigation, Plaintiffs state that after "meeting with Mr. Molnar...and after reviewing Lason's audited financial statements together with the 10Ks and [*8] the 10Qs prepared by...[PwC]...[we] decided to accept Lason's terms and proceed with the sale of our DPS stock to Lason." n16

n15 First Am. Compl. P65.

n16 Carello Aff. P5 (Ex. A to Pls.' Sur Reply); Carello Nocket Aff. P5 (Ex. B to Pls.' Sur Reply)

PwC has attached two affidavits to its submissions opposing Plaintiffs' asserted cause of action. The first affidavit is from Timothy Molnar, the PwC employee whom Plaintiffs allege was the CPA who made certain representations concerning the financial health of Lason to Plaintiffs when they were contemplating the sale of their business; in his affidavit, Molnar denies he participated in PwC's audit of Lason's financial records, states that he was unfamiliar with Lason's financial condition (and denies that he made any representations to the contrary), and refutes that he ever represented to Plaintiffs that he was a CPA. n17 The second of PwC's attached affidavits is from Cheryl L. Dunn, the "engagement partner" for PwC's audits of the financial statements [*9] of Lason, Inc. Dunn's affidavit states "I am confident that, at the time of the issuance of PwC's audit opinion of the 1998 [Lason] financial statements, I did not know about a potential acquisition by Lason of DPS." n18

n17 See Molnar Aff. PP3, 4, 5 (Ex. A to Def.'s Supplemental Reply Mem.).

n18 Dunn Aff. P4 (Ex. B to Def.'s Supplemental Reply Mem.).

## CONTENTIONS OF THE PARTIES

Plaintiffs concede (and PwC argues) that in Delaware the applicable standard of the tort of negligent misrepresentation lies in section 552 of the Restatement (Second) of Torts. That section, in pertinent part, provides that:

> (1) One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others...is subject to liability for pecuniary loss caused to [those others] by their justifiable reliance...
> (2)...the liability is limited to loss suffered (a) by the person or one of a limited group of persons [*10] for whose benefit and guidance [the information supplier]...knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that [the information supplier] knows that the recipient...intends [the information to influence]... n19

n19 Restatement (Second) of Torts § 552 (1977).

The pertinent factual allegations Plaintiffs make in support of their argument that PwC should now be found liable under the Restatement formulation follow: "Upon information and belief, DPS, was targeted for acquisition by Lason as early as the third financial quarter of 1998, and no later than January of 1999, during or prior to the period...[PwC] was performing [its] 1999 audit of Lason's financial statements"; n20 "Upon information and belief, the Defendant as an integral part of Lason's acquisition team had actual knowledge that the Plaintiffs were targeted for acquisition by Lason during or prior to the period the Defendant was performing its 1999 audit of Lason's financial statements"; [*11] n21 "It is believed and therefore averred, that...[PwC] as an integral member of the Lason acquisition team was or should have been aware that companies considering an acquisition by Lason, such as DPS, would rely on the audited financial statements of Lason, and its 10Ks and 10Qs filed with the SEC, to determine if they should accept Lason's offer of purchase"; n22 that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies"; n23

and "As a result and direct proximate cause of...[PwC's] negligence, the Plaintiffs have been and will be damaged, in that had...[PwC] not misstated the income of Lason contrary to GAAP, Plaintiffs never would have agreed to sell DPS to Lason." n24

> n20 First Am. Compl. P20.
>
> n21 First Am. Compl. P21.
>
> n22 First Am. Compl. P64.
>
> n23 Pls.' Answer to Def.'s Mot. at 4 n. 4.
>
> n24 First Am. Compl. P120.

