IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re Owens Corning, et al.

---

| | |
|---|---|
| Credit Suisse First Boston,<br>As Agent for the Pre-Petition Lenders,<br><br>Appellant,<br><br>v.<br><br>Owens Corning, *et al.*,<br><br>Appellees. | Case No. 05-00217<br><br>Bankruptcy Case no. 00-03837 (JKF) |

-----------------------------------------------------------x

**OPENING BRIEF OF APPELLANT CREDIT SUISSE FIRST BOSTON,
AS AGENT FOR THE PRE-PETITION BANK LENDERS
TO OWENS CORNING AND CERTAIN OF ITS AFFILIATES**

*Of Counsel:*

SIMPSON THACHER & BARTLETT LLP

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan
425 Lexington Avenue
New York, New York 10017-3954
Telephone:  (212) 455-2000
Facsimile:   (212) 455-2502

LANDIS RATH & COBB LLP

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Telephone:  (302) 467-4400
Facsimile:   (302) 467-4450

*Attorneys for Credit Suisse First Boston*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ........................................................................ 1

BASIS OF APPELLATE JURISDICTION ...................................................... 3

QUESTIONS PRESENTED .............................................................................. 4

STANDARD OF REVIEW ................................................................................ 4

STATEMENT OF THE CASE .......................................................................... 5

    A.    Nature of the Case ........................................................................ 5

    B.    Course of the Proceedings ............................................................ 5

    C.    Disposition in the Court Below ..................................................... 9

STATEMENT OF FACTS ................................................................................ 10

    A.    Owens Corning and Asbestos ...................................................... 10

    B.    "You May Have Million Dollar Lungs" ....................................... 10

    C.    The Truth Begins To Emerge ....................................................... 14

        1.    The Expert Reports .............................................................. 14

            a.    The Friedman Report ............................................. 14

            b.    The Gitlin Report .................................................. 16

        2.    The Silica Hearings ............................................................ 17

SUMMARY OF THE ARGUMENT .............................................................. 19

ARGUMENT .................................................................................................... 20

I.    THE BANKRUPTCY COURT'S INJECTION OF A NEW
    FACTOR INTO THE DERIVATIVE STANDING LEGAL
    ANALYSIS IS AN ERROR OF LAW JUSTIFYING
    REVERSAL .......................................................................................... 20

    A.    Derivative Suits Are Favored In The Third Circuit ..................... 20

          B.     CSFB's Motion Met All The Standards For
                    Derivative Standing That Are Ordinarily Applied
                    By Courts .............................................................................................. 21

          C.     The Bankruptcy Court's Injection Of A New Factor
                    That Is Unsupported By Case Law And Against
                    Public Policy Must Be Reversed .............................................................. 21

II.     THIS COURT SHOULD REMAND WITH
          INSTRUCTIONS TO GRANT THE MOTION ................................................... 25

CONCLUSION ........................................................................................................... 26

## TABLE OF AUTHORITIES

### Cases

*Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S.
138 (1940).................................................................................................23

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
321 B.R. 147 (D.N.J. 2005) .........................................................3, 23

*Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076 (5th
Cir. 1974).................................................................................................11

*Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94 (3d
Cir. 1988)..................................................................................................3

*Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123 (3d Cir.
1993)...........................................................................................................5

*In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004)................................23

*In re Armstrong World Indus., Inc.*, 320 B.R. 523 (D. Del.
2005)..........................................................................................................23

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) ...................23, 25

*In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d
631 (3d Cir. 1998) ....................................................................................5

*In re Prudential Ins. Co. Am. Sales Practice Litig.*, 278 F.3d
175 (3d Cir. 2002) ....................................................................................5

*In re STN Enters.*, 779 F.2d 901 (2d Cir. 1985) ....................................22, 24

*In re Yes! Entm't Corp.*, 316 B.R. 141 (D. Del. 2004)...................................4

*Official Comm. of Unsecured Creditors of Cybergenics Corp.
ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d
Cir. 2003)...........................................................................................20, 25

*Owens Corning v. Credit Suisse First Boston*, No. 04-00905,
slip op. (D. Del. Mar. 31, 2005) ...........................................................19

*Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d
98 (3d Cir. 1981) ..................................................................................4, 5

### Statutes

11 U.S.C. § 503(b)...........................................................................................6

28 U.S.C. § 158(a)(1) ...................................................................................................................3

28 U.S.C. § 2106 .................................................................................................................4, 25

## **Rules**

Fed. R. Bankr. P. 8002(a) .............................................................................................................3

## **Other Authorities**

American Bar Association Commission on Asbestos Litigation
    Report to the House of Delegates Recommendation,
    Feb. 2003 ..............................................................................................................................11

Jonathan D. Glater, *Asbestos Claims Decline, But Questions
    Rise*, N.Y. Times, Apr. 6, 2005 .........................................................................................17

## PRELIMINARY STATEMENT

This appeal from the Bankruptcy Court (Fitzgerald, J.) concerns the legal standard for granting a creditor derivative standing to prosecute a cause of action on behalf of the debtor's estate and whether the creditor may be required, as a condition to prosecuting a colorable claim, to indemnify the debtor for unspecified and baseless counterclaims that may be asserted against the estate.

On January 12, 2005 Credit Suisse First Boston ("CSFB"), as agent for the prepetition bank lenders to Owens Corning and certain of its subsidiaries, moved the bankruptcy court for authorization to commence a derivative action against a discrete group of medical doctors, known as B-Readers. These proposed defendants, specially trained and certified in the reading of chest x rays, have accounted for a disproportionate number of nonmalignant asbestos personal injury claims paid by Owens Corning and its subsidiary, Fibreboard, prior to their petition for bankruptcy reorganization. Contrary to the medical documentation the B-Reader defendants sponsored in support of personal injury claims against the Debtors, recent studies now indicate that as many as *90%* of the nonmalignant claims paid by the Debtors between 1998 and 2000 actually involved no asbestos-related disease at all and should never have been paid.

Just this February, a number of the same group of B-Readers were exposed as charlatans in the multidistrict silica litigation that is taking place in Corpus Christi, Texas. The federal district judge in that case held hearings to get to the bottom of a puzzling trend: thousands of the very same claimants who have previously been paid for asbestos-related lung injuries are also seeking payment for silica-related lung injuries. Having tapped out their share of asbestos money, these claimants sport new diagnoses—often from the same group of suspicious x-ray readers—that they hope will provide a basis for recovery in the silica litigation.

