## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **IN RE:** | : |
|  | :   **Case No. 05-00217 (JPF)** |
| **OWENS CORNING, *et al.*,** | : |
|  | :   **Bankruptcy Case Nos.: 00-3837** |
| **Debtors.** | :   **to 3854 (JKF)** |
|  | :   **(Jointly Administered)** |
|  | : |
|  | : |

## BRIEF OF APPELLEE OWENS CORNING

SAUL EWING LLP

Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800

Counsel for Owens Corning and
 Fibreboard Corporation

DEBEVOISE & PLIMPTON LLP

Roger E. Podesta
Steve Vaccaro
919 Third Avenue
New York, New York 10022
(212) 909-6000

Special Counsel for Owens
 Corning and Fibreboard
 Corporation

Preliminary Statement.................................................................................................................2

Factual Statement........................................................................................................................4

      1.    The PFT Litigation.........................................................................................4

      2.    CSFB's Demand that the Debtor Commence a Lawsuit
           Against the X-Ray B-Readers, and the Debtor's Response............8

      3.    CSFB's Motion and Positions on the Indemnification Issue.........10

Argument ...................................................................................................................................13

I.     THE BANKRUPTCY COURT'S DETERMINATION THAT THE
       DEBTOR REASONABLY REFUSED TO PURSUE THE
       ADVERSARY PROCEEDING SHOULD BE AFFIRMED. ...............................13

    A.    The Bankruptcy Court Properly Applied the Correct Legal
         Standard. ................................................................................................14

    B.    CSFB's Claim That The Bankruptcy Court Failed to Apply the
         Applicable Legal Standard Is Meritless.....................................................17

    C.    The Bankruptcy Court's Well-Supported Factual Determinations
         Were Not Clearly Erroneous, And Should Be Affirmed. ...........................20

Conclusion .................................................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Flint Glass Workers Union v.*
  *Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999)..............................................20

*Commodore International Ltd. v. Gould*
  *(In re Commodore International Ltd.)*,
  262 F.3d 96 (2d Cir. 2001)..........................................................................................15

*Fogel v. Zell*,
  221 F.3d 955 (7th Cir. 2000).......................................................................................15

*Infinity Investor Ltd. v. Kingsborough (In re Yes! Entertainment Corp.)*,
  316 B.R. 141 (D. Del. 2004) ..................................................................................15, 17

*In re iPCS, Inc.*,
  297 B.R. 283 (N.D. Ga. 2003) ....................................................................................15

*In re Kaiser Aluminum Corp., Inc.*,
  315 B.R. 655 (D. Del. 2004) .......................................................................................20

*Unsecured Creditors Committee v. Noyes (In re STN Enterprises)*,
  779 F.2d 901 (2d Cir. 1985)...................................................................................15, 18

*Mellon Bank, N.A. v. Metro Communications, Inc.*,
  945 F.2d 635, 642 (3d Cir. 1991)................................................................................20

*Official Committee of Unsecured Creditors*
  *of Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003)................................................................14, 16, 17, 21

*Term Loan Holder Committee v. Ozer Group, L.L.C.*
  *(In re Caldor Corp.)*,
  303 F.3d 161 (2d Cir. 2002).......................................................................................15

*Universal Minerals, Inc. v. C. A. Hughes & Co.*,
  669 F.2d 98 (3d Cir. 1981)..........................................................................................20

*Unsecured Creditors Committee v. Noyes (In re STN Enterprises)*,
  779 F.2d 901 (2d Cir. 1985).................................................................................15, 18, 19

*Williams v. National Medical Services,*
No. 04-2665 (8th Cir. Mar. 16, 2005) ..........................................................................21

## FEDERAL STATUTES

28 U.S.C. §158(a)(1)..........................................................................................................20

21934318v3
5198791

## Preliminary Statement

Appellee Owens Corning, debtor and debtor-in-possession in the underlying bankruptcy action ("OC" or "the Debtor"), submits this brief in opposition to the appeal of Credit Suisse First Boston ("CSFB") from the order of Judge Fitzgerald denying CSFB's motion (the "Motion") for authorization to prosecute an adversary proceeding on behalf of the Debtor's estate against certain physicians known as B-readers who allegedly fraudulently interpreted X-rays as positive for asbestos-related disease (the "Adversary Proceeding").

The problem CSFB seeks to redress is an issue with which OC has been familiar for many years. Indeed, OC actually commenced similar fraud and RICO litigation against certain medical screening laboratories in 1996 and 1997, alleging that individuals and companies that conducted pulmonary function tests ("PFTs") fraudulently found lung impairment in asbestos claimants where no such impairment existed. (The *Pitts* and *McNeese* Lawsuits; together, the "PFT Lawsuits.") Most of the B-reader defendants proposed in the Adversary Proceeding had provided X-ray readings to the laboratories that were defendants in the PFT Lawsuits. In connection with the PFT Lawsuits, OC investigated the quality of the B-readings and seriously considered bringing fraud and RICO claims against certain B-readers. For reasons detailed below, OC made a deliberate, strategic decision not to do so.

In response to CSFB's recent demand that OC proceed against the B-readers, OC — now in the role as fiduciary for its creditors — once again considered its potential claim against the B-readers, and once again decided not to bring the suit, for four reasons.