Despite the attached Cheryl L. Dunn affidavit (the "engagement partner" for PwC's audits of the [*12] financial statements of Lason, Inc) to the effect that "at the time of the issuance of PwC's audit opinion the 1998 [Lason] financial statements" PwC did not know about a potential acquisition of DPS by Lason, Plaintiffs state that they "would suspect that...[PwC] has hundreds of employees that may have a different recollection" and that they "have the absolute right to take discovery on this potential issue." n25

> n25 Pls.' Sur Reply at 2.

In response, PwC argues that under section 552 of the Restatement (Second) of Torts, Plaintiffs have failed to allege the requisite duty PwC would have had to have owed them for PwC now to be potentially liable to Plaintiffs. Specifically, PwC argues that Plaintiffs have failed to allege a "pecuniary loss caused by justifiable reliance upon...false information" n26 because "the last audited financial statements issued before the sale of DPS was even contemplated were for the year ending December 31, 1998 [and]...thus Plaintiffs allege that Lason's failure to make a [*13] payment due after October 31, 2000 was caused by PwC's audit report on financial statements for a period that ended almost *two years earlier*." n27 PwC argues that Plaintiff's factual averments "contain[] no cognizable allegation that PwC's audit reports--rather than Lason's subsequent financial problems--caused Plaintiffs' losses." n28 In support of its argument that PwC did not owe Plaintiffs a duty as alleged, PwC states that the pleadings "make[] clear that PwC could not possibly have known about a proposed sale of DPS to Lason, or [have] intended that its audit reports be used in connection with such a sale, since Plaintiffs claim not even to have been approached about the sale until July 1, 1999" and "the audited financial statements on which Plaintiffs claim to have relied...were

filed with the S.E.C. on March 31, 1998 and March 31, 1999, respectively." n29 PwC argues "to be liable for negligent misrepresentation under Restatement Section 552, a defendant must have owed to the plaintiff the requisite duty *at the time the alleged misrepresentations were made.*" n30 Citing Outdoor Techs., Inc. v. Allfirst Fin., Inc., n31 PwC further argues that Plaintiffs' averments, [*14] particularly those relative to their encounter with Timothy Molnar, the PwC employee whom Plaintiffs allege was the PwC CPA who made certain representations to them, fail to establish a business relationship with PwC such that PwC can now be held liable to Plaintiffs.

> n26 Def.'s Mot. P2.
>
> n27 Id. (emphasis in original).
>
> n28 Id.
>
> n29 Def.'s Mot. P3.
>
> n30 Def.'s Supplemental Reply Mem. at 1 (emphasis in original); Def.'s Reply Mem. at 3.
>
> n31 2001 WL 541472 (Del. Super.) (granting defendant-banks' motion for summary judgment because those banks and their counsel did not owe a duty to non-customer attempting to cash a check drawn on them).

Additionally, PwC argues that "a complaint alleging negligent misrepresentation...must allege 'the specific manner in which the [statement] is misleading' (citation omitted)," and that although the pleadings "purport[] to set forth numerous Generally Accepted Accounting Principles, [they] fail to allege how any of these principles [*15] allegedly [were] violated." n32 Accordingly, PwC argues that it is entitled to judgment as a matter of law because Plaintiffs have failed to plead negligence with particularity as required by Superior Court Civil Rule 9(b).

> n32 Def.'s Mot. P5.

## STANDARD OF REVIEW

Summary judgment is granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. n33 The court must view the facts in a light most favorable to the non-moving party. n34 A court "reviews the summary judgment motion and response papers and seeks to determine whether the record reveals a disputed factual issue material enough to require a trial and factfinder

determination...." n35 A "nontrivial factual dispute created by the nonmovant [such as by the attachment of an affidavit disputing the other side's allegations] will usually bar summary judgment so long as the contested facts are material even if the nonmovant's support is considered weak by the court." n36

n33 Super. Ct. Civ. R. 56(c); Burkhart v. Davies, 602 A.2d 56, 59 (Del. 1991). [*16]

n34 Merrill v. Crothall-American, Inc., 606 A.2d 96, 99-100 (Del. 1992).

n35 11 James Wm. Moore et al., Moore's Federal Practice § 56.11[5][a], at 56-108 (3d ed. 2002).

n36 Id., § 56.11[7][b], at 56-124.