1

Yet as one reputable x-ray reader testified, he cannot recall a single case in over 20 years in which he diagnosed both asbestosis and silicosis in the same x ray.

CSFB believes this and other recent evidence, which continues to unfold, leaves no doubt that Owens Corning has been victimized by fraudulent medical documentation on the part of unscrupulous B-Readers, and that these B-Readers ought to be made to account for their systematic over-diagnosis of nonmalignant asbestos-related disease—causing injury not only to CSFB and the other bank lenders to the Debtors, but also to asbestos plaintiffs who are legitimately sick. CSFB asked the company to take action last December against individuals like the proposed defendant Dr. Ray Harron, who admitted in the silica litigation this February, in open court and under oath, that plaintiffs' lawyers, not medical personnel, generally recorded the patients' exposure history. Dr. Harron—who appears to be responsible for a significant percentage of claims paid by Owens Corning under its NSP—also admitted that he routinely allowed his assistants to prepare his medical reports for him, stamp his name, and send out the reports without his review. Despite this evidence and despite CSFB's urging, Owens Corning has not filed suit and apparently intends to allow the statute of limitations to pass—barring these claims forever.

Rather than allow viable claims to expire, CSFB retained counsel at its own expense, drew up a proposed complaint against the worst offenders, and sought leave of the Bankruptcy Court to file an adversary proceeding derivatively. Given that its proposed complaint clearly stated a claim and given that it volunteered to fund the costs of prosecuting the litigation—the two factors that under existing case law are sufficient to obtain derivative standing—CSFB's motion should have been unopposed and summarily granted.

2

The Bankruptcy Court denied the motion. Implicitly conceding that all other requirements for derivative standing had been met, the Bankruptcy Court ruled that the motion would be granted—but only if CSFB further agreed to indemnify the bankruptcy estate for hypothetical "counterclaims" that the x-ray readers might lodge if they are called to account for their fraud. The indemnification requirement imposed by the Bankruptcy Court has no basis in Third Circuit precedent and is wholly contrary to public policy, which favors meritorious derivative actions financed by willing creditors. When CSFB refused to satisfy this newly invented requirement, the Bankruptcy Court denied its motion for derivative standing.

The Bankruptcy Court ruling is wrong as a matter of law. Notwithstanding CSFB's satisfaction of every relevant factor that courts are directed to consider when deciding a motion for derivative standing, the Bankruptcy Court denied the motion solely on the basis of a new factor—indemnification of the estate (or equivalent security) against concededly baseless counterclaims. This decision constitutes reversible error, and should be remedied by a reversal and remand with instructions to grant CSFB's motion.

## BASIS OF APPELLATE JURISDICTION

The order on appeal was entered by the Bankruptcy Court on March 21, 2005. CSFB's notice of appeal was filed on March 22, 2005, and is therefore timely. Fed. R. Bankr. P. 8002(a). The order being appealed from is a final order within the meaning of 28 U.S.C. § 158(a)(1). *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 98 (3d Cir. 1988); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 155 (D.N.J. 2005). This Court thus has jurisdiction to sit as an appellate tribunal, 28 U.S.C. § 158(a)(1), and "may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate

3

judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106.

## QUESTIONS PRESENTED

1. Did the Bankruptcy Court err as a matter of law when, notwithstanding CSFB's offer to bear the costs of prosecuting a colorable adversary proceeding that has the potential to bring over one billion dollars into the estate, the Court denied CSFB permission to bring the claim derivatively for the sole reason that CSFB would not agree to indemnify the estate against unspecified "counterclaims" (the merits of which the Bankruptcy Court expressly declined to assess)?

2. Did the Bankruptcy Court abuse its discretion when it refused to grant CSFB derivative standing based solely on a factor—agreement to indemnify for supposed "counterclaims"—that has never been relied upon or considered germane to the derivative standing inquiry by the U.S. Court of Appeals for the Third Circuit or any other court?

## STANDARD OF REVIEW

The Bankruptcy Court's decision to employ a particular legal standard when considering CSFB's motion for derivative standing is a pure issue of law reviewed *de novo* by this Court. *In re Yes! Entm't Corp.*, 316 B.R. 141, 144-45 (D. Del. 2004) (Farnan, J.) (bankruptcy court erred as a matter of law when it denied a creditor's motion for derivative standing based on a misapprehension of the proper legal inquiry). This is because a "challenge [to the lower court's] *choice*, *interpretation*, or *application* of legal precepts" warrants "the fullest scope of review." *Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981). The decision below is "not shielded by any presumption of correctness." *Id.*[1]

---

[1]    Where, as here, this Court sits as an appellate tribunal reviewing a final order entered by a lower court, the standards of review it applies are identical to those applied by a circuit court in an appeal from a

4

Characterizing the lower court's ultimate conclusion as one reviewable for "abuse of discretion" does not alter this fact. *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 278 F.3d 175, 180 (3d Cir. 2002) (lower court's decision to sanction, even though reviewed for "abuse of discretion," must be reversed if it "resulted from . . . an errant conclusion of law"). Put differently, when a lower court applies "improper legal standards . . . to decide [an] issue, ***an abuse of discretion occurs automatically***, which is merely another way of saying that [appellate] review becomes plenary." *Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 127 (3d Cir. 1993).

## STATEMENT OF THE CASE

### A.   Nature of the Case

CSFB appeals from the Bankruptcy Court's denial of its request for permission to prosecute a derivative action on behalf of the Owens Corning bankruptcy estate.

### B.   Course of the Proceedings

On December 20, 2004, CSFB sent a formal demand to Owens Corning requesting that the bankruptcy estate pursue claims against B-Readers. *See* Motion of Credit Suisse First Boston, as Agent, for Order Authorizing it to Commence an Adversary Proceeding on Behalf of the Debtors' Estates Against Certain Physicians Who Falsely Reported X-Ray Readings as Positive for Asbestos-Related Impairment (the "Motion for Derivative Standing"), Item No. 1, at Ex. C.   A draft complaint was attached.   Owens Corning did not file any claims against the B-Readers, and indicated that it would not do so. *See* Debtors' Response and Conditional Opposition to the Motion of CSFB, as Agent, to Commence an Adversary

---

trial court's order. *Universal Minerals*, 669 F.2d at 102; *In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 635 (3d Cir. 1998) (district court and circuit court "stand in the [same] shoes" when undertaking appellate review of a bankruptcy court order).