2

First, the fraud case against B-readers remains uncertain, despite the evidence that has emerged from the recent hearings in the silica multidistrict litigation; second, the suit would face serious challenge on statute of limitations grounds; third, the filing of the lawsuit will likely subject the Debtor's estate to the risk and expense of litigating against sizeable counterclaims; and fourth, OC's experience in the PFT Lawsuits indicate that attorneys' fees and costs incurred in pursuing the proposed litigation are likely to substantially exceed monetary recoveries by the estate. OC believed that these reasons justified its opposition to the Motion, but offered to withdraw its opposition if CSFB agreed to indemnify the Debtor against costs and liability due to counterclaims likely to be brought against the Debtor. Initially, CSFB refused to do so.

At the hearing on CSFB's Motion, Judge Fitzgerald specifically credited the evidence and reasoning behind OC's business and legal judgment that the Adversary Proceeding should not go forward unless CSFB indemnified the Debtor against liability and expenses arising from anticipated counterclaims. Counsel for CSFB agreed at the hearing to provide the requested indemnity. However, days later, CSFB disavowed its counsel's representation, and insisted that it be permitted to proceed against the B-readers without indemnifying the estate. Judge Fitzgerald therefore denied the Motion.

In this appeal, CSFB seriously distorts the facts by arguing that the Bankruptcy Court "implicitly conceded" that CSFB had met "all . . . requirements for derivative standing", and committed legal error by requiring the indemnity. In fact, the Bankruptcy Court applied the correct legal standard for granting derivative liability, which requires deference to a debtor's reasonable business judgment that proposed litigation would not

3

serve the best interest of the estate. Here, after reviewing the parties' submissions, the Bankruptcy Court deferred to the Debtor's business judgment that the Adversary Proceeding as proposed by CSFB did not serve the best interest of the estate, and that the Motion should be granted only if CSFB indemnified the Debtor against costs and liability due to counterclaims. The Bankruptcy Court's order denying the Motion correctly applied the law, is amply supported by the facts, and should be affirmed by this Court.

## Factual Statement

### 1.    The PFT Litigation.

Because of its manufacture, installation and sale of an asbestos-containing insulation product called Kaylo, OC has been a defendant in asbestos personal injury litigation since the early 1970s. Beginning in the late 1980s, there was a significant increase in the number of non-malignant claims filed against the Debtors. This increase resulted in part from mass screenings of workers believed to have been exposed to asbestos.

By the mid-1990s, OC became aware of what it believed to be fraudulent practices in the conduct and reporting of results of certain mass-screening testing processes. In June 1996, in response to what OC described as "a long-standing scheme" "to generate false medical test results to substantiate tens of thousands of personal injury cases against Owens Corning involving allegations of asbestos-related, non-malignant pulmonary impairment" — a scheme that served "to defraud [OC] out of tens of millions of dollars" — OC brought suit against certain individuals and companies involved in the

4

business of conducting mass screenings (the "*Pitts* Lawsuit"). (*See* Exh. A to Debtor's

Response and Conditional Opposition to the Motion ("Response"), at 1.) The *Pitts*

Lawsuit alleged that defendants, who conducted PFTs and took chest X-rays, disregarded

proper testing procedures and manipulated test outcomes to create false "positive" results

— that is, they found impairment in the pulmonary function of screened individuals when

no impairment existed. The Complaint accused defendants of fraud and RICO violations.

In January 1997, the Debtor brought substantially similar claims against another group of

individuals and businesses involved in mass PFT screenings (the "McNeese Lawsuit")

(*see* Response Exh. B.)

At the time OC filed the PFT Lawsuits, it seriously considered bringing claims

against certain of the X-ray B-readers who were involved in the mass screenings

(including CSFB's proposed defendants Harron, Lucas and Segarra). (*See* Affidavit of

Roger Podesta ("Podesta Aff.") ¶ 3.) OC was well aware at that time that a handful of B-

readers, including several of CSFB's proposed defendants, were responsible for an

enormous number of positive diagnoses, and suspected them of overreading the X-rays so

as to find evidence of asbestosis where other B-readers would not. Indeed, in connection

with the PFT Lawsuits, OC retained Dr. Joseph N. Gitlin to arrange a study of

interpretations of chest X-rays of workers allegedly exposed to asbestos. The study

sought to determine whether the positive findings of asbestos-related disease made by the

B-readers in connection with cases in which the *Pitts* defendants provided PFT results

held up on a review by six independent B-readers. In his December 10, 1998 report, *A*

*Comparison of Readers' Interpretations of Chest X-Ray Interpretations of Chest X-Ray*

5

*Examinations of Workers Asserted to be Exposed to Asbestos*, Dr. Gitlin agreed with what OC had suspected, and reported that the X-ray readings done in connection with the *Pitts* screenings were irreconcilable with those done by his panel. (*See* Response Exh. D at 21.) In particular, the B-readers involved in the *Pitts* screenings reported a vastly higher percentage of asbestosis than did the independent B-readers. (*Id.*)