## DISCUSSION

In order for PwC to be potentially held liable to Plaintiffs, Plaintiffs must show that PwC owed Plaintiffs a duty, either through Plaintiffs' inclusion in a class of similarly-situated business owners who relied to their detriment on what Plaintiffs allege are the negligently-audited financial statements of Lason and which were prepared by PwC, or through a showing that Plaintiffs alone relied to their detriment on those allegedly negligently-audited statements. In either scenario, at the time PwC was auditing Lason's financial statements, PwC would have had to have known (or have had reason to have known) that Lason would share those statements with the class or with Plaintiffs as part of a potential business transaction.

As noted by this Court in its 1990 decision in Guardian Construction Co. v. Tetra Tech Richardson, Inc., n37 [*17] "Delaware case law is divided on the issue of whether privity of contract is a prerequisite for the imposition of liability on a negligence theory where the damages sought to be recovered are purely economic." n38 Finding, however, that a lack of contractual privity between the design engineer and the general contractor involved there was "not fatal," the Guardian Construction court held that section 552 of the Restatement (imposing liability on suppliers of information to third parties who are intended recipients of the information when that information contains negligent misrepresentations) was the proper standard for claims of negligent misrepresentation brought in the Delaware courts, and the Court then "specifically adopted" the Restatement's standard. n39

n37 583 A.2d 1378 (Del. Super. Ct. 1990) (holding in part that claim of general contractor and subcontractor against design engineer for negligent misrepresentation as to tidal heights and project benchmarks in seaside construction project was cognizable despite lack of contractual privity between the parties).

n38 Guardian Construction, 583 A.2d at 1384. [*18]

n39 583 A.2d at 1386.

It has been said that "the Restatement rule...appears to be a sensible and moderate approach to the potential consequences of imposing unlimited negligence liability...[on third parties with whom there is no privity of contract and where the only harm alleged is economic in nature]." n40 This Court, in Danforth v. Acorn Structures, Inc. n41 stated that the Restatement view represented "the definite weight of authority." n42 Some courts have taken different approaches than that suggested by the Restatement, however, either on the one hand "by denying recovery to third parties for auditor negligence in the absence of a third party relationship to the auditor that is 'akin to privity[]'," or on the other hand by allowing recovery "based on auditor negligence to third parties whose reliance on the audit report was 'foreseeable[]'." n43 But "most jurisdictions, supported by the weight of commentary and the modern English common law...have steered [the] middle course...of § 552." n44

n40 Bily v. Arthur Young & Co., 3 Cal. 4th 370, 834 P.2d 745, 769, 11 Cal. Rptr. 2d 51 (Cal. 1992) (adopting the Restatement rule and rejecting the "foreseeability" approach that California courts had until that time followed in a case where investors in corporation brought a professional malpractice action against an independent auditor that had examined a corporation's books prior to the corporation's initial public offering). [*19]

n41 1991 WL 269956 (Del. Super.), aff'd on other grounds, 608 A.2d 1194 (Del. 1992).

n42 Id. at *2.

n43 Bily, 834 P.2d at 752.

n44 Id.

While "most jurisdictions" have analyzed negligent misrepresentation liability of accountants to third parties under the Restatement approach, interpretations of section 552 "vary...[and] the more expansive cases [*i.e.*, those jurisdictions purporting to use section 552 in their analyses but not concentrating on limiting recovery to a person or group of persons that the accountant actually knew would rely on an audit report] have been criticized as effectively eliminating all of the restrictions the Restatement sought to impose." n45 One court has stated that the "better reasoned decisions interpret § 552 as limiting...potential liability...to actual knowledge of the limited although unnamed group...as well as actual knowledge of the particular financial transaction that such information is designed to influence...measured at the moment the audit report is published...." n46 Such an interpretation is supported [*20] by comment h to section 552 itself, which provides:

> ...it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied...it is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it...it is enough...that the maker...knows that his recipient intends to transmit the information to a similar person, persons or group. n47

Thus a plaintiff invoking a cause of action under negligent misrepresentation involving section 552 must show that the defendant supplied the information to a party for use in that party's business transactions with the plaintiff or a class of which the plaintiff was a member. n48

n45 Elizabeth Williams, Cause of Action Against Accountant for Negligent Performance of Professional Services, 15 COA2d 395 (2000); cf. Christiana Marine Serv. Corp. v. Texaco Fuel and

Marine Mktg. Inc., 2002 WL 1335360 (Del. Super.) (finding that company whose primary business purpose was the transportation of fuel oil was not "in the business of supplying information" as required by section 552, and recognizing that those courts that have taken a more "expansive view" of that section may hold otherwise). [*21]

n46 Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 688 N.E.2d 1368, 1372 (Mass. 1998) (applying the Restatement standard to an action brought by a buyer of the controlling interest in a corporation against the accountants who had audited the financial statements accompanying the company's annual report and holding that accountants were not liable to purchaser because they had no knowledge that the controlling interest was to be sold).

n47 Restatement (Second) of Torts § 552 cmt. h (1977).

n48 But cf. Danforth v. Acorn Structures, 1991 WL 269956, at *2 (Del. Super.) (stating that under section 552 "the plaintiff must show that the defendant supplied the information to *the plaintiff* for use in business transactions with third parties) (emphasis added); Christiana Marine Serv. Corp. v. Texaco Fuel and Marine Mktg. Inc., 2002 WL 1335360, at *6 (Del. Super.) (quoting Acorn Structures).

The reasoning behind limiting the liability of an information-providing party (including accountants who audit financial statements) rests [*22] on the theory that "the misinformer actually knows [that the relying party] will receive inaccurate information...because the misinformer knows that [its] client will channel the work product to that restricted group." n49 An illustration of these liability-limiting concepts can be found in an illustration to comment h to section 552 of the Restatement:

> A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used un a wide variety of financial transactions

by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements...to obtain a loan from X Bank...[and] through reliance upon [the negligently prepared financial statements]...X Bank suffers pecuniary loss. A is not liable to X Bank. n50

Thus, under the Restatement, [*23] an information supplier retained to furnish information for no particular purpose does not undertake a duty to third parties when the information supplier neither knows nor has reason to know of the intended use to which that information will be put by the information supplier's client.

n49 First Nat'l Bank of Commerce v. Monco Agency Inc., 911 F.2d 1053, 1060 (5th Cir. 1990) (holding that under Louisiana law circumstantial evidence offered by a bank of an accounting firm's knowledge that statements it had audited for its client would be relied on by the bank in making loans to the firm's client did not raise genuine issue of material fact so as to prevent summary judgment in favor of the accounting firm).

n50 Restatement (Second) of Torts § 552 cmt. h, illus. 10 (1977).

* * *

In this case, Plaintiffs have alleged their reliance on certain financial statements of Lason that were audited by PwC at a time when a class of persons similar to and including Plaintiffs were allegedly contemplating [*24] the sale of their businesses to Lason; Plaintiffs also allege that they would not have sold their business to Lason had the statements PwC audited not been "misstated" and "contrary to Generally Accepted Accounting Principles." Plaintiffs apparently have not been able to collect that part of the purchase price that was to accumulate after the close of the sale of DPS to Lason, given that Lason subsequently filed for bankruptcy. Plaintiffs have therefore potentially shown the cause and effect of their claimed loss, contrary to PwC's assertion that Plaintiffs have failed to show "that PwC's audit reports--rather than Lason's subsequent financial problems--caused Plaintiffs' losses." n51

n51 Def.'s Mot. P.2.