Proceeding on Behalf of the Debtors' Estates Against Certain Physicians (the "Conditional Opposition"), Item No. 6, at Ex. C.

On January 12, 2005, CSFB filed a motion for leave to proceed derivatively on behalf of the estate in pursuit of the claims. *See* Motion for Derivative Standing. In its motion and accompanying papers, CSFB set out the factual basis for the proposed adversary proceeding and explained why its draft complaint alleged colorable claims that would withstand any motion to dismiss. CSFB also explicitly agreed to bear the costs of pursuing the adversary proceeding and agreed that any recovery would benefit the estate as a whole (including legitimate asbestos claimants). CSFB asked only that it have the right to (i) request reimbursement of reasonable attorneys' fees and costs at the conclusion of the adversary proceeding if it proved successful, pursuant to 11 U.S.C. § 503(b)(3)-(4), and (ii) discontinue the suit at any time, subject to reasonable notice to the Debtors.

On February 10, 2005, Owens Corning filed a "conditional opposition" to CSFB's request. *See* Conditional Opposition. The company raised the possibility of "counterclaims" that might arise out of the filing of the lawsuit and be leveled against the estate. Owens Corning stated that it would withdraw its opposition if CSFB agreed to indemnify Owens Corning, "its directors, officers, agents, professionals and employees against any costs or expenses, including legal fees, relating to counterclaims brought by the defendants" in the Adversary Proceeding. *Id.* at 19.

On March 10, 2005 (after seeking and receiving leave), CSFB filed a reply memorandum in further support of its request. *See* Reply Memorandum in Further Support of CSFB's Motion to Commence an Adversary Proceeding Against Certain Physicians on Behalf of

6

the Debtors' Estates, Item No. 11.[2]  CSFB pointed out that indemnification against unspecified

counterclaims that the Debtor conceded would be without merit was not a factor to be considered

in the analysis of whether the motion should be granted.

On February 28, 2005, the Bankruptcy Court held a hearing on CSFB's motion.

*See* Transcript of Hearing Held 2/28/2005 before Honorable Judith K. Fitzgerald United States

Bankruptcy Court ("Tr. 2/28/05"), Item No. 10.  The merit of CSFB's proposed claims was

uncontested—in fact Owens Corning agreed that the recent developments in the silica litigation

strongly supported the claims, Tr. 2/28/05 at 23:6-23:17—whereas neither the Court nor Owens

Corning considered relevant to their analysis whether the feared counterclaims had any

conceivable basis.  Tr. 2/28/05 at 20:14-20:20.  The sole determinant of CSFB's motion thus was

whether it would provide an indemnity or equivalent security against hypothetical counterclaims,

regardless of how unfounded or inconsequential the threat of such counterclaims might be:

> THE COURT:  Well, the issue seems to be, really, comes down to
> one thing, and that is whether or not there is some indemnity that
> the banks, as agents, are willing to provide the debtor in the event
> that counterclaims are filed.
>
>        *    *    *
>
> So, the question is, if Credit Suisse is that convinced that the
> debtor is incorrect [in its view that the adversary proceeding will
> cost more than it will benefit the estate], then provide an
> indemnity, or post a letter of credit, or do something that permits
> the suits to go forward.
>
>        *    *    *
>
> MR. OSTRAGER:  Is it the Court's position that you are going to
> deny the . . . claim unless there's an indemnity?
>
>        *    *    *

---

[2]  *See also* Motion for Leave to File Reply Memorandum, Item No. 8; Order Authorizing Motion for Leave to File Reply Memorandum, Item No. 9.

> THE COURT: I am – I think that's what I'm going to do. . . . it
> seems to me there's some indemnity or some bond. Something has
> to be posted to ensure the creditors of the estate that they will not
> lose as a result of permitting one creditor to go forward with these
> suits.
>
> MR. OSTRAGER: And the indemnity would be for these baseless
> counterclaims that the [x-ray] readers might assert against the
> estate?
>
> THE COURT: It would be for whatever counterclaims are
> asserted against the estate as the result of these actions that lead to
> a judgment against the debtor.

Tr. 2/28/05 at 16:22-20:16.

Given the Bankruptcy Court's stated intention to deny the motion absent an

indemnity or equivalent security, and in light of the statute of limitations concerns attending any

further delay in prosecuting the proposed adversary proceeding, counsel for CSFB offered to

provide an indemnity against counterclaims interposed by B-Readers. Tr. 2/28/05 at 19:24-22:4.

The Bankruptcy Court reserved ruling on the motion subject to the parties reaching agreement on

an indemnity acceptable to both sides after the hearing and submitting a proposed order to that

effect to the Court. *Id.* at 25:12-25:15.

Following the hearing, however, CSFB and other members of the bank lending

syndicate's Steering Committee conferred internally about the indemnity condition required by

the Bankruptcy Court. The Steering Committee concluded that an indemnity against

counterclaims was not an arrangement to which they would agree with Owens Corning. *See*

Certification of Counsel for Credit Suisse First Boston ("CSFB"), as Agent, Regarding a

Proposed Order Denying CSFB's Motion for an Order Authorizing it to Commence an

Adversary Proceeding on Behalf of the Debtors' Estates Against Certain Physicians Who Falsely

Reported X-Ray Readings as Positive for Asbestos-Related Impairment, Item No. 13, at ¶ 7. In

an effort to find an alternative solution, CSFB approached Owens Corning and asked whether

8

Owens Corning either would drop the indemnity requirement, or if not, then abandon the claims

that Owens Corning believed were not worth pursuing in view of the threat of counterclaims, so

that CSFB as agent for the bank lenders could pursue the claims in its own name (subject to an

appropriate sharing of any recovery). *Id.* Owens Corning declined and CSFB asked the

Bankruptcy Court to rule on the record that the motion was denied on the basis of non-

compliance with the Court-imposed indemnity requirement.