Despite Dr. Gitlin's report, OC made the deliberate, strategic decision not to sue the B-readers. (Podesta Aff. ¶ 4.) B-readers — individuals who have been trained and certified to read X-rays to diagnose certain lung diseases — use an accepted method for diagnosing asbestos-related lung disease. Moreover, the process of reading the X-rays is subjective, with substantial interreader variability even among legitimate B-readers who have no incentive to misdiagnose disease. (*Id.*) In a study of B-readings conducted in a non-litigation setting, 23 B-readers, each of whom read approximately 2,000 to 5,000 X-rays, revealed a 300-fold variance in the tendencies of some B-readers to interpret an X-ray as positive for asbestosis, and a 15-fold variance even among NIOSH instructors, the people who train B-reader candidates and administer the certification tests. Alan M. Ducatman *et al., 'B-Readers' and Asbestos Medical Surveillance*, 30 J. of Occupational Medicine 644 (1988)). (Response Exh. E.) This variability made OC's burden to prove fraud far more difficult. For this reason, OC concluded after careful consideration, including consultation with Dan Webb of Winston & Strawn, lead outside counsel in the PFT Lawsuits, that while it had a strong fraud case against the PFT operators, it would be considerably more difficult to prove that the B-readers acted fraudulently. (*See* Podesta Aff. ¶ 4.) In order to avoid weakening its strong case against the PFT laboratories, OC

6

decided not to sue the B-readers but rather to focus the *Pitts* and *McNeese* Lawsuits on PFTs.[1]  (*Id.*)

The PFT Lawsuits were hard-fought and expensive to litigate.  (*Id.* ¶ 5.) Defendants in the *Pitts* Lawsuit brought counterclaims seeking multimillion dollar recoveries, including allegations of abuse of process, interference with business relationships, interference with contractual relations, defamation, intentional infliction of emotional distress, injurious falsehood, trade disparagement and trade libel.  (*Id.*) Defendants in the *McNeese* Lawsuit similarly threatened OC with multimillion dollar counterclaims charging OC with attempting to deter the filing of legitimate personal injury claims and with attempting to drive the PFT operators out of business.  (*Id.*)  After more than three years of time-consuming, expensive litigation, the *Pitts* and *McNeese* Lawsuits were settled in 1999.  Although the settlements were generally favorable to OC, they did not come close to covering the legal expenses that OC had incurred in connection with the PFT Lawsuits.  (*Id.* ¶ 7.)

---

[1]    Although OC did not sue the suspect B-readers in the mid-1990s, it did take steps to protect itself against overreading by these B-readers.  In particular, in many of the NSP Agreements that OC entered into with numerous plaintiffs' law firms in 1998, 1999 and 2000, OC negotiated provisions restricting the circumstances under which they would be required to accept X-ray readings from one or more of the doctors proposed by CSFB as defendants, including, in particular, Dr. Harron.  Further, in settlement agreements pursuant to which OC resolved underlying asbestos claims that gave rise to the PFT Lawsuits, OC inserted provisions to pay only $1,000 per claim in cases supported by X-ray readings from suspect B-readers that did not also have evidence of impairment from valid PFT testing.  (Podesta Aff. ¶ 8.)

7

**2.      CSFB's Demand that the Debtor Commence a Lawsuit**
**Against the X-Ray B-Readers, and the Debtor's Response.**

On December 20, 2004, counsel for the Debtor received from Barry Ostrager of Simpson Thacher & Bartlett LLP, counsel for CSFB, a letter claiming that CSFB had "recently learned" that physicians had falsely and fraudulently diagnosed asbestos-related disease in the X-rays of thousands of individuals who subsequently asserted personal injury claims against the Debtors. Writing that, in its view, "Owens Corning has the opportunity to obtain significant monetary redress" for this fraud, CSFB demanded that the Debtor file suit against the B-readers. (Podesta Aff. ¶ 9 & Exh. 1.)

On January 4, 2004, Stephen Krull, the Debtor's Senior Vice President and General Counsel, Roger Podesta of Debevoise & Plimpton LLP, special counsel to the Debtor, and Norman Pernick of Saul Ewing LLP, bankruptcy counsel to the Debtor, met with Mr. Ostrager and his colleagues. (Podesta Aff. ¶ 11.) At the meeting, the Debtor's representatives told CSFB's representatives that the Debtor was not opposed in principle to commencing a litigation against the proposed defendants or any other B-readers, if those individuals could be shown to have engaged in fraud. (*Id.*) Indeed, Mr. Podesta informed CSFB's representatives of the existence of hearings in the multidistrict silica litigation, concerning possible fraud in that litigation by several of CSFB's proposed B-reader defendants. (*Id.* ¶ 15.) The Debtor's representatives further told CSFB's representatives about the PFT Lawsuits, OC's investigation of a possible claim against the B-readers in conjunction with those suits, its decision not to pursue the claim given the difficulties of proving fraud, and the serious statute of limitations issues that had

8

consequently arisen. (*Id.* ¶¶ 11 & 12.) CSFB's representatives stated that CSFB would agree to bear the legal costs of a suit against the B-readers and would seek reimbursement from the Debtor's estate only out of any recoveries in the litigation. (*Id.* ¶ 13.) CSFB's representatives also informed Debtor's representatives that, notwithstanding the serious legal obstacles to the ultimate success of the proposed lawsuit, the mere filing of the complaint would yield "collateral benefits" to CSFB and other of the Debtor's bank creditors. (*See* Podesta Aff. Exh. 3, at 3.)