Plaintiffs may also possibly be able to show that they were within a "limited group of persons" for whose benefit and guidance PwC knew Lason intended to supply their audited statements and to whom PwC knew that Lason intended to influence with those same statements. n52 Plaintiffs attempt to provide this crucial [*25] link when they allege that "as discovery ensues, [Plaintiffs] will be able to prove that [PwC] was actively assisting Lason in gobbling up companies." n53 Given that Plaintiffs allege that from 1996 through 1999 Lason "completed the acquisition of 76 companies," n54 and that PwC presumably was the accounting firm that Lason retained during this time period, Plaintiffs' assertion that PwC played some part in Lason's competitive acquisitioning might be established.

n52 See Restatement (Second) of Torts § 552 (1977).

n53 Pls.' Answer to Def.'s Mot. at 4 n. 4.

n54 First Am. Compl. P13.

If in fact Lason was "actively gobbling up companies," and PwC was in fact Lason's accounting firm during this time period, it is possible that PwC knew or should have known that third parties might be relying on the PwC work product Plaintiffs claim was negligently prepared, because "in many cases, the accountant preparing a financial statement for his client, although he does not know the identity of the particular [*26] party or parties to whom his client intends to exhibit his report, is aware of the use to which his client intends to put the report, and thus is aware of the class of parties to whom the report will be exhibited." n55 Under the facts as Plaintiffs present them (that Lason completed the acquisition of 76 companies during the period 1996 through 1999, all the while using PwC's services), such a class could possibly consist of those entities or persons who utilized the PwC reports as part of their pre-sale considerations in those years Lason was actively acquiring other businesses, i.e., those parties who would reasonably rely on the statement PwC audited for Lason with knowledge that Lason would then show the statements to third parties with an interest similar to that of Plaintiffs. Such a class, if so determined, would comport with the Restatement's contemplated limitation on liability, and in so doing, should allay the concerns of an accountant's liability to an unknown class for unknown amounts in an unknowable time frame. Thus, PwC's argument that it is not liable for Lason's failure to make "earn out" payments to Plaintiffs in late 2000 based on the fact that PwC's alleged [*27] negligently-prepared work product covered a period ending at least two years prior is not persuasive at this summary

judgment stage; to the extent that Lason's last public filing prior to the sale of Plaintiffs' business occurred in March 1999, given that Plaintiffs may have been members of a class of companies Lason "gobbled up" between 1996 and 1999, and to whom PwC potentially knew its work product was to be distributed, the March 1999 date is not critical. Additionally, should Plaintiffs eventually be able to show that they were in fact a member of such a class, PwC's argument that Plaintiffs cannot show "something more than a casual business encounter" n56 with PwC would be meritless, as a business relationship between the class members and PwC via Lason and its utilization of PwC's auditing services for the purpose of acquiring members of the class might well impliedly establish the requisite business relationship.

> n55 Jack W. Shaw, Jr., Annotation, Liability of Public Accountant to Third Parties, 46 A.L.R.3d 979, 1003 (1972).

> n56 Outdoor Technologies, 2001 WL 541472, at *5.

[*28]

PwC's claim that liability may be improperly imposed on a party such as PwC (as enunciated by illustration to comment 10 of the Restatement) is unfounded. That illustration applies only to audited statements where the auditor neither knows nor has reason to know of the intended use to which the audited statements will be put. In the illustration, the financial statements were audited by an accountant primarily to benefit its own client and only collaterally or incidentally audited to benefit a potential lender. The facts of this case, if developed as Plaintiffs allege, tend to show otherwise. This Court cannot be sure from the present state of the record what knowledge PwC had at the time it audited the relevant Lason statements, and for whose benefit the services were performed. Where "reasonable minds could conclude from the allegations [in the pleadings] that...annual audits...were prepared for another purpose [other than being prepared solely to file with the SEC], that being the influencing of the transactions in question," a motion to dismiss can be denied under § 552. n57 In the context (as here) of a motion for summary judgment and at the outset of litigation, "the record [*29] is necessarily thin...[and] as litigation continues with ensuing disclosure and discovery, the record becomes far richer factually." n58