### C.    Disposition in the Court Below

On March 21, 2005, the Bankruptcy Court denied CSFB's motion for derivative

standing. *See* Order Denying Motion to Authorize CSFB to Commence an Adversary

Proceeding on Behalf of the Estates of the Debtors Against Certain Physicians (the "Order"),

Item No. 15. The sole reason provided was CSFB's unwillingness to provide indemnity for

supposed "counterclaims" that might arise out of the filing of the Adversary Proceeding. In

imposing an indemnity requirement against prospective counterclaims, the Bankruptcy Court

expressly declined to consider whether the feared counterclaims would be colorable and in fact

the parties agreed they would be baseless. Tr. 2/28/05 at 20:14-20:20. Moreover, the

Bankruptcy Court both on the hearing record and in the Order implicitly found that CSFB met all

of the other requirements for derivative standing since, but for its failure to satisfy the indemnity

requirement, the Court indicated it would have authorized CSFB to prosecute the Adversary

Proceeding. Tr. 2/28/05 at 18:15-18:17 ("either provide an indemnity or figure out how you're

going to compensate the estate in the event that that eventuality happens [counterclaims are filed]

and then you'll have your authority"); *see also* Tr. 2/28/05 at 17:20-18:1, 25:12-25:15; Order at 2

(stating that the order would be reconsidered "upon proof that an indemnity, bond, or equivalent

form of security has been provided as ordered on the hearing record").

## STATEMENT OF FACTS

### A.      Owens Corning and Asbestos

By all accounts, Owens Corning was driven to bankruptcy by the weight of thousands upon thousands of asbestos personal injury lawsuits. First the company fought the claims in court, settling some and litigating others, no doubt hoping all the while to ride out what should have been an ebbing tide. The hazards of asbestos had become widely known by the late 1970s, and the era of widespread asbestos use was receding further into the past. Both Owens Corning and Fibreboard had stopped manufacturing asbestos-containing products by 1972.

But the number of asbestos claims kept growing, defying all epidemiologic predictions. Nearly seventy thousand new claims were filed in 1998 alone. In an effort to stem the tide, Owens Corning created a National Settlement Program, or NSP, in December 1998. This program was actually a series of agreements with a number of asbestos plaintiff law firms under which the company would essentially become a huge claims payment facility. The hope was that an offer of fixed settlement amounts for consensual, out-of-court resolution would make the mounting liabilities more manageable.

The NSP failed. In late 2000, Owens Corning sought bankruptcy protection. The company remains in reorganization proceedings to this day.

### B.      "You May Have Million Dollar Lungs"

There is an explanation for why—contrary to all epidemiologic predictions—the number of asbestos personal injury claims has grown even as exposure to asbestos dramatically decreased decades ago. The massive increase in raw *quantity* of claims is only half the story; at least as significant is the difference in the *quality* of claims being filed.

The first wave of asbestos litigation was precipitated by claimants with serious illnesses. For example, the plaintiff in the Fifth Circuit's 1974 *Borel* decision (which is widely

10

considered the genesis of asbestos personal injury litigation) had been exposed to asbestos for 33 years and died of asbestosis and mesothelioma. *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1081 (5th Cir. 1974).

But modern asbestos claims are qualitatively different. By 2002, nearly ***two thirds*** of the dollars being paid out in settlement of asbestos claims is going to those who purport to have nonmalignant claims. And recent studies have revealed that a staggering percentage of these nonmalignant claims may actually have ***no medical basis whatsoever***. The Rand Institute estimates that as of 2002 up to 90% of new asbestos claims were filed by individuals with little or no impairment.

> [In the 1990s] for-profit litigation screenings began systematically generating tens of thousands of new non-malignant claims each year by individuals who had some degree of occupational asbestos exposure, but did not have, and probably would never get an impairing asbestos-related disease. These individuals may or may not have markings on lung x-rays "consistent with" exposure to asbestos (and dozens of other possible causes) but do not, and may never, experience any symptoms of asbestos disease or develop any asbestos-related conditions that would impair or affect their life or daily functions.

American Bar Ass'n Commission on Asbestos Litigation (Feb. 2003) at 6.

The so-called "entrepreneurial" model of asbestos litigation is based upon the mass recruitment of plaintiffs through "screenings" sponsored by plaintiffs' law firms in collaboration with "for profit" litigation screening companies. These screening companies are set up by individuals with little or no medical training. They use a uniform mechanism for screening hundreds of thousands of workers who could claim to have been exposed to asbestos in the workplace. The ABA Asbestos Commission noted that such companies actively solicit asymptomatic workers who may have been occupationally exposed to asbestos to have free chest

11

x rays. The companies' mass mailings proclaim: "You May Have Million Dollar Lungs" and urge workers to be screened even if they are not sick and exhibit no symptoms.

Professor Lester Brickman recently testified before this Court in connection with claims estimation proceedings:

> There are approximately 15 screening enterprises that have arisen. They are all paid by plaintiff lawyers to go out to various locations, local union halls, motel parking lots. There's a substantial amount of advertising that precedes them, inviting former workers to come and be screened. The letters that go out indicate health risks, also indicate potential financial benefits. The screening is actually done using a mobile x-ray van, that is a truck, sometimes called an exam mobile, which contains x-ray equipment and x-rays are administered on an assembly line basis, one every five, six, seven minutes, and they might screen, depending upon the size of the truck, they might screen two, three hundred workers a day.

Claims Estimation Hearing Tr. 1/19/05 a.m. at 22-23. These screening companies have reportedly "processed" over one million workers, and "well in excess of 90 percent of all nonmalignant claims are generated by screenings." *Id.* at 23.

To evaluate the volumes of x rays taken by screening companies, plaintiffs' lawyers retain radiologists known as "B-Readers," who are certified by the National Institute for Occupational Safety and Health (NIOSH), a division of the Centers for Disease Control. To become a B-Reader, a radiologist must obtain the highest certification available for physicians trained in the use of the International Labour Organization System for classifying x rays for the presence of dust-related lung conditions, including asbestos exposure injuries.

While it is estimated that there are 600 to 700 B-Readers in the United States, plaintiffs' counsel routinely use only a small percentage of these physicians (approximately 5%) to evaluate screening results. The B-Readers examine the x rays after the fact, away from the patient and the testing site, and may not even be licensed to practice medicine in the state where the x rays were taken. Some workers' x rays are reportedly "shopped around" to a number of B-

12

Readers until one is found who will report a positive reading for asbestos-related injury sufficient to sustain a claim for compensation. As the ABA Report indicates, these x-ray readers spend only minutes in making their findings and are paid hundreds of thousands of dollars in the aggregate for reading mass quantities of chest x rays.