Given the consideration the Debtor had already given to the proposed lawsuit and the difficulties in proving the fraud claim, and in light of the serious statute of limitations problems that had since arisen with the passage of time, the Debtor told CSFB at the January 4 meeting that it was reluctant to bring suit against the proposed defendants in the absence of new evidence of fraud. Mr. Podesta asked Mr. Ostrager for new proof of fraud, and in particular, for support for the allegation in Paragraph 39 of CSFB's proposed complaint alleging that the defendants received greater compensation for finding positive indications of asbestos-related injury than for negative ones — evidence that OC had unsuccessfully tried to develop during the PFT Lawsuits. (*See id.* ¶¶ 6 & 14.) Mr. Ostrager did not provide any indication that he was aware of new evidence or of specific support for Paragraph 39, despite being asked several times. (*Id.* ¶ 14.)

By letter dated January 10, 2005, counsel for the Debtor reiterated the information provided to counsel for CSFB at the January 4 meeting. (*See* Podesta Aff. Exh. 3.) The Letter also raised the risk that CSFB's proposed Adversary Proceeding would engender multimillion dollar counterclaims such as those asserted against OC in the PFT Lawsuits,

9

which could lead to defense costs and potential liabilities far in excess of any monetary recovery from the B-readers. (*Id.* at 2.) On this basis, OC informed CSFB that "at the present time and on the existing state of knowledge, Owens Corning is not prepared to file the proposed CSFB complaint." (*Id.* at 2.) OC explained that "[g]iven the serious statute of limitations problems and in the absence of significant new evidence of fraud, Owens Corning believes that prosecution of the proposed lawsuit would have uncertain prospects for success, would not be in the best interest of its estate and would amount to little more than a publicity stunt." (*Id.* at 2-3.) Nevertheless, OC stated that it "may reconsider its opposition to CSFB's prosecution of the proposed complaint" — in light of the upcoming hearings in the silica multidistrict litigation, and "if CSFB and the members of the Bank Group agree not only to bear the costs of litigation but also to indemnify Owens Corning, its directors, officers, agents, professionals and employees from any counterclaims that may be filed by the Defendants." (*Id.* at 3, 2, 3.)

###### 3.    CSFB's Motion and Positions on the Indemnification Issue.

On January 12, CSFB filed its Motion for derivative standing to pursue the Adversary Proceeding. The Motion argued that the Debtor's refusal to commence the Adversary Proceeding was unjustified, and that the Adversary Proceeding would be of benefit to the estate. The Motion asserted that because CSFB was willing to pay the legal fees necessary to prosecute the Adversary Proceeding, "there will be essentially no cost to the Debtors' estates if the lawsuit does not result in a recovery". (Motion at 17.)

The Debtor filed its Response and Conditional Opposition to the Motion, setting forth the basis on which it had refused CSFB's demand to pursue the Adversary Proceeding. The Response explained that the Adversary Proceeding was not in the best interest of the Debtor's estate because it was unlikely to yield more than a *de minimis* recovery, and created a significant risk of a net loss. (Response at 14–17.) However, having no sympathy for the proposed B-reader defendants, the Debtor offered to withdraw its opposition to the Motion on the condition that CSFB indemnify the Debtor against any costs and liabilities arising from counterclaims. (*Id.* at 19.)

On February 28, 2005, a hearing on the Motion was held before the Bankruptcy Court. During the hearing, Judge Fitzgerald raised the limited resources of the proposed defendants in the Adversary Proceeding as a key factor in deciding the Motion:

> THE COURT: . . . .
> [A]re these B readers even solvent? . . . . If [the B-readers are] going to be subject to judgments in the silica cases, by the time you get in line in priority, are they going to have anything to pay over?

(Tr. 2/28/05, at 19.)[2]

Judge Fitzgerald cited this and other evidence as the basis for her finding that the Debtor's refusal to pursue the Adversary Proceeding without an indemnity against counterclaims was reasonable:

> THE COURT: . . . .
> The Debtor has done an analysis, indicated that in its view

---

[2]     References to pages of transcript of the February 28, 2005 hearing are in the form "Tr. 2/28/05, at #."

11

the suits will cost more than will be recovered for the
benefit of the estate, and on top of that there could be
significant counterclaims filed. That does not appear to be
an unreasonable basis upon which to refuse to take the suits
forward.

. . . .

MR. OSTRAGER: . . . .
Your Honor did take note of the fact that the pre-petition
bank lenders are prepared to fund this, so there can be no
cost to the estate.

THE COURT: Of course there can. There can be
significant cost to the creditors in the estate if
counterclaims are filed and you are unsuccessful in the suit.
And that's the issue the debtor is raising. The debtor has a
fiduciary duty to all creditors to make sure that the estate
assets are not wasted. And by permitting a suit to go
forward that could increase the claims exponentially
against the benefit to the estate, *that's a good reason why
the debtor can refuse to go forward.*

(Tr. 2/28/05, at 17, 19; emphasis added.)