> n57 In re Smartalk Teleservices, Inc. Securities Litigation, 124 F. Supp. 2d 505, 525

(S.D. Ohio 2000) (denying motion to dismiss and holding that auditors owed a third party a duty of care where there were aware during preparation of documents that their client was interested in acquiring another company, which company was one of only four on national participants in the market).

> n58 Moore's, supra note 35, § 56.11[3], at 56-98.

Having found that on the present record PwC is not entitled to judgment as a matter of law, the Court could deny PwC's motion for summary judgment on that prong alone. However, the competing affidavits submitted by the parties additionally show that there are some material facts in dispute--namely, what PwC knew about Lason's potential use for the statements PwC was auditing, and when PwC knew it. Summary judgment is not [*30] warranted on that prong either. As an oft-cited treatise states, in the context of a summary judgment motion, a court is constrained to deny the motion even if the "nonmovant's support is considered weak by the court." n59 Summary judgment will further not be granted if "upon examination of all the facts, it seems desirable to inquire [more] thoroughly into them in order to clarify the application of the law to the circumstances." n60 Here, the Court cannot presently know what facts Plaintiffs may ultimately be able to establish, but at this juncture the Court will allow further discovery based on Plaintiffs' somewhat meager but legally sufficient showing of material facts in dispute.

> n59 Moore's, supra note 36.

> n60 Ebersole v. Lowengrub, 54 Del. 463, 180 A.2d 467, 470, 4 Storey 463 (Del. 1962) (reversing grant of summary judgment where the record failed to explain why a driver of a motor vehicle suddenly stopped his vehicle thereby causing a multiple-vehicle collision).

* * *

PwC's second argument [*31] that the pleadings fail to plead negligence with particularity is also not persuasive. In Snyder v. Butcher & Co., n61 the defendants filed a motion to dismiss predicated on plaintiffs' alleged failure to plead fraud and negligence with particularity, even though the plaintiffs had identified the promotional materials they relied upon in deciding to invest in privately-owned radio stations, had identified the alleged misrepresentations contained in those promotional materials, and had identified the parties who prepared and distributed the promotional

materials. This Court there permitted the fraud and negligence claims to withstand the motion to dismiss as "Defendants were informed of the act Plaintiff complained of and... [could] adequately prepare for response and defense[;] the Amended Complaint did not seem to be a pretext for a fishing expedition, but contained allegations of a substantial suit[;]...[and] Defendants were being exposed to a suit which, while it may not [have] ultimately been successful...[could not] correctly be characterized as unfounded." n62 Additionally, the rule requiring particularity in the pleading of negligence "must be applied in light [*32] of the particular situation presented in any case," n63 and less particularity is required "when the facts lie more in the knowledge of the opposite party, than of the party pleading." n64 The Court finds those statements and the holding of Snyder applicable to this case, requiring denial of PwC's motion for summary judgment on this ground.

n61 1992 WL 240344 (Del. Super.) (denying motion to dismiss and holding in part that claims of fraud and negligence were sufficiently pleaded to satisfy Superior Court Civil Rule 9(b)).

n62 Snyder, 1992 WL 240344, at *10.

n63 Phillips v. Delaware Power & Light Co., 56 Del. 533, 194 A.2d 690, 697, 6 Storey 533 (Del. Super. Ct. 1963)

n64 Id.

## CONCLUSION

For the reasons stated above, PwC's motion for summary judgment is **DENIED**. The Court will deem the Plaintiffs' First Amended Complaint filed today; PwC shall file an answer to that amended complaint by July 15, 2002.

**IT IS SO ORDERED** [*33] .

Richard R. Cooch