When B-Readers interpret x rays for asbestos-related disease, they know they are doing so for purposes of providing "independent" and professional medical documentation necessary to substantiate an asbestos personal injury claim that will be filed against an asbestos defendant. They are also well aware of the cut-off of "1/0" in the ILO system that generally qualifies for compensation from an asbestos defendant. It has even been reported that some B-Readers receive payment for their services depending upon the results of the reading they provide, with greater compensation if they report that an x ray exhibits positive indications of asbestos-related injury than if they report it does not.

It has become apparent that the overwhelming majority of B-Reader reports used to substantiate nonmalignant asbestos-related claims lack a sound scientific basis and are bereft of credibility. Rates of "positive" findings by certain doctors have been as high as 90% according to some studies, and an audit of nonmalignancy claims conducted by the Manville Personal Injury Trust (one of the largest asbestos claims processors) has shown that certain B-Readers whose findings served as the basis for thousands of claims failed an independent peer review more than 50% of the time. Given these findings, the Manville Trust now refuses to pay claims based on medical evidence from certain laboratories and physicians whose diagnostic records are medically unsound.

C.      **The Truth Begins To Emerge**

1.      **The Expert Reports**

Recent scientific studies, in particular the report of Dr. Joseph Gitlin and the report and testimony of Dr. Gary Friedman, suggest that most of the several hundred thousand nonmalignant asbestos personal injury claims paid by Owens Corning and Fibreboard between 1990 and 2000 had no legitimate medical basis.

a.      **The Friedman Report**

Gary K. Friedman, a board-certified pulmonologist, was retained by Owens Corning in 1999 to serve as a medical consultant to the NSP and thereafter continued to serve as a consultant to Owens Corning in the bankruptcy. In 2002, Dr. Friedman submitted a report to Owens Corning to provide an estimate of the percentage of impaired nonmalignant claims under NSP criteria to be expected in the population of total future claims asserted against Owens Corning. Dr. Friedman also gave testimony, via videotaped deposition, in the claims estimation hearings held before this Court.

As a part of his study, Dr. Friedman analyzed medical reports of 1,691 claims of nonmalignant asbestos-related injury submitted to Owens Corning under its National Settlement Program. The cases were randomly selected from 22,578 nonmalignant claims submitted to the NSP. The case files Dr. Friedman reviewed contained analyses of chest x-ray reports, Pulmonary Function Test results (PFTs), and other data.

Dr. Friedman determined that of the sampled claims, only 13.3% met NSP criteria as impaired. In other words, over 86% of the nonmalignant claims studied were unsupported by competent medical evidence. Moreover, Dr. Friedman found that the incidence of impaired claims which might be attributable to asbestos were between 8.16% and 10.46%, and concluded that the vast number of claims for nonmalignant asbestos disease could not be explained on

14

medical, epidemiologic, pathologic, or other scientific grounds.   The credibility of the initial B-Readers' reports was further weakened by Dr. Friedman's observation that although there were approximately 600 certified B-Readers in the United States at the time these reports were generated, only five radiologists were responsible for over 80% of the readings reviewed in the study.   Of the 1,691 cases Dr. Friedman studied, 772 (46%) had been reviewed by Dr. Ray A. Harron, 229 had been reviewed by Dr. Jay Segarra, 87 had been reviewed by Dr. Philip H. Lucas, and 60 had been reviewed by Dr. James W. Ballard.  As such, these four physicians (each of whom CSFB named as a defendant in the proposed complaint submitted with the Motion for Derivative Standing) provided the medical documentation for the majority of the 1,691 randomly sampled claims that Dr. Friedman reviewed.

Dr. Friedman concluded that the x-ray readings recorded by the proposed defendants differed significantly from what would be anticipated by a randomly selected panel of B-Readers nationwide and yielded results which were not even consistent with the spectrum of nonmalignant asbestos-related diseases identified within the peer-reviewed literature authored by plaintiff-approved experts.  For example, peer-reviewed studies consistently show that pleural disease (abnormality of the tissue that lines the outside of the lung and the inside of the rib cage) is more prevalent than pulmonary asbestosis in a variety of exposure settings.  However, as Dr. Friedman found, none of the proposed defendants identified more "pleural only" cases than pulmonary asbestosis. Of the 1,691 cases reviewed, only 124 "pleural only" cases were identified, a result that is fundamentally inconsistent with the peer-reviewed literature.  In the medical reports generated by the proposed defendants, the ratio of pulmonary asbestosis to "pleural only" disease (the far more prevalent type), was 47 to 1.  In the remaining reports submitted by over 40 other B-Readers and physicians, the ratio of pulmonary asbestosis to

15

"pleural only" disease was 2 to 1. In addition, the proposed defendants demonstrated medically unsound idiosyncrasies and propensities in diagnosing asbestos-related injury. For instance, several proposed defendants repeatedly found that all six lung zones were involved in a low-profusion x ray with no pleural change, an extremely rare occurrence according to peer-reviewed literature. Dr. Friedman concluded that the results of his study could not be explained by subjective variation in x-ray interpretation, or so-called inter-reader variability.

**b.    The Gitlin Report**

Dr. Friedman's report was followed more recently in 2004 by the results of a study conducted by Dr. Joseph Gitlin published in the Journal of Academic Radiology of the Johns Hopkins University Department of Radiology. The study reviewed 492 chest x rays that were read as positive for asbestos-related impairment by initial B-Readers. Six consultants in chest radiology and certified B-Readers were asked to reinterpret the x rays independently and without knowledge of their provenance.

Whereas initial B-Readers had diagnosed asbestosis in 95.9% of the studied cases, the six consultants classified the same x-ray films as positive in only 4.5% of the cases. As Gitlin concluded, the sheer magnitude of the difference between the interpretations by initial readers and the six consultants is simply too great to be attributed to good-faith inter-observer variability. Compared with the consultant readers, the initial B-Readers were 9.2 times more likely to conclude that pleural abnormalities consistent with asbestos exposure were visible in the x rays.

Almost two-thirds of the claimants whose x rays were studied in the Gitlin report are plaintiffs who have filed claims against Owens Corning. The initial B-Readers studied in the Gitlin report included CSFB's proposed defendants Dr. Jay T. Segarra, Dr. James W. Ballard, Dr. Phillip H. Lucas, and Dr. Ray A. Harron. When the results are aggregated, these

16

radiologists, identified in both the Friedman and Gitlin reports, are virtually certain to have submitted x-ray reports that were fraudulent.