Recognizing that the Bankruptcy Court would deny the Motion on the ground that

the Debtor's refusal was reasonable, counsel for CSFB decided to agree to the indemnity

requested by the Debtor as a condition of withdrawing its opposition to the Motion:

THE COURT: . . . .
Credit Suisse should act at its risk under these
circumstances. That is a reasonable position for the debtor
to take.

MR. OSTRAGER: Okay. I'm going to make the executive
decision on behalf of my client that we will indemnify the
debtor for any counterclaims that are interposed by the B-
readers, and that should terminate the controversy here
because the debtor doesn't oppose proceeding . . . .

12

(Tr. 2/28/05, at 21-22); *see also* Certification of Counsel for CSFB Regarding A

Proposed Order Denying CSFB's Motion ("CSFB Cert.") ¶ 5 (counsel for CSFB agreed

to provide an indemnity in response to the Bankruptcy Court's apparent intent to deny the

Motion.)

Shortly after the hearing, representatives of the bank lending syndicate's steering

committee in the Debtor's chapter 11 case (to which CSFB belongs) informed Debtors

that CSFB would not provide Debtors with the indemnity that Mr. Ostrager agreed to at

the hearing. (CSFB Cert. at ¶ 7.) CSFB then requested that the Bankruptcy Court grant

the Motion without requiring an indemnity. (*Id.* ¶ 10.) The Bankruptcy Court denied the

Motion.

**Argument**

**I.    THE BANKRUPTCY COURT'S DETERMINATION THAT
THE DEBTOR REASONABLY REFUSED TO PURSUE
THE ADVERSARY PROCEEDING SHOULD BE AFFIRMED.**

This Court should affirm the Bankruptcy Court's determination under the

applicable law that the Debtor was justified in refusing to pursue the Adversary

Proceeding without indemnification against counterclaims. That determination was

based on findings that the Adversary Proceeding would be unlikely to yield a significant

recovery, and would likely engender counterclaims that might result in a substantial net

loss to the Debtor's estate. CSFB's cry of legal error ignores that the Bankruptcy Court's

deference to the Debtor's indemnity condition was fully justified by the legal requirement

that a proposed derivative action be in the best interest of, and provide a net benefit to,

13

the estate. Any ambiguity in the record as to the Bankruptcy Court's reasons for denying the Motion was created by CSFB's offer of indemnification which prematurely terminated the Motion hearing. Nothing raised by CSFB on appeal justifies overturning the Debtor's well-grounded business and legal judgment against pursuing the Adversary Proceeding.

Therefore the issue presented is whether the Debtor was justified in refusing to pursue a derivate action with substantial legal and factual obstacles, in which recovery from the putative defendants would be highly uncertain even if a judgment were obtained, and in which the estate would likely be confronted with multimillion dollar counterclaims that, at a minimum, would be costly to defend. Because such circumstances present a clear case for denying derivative standing under the applicable law, the Bankruptcy Court's order should be affirmed.

## A.    The Bankruptcy Court Properly Applied the Correct Legal Standard.

The Bankruptcy Court applied the correct legal standard in denying CSFB's Motion. In *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (en banc), the Court of Appeals for the Third Circuit held that a creditors' committee may be permitted to bring derivative lawsuits on behalf of debtors-in-possession under certain circumstances. Although it did not directly address the standards for granting derivative standing, the *Cybergenics* court cited with approval the standard established by the Second and Seventh Circuits, *id.* at 566-67, which hold generally that derivative standing may exist where a debtor-in-possession "unreasonably"

14

or "unjustifiably" fails to bring suit on "colorable claims." [3]  In *Infinity Investor Ltd. v. Kingsborough (In re Yes! Entertainment Corp.)*, 316 B.R. 141, 145 (D. Del. 2004), this Court drew upon Second and Seventh Circuit precedent in holding that a creditor seeking derivative standing must establish the following three elements: "(1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) the permission of the bankruptcy court to initiate the action."

In determining whether the trustee or debtor in possession is justified in refusing to pursue a claim, courts have looked to whether the proposed litigation is in the best interest of the estate given the "probabilities of legal success and financial recovery in [the] event of success." *Unsecured Creditors Comm. v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 905 (2d Cir. 1985); *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001) (claim must be in the "best interest" of the estate); *see also In re iPCS, Inc.*, 297 B.R. 283, 291 (N.D. Ga. 2003) (to determine whether pursuit of a claims is likely to benefit the estate, the court should weigh the likelihood of success and of financial recovery, as well as the costs of the litigation).  CSFB asked the Bankruptcy Court to apply the "best interest" test and cost-benefit analysis in determining

---

[3]    *See Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001) (derivative standing may exist "where the debtor in possession unreasonably fails to bring suit on its claims"); *Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)*, 303 F.3d 161, 166 n.2 (2d Cir. 2002) (standing may exist where the debtor "unjustifiably failed to bring suit"); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) (a creditor may obtain permission to bring a derivative action where a trustee "unjustifiably refuses a demand to bring an action to enforce a colorable claim" of the creditor).