## 2. The Silica Hearings

Ironically, the turning point in uncovering fraudulent asbestos diagnoses may end up being a case that does not deal with asbestos. U.S. District Judge Janis Jack is presently presiding over a multidistrict litigation concerning silica, which is proceeding in the Southern District of Texas. She recently held hearings to determine whether certain cases should be dismissed based on the questionable medical findings of several doctors responsible for diagnosing nearly 10,000 patients claiming to have been injured by exposure to silica dust. Several of the x-ray readers identified by Judge Jack (including Ray Harron, Jay Segarra and James Ballard) are proposed defendants in CSFB's proposed complaint.

During the course of Judge Jack's hearings, conclusive evidence emerged that B-Readers who diagnose asbestos-related impairments and silica-related impairments routinely have been making multiple inconsistent diagnoses of the x rays of the same patients for different purposes. In particular, the B-Reader would make a positive diagnosis of asbestosis and then later diagnose the same patient with silicosis (despite the different markers for each disease), in each instance failing to note the existence of the other disease. *See generally* Jonathan D. Glater, *Asbestos Claims Decline, But Questions Rise*, N.Y. Times, Apr. 6, 2005. Tellingly, of the 1,587 patients Dr. Harron evaluated in connection with an asbestos claim and a silica claim, the evaluations in 1,582 of those cases were inconsistent. Plaintiffs' lawyers, and not medical personnel, generally recorded the exposure history of the patients Dr. Harron diagnosed and Dr. Harron routinely allowed his assistants to prepare his medical reports, stamp his name and send the reports out without reviewing or editing them. The fraudulent nature of Dr. Harron's practices became so abundantly obvious during the silica proceedings that Dr. Harron himself

17

remarked: "If you're accusing me of fabricating these things, I think that's a serious charge" and proceeded to ask for legal representation. Judge Jack halted the examination upon Dr. Harron's request, noting the possibility that his conduct may have been criminal.

Dr. Ballard's testimony in the silica cases revealed a similarly dubious tendency for inconsistent diagnoses. During cross-examination, Dr. Ballard was asked to explain how he reached completely different diagnoses when reading the same x ray for two different types of claims, asbestosis and silicosis. It became clear that Dr. Ballard was relying heavily on the direction given from Plaintiffs' lawyers, rather than reading the x rays neutrally and objectively.

As Judge Jack observed, fraud is the only explanation for the conflicting diagnoses revealed in the silica litigation. Dr. John E. Parker, a physician and certified B-Reader who administered the B-Reader program at NIOSH between 1976 and 1998, could not recall a single case in which he diagnosed both asbestos and silicosis in the same x ray and found it "stunning and not scientifically plausible" that in the silica litigation, some 6,000 patients were diagnosed with both diseases. Dr. Parker also testified that the consistency with which x rays had been read as 1/0 "defies all statistical logic and all medical and scientific evidence of what happens to the lung when it's exposed to workplace dust" and suggests that "readers are not being intellectually and scientifically honest in their classifications."

Counsel for Owens Corning acknowledged the significance of the evidence that has developed in the silica litigation at the February 28, 2005 omnibus hearing before the Bankruptcy Court:

> I will certainly acknowledge that we have long had concern about these B-Readers, and certainly with respect to Dr. Harron, there has been strong new evidence in the silica hearings held before Judge Jack in Corpus Christi last week, including the adoption of the amazing practice of rendering so-called ['two-fer'] diagnoses, whereby Dr. Harron would read x-rays for one group of plaintiff's

> lawyers for asbestosis and find small irregular opacities, and then
> read either the same x-ray or another x-ray for the same individual
> for silica plaintiff's lawyers and diagnose silicosis based on large
> rounded opacities without ever once referencing the other. I think
> that's a problem.

Tr. 2/28/05 at 23:6-23:17. This Court too, in its March 31, 2005 Memorandum and Order

estimating Owens Corning's liability for pending and future asbestos personal injury claims

recognized that unethical practices have infected asbestos litigation for years: "Labor unions,

attorneys, and other persons with suspect motives [have] caused large numbers of people to

undergo x-ray examinations (at no cost), thus triggering thousands of claims by persons who had

never experienced adverse symptoms." *Owens Corning v. Credit Suisse First Boston*, No. 04-

00905, slip op. at 6 (D. Del. Mar. 31, 2005). This Court also took note of the fact that x-ray

reports underlying asbestos claims submitted to Owens Corning have been evaluated by B-

Readers "prone to find asbestosis," and that "[c]ertain pro-plaintiff B-Readers were so biased

that their readings were simply unreliable." *Id.*

Recognizing there are meritorious claims to be pursued here, CSFB sought leave

to sue B-Readers derivatively on behalf of the estate. The motion was denied on the sole ground

that CSFB, though willing voluntarily to assume the cost of prosecuting the proposed claims,

was not willing to provide still further an indemnity to the Debtor and all of its directors,

officers, agents, and employees against the specter of admittedly hypothetical and baseless

counterclaims.

## SUMMARY OF THE ARGUMENT

First, the Bankruptcy Court erred as a matter of law when it denied CSFB's

motion based on a factor not contemplated in any case and contrary to public policy. Derivative

actions to recover property of the estate are, after all, favored in the Third Circuit. *See* Point I.A.

It is not even disputed that CSFB met every other articulated requirement for obtaining

19

derivative standing. *See* Point I.B. Thus, the sole question is whether the Bankruptcy Court's

injection of a new factor—one with no support in the case law and that is against public policy—

is an error of law that should be reversed. *See* Point I.C.

Second, the proper disposition of this appeal is to remand with instructions to

grant CSFB's motion, given the absence of any challenge below to CSFB's satisfaction of the

correct legal standards. *See* Point II.

**ARGUMENT**

I.    **THE BANKRUPTCY COURT'S INJECTION OF A NEW FACTOR INTO THE DERIVATIVE STANDING LEGAL ANALYSIS IS AN ERROR OF LAW JUSTIFYING REVERSAL**

A.    **Derivative Suits Are Favored In The Third Circuit**

Third Circuit case law favors derivative suits by creditors willing to step up and

pursue colorable claims on behalf of the estate. In the landmark *Cybergenics* decision, the court

concluded that "the most natural reading of the Code is that Congress recognized and approved

of derivative standing for creditors' committees [and intended] committees to play a ***robust and***

***flexible role in representing the bankruptcy estate***, even in adversarial proceedings." *Official*

*Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330

F.3d 548, 566 (3d Cir.), *cert. dismissed*, 540 U.S. 1001-02 (2003). Indeed, it is "unmistakably

clear that Congress approved of creditors' committees suing derivatively to recover property for

the benefit of the estate." *Id.* at 567.