15

its Motion (Motion at 16-18), and the Debtor agrees that these factors form part of the applicable legal standard. In weighing costs and benefits and determining the best interest of the estate, the Bankruptcy Court was required to pay the Debtor's own analysis "the deference normally accorded pursuant to the business judgment rule." *Cybergenics*, 330 F.3d at 575.

During the hearing Judge Fitzgerald applied this standard, focusing on whether the Debtor's refusal to pursue the Adversary Proceeding was reasonable in light of the likely costs and benefits to, and the best interest of, the Debtor's estate. Judge Fitzgerald rejected CSFB's unsupported assertion that the Adversary Proceeding could yield "billions of dollars" to the estate, and then pointedly inquired as to the solvency of the proposed B-reader defendants, the priority of their other creditors, and their potential inability to satisfy any judgment that might be rendered against them in the Adversary Proceeding. (Tr. 2/28/05, at 18-19.) Judge Fitzgerald stressed that costs due to counterclaims likely to arise in the Adversary Proceeding could exceed any recovery, causing estate assets to be "wasted." (*Id.* at 18.)

Based on this cost benefit-analysis, Judge Fitzgerald concluded, repeatedly, that the Debtor's refusal to pursue the Adversary Proceeding was reasonable:

- The Debtors' refusal to proceed without indemnification "was a reasonable position for the Debtor to take" (*id.* at 21);

- "[W]ith respect to the debtor's refusal, based on the fact that the claims against the estate could exceed the recovery, that's a legitimate reason for refusing to go forward." (*id.* at 17);

16

- The Debtor's "view [that] the suits will cost more than will be recovered for the benefit of the estate, and on top of that there could be significant counterclaims filed . . . . does not appear to be an unreasonable basis upon which to refuse to take the suits forward" (*id.* at 17.)

Thus the Bankruptcy Court properly applied a cost-benefit analysis in reaching the relevant determination that the Debtor's refusal to prosecute the Adversary proceeding was reasonable and in the best interest of the estate.

## B.    CSFB's Claim That The Bankruptcy Court Failed to Apply the Applicable Legal Standard Is Meritless.

Given the record below, CSFB's contention that the Bankruptcy Court "implicitly conceded" that CSFB met all of the applicable requirements for derivative standing is astonishing. (*See* Appellant CSFB's Opening Brief ("App. Br.") at 3). The Bankruptcy Court explicitly commented *three times* on the reasonableness of the Debtor's refusal of CSFB's demand to prosecute the Adversary Proceeding (Tr. 17, 17, 21) — a factor which negates derivative standing under the legal standard that CSFB has admitted is controlling. *See Infinity Investor Ltd. v. Kingsborough (In re Yes! Entertainment Corp.)*, 316 B.R. 141, 145 (D. Del. 2004) (creditor seeking derivative standing must establish, among other things, that "the trustee unjustifiably refused to pursue [a colorable] claim"); *compare* Motion at 12-13 (citing this passage from *Yes! Entertainment* as controlling law).

CSFB profoundly misunderstands the proceedings below when it argues that the Bankruptcy Court departed from the applicable law by imposing a "newly invented requirement" on CSFB that it indemnify the Debtor against counterclaims. To the

17

contrary, Judge Fitzgerald deferred to the Debtor's judgment that the Motion should be denied unless an indemnity was granted for two reasons, both rooted in applicable law. First, as a matter of procedure, OC had agreed to withdraw its opposition to the Motion if the indemnity was provided. Second, as a matter of substance, OC had demonstrated that without the indemnification, the Adversary Proceeding entailed little if any benefit to the estate and potentially significant costs. The requirement that CSFB indemnify OC against counterclaims is not the "injection of a new factor" into the Bankruptcy Court's legal analysis (App. Br. at 20); it is the application of the "best interest of the estate" and cost-benefit principles to the particular facts of this case.

CSFB's contention that "it is not even disputed that CSFB met every *other* articulated requirement for obtaining derivative standing" is incorrect (*see* App. Br. at 19-20), because absent CSFB's compliance with the Debtor's indemnity condition, the Adversary Proceeding would not meet the articulated requirement that proposed litigation offer a net benefit to the estate. CSFB apparently understands and accepts this net benefit legal requirement, because it has offered to pay the expenses of prosecuting the Adversary Proceeding and urges (incorrectly) that this offer eliminates all cost to the estate. (Tr. 2/28/05, at 18.) Indeed, CSFB cites the legal standard set forth in *STN Enterprises* — a case in which derivative standing was granted based on the "creditors' committee represent[ation] that its fee arrangement with its attorney *will in no event impose a net burden* on the bankruptcy estate . . . ." *STN Enterprises*, 779 F.2d at 906 (emphasis added); *compare* App. Br. at 21-22 (citing *STN Enterprises* for the proposition that derivative standing requires only proof of a colorable claim). Under *STN*

18

*Enterprises*, the costs of prosecuting the Adversary Proceeding are only part of the picture. The Debtor's estate will realize a net benefit only if its recovery exceeds its *total* costs, including costs and liabilities due to counterclaims. CSFB's assertion that Judge Fitzgerald misapplied the *STN Enterprises* cost-benefit analysis because she considered all instead of just some of the likely costs of the Adversary Proceeding is specious.[4]

Remarkably, CSFB cites the hearing record as proof that the Bankruptcy Court failed to consider anything other than the indemnification issue. (Tr. 2/28/05, at 21.) CSFB truncated the hearing record by agreeing to accept OC's offer to withdraw its opposition to the Motion in exchange for granting the indemnity, and then insisting that argument on the Motion "should terminate":

> MR. OSTRAGER:    Okay. I'm going to make the executive decision on behalf of my client that we will indemnify the debtor for any counterclaims that are interposed by the B-readers, and *that should terminate the controversy here* because the debtor doesn't oppose proceeding . . . .