The reason for this strong approval is not difficult to discern: derivative suits

carry with them the potential to bring money into the estate that would not otherwise be there.

The facts here are a prime example. If, as the evidence shows, Owens Corning has been

victimized by systematic over-diagnosing of nonmalignant asbestos personal injuries, it is

potentially owed as much as $1.5 billion. Yet Owens Corning is not interested in pursuing these

20

claims and the statute of limitations is ticking. CSFB, however, is willing to step in and

prosecute the action at its own expense and thus may harvest a significant amount of value that

would otherwise wither away as the statute of limitations expires.

**B.     CSFB's Motion Met All The Standards For Derivative
         Standing That Are Ordinarily Applied By Courts**

The Bankruptcy Court's denial of CSFB's motion was based on one factor and

one factor only: CSFB's failure to provide an indemnity for unspecified future counterclaims

against the estate, the merits of which the Court expressly declined to consider, but that CSFB

and Owens Corning agree would not have any merit, as a condition to pursuing claims that,

everyone agrees, do have merit. This fact is clear from the hearing record and from the text of

the Bankruptcy Court's order, which addresses only indemnity and even when denying the

motion notes that the decision would be "reconsidered" upon posting of an indemnity. Similarly,

Owens Corning's only opposition in the end amounted to the indemnity, as Owens Corning

agreed that if an indemnity was provided it would withdraw its opposition.

**C.     The Bankruptcy Court's Injection Of A New Factor That Is
         Unsupported By Case Law And Against Public Policy Must Be Reversed**

Neither the Bankruptcy Court nor Owens Corning cited a single case—from the

Third Circuit or from any court—holding that a putative derivative plaintiff's indemnification of

the debtor against potential, and presumably meritless counterclaims (as the Bankruptcy Court

declined to consider their merits), is a factor to be considered with respect to the granting of

leave to proceed derivatively. If anything, the imposition of such a requirement conflicts with

the standard previously and thoroughly vetted in this context. The Second Circuit has explained

that where, as here, the would-be plaintiff is willing to advance all costs up-front and seek

reimbursement of expenses only out of a recovery, if any, then "the preliminary inquiry can be

limited to ascertaining whether the proposed lawsuit has a colorable basis on which to proceed."
*In re STN Enters.*, 779 F.2d 901, 906 (2d Cir. 1985).

In addition to being completely unsupported in the case law, the injection of an indemnity requirement into the derivative standing inquiry does not make practical sense. First, it allows those who have defrauded the bankruptcy estate to avoid getting called to account for their actions merely by threatening baseless, big-dollar counterclaims. By requiring an indemnification, the Bankruptcy Court in effect ruled that an admittedly good cause of action could simply be abandoned by the estate (but without opportunity for anyone else to take up the abandoned asset) to avoid hypothetical and concededly groundless counterclaims. Just as it makes no sense to allow the debtor to ignore colorable claims that may increase the size of the estate—and to afford derivative standing to creditors when that is the case—it equally makes no sense to do so because the debtor conversely perceives a threat of counterclaims against the estate that admittedly would not have any colorable basis.

Such an approach is out of step with the tenor of Third Circuit case law on derivative standing and asbestos bankruptcies—topics jointly implicated in this case. As noted above, Third Circuit case law favors derivative standing. Any attempt to make derivative standing more onerous to attain goes against that general principle. And the case law with respect to asbestos bankruptcies is also on point, given the renewed focus on fairness and procedural regularity. If the estate was defrauded out of as significant an amount of money as CSFB's proposed allegations suggest, then there are serious questions raised on CSFB's motion about the true size of the estate and the fairness with which creditors are treated.

Within the last 12 months, a number of cases within this Circuit have clearly held that asbestos bankruptcies are not entitled to special treatment, and that creditors of asbestos-

tainted debtors are entitled to the same fair and balanced application of the Bankruptcy Code and Rules as everyone else.  For example, in the landmark *Combustion Engineering* case, the second sentence of the Third Circuit's opinion sets out the foundational concern:  compensation of the "injured person with a legitimate claim (where liability and injury can be proven)."  *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 200 (3d Cir. 2004).  With that starting point, the Third Circuit in the remainder of the opinion sets out the standards for a fair and balanced application of the Bankruptcy Rules to assure that, as stated by its citation to Justice Douglas's seminal *Avon Park* decision, the "the totality of circumstances surrounding a reorganization plan" are examined before reorganization dollars are distributed.  *Combustion Eng'g*, 391 F.3d at 242 n.55 (citing *Am. United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 146 (1940)).

But if billions of dollars have been wrongly paid out then creditors cannot be fairly treated.  In the context of a two-trust structure, the Third Circuit ruled that the pre-petition transfer in *Combustion Engineering* "implicates the fundamental bankruptcy policy of equality of distribution among creditors."  *Id.* at 241.  This policy is just as much at issue here, where up to $1.5 billion appears to have wrongly flowed out of the estate pre-petition.[3]

---

[3]    Other examples of the sea change in Third Circuit asbestos bankruptcy practice include *In re ACandS, Inc.*, 311 B.R. 36 (Bankr. D. Del. 2004), which denied confirmation of a plan because certain creditors were to be favored.  Here, bogus nonmalignant asbestos claims based on fraudulent x-ray reports were essentially paid in full using money siphoned out of Owens Corning; CSFB and other banks will receive far less.  That disparity in treatment is more discriminatory than what was rejected in *ACandS*.

Another is Judge Robreno's decision overturning the confirmation of the Armstrong reorganization plan, in which the court rejected the argument that the ends justify the means and required strict compliance with the Bankruptcy Rules.  *In re Armstrong World Indus., Inc.*, 320 B.R. 523, 540 (D. Del. 2005).  Strict compliance does not include the invention of burdensome new requirements to recover stolen money from an estate.  Similarly, Judge Chesler recently affirmed in all respects Judge Ferguson's Rule 2019 Compliance Order, *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147 (D.N.J. 2005), rejecting the contentions of the plaintiffs' bar that it was unprecedented and too broad.  *Id.* at 168 (specifically noting the "tenor" of *Combustion Engineering*).