(Tr. 2/28/05, at 22; emphasis added.)

At the point when counsel for CSFB demanded that the argument terminate on the ground that the Motion was now unopposed, counsel for Debtors' counsel *had not even spoken*. (*See* Tr. 2/28/05, at 14-22.) CSFB admits that its offer to indemnify the Debtor

---

[4]    It is particularly noteworthy that CSFB refuses to indemnify the Debtor for attorneys' fees and other costs related to the counterclaims, yet reserves the right to discontinue the proceeding at any time. (*See* Motion at 18.) It is not difficult to imagine CSFB initiating suit and then discontinuing it only after saddling the Debtor with the need to contest vigorously pursued counterclaims.

was made because the Bankruptcy Court had already "indicated that it would deny the

Motion" based on the parties' submissions and the argument of counsel for CSFB.

(CSFB Cert. at ¶ 4.) Seeing the writing on the wall, counsel for CSFB made a strategic

choice to "terminate" the argument by representing that he had the authority to make an

"executive decision on behalf of [CSFB]" to offer the requested indemnity. (Tr. 2/28/05,

at 22.) CSFB's suggestion that the Bankruptcy Court committed legal error by single-

mindedly focusing on indemnification ignores this sequence of events at the hearing.

### C.   The Bankruptcy Court's Well-Supported Factual Determinations Were Not Clearly Erroneous, And Should Be Affirmed.

In this appeal pursuant to 28 U.S.C. §158(a)(1), the court "applies a clearly

erroneous standard to the bankruptcy court's findings of fact and a plenary standard to

that court's legal conclusions." *In re Kaiser Aluminum Corp., Inc.*, 315 B.R. 655, 657-

658  (D. Del. 2004) (citing *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,

197 F.3d 76, 80 (3d Cir. 1999)). When reviewing mixed questions of law and fact, the

district court should "accept the bankruptcy court's finding of 'historical or narrative facts

unless clearly erroneous, but . . . exercise plenary review of the trial court's choice and

interpretation of legal precepts and its application of those precepts to the historical

facts.'" *Kaiser Aluminum*, 315 B.R. at 657-658 (quoting *Mellon Bank, N.A. v. Metro*

*Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991)). "No legal precept is

implicated in drawing permissible factual inferences" from historical or narrative facts.

*Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir. 1981).

The Bankruptcy Court's conclusion that the Adversary Proceeding posed marginal benefits and substantial risks to the Debtor's estate was based on findings of fact and factual inferences that were not clearly erroneous. In making those findings, the Bankruptcy Court properly deferred to the Debtor's analysis and judgment as required by *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 575 (3d Cir. 2003) (en banc). That analysis, set forth in detail in the Affidavit of Roger Podesta and its attachments, drew on OC's intimate understanding of the B-reader problem and highly relevant experience in the PFT Lawsuits, and identified numerous significant obstacles and risks posed by the Adversary Proceeding including:

- Limitations Issues. Due to OC's deliberate decision not to sue the B-readers for fraud in 1996 and 1997, the Adversary Proceeding could face a potentially serious statute of limitations challenge (*see* Podesta Aff. ¶¶ 11-12);

- Lack of Significant New Evidence. Since OC received Dr. Gitlin's 1998 report raising potential B-reader abuses, it does not appear that subsequent developments — such as the 2002 report of Dr. Gary Friedman, the 2004 study by Dr. Gitlin, and the 2005 hearings in the silica multidistrict litigation — have added significant new evidence of fraud or concealment that would undercut a potential limitations defense, or obviate the difficult factual issues raised by inherent inter-reader variability among B-readers (*see* Podesta Aff. ¶ 4);[5]

---

[5]    Count Two of the CSFB's proposed 2-count complaint seeking damages for negligent misrepresentation also faces serious difficulty, because it is premised on the unprecedented notion that defendants, as expert witnesses in the underlying asbestos cases, owed a duty to the opposing party — OC to exercise reasonable care in forming their opinions (*see* Motion Exh. B, at 14 ¶¶ 60-64); *see Williams v. Nat. Med. Servs.*, No. 04-2665 (8th Cir. Mar. 16, 2005) (testifying expert did not owe a duty of care to an opposing party in litigation).