Finally, there are simply a host of practical problems with the indemnity rule invented by the Bankruptcy Court. Creditors wishing to bring derivative claims would have to anticipate every plausible counterclaim, no matter how baseless. Bankruptcy courts would have to do the same, and come to explicit conclusions regarding the amount of money at stake in order to determine whether the putative derivative plaintiff who grants the indemnity is actually solvent enough. There is also the possibility for a host of disputes as to the precise scope of the indemnity (such as whether it should cover officers and directors of the debtor, and whether it should last in perpetuity). All of this raises the distinct risk of mini-trials on whether to grant derivative standing, which is precisely what courts disfavor—particularly when the creditor has agreed to bear the cost of prosecuting the action. *STN Enters.*, 779 F.2d at 906 (cautioning against mini-trials when addressing a motion for derivative standing).

Even if it were reasonable to consider the relative impact of *meritorious* potential counterclaims against the estate (vis-à-vis the colorability of the claims a movant proposes to prosecute), the Bankruptcy Court here did not do that. It ordered an indemnity against counterclaims expressly without making any inquiry into their merit and even though the parties both agreed there was no conceivable basis for the feared counterclaims. *Baseless* counterclaims are a risk in any derivative lawsuit; the Bankruptcy Court's ruling on CSFB's motion suggests that an indemnification of the debtor is a necessary condition any time a motion for derivative standing is granted. The case law makes clear that is not so.

\*    \*    \*

The Bankruptcy Court's decision to change the established legal inquiry with respect to motions for derivative standing is unsupported in the case law and contrary to public policy. Its validity is a question for this Court to consider *de novo*, and CSFB respectfully

24

submits that this new requirement should be rejected in light of the plain text (as well as the

tenor) of recent Third Circuit case law on derivative standing (*Cybergenics*) and fairness in the

asbestos bankruptcy context (*Combustion Engineering*).

## II.   THIS COURT SHOULD REMAND WITH INSTRUCTIONS TO GRANT THE MOTION

In addition to reversing the erroneous inclusion of an additional legal criterion for

derivative standing, *see supra* Point I, CSFB respectfully requests that the Court remand the

matter with instructions to grant the motion. This Court's power as an appellate tribunal is

broad:

> [A]ny . . . court of appellate jurisdiction may affirm, modify,
> vacate, set aside or reverse any judgment, decree, or order of a
> court lawfully brought before it for review, and may remand the
> cause and direct the entry of such appropriate judgment, decree, or
> order, or require such further proceedings to be had as may be just
> under the circumstances.

28 U.S.C. § 2106.

Given the Bankruptcy Court's essential implication that the motion would have

been granted had an indemnity been posted, a finding that an indemnity requirement is erroneous

as a legal matter logically compels granting of CSFB's motion. Accordingly, this Court's

mandate should, in addition to reversing the Bankruptcy Court's order, remand the matter to that

court with instructions to grant the motion.

## CONCLUSION

For the reasons set out above, CSFB respectfully submits that the order under review must be reversed. This matter should be remanded to the Bankruptcy Court with instructions to grant CSFB's motion for leave to proceed derivatively.

Dated:    April 14, 2005

*Of Counsel:*

SIMPSON THACHER & BARTLETT LLP

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan

425 Lexington Avenue
New York, New York 10017-3954
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

LANDIS RATH & COBB LLP

Richard S. Cobb (I.D. No. 3157)
Rebecca L. Butcher (I.D. No. 3816)
919 Market Street, Suite 600
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

*Attorneys for Credit Suisse First Boston*

## CERTIFICATE OF SERVICE

I, Rebecca L. Butcher, Esquire, do hereby certify that a true and correct copy of the foregoing **OPENING BRIEF OF APPELLANT CREDIT SUISSE FIRST BOSTON, AS AGENT FOR THE PRE-PETITION BANK LENDERS TO OWENS CORNING AND CERTAIN OF ITS AFFILIATES** was served this 14th day of April, 2005 on the attached list by hand delivery (**City of Wilmington addresses only**) and first class U.S. Mail.

Dated: April 14, 2005

Rebecca L. Butcher, Esq. (#3816)

**Owens Corning**
**Service List**

Norman L. Pernick, Esq.
J. Kate Stickles, Esq.
Saul Ewing LLP
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE 19899-1266
(Counsel to Owens Corning, et al.)

Frank J. Perch, III, Esq.
Office of the U.S. Trustee
Federal Bldg. 2nd Floor
844 King Street
Wilmington, DE 19801
(US Trustee)

William H. Sudell, Jr., Esq.
Morris, Nichols, Arsht and Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(Counsel to Creditors' Committee)

Edmund Emrich, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022
(Counsel to Future Representative)

Elihu Inselbuch, Esq.
Rita Tobin, Esq.
Caplin & Drysdale, Chartered
399 Park Avenue
New York, NY 10022-4614
(Counsel to Asbestos Committee)

Stephen H. Case, Esq.
Davis Polk & Wardell
450 Lexington Avenue
New York, NY 10017
(Counsel to Creditors' Committee)

James L. Patton, Esq.
Young Conaway, et al.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(Counsel to Future Representative)

Marla Eskin, Esq.
Mark Hurford, Esq.
Campbell & Levine, LLC
800 King Street, Suite 300
Wilmington, DE 19801
(Counsel to Asbestos Committee)

J. Andrew Rahl, Jr., Esq.
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020
(Special Counsel to Creditors' Committee)

James J. McMonagle, Esq.
24 Walnut Street
Chagrin Falls, OH 44022
(Future Representative)

Francis A. Monaco, Jr., Esq.
Monzack & Monaco, P.A.
1201 Orange Street
Suite 400
Wilmington, DE 19801
(Special Counsel to Committee)

Charles O. Monk, II, Esquire
Saul Ewing LLP
100 S. Charles Street
Baltimore, MD 21201

Barry R. Ostrager
Tyler B. Robinson
Robert J. Pfister
Katharine E. Nolan
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954

Roger E. Podesta, Esq.
Mary Beth Hogan, Esq.
Helen Y. Kim, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
(Special Counsel to Debtors)