21

- <u>B-Readers' Limited Resources</u>.  The B-readers presumably have limited resources available to satisfy a significant judgment, given that they are in some cases retired (Tr. 2/28/05, at 23), would likely have no malpractice insurance providing coverage for fraud liability (*id.*), and might be rendered insolvent by judgments in favor of silica defendants before the Adversary Proceeding could be determined (*id.* at 19);[6]

- <u>Risk of Multimillion Dollar Counterclaims</u>.  The Adversary Proceeding would impose on the Debtor at least some risk of liability on counterclaims alleging, *e.g.*, abuse of process, interference with business relationships, interference with contractual relations, defamation, intentional infliction of emotional distress, injurious falsehood, trade disparagement and trade libel (*see* Podesta Aff. ¶¶5, 16 & Exh. 3, at 2);

- <u>Risk of High Defense Costs</u>.  CFSB's proposed Adversary proceeding litigation would impose on the Debtor the high costs of defending against counterclaims — costs which, during the Debtor's PFT Lawsuits, contributed to defense expenditures three times greater than the recovery rate. (Podesta Aff. ¶7; Tr. 2/28/05, at 23.)

Given these obstacles and risks, the Debtor was justified in refusing to pursue the

Adversary Proceeding without indemnification against counterclaim-related costs and

liability. CSFB dismisses the B-readers' counterclaims as "hypothetical" and "meritless"

(App. Br. at 3, 21), but Debtor can see no reason why the proposed B-reader defendants

would not bring counterclaims in the Adversary Proceeding similar to those brought in

the PFT Lawsuits. The fact that the counterclaims would have dubious merit does not

make them free of risk, nor render them inexpensive to litigate. As any participant in the

litigation process is aware, there is always the possibility of a large adverse judgment if a

---

[6]     CSFB fails to explain why not a single other asbestos defendant has ever sued the B-readers for fraud, even though X-rays by these same B-readers have been submitted to scores of asbestos defendants and trusts, including many who continue to be active in the tort system.

claim is able to get to a jury. Indeed, it was the logical force of the argument that the

Debtor could reasonably decline these litigation risks that led counsel for CSFB to agree

to indemnify the Debtor at the hearing:

> THE COURT:    .... All I'm saying is the debtor is
> concerned in its fiduciary capacity that undertaking these
> suits will cost more than the recovery..... So, if Credit
> Suisse, as agent, is convinced that the debtor is in error . . . .
> then it should be, I guess, willing to provide that indemnity.
> Perhaps the debtor is wrong and Credit Suisse is correct.
> And if it is the indemnity will never be called upon. But if
> the debtor is correct and Credit Suisse is wrong, and . . . in
> fact the costs exceed the return to the estate, then Credit
> Suisse should act at its risk under these circumstances.
> That is a reasonable position for the debtor to take.
>
> MR. OSTRAGER:         Okay. I'm going to make the
> executive decision on behalf of my client that we will
> indemnify the debtor for any counterclaims that are
> interposed by the B-readers . . . .

(Tr. 2/28/05, at 21.)

At most, CSFB asserts a difference of opinion with the Debtor as to the extent of

the risk posed by the counterclaims, which is insufficient to override the deference due

the Debtor's business judgment. Judge Fitzgerald properly credited and deferred to the

Debtor's analysis in finding that the risks of the Adversary Proceeding outweighed the

benefits absent indemnification against counterclaim liability.

When CSFB first presented its demand that the Debtor pursue the Adversary

Proceeding, it suggested that the litigation would bring certain largely unspecified

"collateral benefits" to CSFB and other of the Debtor's bank creditors apart from any

financial recovery. (*See* Podesta Aff. Exh. 3, at 3.) The only such "benefit" explicitly

23

identified was the potential impact of the pendency of the Adversary Proceeding upon this Court's estimation hearing, which has already concluded. Such non-financial collateral benefits which the Debtor's bank creditors might reap directly, rather than through their status as creditors, are not benefits to the estate and cannot support CSFB's Motion.

On appeal, this Court should adopt Judge Fitzgerald's findings concerning the obstacles faced and the risks posed by the Adversary Proceeding, because they are not clearly erroneous and are rooted in the Debtor's reasonable legal and business judgments. The issue presented therefore is whether the Debtor was justified in refusing to pursue a derivative action with substantial legal and factual obstacles, in which recovery from the putative defendants would be highly uncertain even if a judgment were obtained, and in which the estate would be confronted with big-dollar counterclaims that, at a minimum, would be costly to defend. The Debtor submits that its refusal clearly was reasonable and justified — as was its offer to allow CSFB to pursue the Adversary Proceeding on the condition that it provide an indemnity to the Debtor that would substantially alter the cost-benefit analysis in favor of the estate's best interest. The Debtor therefore respectfully request that the Court affirm Judge Fitzgerald's order in its entirety.

24

## Conclusion

For the reasons stated above, the Debtor respectfully requests that the Court affirm the Bankruptcy Court's order denying CSFB's Motion, and grant such further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
April 26, 2005

Respectfully submitted,

SAUL EWING LLP

By: _____

Norman L. Pernick (No. 2290)
J. Kate Stickles (No. 2917)
222 Delaware Avenue
P.O. Box 1266
Wilmington, Delaware  19899-1266
(302) 421-6800

Counsel for Owens Corning and
Fibreboard Corporation

-and-

DEBEVOISE & PLIMPTON LLP
Roger E. Podesta
Steve Vaccaro
919 Third Avenue
New York, New York  10022
(212) 909-6000
Special Counsel for Owens
Corning and Fibreboard Corporation

25